1               UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA

2

3                       Case No.:  17-20358-LMI
                       Chapter 13

4
   In Re:

5
   JOSUE CEPERO and LETICIA CEPERO,

6
      Debtors.

7   _____/

8

9

10                 ECF # 199, 240

11               February 26, 2020

12

13

14        The above-entitled cause came on for a

15   hearing before the HONORABLE LAUREL M. ISICOFF, one

16   of the Judges of the UNITED STATES BANKRUPTCY COURT,

17   in and for the SOUTHERN DISTRICT OF FLORIDA, at 301

18   N. Miami Avenue, Miami, Miami-Dade County, Florida,

19   on Wednesday, February 26, 2020, commencing at or

20   about 1:42 p.m., and the following proceedings were

21   had:

22

23

24        Transcribed from a digital recording by:
           Helayne Wills, Court Reporter

25

```
 1   APPEARANCES:
 2       BROOKS FRANK AND DE LA GUARDIA, by
         MICHAEL A. FRANK, ESQ.,
 3       on behalf of the Debtors
 4
         LAW OFFICES OF MIGUEL PARLADE, P.A., by
 5       MIGUEL F. PARLADE, ESQ.,
         on behalf of the Hammocks Community Association
 6       and Marglli Gallego
 7
         ALSO PRESENT:
 8       ECRO - Electronic Court Reporting Operator
         LORENZO ESTEVA
 9       DENISE OTERO VILARINO
10
11                       INDEX
12   WITNESS            DIRECT     CROSS     REDIRECT
13   L.J. COBO
       (By Mr. Frank)     18                   21
14     (By Mr. Parlade)             19
15   MARIA ALONSO
       (By Mr. Frank)    24, 38                 50
16     (By Mr. Parlade)          32, 43
17   JOSUE CEPERO
       (By Mr. Frank)     53       60           84
18     (By Mr. Parlade)
19   JORGE MATUS
       (By Mr. Parlade)   89      108          122
20     (By Mr. Frank)
21
22
23
24
25
```

Page 3

1                          **EXHIBITS**

2

3  **DEBTORS'**                                        **PAGE**

4   **Nos. 9 and 10 in evidence**                        **9**
    **Nos. 13 and 14 in evidence**                       **9**
5   **No. 13 withdrawn**

6

7  **COMMUNITY ASSOCIATION'S**
    **A through E in evidence**                          **12**
8   **F in evidence**                                    **13**
    **M for identification**                             **66**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1               THE COURT:  We're  going to switch now and

2    go to the Cepero matter, 17-20358.  I'll take

3    appearances from the debtors and then from the other

4    side.

5               MR. FRANK:  Michael Frank, F-R-A-N-K, on

6    behalf of the debtors, the Ceperos.

7               THE COURT:  Okay.

8               MR. PARLADE:  Miguel Parlade on behalf of

9    Hammocks Community Association and Marglli Gallego.

10              THE COURT:  All right.  I'm going to ask

11   you to spell your last name for the record.

12              MR. PARLADE:  P as in Peter, A-R-L-A-D as

13   in David, E.

14              THE COURT:  Okay.  All right.  Why don't

15   we go to the motion in limine, okay?  Have you all

16   resolved that?

17              MR. PARLADE:  No, ma'am.

18              THE COURT:  Okay.  So, Mr. Parlade, if I

19   understand it, your objection is not to the police

20   officer's testimony, it's to the extent that it's

21   become tendered as an expert testimony as to what

22   happened.

23              MR. PARLADE:  Correct, and any opinion

24   testimony given by the officer beyond the facts.

25              THE COURT:  Okay.  And, Mr. Frank, why

Page 5

1   would I -- I mean, it's certainly okay to hear fact

2   testimony from the police officer, but aren't I the

3   one that has to make a determination --

4           MR. FRANK:  Yes, Judge.  We need him --

5           THE COURT:  You have to let me finish.  I

6   know you're excited, but you have to let me finish,

7   because the next thing I'm going to ask you is,

8   "Isn't it true that you were going to buy your wife

9   a $10,000 diamond ring when you leave here today?"

10          MR. FRANK:  Is that all?

11          THE COURT:  And then you said yes.  So,

12  you see, that's why you have to wait for me to

13  finish talking.

14          Okay.  So, Mr. Frank, are you suggesting

15  that someone other than me should be rendering an

16  opinion as to what occurred?

17          MR. FRANK:  No, Judge.

18          THE COURT:  Okay.  So then I assume that,

19  if I clarify what I will allow the testimony for and

20  not, you will not ask questions regarding the

21  ultimate fact, which is, "What do you think

22  happened?"

23          MR. FRANK:  No, Judge.  I need him to get

24  the police report into evidence.

25          THE COURT:  Well, I understand the police

1   report has to get into evidence.  I'm not going to

2   strike -- I'm not going to prevent the witness from

3   testifying.  I'm just agreeing, and it doesn't sound

4   like to me you disagree, that the police officer is

5   not going to render an ultimate opinion as to what

6   occurred.

7           MR. FRANK:  No, Judge.

8           THE COURT:  Mr. Parlade, do you agree that

9   that is a correct and appropriate limitation?

10          MR. PARLADE:  I do agree, Your Honor.

11          THE COURT:  Okay.  So -- I don't know

12   whether I'm granting the motion in limine.  I think

13   I may be granting it in part and denying it in part,

14   or maybe just clarifying.  Maybe they'll just be an

15   order on the motion in limine that says that the

16   debtor's counsel has clarified that the police

17   officer will be presented as a fact witness and not

18   an opinion witness.

19          How's that?  There won't be a grant, a

20   deny, just a clarification.  So you prepare the

21   order, because it's your motion.

22          MR. PARLADE:  Yes, Your Honor.

23          THE COURT:  All right.  So fact witness

24   only.

25          (Thereupon, a recess was taken, after

1   which the following proceedings were had:)

2            THE COURT:  Now we're back to Cepero.

3            Let's go through exhibits, all right?  I

4   know there's a lot of video exhibits that you both

5   are seeking -- for which you both are seeking

6   admission.  We'll get to those, but are there any

7   non-video exhibits that the two of you have and have

8   discussed?

9            MR. PARLADE:  Your Honor, going through

10  the exhibits, there's some stuff that's going to be

11  cumulative.  For example, if the police officer is

12  going to testify as to the facts of an incident, and

13  later on a police report is brought in that

14  reverberates what the testimony is, I do feel that

15  that would be cumulative evidence.

16           THE COURT:  Okay.  Well, luckily I'm not a

17  jury, so somebody can say something 12 times, and

18  other than it making me want to shoot myself, it's

19  not going to make it any more real or true.

20           Okay.  Any other -- let's go first to the

21  debtor.  So other than that concern, and that would

22  be regarding -- well, I mean -- let's first go to

23  the debtors' exhibits.

24           There's no trick question.  If there's

25  none that can be admitted without the foundation, et

1    cetera, that's fine.  I'm just trying to figure out

2    what we can and cannot do while we're waiting.

3            So, Mr. Parlade, with respect to the

4    debtors' exhibits, putting aside the videos for a

5    minute, any for which you do not have an objection

6    or -- for which you don't have an objection to

7    admission without requiring further introduction?

8            MR. PARLADE:  The only ones I have an

9    objection are Exhibit Number 11, which is a verified

10   petition for injunction, which is something not at

11   issue.  There is a docket case, a printout of a

12   docket for a case --

13           THE COURT:  I just need numbers.  So 11 is

14   the only one that's not a video for which you have

15   an objection?

16           MR. PARLADE:  Eleven, 12 and 16, as well.

17           THE COURT:  Okay.  So that means I can

18   admit 9, 10, 13, 14 and 15?  Again, it's not a trick

19   question.

20           MR. PARLADE:  Yes, Your Honor.

21           THE COURT:  Are you still seeking

22   admission of those documents, Mr. Frank?  I just

23   want to make sure.  Before I put it in my red pen,

24   9, 10 -- let's go -- all right.  Nine and 10, those

25   are okay, Mr. Parlade?

1              MR. PARLADE:  Yes, Your Honor.

2              THE COURT:  Okay.  So 9 and 10 will be

3    admitted.

4              (Thereupon, Debtors' Exhibit Nos. 9 and 10

5        were admitted into evidence.)

6              THE COURT:  And then 13, 14, are those

7    okay?

8              MR. PARLADE:  They're okay, Your Honor.

9              THE COURT:  Okay.  So 13 and 14 will be

10   admitted.

11             (Thereupon, Debtors' Exhibit Nos. 13 and

12       14 were admitted into evidence.)

13             THE COURT:  And 15?  Again, not a trick

14   question.

15             MR. PARLADE:  If the foundation is laid.

16             THE COURT:  That's fine.  We'll go back

17   there.

18             (Thereupon, a recess was taken, after

19   which the following proceedings were had:)

20             THE COURT:  Okay.  For the last time, for

21   the final time, back to Cepero.

22             All right.  So did you all need to gather

23   anybody, or everybody else is witnesses and --

24             MR. FRANK:  Everyone else is --

25             THE COURT:  Are you both invoking the

1    rule?

2            MR. PARLADE:  Yes, Your Honor.

3            THE COURT:  Okay, fine.  That's fine.

4    Hopefully it's more comfortable out there than it is

5    in here.

6            MR. PARLADE:  It's hot.

7            THE COURT:  Because two days ago it was

8    65 degrees in here and we complained.  So now we're

9    in sauna mode.

10            Anyone in the courtroom who's

11    uncomfortable, as long as you're wearing a shirt

12    underneath, you may remove your jackets.  That

13    includes the CSOs, and your secrets are safe with

14    us.  I, of course, can't remove my robe, whatever.

15    And it's not -- I have a dress underneath, but I

16    feel like I have to keep my robe on.  I just felt

17    like I had to make that clear.

18            MR. FRANK:  With reference to Number 15,

19    Judge --

20            THE COURT:  Wait.  Let's back up.

21            We're now on the Community Association's

22    exhibits.  So, Mr. Frank, let's go -- all we're

23    doing now is talking about noncontroversial

24    exhibits.  For the non-video exhibits, what, if any,

25    exhibits submitted by the Community Association are

1   not a problem, and I can admit them at this point?

2   A couple of them look like they're the same exhibits

3   that you have.

4           MR. PARLADE:  All the video exhibits are

5   the same as debtors' exhibits.

6           THE COURT:  Oh, good.  That will certainly

7   make it easier when we get to the part about

8   introducing them.  Everybody agrees they're

9   authentic, so we can skip that part, right?

10          MR. PARLADE:  I don't know --

11          THE COURT:  I'm talking about anything

12   that doesn't say "video" on it.

13          MR. FRANK:  I don't know which exhibit it

14   was, because there were two exhibit registers.  One

15   was amended.  I'm looking at the --

16          THE COURT:  I'm looking at the amended

17   exhibit register.  That's what I have.

18          MR. FRANK:  I'm looking at -- I think it's

19   H.  It's a picture of physical injuries of Marglli

20   Gallego.

21          THE COURT:  Let's start with A.  Any

22   objection to Exhibit A?

23          MR. FRANK:  Nothing on the first page.

24          THE COURT:  Nothing that you object to, or

25   nothing that you agree to?

1              MR. FRANK:  Nothing I object to.

2              THE COURT:  Okay.  I need you to be

3    specific.

4              So I'm going to admit A through E.  Yes?

5              MR. FRANK:  Correct.

6              THE COURT:  Okay.  It doesn't mean you

7    gentlemen can't -- I want you gentlemen to still

8    talk about these exhibits, but at least we can get

9    through the preliminary -- we can go right to the

10   discussion of the exhibit.

11             (Thereupon, Hammocks Exhibits A through E

12        were admitted into evidence.)

13             THE COURT:  Now we're on the next page.

14   So F you have an issue with.  G?  Isn't that the

15   same one as your exhibit?  No?

16             MR. FRANK:  H, the letter.

17             THE COURT:  Okay.  What is F?  Any

18   objection to F?

19             MR. FRANK:  In my book it's an affidavit

20   of Jorge Matus.

21             THE COURT:  No.  I'm looking at the

22   amended exhibit register.

23             Whoever did your exhibits, Mr. Parlade,

24   they're upside down.

25             MR. PARLADE:  I apologize.

1          THE COURT:  Once you find it let me know.

2          We had some folks come in.  Of course, we

3    haven't gotten past the opening statement yet.  You

4    might want to tell them that they don't -- they're

5    going to be asked to leave again.

6          Let me know when you're ready.

7          MR. FRANK:  I don't have a problem with F,

8    the pictures.  Part of F, something about an open

9    criminal investigation --

10          THE COURT:  I have F is pictures --

11    picture of debtors in their vehicle holding up a

12    letter.

13          MR. FRANK:  That's fine, Judge.  F is

14    fine.

15          (Thereupon, Hammocks Exhibit F was

16        admitted into evidence.)

17          MR. FRANK:  G is --

18          THE COURT:  Just tell me fine or not.

19    We're not getting into details.

20          MR. FRANK:  I don't know what it is, so I

21    don't agree with that one.

22          THE COURT:  Okay.  We'll get to that in a

23    minute.  We'll go back to that.

24          H, just yes or no.

25          MR. FRANK:  It's a picture of injuries

1    which --

2            THE COURT:  Yes or no, that's all.

3            MR. FRANK:  No.

4            THE COURT:  Then we just go to the

5    foundational part, which is fine.  I'm just trying

6    to save time.

7            How about I?

8            MR. FRANK:  I, the affidavit of Jorge

9    Matus, I object to.  If he's here to testify, fine.

10           THE COURT:  Okay.  And how about whatever

11   the next one is?

12           MR. FRANK:  Same thing, Marlo Urueta, if

13   he's here to testify, fine, but I don't agree with

14   that exhibit.

15           THE COURT:  Okay.  What else?

16           MR. FRANK:  Same thing as to K, the

17   affidavit of Maria Gil, same objection.

18           THE COURT:  Okay.  What else?  The rest

19   are audio files and videos?

20           MR. FRANK:  Audio, right.

21           THE COURT:  All right.  We've gone through

22   the exhibits.

23           Let's get started.  I had an opening

24   statement from Mr. Parlade, but I did not get an

25   opening statement from you, Mr. Frank.

1          MR. FRANK:  I don't know why you didn't,

2    Judge.  Maybe my paralegal did not see that portion,

3    because I know you've got a bunch of different

4    things in your order.  So I don't have an opening

5    statement.  I apologize.

6          THE COURT:  Well, are you going to make an

7    opening statement?

8          MR. FRANK:  I'll make an opening

9    statement, Judge.

10          In this case, Judge, it starts off as a he

11    said she said incident, an incident in the parking

12    lot.  One says the other one was blocking someone,

13    the other one says the other person is blocking the

14    other one.

15          It really comes down to two things.  We

16    believe that there was a violation of that court

17    order from December that said that Ms. Gallego

18    cannot approach my clients.  The evidence will show

19    that Ms. Gallego approached my clients in their car

20    in the parking lot.

21          Secondly, it was also part that you're not

22    supposed to mention anything about my clients in the

23    Hammocks.  The evidence will show that a letter went

24    out about tree trimming, and part of that letter

25    states that there are people that are spreading

1   rumors and --

2          THE COURT:  I read the letter.

3          MR. FRANK:  Those are the two issues I

4   think will show that Ms. Gallego was in contempt.

5          MR. PARLADE:  Objection, Your Honor.

6   Counsel is misstating the order of this Court.  The

7   order of this Court --

8          THE COURT:  In the microphone.

9          MR. PARLADE:  The order of this Court does

10  not prohibit any mention of the debtors within the

11  Hammocks.  That's not what's in the explicit four

12  corners of the order of this Court.  There are two

13  orders of this Court.

14         MR. FRANK:  I know you read them, because

15  the second order was culled by you to be entered

16  into, because it didn't clarify the first order.

17  One is ECF 189 and the other one is ECF 191.

18         There is no per se prohibition from

19  Hammocks from just mentioning the debtors.  That is

20  an extreme measure, and one that has not been

21  reverberated by this Court.

22         THE COURT:  All right.  The issue is going

23  to be whether the letter with -- the tree trimming

24  letter we'll call it and -- well, one, what happened

25  on May 15th.  That's one.  What happened on May

1    15th.  And the other will be the tree trimming

2    letter.

3              All right.  This is your motion,

4    Mr. Frank.  It's your burden of proof.  Please

5    proceed.  Call your first witness.

6              MR. FRANK:  I'm going to call the officer

7    first, just to get him in and out quick.

8              THE COURT:  Okay.  What is the name of the

9    officer?

10             MR. FRANK:  Officer Cobo.

11             THE COURT:  Is he here?

12             MR. FRANK:  He's here.

13             THE COURT:  Okay.  The CSO is not supposed

14   to be your bailiff.  He's just here to protect me.

15             Good afternoon, Officer Cobo.  Thank you

16   for coming in today.  You probably know the routine,

17   so please get sworn in and then we'll begin.

18   Thereupon:

19                        L.J. COBO

20   was called as a witness by the Debtors, and having

21   been first duly sworn, was examined and testified as

22   follows:

23             MR. PARLADE:  I'm waiting for it to load

24   up, Judge.

25             THE COURT:  Officer, the microphone is

1    this, so just make sure that you speak into it.

2    Please, when you answer Mr. Frank's questions, wait

3    until he finishes before you answer.  And Mr. Frank

4    is going to absolutely wait until your answer is

5    finished before he asks his next question.

6                        DIRECT EXAMINATION

7    BY MR. FRANK:

8         Q    Please state your name.

9         A    I'm Officer Cobo, Miami-Dade Police

10   Department.

11        Q    What you're looking at --

12             THE COURT:  Could you ask the witness to

13   spell his last name for the record, please?

14   BY MR. FRANK:

15        Q    Please spell your last name for the

16   record.

17        A    C-O-B-O.

18        Q    You should have a screen in front of you

19   there that shows a copy of a police report.

20        A    Yes, I do.

21             THE COURT:  What exhibit is this?

22             MR. FRANK:  This is Exhibit 11.

23             THE COURT:  All right.  My Exhibit 11 is a

24   verified petition for injunction against --

25             MR. FRANK:  I'm sorry, it's Exhibit 10.

```
 1   That was already admitted?
 2             THE COURT:  Yes.
 3   BY MR. FRANK:
 4      Q    I show you a copy of this police report.
 5   This was prepared by you?
 6      A    Yes, sir.
 7             THE COURT:  Wait just a minute.  Could you
 8   turn that microphone off?  It's picking up your --
 9   Mr. Frank turned it off.  Okay.  I'm sorry.
10             Please continue, Mr. Frank.
11   BY MR. FRANK:
12      Q    Okay.  I'm scrolling down.  As I go down,
13   if you look at -- if you remember, there's a box
14   that asks if any injuries were reported.
15             Is that box checked?
16      A    No.
17      Q    So there were no injuries reported?
18      A    From my recollection, no, sir.
19             MR. FRANK:  Okay.  I think that's good
20   enough, Judge.  He's excused unless --
21             THE COURT:  Well, Mr. Parlade might want
22   to cross-examine him, either with respect to Exhibit
23   10 or with respect to his testimony.  Short
24   testimony, but testimony nonetheless.
25                       CROSS-EXAMINATION
```

Page 20

1    BY MR. PARLADE:

2        Q    Officer Cobo, good afternoon.

3        A    Good afternoon, sir.

4        Q    Really quick question.  Other than what's

5    in the four corners of that report, do you yourself

6    have any knowledge or any memories of this incident

7    in question?

8        A    I have some recollection of the incident.

9        Q    Do you have knowledge if at the time of

10   the incident, any of the parties involved claimed

11   injuries?

12       A    Not injuries, but claimed they got hit by

13   a car.

14       Q    And who claimed that they got hit by a

15   car?

16       A    The reporting person, Marglli -- I don't

17   know how to pronounce the last name.

18       Q    Is it Gallego?

19       A    Yeah.

20       Q    Okay.  Why wasn't that in the report, do

21   you know?

22       A    It was noted that she claimed that she got

23   hit by a car, but evidence on scene proved that she

24   was refusing to leave -- letting the person leave

25   the scene and cut her off.  At no point the video

1    recording showed Marglli getting hit by a car.

2         Q    Did you examine her for injuries?

3         A    I asked if she wanted fire rescue and she

4    refused fire rescue.

5         Q    Did she claim she was injured, do you

6    remember?

7         A    No.

8              MR. PARLADE:  That's all, Your Honor.

9              THE COURT:  No redirect?

10                    REDIRECT EXAMINATION

11   BY MR. FRANK:

12        Q    I just want to be clear --

13             THE COURT:  You're redirecting?

14             MR. FRANK:  Yes.  The officer was asked

15   about his memories of the incident.

16             THE COURT:  Ask him.  This is evidence

17   time, not argument time.

18   BY MR. FRANK:

19        Q    You had stated that from what you saw,

20   Ms. Gallego was blocking the car of the Ceperos?

21        A    Blocking the car, of Gail Sharp, I

22   believe.

23             MR. FRANK:  No further questions.  I just

24   wanted to clarify that.  No further questions.

25             THE COURT:  Okay.  Thank you very much,

1    Officer Cobo.  Thank you for your time.

2              Officer Cobo is excused, correct?

3              MR. FRANK:  Yes.

4              THE COURT:  Thank you so much.

5              Do I have an interpreter over here also,

6    on this side?

7              MR. FRANK:  Yes.

8              THE COURT:  Can you make sure that your

9    microphone also is off.  I'm hearing -- it is off?

10   There's no green light?

11             It's fine.  We'll manage.  All right.

12             Is there a problem with the witness?  Did

13   you want to put that question on the record?  Is

14   there an issue that needs to be on the record.

15             MR. PARLADE:  Opposing counsel has listed

16   body cam on his exhibit register.  I just asked the

17   officer if they were taken off of his camera or if

18   there was another officer's camera.

19             MR. FRANK:  I'm not even moving that into

20   evidence, Judge.

21             THE COURT:  Okay.  So then I'm going to

22   put "not introduced" on the body cam, and we can

23   just take that off the to do list.

24             All right.  Who's your next witness?

25             MR. FRANK:  It's Maria Alonso.

1          THE COURT:  Oh, body cam.  So Exhibit 2,
2  you're not seeking admission of that?
3          MR. FRANK:  That is correct.
4          THE COURT:  Okay.  Maria Alonso.  Are you
5  Ms. Alonso?
6          MS. ALONSO:  I am.
7          THE COURT:  Please stand and be sworn.
8  Thereupon:
9                    MARIA ALONSO
10  was called as a witness by the Debtors, and having
11  been first duly sworn, was examined and testified as
12  follows:
13          THE COURT:  Ms. Alonso, I'm going to ask
14  you to make sure that you stay close to the
15  microphone, which is that big black thing sticking
16  in your face.
17          THE WITNESS:  Okay.
18          THE COURT:  Also, please wait until
19  Mr. Frank finishes his question before you answer.
20  Mr. Frank is going to wait until your answer is
21  complete before he asks the next question.
22          If Mr. Parlade stands up after Mr. Frank
23  asks the question, don't answer until I hear
24  Mr. Parlade's objection, and after I've ruled on it,
25  I'll either instruct you to answer or not, or I'll

1    forget and someone will remind me to tell you.

2              THE WITNESS:  Okay.

3              THE COURT:  And equally, when Mr. Frank --

4    when Mr. Parlade is cross-examining you, if

5    Mr. Frank stands up, same thing.

6              All right.  Please proceed.

7                     DIRECT EXAMINATION

8    BY MR. FRANK:

9         Q    Please state your name.

10        A    My name is Maria Alonso.

11        Q    Can you spell your last name, please?

12        A    Sure.  A-L-O-N-S-O.

13        Q    And what is your address?

14        A    8200 Southwest 115th Street, Miami,

15    Florida, 33156.

16        Q    Now, were you present at an incident on

17    May 19, 2019, in the parking lot of the Heron

18    Condominium?

19        A    Let me correct you.  May 15th.

20        Q    May 15th.  I'm sorry.

21             Were you present?

22        A    Yes, I was.

23        Q    Okay.  Can you tell me why you were there?

24        A    I was there to see Gail Sharp, and also to

25    see my tenants.

1       Q    Okay.  You wanted to see your tenants to

2   do what?

3       A    I wanted to collect rent, and I was there

4   to give them some eggs, because they have a sick

5   young lady.

6       Q    And what is your relationship with the

7   Ceperos?

8       A    I just know them from the association, the

9   Hammocks Association.

10      Q    Okay.  And how did it happen that all

11  three of you were at the parking lot together?

12      A    Well, I was there -- I don't know.  I got

13  there right after 4:00, and I was by Building 8.  I

14  was speaking to Gail Sharp, and we had previously --

15  I had spoken to the Ceperos a few days before and

16  that morning, because they wanted to see me, because

17  we had election at The Heron, and they wanted to

18  congratulate us.

19      Q    And that election at The Heron was for

20  what?

21      A    Was for new board members.

22      Q    Okay.  And what is your position with The

23  Heron?

24      A    I'm the president.

25           THE COURT:  I'm sorry to bother everybody

1    again.  I'm going to ask the interpreters to sit in

2    the back with the people they're interpreting for,

3    because I'm sorry.  I'm just finding it very

4    distracting.  Sorry.  No insult -- all the way back,

5    both of you.  That way you can interpret to your

6    heart's content, and I can hear without being

7    distracted.  I'm sorry.

8              Okay.  Ask your next question.

9    BY MR. FRANK:

10        Q    You were present at that time, and did you

11   receive a call from the Ceperos?

12        A    Yes, I did.  I received several calls

13   while I was speaking to Gail Sharp.

14        Q    And what were the content of those

15   telephone calls?

16        A    Well, I received like two calls that I

17   wasn't answering.  I was still speaking to Gail.

18   And then they send me a text that they were being

19   blocked at The Heron.

20        Q    Did they tell you who was blocking them

21   in?

22        A    Then they called again.  I answered the

23   phone, and the Ceperos stated that they were being

24   blocked by Marglli.

25        Q    Marglli who?

1       A       Gallego.

2       Q       And then did you go to the scene?

3       A       Yes, I did.

4       Q       And at that scene what did you observe

5   Ms. Gallego doing?

6       A       Ms. Gallego was filming them, was saying

7   something, doing something with her hands.  In one

8   hand she had the phone and the other one she was

9   doing stuff.

10              I don't know what she was saying, because

11  I'm far away from her.  I know she's saying

12  something, but I couldn't tell you what she was

13  saying.  And she was taking pictures and filming

14  them and going all around the car.

15      Q       Now, when you say you saw her approach the

16  car and start yelling and screaming at the Ceperos,

17  what else did you see?

18      A       Well, when I got there she was already

19  right at the car, by their window, and going all

20  around the car.  As soon as she saw me getting there

21  then she came charging at me.

22      Q       Then what happened?

23      A       Then what happened was, she started

24  filming me.  She started taking pictures.  She

25  started to tell me, "Come on, and you're going to

1    pay for it."

2         Q    Were you there the whole time?

3         A    I was there -- as soon as they called me,

4    as soon as I got there, I was there the whole time,

5    yes.

6         Q    And you were there when the police came?

7         A    Yes, I was.

8         Q    So you sat back, and were you interviewed

9    by the officer?

10        A    Yes.

11        Q    And you told him what happened?

12        A    Yes, I did.

13        Q    Just as you testified here?

14        A    Yes.  I even went to the police department

15   and I did a police report that states all of that,

16   and the time that I even got the Ceperos' calls and

17   everything.

18        Q    Hold on one second.  I'm sorry.

19             Did you see or observe any banging on the

20   car by Ms. Gallego?

21        A    I don't know about the banging on that

22   car, but I did observe the banging in the other

23   vehicle, because after I came, then right after me

24   came Gail Sharp.  Then she went charging at Gail

25   Sharp's car, and she banged Gail Sharp's car.

1   There's a video on that.

2       Q    Okay.  What cars were present from the

3   association?

4       A    There was The Hammocks logo car, and there

5   were two safety vehicles.

6       Q    And what car was Ms. Gallego driving?

7       A    She was driving The Hammocks vehicle with

8   the logo.

9       Q    It had the logo of The Hammocks on the

10  side of the vehicle?

11      A    Yes, it does.

12          THE COURT:  I've got to remind you,

13  Ms. Alonso, let Mr. Frank finish the question,

14  because the recording can't pick up two voices at

15  once.

16          THE WITNESS:  Okay.  I'm sorry.

17          THE COURT:  So I think the question was,

18  was The Hammocks logo on the car, and the answer was

19  yes; is that correct?

20          THE WITNESS:  Yes.

21          THE COURT:  All right.  Please proceed

22  with your next question.

23  BY MR. FRANK:

24      Q    How many other security vehicles were

25  there?

1       A     There was two.

2       Q     Is it usual to have three different

3    Hammocks Association vehicles driving around The

4    Heron, of which you are the president?

5       A     No.  I've never seen it.

6       Q     You've never seen that before?

7       A     No.

8       Q     Do they have any jurisdiction, meaning The

9    Hammocks Association, on The Heron property, which

10   is a separate association?

11            MR. PARLADE:  Objection, Your Honor.

12            THE COURT:  You have to say it into a

13   microphone.

14            MR. PARLADE:  I object, Your Honor.  Calls

15   for opinion testimony from the witness.

16            THE COURT:  Repeat the question,

17   Mr. Frank.

18   BY MR. FRANK:

19       Q     Is it usual for The Hammocks --

20            THE COURT:  Oh, is it usual.  I'll sustain

21   the objection.

22            MR. FRANK:  She's the president of the

23   association.

24            THE COURT:  I hear you.  You didn't lay a

25   proper foundation --

1              MR. FRANK:  Okay.

2              THE COURT:  -- to get it out of opinion

3   testimony.

4   BY MR. FRANK:

5       Q    You are the president of the association,

6   right?

7       A    Yes.

8       Q    You are familiar with the rules and

9   regulations of The Heron Association?

10      A    Yes.

11      Q    Now, being as stated that way, are you

12  aware of these vehicles being all there at the same

13  time?  Has that ever happened before?

14      A    No.

15             MR. FRANK:  I have no further questions at

16  this time, Judge.

17             THE COURT:  All right.  Are you done with

18  your direct?

19             MR. FRANK:  I'm done with my direct.

20             THE COURT:  Okay.  Mr. Parlade, you may

21  cross-examine.

22             MR. FRANK:  Oh, I'm sorry, Your Honor.  I

23  do have one other question.  Excuse me.

24             THE COURT:  Not yet.  It was just a

25  teaser.

1    BY MR. FRANK:

2         Q    You have a video screen right in front of

3    you here?

4         A    Yes.

5         Q    This is Exhibit 13.  Are you familiar with

6    this letter that was put out or sent by The Hammocks

7    Association?

8              You can scroll down if you want.  You can

9    use your finger.

10        A    Yes.

11        Q    And this was received by -- I take it not

12   by you, but by your tenant?

13        A    Yes.

14             MR. FRANK:  I have no further questions.

15   I'm done with direct.  Thank you, Judge.

16             And that is already admitted, as well.

17             THE COURT:  The document, Exhibit 11, is

18   in evidence.  You had already agreed to its

19   admission.

20             So cross-examination, Mr. Parlade?

21                  CROSS-EXAMINATION

22   BY MR. PARLADE:

23        Q    Good afternoon.  Just a few questions.

24             On May 15, 2019, when you arrived at the

25   scene you saw the vehicle driven by Josue and

1   Leticia Cepero, and you also saw an association

2   vehicle given by Marglli Gallego, correct?

3        A    Yes.

4        Q    Other than them two, when you arrived,

5   were the security vehicles already there, as well,

6   or they arrived later?  They were there before you?

7        A    Yes.

8             THE COURT:  Mr. Frank, you need to sit

9   down.  You're confusing, Ms. Alonso.

10            MR. FRANK:  Sorry.

11            THE COURT:  I'm sorry.  Go ahead.

12            You said the security vehicles were still

13   there -- I mean, they were there already.  Is that

14   what your testimony was?

15            THE WITNESS:  Yes.

16   BY MR. PARLADE:

17        Q    Where were they parked in relation to the

18   debtors' vehicle, the Ceperos' vehicle?  Were they

19   next to it, were they behind it, were they somewhere

20   aside?  Where were they?

21        A    One was parked behind The Hammocks logo

22   car, the white car, right behind it, and the other

23   one was on the other side.

24        Q    The Hammocks logo car, is that the one

25   that was driven by Ms. Gallego?

1        A     Yes.

2        Q     Was Ms. Gallego's car in front of or

3   behind the Ceperos' vehicle?

4        A     In front.

5        Q     So the other security vehicle was also in

6   front of the Ceperos' vehicle, correct?

7        A     One was behind The Hammocks logo car, and

8   one was on the other side behind over there -- their

9   car is right here and the other one is on that side.

10       Q     Okay.  What was immediately behind the

11  Ceperos' vehicle?  Was there anybody parked behind

12  the vehicle, the Ceperos' vehicle?

13       A     There's like an open area, and then

14  there's the other car, the other Hammocks car.

15       Q     Behind the vehicle, so to the rear?

16       A     There's like a distance right there.

17       Q     Okay.  So there's a distance between the

18  Cepero vehicle and the security vehicle, correct?

19       A     Yes.

20       Q     Now, you had mentioned in reference to

21  this letter, which has already been admitted as

22  Exhibit 11 -- that is Exhibit 11?

23             THE COURT:  It was 13.

24  BY MR. PARLADE:

25       Q     This includes a letter, which is Page 3,

1    that is also from The Hammocks board of directors.

2              Have you had a chance to look at that

3    letter?

4         A    Which one?

5         Q    This is Exhibit 13, the exhibit just

6    admitted by the debtors.  This is a letter from

7    Hammocks Association -- it says Hammocks board of

8    directors.  This would be Page 3 of the exhibit.  It

9    starts off saying, "Dear resident."

10        A    What was your question?

11        Q    Have you ever seen that portion of the

12   letter before?  Have you seen that page of the

13   exhibit before?

14        A    No.

15        Q    You've never seen that before?

16        A    But again, I never pay attention to all

17   the papers.

18        Q    Okay.  So as we sit here, you can't say

19   yes or no whether The Hammocks board of directors

20   sent this out to residents; is that correct?

21        A    Well, we get a lot of letters in The

22   Heron, and they say it's coming from The Heron, but

23   I don't see anybody physically taking it anywhere,

24   because I don't live there.  My tenants live there.

25   And from time to time they let me know about what

1    letters were put on there or whatever.

2         Q    Okay.  At the time of the incident on

3    May 15, 2019, you mentioned that you heard

4    Ms. Gallego taking video and pictures and saying

5    some stuff.

6              Did she ever say anything to you directly?

7         A    Yes, she did.

8         Q    Okay.  When she was talking to you

9    directly, were you outside your vehicle or inside

10   the vehicle?

11        A    Never left my vehicle.

12        Q    When she was around the debtors' vehicle,

13   were the debtors inside their vehicle or outside

14   their vehicle?

15        A    Whose vehicle?

16        Q    The Ceperos, Josue and Leticia Cepero.

17             When Josue and Leticia Cepero were there

18   on May 15, 2019, did they ever get out of their

19   vehicle while Ms. Gallego was there?

20        A    No.

21        Q    They always stayed in their vehicle?

22        A    Yes.

23        Q    Did Ms. Gallego ever try to open the

24   vehicle, or ever try to physically contact the

25   Ceperos?

1        A     No.  She never tried opening the vehicle,

2   but she was right on their window.  And they also

3   were showing a piece of paper on their window.

4              MR. PARLADE:  Your Honor, I'm just

5   renewing my objection to this exhibit.  The witness

6   said that part of the exhibit has never been seen by

7   her, so I object to the foundation as to, she says

8   she's never seen it before.

9              THE COURT:  Okay, well -- okay.  So you're

10  rescinding your non-objection to the admission?

11  Because you had agreed to the admission before.

12             MR. PARLADE:  I had agreed, but I said

13  pending the proper foundation being laid.

14  Foundation has not been laid.

15             THE COURT:  Okay.  I did not hear that.

16  I'm going to reopen direct, so that Mr. Frank can

17  try to lay a foundation with respect to Exhibit 11.

18  I'm going to unadmit it, but I need you then to look

19  back, because my question was -- because the one

20  that you did say that there was an issue regarding

21  foundation, I did not admit it.

22             So I'm not going to -- I'm going to not

23  admit now Exhibit 13, but let me back up.

24             Mr. Parlade, do you have any other

25  cross-examination for this witness?  Of course, with

Page 38

1   respect to giving Mr. Frank the opportunity to try
2   to lay a greater foundation with respect to Exhibit
3   11, we'll go back, and then I'll allow you to
4   cross-examine.
5                   DIRECT EXAMINATION (continued)
6   BY MR. FRANK:
7        Q    Ms. Alonso --
8        A    Yes.
9        Q    -- from your understanding of this
10   package, this was delivered to your tenants?
11       A    Yes.
12            MR. FRANK:  I don't know how much clearer
13   that can be, Judge.  This is a composite exhibit.
14   This is what was stuck on the doors of all
15   residents.
16            I don't know how they can deny that this
17   was sent out.  It's signed by The Hammocks board of
18   directors.
19            THE COURT:  Okay.  All right.  You have to
20   stand when you address the court, Mr. Parlade.  You
21   have to speak into the microphone.
22            I will give you the opportunity to go
23   through -- to try to relay your foundation.  I know
24   you asked if the witness saw the first page.  You
25   didn't show her the balance of the exhibit.  So now

1    why don't you let the witness look at the rest of

2    the exhibit, and then you may ask the foundational

3    questions.

4              MR. FRANK:  Then can I go back to the

5    other question I had on cross?  He crossed --

6              THE COURT:  I understand.  I reopened

7    direct.  You need to lay the foundation for this

8    exhibit.

9              MR. FRANK:  Okay.

10             THE COURT:  Then I'm going to -- just

11   stay.  Then you can seek admission of the exhibit.

12             Now, my notes say you only objected to

13   Exhibit 15 on foundation, but I'm going to give you

14   this break, because it was just for purposes of

15   trying to speed things along.  And since the police

16   officer was not the witness through whom Mr. Frank

17   was going to try to get this exhibit, I'm going to

18   allow you this one time.

19             Mr. Frank, now Mr. Parlade has objected.

20   He wants you to lay a foundation.

21             MR. FRANK:  For this one or another one

22   also?

23             THE COURT:  For Exhibit 13.  That's this

24   letter, which you need to allow the witness to look

25   at the entire exhibit, and then you may ask your

1    foundational questions.

2    BY MR. FRANK:

3        Q    If you want to go to the beginning, you

4    can use your finger to stroll up to the beginning,

5    where it has that Hammocks logo on top.

6            THE COURT:  Just go through the entire

7    exhibit.

8    BY MR. FRANK:

9        Q    Just scroll.

10       A    If I go this way I don't see it moving.

11           THE COURT:  At some point you get to the

12    top.  Then go the other way.  That's the top.  Now

13    go the other way.  Believe it or not, you have to

14    scroll the other way to make it move.  It's very

15    confusing.

16           It's not moving now?

17           THE WITNESS:  No.

18           THE COURT:  All right.  Mr. Frank, scroll

19    for the witness, slowly.

20    BY MR. FRANK:

21       Q    I'm going to start scrolling.  This is

22    Page 1, where it starts with, "Dear Pelican Point

23    Residents."  Next page is the same Hammocks logo in

24    Spanish.

25       A    Uh-huh.

Page 41

1      Q    You have to answer yes or no.

2      A    Yes.

3      Q    The next page is a letter, starting with

4  "Dear Residents."  If I scroll down, you see that

5  it's signed by Hammocks board of directors.

6      A    It says Hammocks board of directors.

7           MR. PARLADE:  Your Honor --

8           THE COURT:  What is the objection?

9           MR. PARLADE:  I object to the exhibit.

10  It's not a signed letter.

11          THE COURT:  This is just foundational

12  questions.  Go ahead.

13  BY MR. FRANK:

14     Q    Going to the next page now, which again, I

15  don't speak Spanish, but it looks like it's the same

16  letter in Spanish.  Yes or no?

17     A    Yes.

18     Q    And then the next page looks like a card

19  from the property manager.

20     A    Yes.

21     Q    Then the next page is the information

22  about the tree trimming?

23     A    Yes.

24     Q    And then attached to this, the next one is

25  a domestic violence lawsuit.

Page 42

1           Do you see that?

2      A    Yes.

3      Q    And attached to that is the criminal

4  justice online system.  The next page looks like

5  it's an officer's info card.

6      A    Yes.

7      Q    That's the end of that exhibit.

8           Now, it's my understanding and you've

9  testified that this package was left at your

10 tenants' doors?

11     A    Yes.

12          MR. FRANK:  No further questions on

13 foundation, Judge.  I move to admit it in.  She's

14 identified it.

15          MR. PARLADE:  Objection, Your Honor.  It's

16 hearsay, without it being an exception.  Foundation

17 has not been laid.

18          THE COURT:  Well, it's not hearsay unless

19 it's coming in for the truth of what's -- it's just

20 a question of whether it's the letter.

21          How is your foundation?

22          MR. FRANK:  The witness has testified that

23 this package was left on her tenants' door.  Which

24 means that it was left there.

25          THE COURT:  Okay.  I'm going to allow

Page 43

1    Mr. Parlade to voir dire the witness with respect to

2    this exhibit, which is where we were before we get

3    to redirect.

4              So Mr. Parlade, go ahead and voir dire the

5    witness with respect to this exhibit, and then I'll

6    make a determination regarding admission.

7                    VOIR DIRE/CROSS-EXAMINATION

8    BY MR. PARLADE:

9       Q    Just a few minutes ago I asked you some

10   questions --

11             THE COURT:  In the microphone.

12   BY MR. PARLADE:

13      Q    Just a few minutes ago I asked you some

14   questions, and I had asked you if you had seen

15   Page 3 of the exhibit, which was a letter allegedly

16   from The Hammocks board of directors, and you said

17   you'd never seen it before.  It's possible that it

18   might have been sent, but you've never seen it

19   before.

20      A    What happens is, sometimes they send

21   packages and stuff, so, you know -- not just one

22   thing, because every month The Heron gets flyers and

23   all kinds of different documents from The Hammocks.

24   And I glance at them.  I may look at something in

25   the front, whatever, but I don't look at everything

Page 44

1    and read everything.

2         Q    So this looks like a package that might

3    have been sent to residents, correct?

4         A    The front page I do remember.

5         Q    The front page?

6         A    Yes.  And I do remember also some of the

7    pages that he showed me, like towards the end.  But

8    I usually glance at it, look at it, and just go

9    through it or whatever, and that's it.

10        Q    Okay, but you can say with certainty that

11   the first page at least was on one of those packets,

12   correct, the one --

13        A    Yes.  And I do remember other pages.

14             THE COURT:  You have to let him finish and

15   then you can answer.

16             Finish the question, Mr. Parlade, and then

17   I'm going to let Ms. Alonso answer.

18   BY MR. PARLADE:

19        Q    You can state with certainty that the

20   first page, the one that mentions tree trimming, was

21   part of the package sent to tenants and received by

22   your tenants, correct?

23        A    Yes.

24        Q    Okay.  You mentioned you remembered some

25   other pages that might have been sent in that

Page 45

1    package.

2            Which pages of the exhibit do you

3    remember?

4        A    I also remember the page that said to fill

5    out information if you wanted some tree or something

6    to -- because I looked at -- I remember that page,

7    because I just glanced through them and that's it.

8        Q    So the tree trimming, the one that says

9    "Tree Trimming," and it's a blank form, and you

10   remember the first page?

11       A    Yes.  I also remember that card

12   (unintelligible).

13       Q    I'm sorry, what?

14       A    That business card that's there I also

15   remember.

16       Q    But as we stand here today, you don't

17   recall that the letter attached in this exhibit, and

18   it says, "Dear Residents, This letter is to inform

19   that we have been trimming trees since July and

20   August 17th."

21           As you sit here today, you don't remember

22   having seen that letter in one of the packages to

23   your tenants; is that correct?

24       A    Remember, in that package, it was a thick

25   package.  I glanced and I went through whatever.

Page 46

1    Because it has nothing to do with us.

2         Q    But you stated that the tenants usually

3    get multiple packages from the association, right?

4         A    Yes.

5         Q    So usually multiple letters, it's not just

6    one packet, it's usually multiple packets, right?

7         A    Yes.

8         Q    This looks like one of those pockets?

9         A    Yes.

10        Q    A couple of the pages here look familiar?

11        A    Yes.

12        Q    But you don't remember Page 3 being sent?

13        A    No.  I don't know what page was what

14   either.

15             MR. PARLADE:  Okay.  I renew my objection,

16   Your Honor, as to this part of the exhibit.  The

17   witness has stated she has no recollection of her

18   residents receiving that.  She says the package

19   looks like something that might have been received.

20             And she has identified Page 1 and the

21   final page of the exhibit, but as to the included

22   letter, I object to the foundation of this witness.

23             THE COURT:  Okay.  Thank you.

24             All right, I'm not going to admit Exhibit

25   13.  If you can get it in through another witness,

1   that's fine, Mr. Frank, but as to this particular

2   exhibit, the foundation has not been laid.

3            You're done with your cross-examination

4   then, yes, Mr. Parlade?

5            MR. PARLADE:  Two more questions and

6   that's it.

7            THE COURT:  All right.  Go ahead.  And

8   then, Mr. Frank, you can do your redirect.  Go

9   ahead.

10  BY MR. PARLADE:

11       Q    When you arrived on May 15, 2019, and you

12  saw Ceperos and Gallego in their vehicles, you had a

13  basket of eggs next to you, correct?

14       A    I had eggs in my car.

15       Q    This is perhaps the only time I'll ask a

16  witness this.

17            Why did you have eggs in your car?

18       A    Because, like I stated about, I was going

19  to go see my tenants, and they have a sick little

20  girl.  First I went to Gail's house, dropped off

21  some eggs, and then I was going to go see my tenants

22  and drop some eggs for her.

23       Q    But you never got to see the tenants until

24  when the incident occurred?

25       A    Until after, yes.  I had already given

 1  Gail the first eggs in a separate little holder.

 2       Q    Now, your tenants, in what building do

 3  they live, relative to Ms. Gallego's apartment or

 4  townhouse?

 5       A    I have several apartments there.

 6       Q    Okay.  Do you have any in the same

 7  building as Ms. Gallego?

 8       A    No, I don't.

 9       Q    So you would have been in a different

10  building?

11       A    I was at Building 8 after arriving.

12       Q    This incident, the one on May 15th,

13  happened at what building?

14       A    It was between Buildings 1 and 2.

15       Q    Buildings 1 and 2.  Okay.

16            So it wasn't close to Building 8, you had

17  to drive there?

18       A    Yes.

19       Q    Now, you had just met Gail Sharp, you had

20  just testified, correct?

21       A    Yes.

22       Q    And then you were going to meet your

23  tenants, is that correct, after leaving Gail Sharp's

24  residence?

25       A    Depending on when I knew when the Ceperos

1    would be arriving or not.

2        Q    What do you mean?

3        A    I was to meet them there.

4        Q    Where?

5        A    At The Heron.

6        Q    Where at The Heron?

7        A    Wherever I was.  I couldn't tell them

8    where I was going to be.  I asked them to give me a

9    call.

10       Q    Okay.  But at the time you were at

11   Building 8, correct?

12       A    Yes, I was.

13       Q    And the other building from your tenant

14   would have been what building?

15       A    I have Buildings 3, 23 and 6.

16       Q    But the one you were going to right after

17   you saw Gail Sharp, where was that building?

18       A    Whichever tenant got there before one or

19   the other.

20       Q    Buildings 1 and 2, you had no --

21       A    No tenants at all.

22       Q    Which is where the incident occurred,

23   correct?

24       A    One and two.

25            MR. PARLADE:  Okay.  I have nothing

Page 50

1   further, Your Honor.

2            THE COURT:  Okay.  Redirect, Mr. Frank?

3                 REDIRECT EXAMINATION

4   BY MR. FRANK:

5        Q    Ms. Alonso, you testified that when you

6   got there it was because you received a phone call

7   from the Ceperos, correct?

8        A    When I got there?

9        Q    Buildings 1 and 2, where this incident

10  happened, you were there because you got a call from

11  the Ceperos?

12       A    Yes.

13       Q    And that's when you drove over there?

14       A    Yes.

15       Q    Now, also you testified for counsel that

16  the Ceperos were blocked by The Hammocks car driven

17  by Ms. Gallego, correct?

18       A    Yes.

19       Q    Now, they had tried to get away from the

20  Gallegos, right?  They were trying to get away,

21  correct?

22            MR. PARLADE:  Objection.  Counsel is --

23            THE COURT:  You need to --

24            MR. PARLADE:  It mischaracterizes the

25  testimony.  That's not what was said.

Page 51

1          THE COURT:  I'm going to sustain the

2    objection.

3    BY MR. FRANK:

4         Q    Okay.  After you saw the car blocked in,

5    did the Ceperos try to go around them to get away?

6         A    When I got there there was totally

7    blocked, and cars -- Marglli was out of the car.

8    She was where the Ceperos were.  The car was in the

9    way.  They couldn't get out.

10        Q    But I want you to picture this parking

11   lot.

12        A    Yeah.

13        Q    They are parked head first?

14        A    Yes.

15        Q    And Ms. Gallego's car is behind them?

16        A    Yes.

17        Q    And there are empty spaces on both sides,

18   other parking spaces there?

19        A    Yes.

20        Q    Did they try to get away through those

21   empty parking spaces?

22        A    No.

23             MR. FRANK:  That's all I have, Judge.

24             THE COURT:  All right.  Thank you.

25             Thank you, Ms. Alonso.  You may step down.

Page 52

```
 1              Are you going to be calling Ms. Alonso in
 2    your case, Mr. Parlade?
 3              MR. PARLADE:  No, Your Honor.
 4              THE COURT:  Okay.  So, Ms. Alonso, if you
 5    would like you may stay in the courtroom.  It's up
 6    to you.
 7              Mr. Frank, your next witness, please.
 8              MR. FRANK:  Mr. Cepero.
 9              THE COURT:  Do we have the chair there for
10    the translator?
11              So we're going to swear the translator in
12    first and then the witness.
13    Thereupon:
14                        MAYRA RIVERO
15    an interpreter, having been first duly sworn,
16    translated from English to Spanish and from Spanish
17    to English to the best of her ability.
18    Thereupon:
19                        JOSUE CEPERO
20    was called as a witness, and having been first duly
21    sworn, was examined and testified as follows:
22              THE COURT:  I need the translator next to
23    the microphone, not the debtor.
24              Now, it's very important that we follow
25    the rules here.  So, Mr. Frank, you need to -- and
```

1    Mr. Parlade, when it's your turn, same rules.  No

2    long questions, because the translator needs to be

3    able to translate.  Then all the other same rules

4    apply.

5              Mr. Cepero, when you are testifying, you

6    need to speak and stop once in a while, so that the

7    translator can translate.  Okay?  Otherwise,

8    Ms. Rivero's head might explode.

9              So with that -- and, Mr. Cepero I assume,

10   Ms. Rivero, that you already explained to the

11   witness about the standing and not interrupting, et

12   cetera.

13             THE INTERPRETER:  Yes.

14             MR. FRANK:  Do you think he can get closer

15   to the mic?  I don't know if you're picking up on

16   both of those.

17             THE COURT:  So the translator is going to

18   take the microphone closer to her.  All right.  Now

19   we'll proceed.

20                   DIRECT EXAMINATION

21   BY MR. FRANK:

22        Q    Please state your name.

23        A    Josue Cepero.

24        Q    And your address?

25        A    9541 Southwest 148th Place.

1        Q    I'm going to be asking you questions about

2   the incident that occurred in the parking lot of The

3   Heron on May 15, 2019.

4             Are you familiar with that incident?

5        A    Yes, sir.

6        Q    And you were present in that parking lot

7   with your wife?

8        A    Yes, sir.

9        Q    Why did you go to The Heron building?

10       A    We went to see Maria Alonso, the

11  president.

12       Q    And what is your relationship to

13  Ms. Alonso?

14       A    We know her from meetings from the

15  association.

16       Q    And you were going there to meet with her

17  to do what?

18       A    To congratulate her, because she's

19  reelected president of the council of owners.

20       Q    Prior to your arriving at the parking lot

21  where were you?

22       A    Wells Fargo Bank.

23       Q    And that bank is located where?

24       A    88th Street Southwest, and 137th Avenue.

25       Q    I'm going to point you to the screen

1    that's in front of you there.

2              THE COURT:  Identify the exhibit number.

3              MR. FRANK:  Yes.  This is -- I believe

4    it's -- this is marked as Exhibit 14.

5              THE COURT:  According to my notes, Exhibit

6    14 has been admitted.

7              MR. FRANK:  That is correct, Judge.  Thank

8    you.

9    BY MR. FRANK:

10        Q    I want you to look at this exhibit, and

11   why did you go to Wells Fargo Bank?

12        A    To buy a money order for the bankruptcy.

13        Q    And if you look at the Wells Fargo

14   transaction receipt, it shows a time stamp, doesn't

15   it?

16        A    Yes.

17        Q    What was that time?

18        A    4:17 in the afternoon.

19        Q    Now, what is your estimate of the time it

20   takes to drive from Wells Fargo Bank to The Heron?

21              MR. PARLADE:  Objection, Your Honor.

22              THE COURT:  What is your objection?

23              MR. PARLADE:  The question asks for an

24   opinion, and asks for speculation on behalf of the

25   witness.

1            THE COURT:  I sustain the objection on the

2    basis of speculation.  You said -- because your

3    question was, "How long do you think it takes?"  So

4    that objection is sustained.  If you have a

5    different question maybe we'll have a different

6    response.

7    BY MR. FRANK:

8        Q    How long did it take you to drive from the

9    bank to The Heron?

10       A    Six minutes.

11       Q    You are aware that there's been an

12   allegation that you drove to Ms. Gallego's son's

13   school, and followed Ms. Gallego to Heron?

14       A    Yes.

15       Q    Did you follow Ms. Gallego?

16       A    No.

17       Q    Now, let's get back to the incident

18   itself.

19            When you drove into The Heron, what did

20   you do?

21       A    I entered a guest parking.

22       Q    And you pulled into the parking space?

23       A    Yes, sir.

24       Q    And then what happened?

25       A    A minute hadn't even gone by.  There was a

Page 57

1   car with the logo of The Hammocks parked behind me
2   in the street.  She lowered the window.
3        Q    Hold on.  You said "she."
4             Who is she?
5        A    Marglli Gallego.
6        Q    Okay.  Go ahead.
7        A    When she lowered the right window I saw
8   that it was Marglli Gallego taking pictures of us
9   with the cellphone.  I told my wife, and I took the
10  decision to leave the place.
11       Q    So you tried to leave, and how did you
12  attempt to leave?
13       A    I put the car in reverse.  In a space that
14  was there on my left side I could get the car out,
15  and en route to find a place of exit so I can leave
16  from the place.
17       Q    So you backed up, went forward, backed up,
18  and then got out from the side where the parking
19  space was empty?
20       A    Yes, sir.
21       Q    Then where did you go?
22       A    Yes, sir.
23       Q    Then where did you go?
24       A    I told you, trying to find an exit to
25  leave the place.

1        Q    So were you able to find an exit?

2        A    No, sir.

3        Q    Did Ms. Gallego or someone else block your

4   exit from the Blue Heron?

5        A    When we were trying to leave she

6   brought -- she tried again to block.

7        Q    Did she move her car to block you at

8   another location?

9        A    Yes, sir.

10       Q    And then what happened?  Did you call the

11  police?

12       A    Immediately.  4:30 p.m.

13       Q    So you called the police officer or 911,

14  whichever way you did it --

15       A    911.

16       Q    At 4:30?

17       A    Yes, sir.

18       Q    And how long did it take for the officers

19  to arrive?

20       A    Five, six minutes.

21       Q    So you drove directly from the bank to the

22  Blue Heron?

23       A    Yes, sir.

24       Q    Do you know where this school is that you

25  supposedly or allegedly followed Ms. Gallego?

1        A    At that moment, no.

2        Q    Do you even know that she had a child?

3        A    Yes.

4        Q    And again, I'm going to ask you,

5   4:17 p.m., to the Blue Heron at 4:35.  That's 18

6   minutes.

7             So again, did you follow Ms. Gallego from

8   her son's school?

9             MR. PARLADE:  Objection.  Asked and

10  answered.

11            THE COURT:  Sustained.  You don't have to

12  answer that question.

13  BY MR. FRANK:

14       Q    Now, once the police officers arrived,

15  what happened?

16       A    Two officers arrived.  One stayed speaking

17  with her and the other came to speak with us.

18       Q    Okay.  And how long were you there

19  speaking with the police officers?

20       A    Speaking with the police, about 15, 20

21  minutes.

22       Q    How long did it take you to finally be

23  able to leave the Blue Heron?

24       A    Two hours only.

25       Q    Two hours only?

Page 60

1      A     Yes.

2      Q     After the police officers left, did you

3 leave right away?

4      A     We left and the officers stayed there.

5            MR. FRANK:  No further questions, Judge.

6            THE COURT:  All right.  Any

7 cross-examination, Mr. Parlade?

8                    CROSS-EXAMINATION

9 BY MR. PARLADE:

10      Q     Good afternoon, Mr. Cepero.

11      A     Good afternoon.

12      Q     I just have a few questions for you.

13 Prior to the time 4:17 p.m. --

14            THE COURT:  I know it's hard, but you've

15 got to speak into the microphone.

16            MR. PARLADE:  Sorry.

17 BY MR. PARLADE:

18      Q     Prior to 4:17 p.m., the time mentioned on

19 the exhibit of the Wells Fargo Bank that has been

20 introduced into evidence, where were you?

21      A     In the bank.

22      Q     Before you went to the bank, where were

23 you?

24      A     In my house.

25      Q     What time did you leave your house?

1        A      Before 4:00.

2        Q      How much before 4:00; 3:30, 3:45?

3        A      I cannot tell you exactly.

4        Q      Was it after 3:00?

5        A      Yes, sir.

6        Q      You had left your house after 3:00,

7   correct?

8        A      After 3:30.

9        Q      And how far from your house to Wells Fargo

10  Bank?

11       A      About two and a half miles.

12       Q      What's the duration of that, in terms of

13  time?

14       A      About ten minutes.

15       Q      Prior to you leaving your house at around

16  3:30, had you gone anywhere within the span of two

17  hours?

18       A      No, sir.

19       Q      You were home all day?

20       A      Yes, sir.

21       Q      You were home all day, and at 3:30 you

22  leave for the bank -- around 3:30, correct?

23       A      More than 3:30, more or less.

24       Q      Now, you had also stated that after the

25  bank you were going to meet Ms. Alonso; is that

1    correct?

2         A    Yes, sir.

3         Q    Had you called her and told her, "We're

4    going to meet you"?

5         A    My wife had called her.

6         Q    Okay.  And where were you meeting her?

7         A    Heron.

8         Q    Where in Heron?

9         A    When we were there in Heron we would call

10   her.

11        Q    Now, Ms. Alonso testified today that she

12   was in Building 8 when she was called by you on

13   May 15, 2019.  She also testified she had no units

14   near Buildings 1 or 2, which is around where this

15   incident occurred, correct?

16        A    We parked in front of Building 15.

17        Q    You parked in front of Building 15?

18        A    Sixteen.  I did a drawing where everything

19   is there.

20        Q    You did a drawing that's been introduced

21   into evidence?

22        A    Uh-huh.

23        Q    So you were in Building 15?  Is that by

24   Building 15?

25             THE COURT:  Sixteen.

1    BY MR. PARLADE:

2        Q    Sixteen.  I apologize.

3        A    Sixteen.

4        Q    Does Ms. Alonso have a unit in Building

5    16?

6        A    I don't know.

7        Q    It was just a building chosen by you to

8    wait, correct?

9        A    I picked that one to wait, because there

10   was a guest parking available.

11       Q    And that just happens to be next to where

12   Marglli Gallego lives, correct?

13       A    I didn't know where Ms. Gallego lived.

14       Q    You know she has a son?

15       A    Yes.

16       Q    But you don't know where she lives?  Is

17   that what you're telling me?

18       A    I'm not familiar how Heron is distributed.

19       Q    I don't understand.  Tell me what you mean

20   by that.

21       A    How many buildings does Heron have?

22       Q    That wasn't the question I asked.

23            I had asked you, you testified that you

24   know Ms. Gallego has a son, correct?

25       A    Yes.

Page 64

1          Q     You know she's the president of the
2    association, correct?
3          A     The Council of the Hammocks Community
4    Association.   It's totally different, totally
5    different of Heron.
6          Q     By "counsel," do you mean officer?   I
7    don't know what you mean by "counsel."
8          A     No.   She's the president of all the
9    Hammocks associations.
10         Q     But you've had dealings with her for
11   years?
12         A     Since 2016.
13         Q     So before the bankruptcy, correct?
14         A     Yes, sir.
15         Q     But your testimony today is that you don't
16   know where she lives?
17         A     I did not know where she lives.
18         Q     So it was just a coincidence that you
19   ended up near where she lives?
20         A     I didn't take the chance to measure the
21   distance of where she lives.
22         Q     I'm going to show you what's marked --
23               THE COURT:   Counsel, can both of you come
24   up here for just a minute?
25               (Discussion off the record.)

1          THE COURT:  Okay.  Continue with your

2   questioning, Mr. Parlade.

3          MR. PARLADE:  Thank you, Your Honor.

4          I'm going to need a little help opening

5   the video file.

6          THE COURT:  You will all be happy to know

7   that they're already doing it in Fort Lauderdale and

8   Palm Beach.  They'll be doing it in Miami.

9   Technology exhibition on how to use technology in

10  the courtroom, and they'll be giving one CLE credit

11  for TET, which you all need for the Florida Bar.

12         Is he doing it right?  Do you want to go

13  help him?

14         I'm just happy everybody is using the

15  technology now.  This is like how many lawyers does

16  it take to play a video.

17         Which exhibit are you showing?

18         MR. PARLADE:  Exhibit M, Your Honor.

19         THE COURT:  Is this the same as your

20  exhibit?  Which video is this?  Do you have that

21  exhibit also?  I have one -- your Exhibit Number 7

22  says "Josue."

23         Is there an objection to the admission of

24  the video?  I'm just asking both of you.  I'm trying

25  to speed things along.

Page 66

1          MR. PARLADE:  We had no objection in the
2     beginning.
3          MR. FRANK:  I wasn't going to move it in,
4     but I'd like to see it before it goes through.
5          MR. PARLADE:  It's your exhibit.
6          MR. FRANK:  It's your exhibit.  I'm not
7     moving it in.
8          MR. PARLADE:  You haven't seen it?
9          MR. FRANK:  I haven't reviewed all the
10    exhibits since I wasn't moving it in.  I don't
11    remember specifically which one it is.
12         THE COURT:  All right.  Show the video for
13    identification purposes only.
14         (Thereupon, the said video was marked
15      as Hammocks Exhibit M for identification.)
16         THE COURT:  I'm assuming that -- what is
17    your concern regarding the video, Mr. Frank?
18         MR. FRANK:  I don't know, since I don't
19    know which video this is.  I've gone through a whole
20    bunch of different videos.
21         THE COURT:  Okay.  So I'm going to --
22    because I'm a bench trial, I'm going to allow you to
23    show the video.  If you have a concern, raise it.
24    Let's just move to that.  That's the benefit of
25    having a bench trial.

1          MR. PARLADE:  In the presence of the

2    witness?

3          THE COURT:  Yes.

4          MR. PARLADE:  Okay.

5          THE COURT:  It's his video, correct?

6          MR. PARLADE:  Yeah.

7          THE COURT:  Okay.  All right.  Don't you

8    have to ask the witness to identify it?

9          MR. PARLADE:  We'll have to play it so he

10    can identify it.

11          THE COURT:  Exactly.  But if the witness

12    isn't here, that would be awkward, wouldn't it?

13          MR. PARLADE:  I'm not talking about

14    dealing with objections.

15          THE COURT:  Go ahead.  So we're looking at

16    what's been marked for identification as Community

17    Association Exhibit M, like Mickey, correct?  Okay.

18          (Thereupon, the video was played.)

19          THE COURT:  Is there a certified

20    translation of this transcript?

21          There's no picture.

22          MR. PARLADE:  I apologize, Your Honor.  I

23    don't know why the video is not working.

24          THE COURT:  Is there a transcript -- the

25    thing is, if you're seeking to get in the transcript

```
 1   of the video, there needs to be a certified
 2   translation.  If you're seeking to admit the
 3   picture, then we actually need to get the picture.
 4              Do you want to try it again?
 5              MR. PARLADE:  I do.  I need the picture.
 6              THE COURT:  I'm going to take a
 7   five-minute break while you try to figure out how to
 8   fix it.
 9              (Thereupon, a recess was taken, after
10   which the following proceedings were had:)
11              THE COURT:  Thank you.  Please be seated.
12   Mr. Cepero, you may sit down.
13              Mr. Parlade, where are we?
14              MR. PARLADE:  Your Honor.
15   BY MR. PARLADE:
16        Q    Mr. Cepero, you have previously testified
17   you had no clue --
18              THE COURT:  Microphone.
19   BY MR. PARLADE:
20        Q    -- you had no clue where Marglli Gallego
21   lived; is that correct?
22        A    No.
23        Q    No, you didn't testify to that, or no, you
24   don't know where she lives?
25        A    I don't know where she lives.
```

1        Q    You've never been to her house?

2        A    No.

3        Q    In 2016, when they gave you a check for

4   what you had done for the association, you didn't go

5   to her house to pick it up?

6        A    No.

7        Q    So in 2016, when her son had a knee

8   injury, and you had a family member who was a doctor

9   at Miami Children's that was treating her son, you

10  didn't visit her in her home, correct?

11       A    No.  She visited mine.

12       Q    She visited your house, as well?

13       A    Yes.

14       Q    And what did she do at your house?

15       A    She came the first time to speak with us

16  in relation to her election in 2016.

17       Q    That was it, she never came over for

18  dinner?

19       A    My house?

20       Q    Yes.

21       A    Twice more.

22       Q    Did you ever invite her on a friendly

23  basis to your house?

24       A    Yes.

25       Q    So suffice to say, at some point you guys

1    were friends?

2         A    Yes.  Not friends, acquaintances.

3         Q    But acquaintances who you invite to your

4    house to have dinner?

5         A    We never invited her for dinner at our

6    house.

7         Q    But invited to --

8              MR. PARLADE:  Strike that.

9    BY MR. PARLADE:

10        Q    But as acquaintances, she came to your

11   house three times, and you're stating you never went

12   to her house, correct?

13        A    Never.

14        Q    On May 15, 2019, did either you or your

15   wife take video?

16        A    I didn't.

17        Q    So if your attorney has an exhibit that

18   was introduced to this Court as a video --

19             MR. FRANK:  (Inaudible).

20             THE COURT:  None of the videos have been

21   entered into evidence, so I'm going to ask you to

22   rephrase the question, Mr. Parlade.

23             MR. PARLADE:  Okay.

24   BY MR. PARLADE:

25        Q    So if your attorney was attempting at some

1    point to introduce a video from your phone, you

2    would have no knowledge of that?

3         A    From my phone?

4         Q    That's correct.

5         A    There's a little video that they were

6    trying to show.

7         Q    And what was that video?

8         A    From the time that she gets in front of me

9    on the second occasion.

10        Q    What do you mean she got in front of you

11   on a second occasion?

12        A    Because the first time she tried to block

13   us when we were in the guest parking.

14        Q    She got in front of you when you were in

15   the guest parking, or did she get behind you?

16        A    She was behind me, because I parked like

17   everyone parks, with the front to the front of the

18   parking space so that you could see the tag, it's

19   visible.

20        Q    And how far was she from your car when you

21   were in that parking space?

22        A    I don't know.  I was inside the car.

23        Q    More than three feet?

24        A    Do not put words in my mouth.

25        Q    I'm not putting any words in your mouth.

Page 72

1    I'm asking you a question.

2        A    I told you already, I don't know.

3        Q    Was it more than ten feet?

4        A    I told you, I don't know.

5        Q    More than half a block?

6            MR. FRANK:  Your Honor --

7            THE COURT:  What's your objection?

8            MR. FRANK:  Asked and answered three times

9    now.  He does not know.

10           THE COURT:  I'm going to sustain the

11   objection.

12   BY MR. PARLADE:

13       Q    But her car was far enough from you that

14   you were able to get out of the parking?

15       A    In reality, I don't know how I got out.

16       Q    So you just appeared in front of the car,

17   magically appeared there, you don't know how you got

18   there?

19           THE COURT:  Mr. Parlade --

20           MR. PARLADE:  I apologize.  I'll strike

21   the question.

22   BY MR. PARLADE:

23       Q    You had testified before that you got out

24   of the parking by going to the left and moving

25   forward and repositioning the car, correct?

1      A     Could you present all the drawings that I
2   presented?
3      Q     I'm asking the questions, and I'm asking
4   you about what you already testified to.
5            You already testified that you were in the
6   parking at Heron Bay, in front of Building 16, and
7   Ms. Gallego was parked behind you, correct?
8      A     Yes.
9      Q     You also testified that in order to get
10  out of the parking, you had to pull to your left and
11  drive forward in order to get out of the parking; is
12  that correct?
13     A     Correct.
14     Q     What was to your left when you pulled up?
15     A     To my left?
16     Q     Yes, sir.
17     A     The other parking spaces.
18     Q     And the other parking spaces were empty?
19     A     Yes, sir.
20     Q     Did you have to back up at all in order to
21  pull forward?
22     A     Correct.
23     Q     You backed up, you pulled forward, pulled
24  to your left, and you got on the street; is that
25  correct?

Page 74

1        A     Exactly.  Heading direction west.

2        Q     So there was enough space between your car

3  and Ms. Gallego's car so you could maneuver out of

4  that parking space, correct?

5        A     I don't have an answer.

6        Q     But you maneuvered out of the parking

7  space, didn't you?

8        A     I told you already.  I told you already I

9  don't know how I could get out of that parking space

10 without hitting her.

11       Q     And you also remember the video that we

12 had talked about.  Do you recall in that video if

13 your wife told you to back out and leave?

14       A     It wasn't at that moment.

15       Q     At what moment was it?

16       A     The second occasion when she tried to

17 block us.

18       Q     Because the second location she was in

19 front of you?

20       A     Correct.

21       Q     And there was nobody behind you?

22       A     At that moment two security arrived.

23       Q     At the same moment Marglli Gallego pulled

24 in front of you?

25       A     No.  Ten minutes --

1           THE COURT:  Stop.  Mr. Cepero, you have

2   chosen to use a translator, so you must wait until

3   the translator translates, even if you think you

4   understand the question.

5           Madam Translator, are you done translating

6   the question?

7           THE INTERPRETER:  Yes, ma'am.  Thank you.

8           THE COURT:  Would you like to answer now,

9   Mr. Cepero?

10          THE WITNESS:  Can you repeat the question?

11  BY MR. PARLADE:

12      Q    Yes.  When Ms. Gallego pulled in front of

13  you on what you allege is the second time she tried

14  to block you, there was nobody behind you, correct?

15      A    No.

16      Q    And it wasn't until ten minutes later that

17  you stated that security officers came in their

18  cars, correct?

19      A    Who said ten minutes after?

20      Q    You just stated a few seconds ago as you

21  were explaining it --

22      A    I didn't say ten minutes.

23      Q    Okay.  How many minutes?

24      A    Two or three minutes.

25      Q    Did you attempt to back out and leave?

1      A      No.

2      Q      But it was at that time your wife had told

3  you to back out and leave, correct?

4      A      I decided, and I was the one that was

5  driving.  I put my car in park.  I put the lever in

6  park and called 911, because it was the second time

7  she had done this, and I cannot continue attempting

8  to escape, an attempt of blocking me in a place

9  where there could be children, people, animals, or

10  hit a car.

11          So I decided.  I called 911 and solicited

12  that an officer come so that he could finalize the

13  situation.

14      Q      So you decided to stay?

15      A      Yes.

16      Q      Had you had any idea at this point as to

17  why Marglli Gallego was there on May 15, 2019?

18      A      No.

19      Q      Was it unusual for someone just to try and

20  block you for no reason?

21      A      No.

22      Q      It's not unusual?

23      A      That they try to block me?

24      Q      Yes.

25      A      It's not strange.

1      Q      This happens to you a lot?

2      A      Me, never.

3      Q      Did you have any information as to why she

4   would be doing it that day?

5      A      Who is her?

6      Q      Ms. Gallego.

7      A      If I have some information?  No.

8      Q      So to this day, you have no clue why she

9   did that?

10      A      No.

11      Q      At any point during this incident, did you

12   get to call 911?

13      A      Yes.

14      Q      And who called, you or your wife?

15      A      Both.

16      Q      Are you aware of a video taken on your

17   wife's phone when she tried to call 911?

18      A      This is my video also, yes, in which you

19   could not open yet.

20      Q      Well, I can play it to refresh your memory

21   if need be, but if you recall, did your wife ask you

22   to call 911 or did you ask her to call 911?

23      A      When I put the car in park I told her call

24   911.

25      Q      Was there also a point in the video where

1    your wife says, "Tomorrow I'm going to call 911,

2    because we're not following her"?

3        A    That's not correct.

4        Q    I'm going to play this video, and you tell

5    me if this is the video that your wife recorded and

6    which you've heard, and whether this is the video

7    that we're talking about right now?

8              THE COURT:  What is your objection,

9    Mr. Frank?

10             MR. FRANK:  They're saying there's a

11   video, but I still haven't seen a video, I only

12   heard audio.

13             MR. PARLADE:  I'll play the audio.  I can

14   refresh his recollection with audio or video.

15             THE COURT:  Okay.  So you're only seeking

16   to play the video to refresh his recollection?

17             MR. PARLADE:  Correct, Your Honor.

18             THE COURT:  Okay.  Mr. Frank?

19             MR. FRANK:  I don't understand Spanish.  I

20   don't know how he's going to get that in.

21             THE COURT:  It's not going to come into

22   evidence.  He's using it to refresh his

23   recollection, but I'm going to direct the translator

24   to translate it, and I will state this:

25             The business of the court is conducted in

1    English.  Any exhibits that are sought to be

2    introduced for any reason must be in English.

3    Because you are only asking to use this to refresh

4    the witness' recollection, it would be Mr. Frank's

5    decision whether he wishes to have the exhibit

6    admitted.

7              MR. PARLADE:  Correct.

8              THE COURT:  Yes, Mr. Frank?

9              THE INTERPRETER:  Can he stand over here,

10   Judge, next to me?

11             THE COURT:  The translator is going to

12   translate it for the record, so it's going to be

13   into the microphone.  You can stand next to the

14   translator if you want.

15             I want to make clear that this is not --

16   this audio is not being considered as evidence.  You

17   can only use it to refresh the witness'

18   recollection.

19             MR. PARLADE:  Agreed, Your Honor.

20             THE COURT:  Actually, let me stop you.

21   You have not laid the foundation to refresh the

22   witness' recollection.  The question is, "Do you

23   remember?"  You're trying to use this to impeach

24   him.

25             MR. PARLADE:  He says he remembers the

Page 80

1    video, and I asked him, "Did you make the call, did

2    your wife make the call?"  Then I asked him, "Do you

3    remember this statement made by you," and he said,

4    "I don't remember that statement."  I said, "If I

5    play you this audio, would it help refresh your

6    memory?"

7              THE COURT:  I don't remember you asking

8    him that question.

9              MR. PARLADE:  Yes, Your Honor.

10             THE COURT:  Okay.  I'll accept your

11   representation that you asked that question.  Go

12   ahead.  Play the audio.

13             MR. PARLADE:  Hold on.  Let me start from

14   the beginning.

15             (Thereupon, audio was played)

16             THE INTERPRETER:  I'm sorry.  I cannot

17   decipher the first two or three words that he or she

18   is saying, and then I understand that she says, "I

19   am not following her."

20             MR. PARLADE:  I can hear it clearer from

21   these speakers.  I'll play it again.

22             If you can translate or not.  If not --

23             MR. FRANK:  I'm going to object.  This is

24   a problem.  Number one, the audio is hard to

25   understand, and number two, it's in Spanish.

Page 81

 1                THE COURT:  Okay.  It's not going to work,
 2     Mr. Parlade.
 3                MR. PARLADE:  One more time, please.
 4                THE COURT:  If the translator can
 5     translate it.  Next time --
 6                THE INTERPRETER:  You can use your
 7     interpreter if you want.
 8                THE COURT:  Go ahead.
 9                UNIDENTIFIED VOICE:  I am not behind her.
10     She's the one that's following me.
11                UNIDENTIFIED VOICE:  Call 911.
12                THE COURT:  Okay.  Now ask your question
13     again, now that the witness has listened to the
14     audio.
15     BY MR. PARLADE:
16         Q    After having heard the audio, does this
17     refresh your memory of requesting your wife call 911
18     that day?
19         A    We both called.
20         Q    And there was no conversation as to
21     calling 911 the day after, or calling 911 as to
22     who's following who?
23         A    We all heard the audio, and at no time do
24     you hear anyone saying "tomorrow."  You keep on
25     insisting and putting words in our mouth.

1        Q    I have a different audio.

2              THE COURT:  Stop.  What audio are you

3    seeking to use?

4              MR. PARLADE:  I'm trying to lay the

5    foundation.

6              THE COURT:  You can try to lay a

7    foundation --

8              MR. PARLADE:  It's an audio provided by

9    opposing counsel through discovery, which appears to

10   be different than the one they have in their

11   exhibit.

12             THE COURT:  What are you seeking -- what

13   are you doing?  What is the audio that you're

14   seeking to use?

15             MR. PARLADE:  The audio I'm seeking to use

16   is from Leticia Cepero's phone on the date of the

17   incident, on 5-15-2019, with Mr. Cepero and Leticia

18   Cepero speaking while the incident is going on.

19             THE COURT:  And you have a transcript in

20   English?

21             MR. PARLADE:  I do not.  I'm just seeking

22   to refresh his --

23             THE COURT:  You already did that.  It

24   didn't work.

25             MR. PARLADE:  Okay.

Page 83

1            THE COURT:  If you have something to
2   impeach the witness that is something that is
3   admissible under the Federal Rules of Evidence, then
4   go to town.  Okay?
5            MR. PARLADE:  Yes.
6   BY MR. PARLADE:
7       Q    Mr. Cepero, do you know where Herbert A.
8   Ammons Middle School is?
9            THE INTERPRETER:  I'm sorry.  What is the
10  name of the school?
11           MR. PARLADE:  Herbert A. Ammons Middle
12  School.
13           THE WITNESS:  No, sir.
14  BY MR. PARLADE:
15      Q    In the many times since 2016 you said
16  you've met Ms. Gallego, did you ever meet her son?
17      A    Yes.
18      Q    Do you ever speak to him?
19      A    No.
20      Q    Did your wife ever speak to him?
21      A    No, that I'm aware of.
22      Q    You never asked where he went to school?
23      A    No.
24           MR. PARLADE:  Okay.  Your Honor, nothing
25  further for this witness.

1          THE COURT:  Okay.  Any redirect?

2                  REDIRECT EXAMINATION

3  BY MR. FRANK:

4      Q    Mr. Cepero, you had stated in your

5  testimony and under cross-examination the fact that

6  you were blocked twice.

7      A    Yes, sir.

8      Q    The first time was when you were in your

9  parking space?

10     A    Yes.

11     Q    And that you got around, because of the

12  empty parking space next to your car?

13     A    Yes, sir.

14     Q    And then you tried to leave Heron?

15     A    Correct.

16     Q    Then Ms. Gallego blocked you again on your

17  way out?

18     A    Yes, sir.

19     Q    Did you make a drawing?

20     A    Yes.

21          MR. FRANK:  If I may approach, Judge, to

22  try to refresh a recollection or to clarify.  If

23  not, it doesn't matter.

24          THE COURT:  Refresh what recollection?

25          MR. FRANK:  Of how it happened, showing

Page 85

1    the positions of the cars and the automobiles.

2            THE COURT:  He hadn't said he doesn't

3    remember.

4            MR. FRANK:  Doesn't remember what?

5            THE COURT:  He didn't say he didn't

6    remember.

7            MR. FRANK:  That's fine.

8            THE COURT:  I mean, that's what refreshing

9    recollection is.

10   BY MR. FRANK:

11       Q    So then once she blocked you --

12   Ms. Gallego blocked you the second time, you called

13   911?

14       A    Yes.

15       Q    And waited for the police?

16       A    Correct.

17           MR. FRANK:  That's fine.  We're good.

18           THE COURT:  Nothing else?

19           MR. FRANK:  Nothing else, Judge.

20           THE COURT:  Okay.  You may step down

21   Mr. Cepero.  Thank you.

22           Your next witness.

23           MR. FRANK:  I have no witnesses.

24           THE COURT:  Do you have any additional

25   evidence for which you seek admission?  I'll go over

1    the documents that have been admitted in your case

2    in chief.

3              I have Exhibit 9, Exhibit 10 and Exhibit

4    14.  I refused admission of Exhibit 13.  You advised

5    that you were not introducing Exhibit 2.

6              Should I assume that you're not seeking

7    introduction of 1, 3, 4, 5, 6, 7, 8, 11, 12, 15 and

8    16?

9              MR. FRANK:  That is correct.

10             THE COURT:  Okay.  So I will mark those

11   exhibits as not being introduced.

12             Does the debtor rest?

13             MR. FRANK:  Yes, Your Honor.

14             THE COURT:  All right.  Mr. Parlade, do

15   you wish to put any witnesses on in your case in

16   chief?

17             MR. PARLADE:  Yes, Your Honor.  Just for

18   clarification --

19             THE COURT:  In the microphone, please.

20             MR. PARLADE:  Exhibit Number 13, the

21   objection was sustained?

22             THE COURT:  That was -- admission refused.

23             MR. PARLADE:  Your Honor, the Hammocks

24   Community Association would like to call Jorge Matus

25   to the stand.

1          THE COURT:  Okay.  Is Jorge Manus here?

2  That's very nice of the CSO to do that, but that is

3  my court security officer.  I do not have a bailiff.

4  So their job is to just shoot you guys if you

5  misbehave.  They're just doing this other stuff to

6  be nice.

7          Sir, if you'll please come forward to be

8  sworn in.

9          Mr. Parlade, do not forget to ask the

10  witness to spell his last name when you get to

11  questioning.

12          This witness doesn't speak English?

13          MR. MATUS:  A little but I'd prefer --

14          THE COURT:  Okay.  That's fine.  So we're

15  going to swear in the translator first.  And the

16  translator will be the one sitting next to the

17  microphone.

18  Thereupon:

19                    SUSANA COLETTI

20  an interpreter, having been first duly sworn,

21  translated from English to Spanish and from Spanish

22  to English to the best of her ability.

23          THE COURT:  Please state your name for the

24  record.

25          THE INTERPRETER:  Susana Coletti.

1          THE COURT:  Could you spell your last name

2     for the record?

3          THE INTERPRETER:  C-O-L-E-T-T-I.

4          THE COURT:  Okay.  Thank you, Ms. Coletti.

5          Now swear in the witness.

6     Thereupon:

7                    JORGE MATUS

8     was called as a witness by the Hammocks Community

9     Association, and having been first duly sworn, was

10    examined and testified as follows:

11         THE COURT:  Now, going over the ground

12    rules, because you weren't here for the last one --

13    everybody can sit.

14         Because you have chosen to use a

15    translator, which is fine, I certainly understand.

16    I speak Spanish, but I would never testify at a

17    trial in Spanish.  I understand.

18         So you've chosen to use a translator,

19    which means, even if you are absolutely sure what

20    Mr. Parlade asked you in Spanish -- I mean, in

21    English -- or Mr. Frank when it's his turn, you must

22    wait for the translator to translate.  Got it?

23         THE WITNESS:  Yes.

24         THE COURT:  Mr. Parlade is going to give

25    the translator time to translate, so he won't ask a

Page 89

1    20-minute question.  I've done that before.  And in

2    your answers, take a breath, so that the translator

3    can translates your answer.

4              THE WITNESS:  Okay.

5              THE COURT:  If you see Mr. Frank stand

6    up -- Mr. Frank, wave.  If Mr. Frank stands up,

7    please don't answer until I hear the objection.

8    When Mr. Frank is questioning you, if Mr. Parlade

9    stands up, again, wait until I hear the objection

10   before you answer.

11             Mr. Parlade, please proceed.

12                  DIRECT EXAMINATION

13   BY MR. PARLADE:

14        Q    Would you please state your name for the

15   record?

16        A    Jorge Matus.

17        Q    Would you please spell your last name?

18        A    M-A-T-U-S.

19             THE COURT:  And, Mr. Matus, it's the

20   translator who needs to be in the microphone, not

21   you.  You can relax, sit back.  Just as long as the

22   translator can hear you.

23             MR. PARLADE:  Your Honor, may I approach

24   to move the microphone to the translator?

25             THE COURT:  Yes, please.  Thank you.

1    BY MR. PARLADE:

2        Q    Mr. Matus, what is your employment?

3        A    I am the supervisor for The Hammocks

4    Community -- supervisor of security for Hammocks

5    Community.

6        Q    And how long have you been the supervisor

7    for security for The Hammocks Community?

8        A    I've been a supervisor for two years, but

9    I've worked there for four years.

10       Q    Okay.  And did you have previous

11   experience working in security before The Hammocks

12   Community?

13       A    Yes, sir.

14       Q    How long have you been in the security

15   industry?

16       A    Around 12 years.

17            THE COURT:  I'm going to ask that the

18   witness and the translator switch places, because I

19   cannot see the witness' face.  So I'm going to ask

20   you to switch places.

21            Madam Translator, just swing that

22   microphone around so you're still talking into it.

23   Don't forget the microphone.  There you go.  Thank

24   you so much.  Please continue.

25            MR. PARLADE:  Thank you, Your Honor.

1   BY MR. PARLADE:

2        Q     So you've been in the security industry

3   for about 12 years; is that correct?

4        A     That is correct.

5        Q     And what type of training do you have as

6   security?

7        A     I have renewed my license to be able to

8   work without carrying a firearm.  I also have my

9   license to work carrying a firearm.  That license

10  has expired, because at the present job that I have

11  right now it's not required.  I work for another

12  industry also, but in security, as well.

13             We constantly receive training.  You have

14  batons to detain people.  Also, working with

15  people's behavior when they show frustration, and

16  different courses related to people, in this case,

17  the visitors.

18       Q     So you're trained to deal in situations

19  that deal with conflict; is that correct?

20       A     Yes.

21       Q     And you are also trained to detail the

22  incident in question?

23       A     As people that are trained in the security

24  field, those are the first training sessions that we

25  receive.  We always use the steps in order to get to

Page 92

1  the place to observe, and then document the events.

2       Q    Now, are you familiar with an incident

3  that happened on May 15, 2019, in The Hammocks

4  Community?

5       A    Yes, sir.

6       Q    Was this an incident with Marglli Gallego

7  and the debtors in this case, Josue Cepero and

8  Leticia Cepero?

9       A    On that day I was working, and I had to

10 respond to the call with regard to the event that

11 happened in The Hammocks Community.

12      Q    And approximately when did you receive

13 that call?

14      A    I remember that it was a Wednesday,

15 May 15th, in the afternoon.

16      Q    Approximately what time, do you know?

17      A    Working in the security field you receive

18 a number of phone calls on a daily basis, but these

19 are registered on the cellphone log.  Once the

20 situation has ended, and then we are going to

21 document the event, we look at the cell log.

22      Q    And who typically calls you when you get

23 one of these calls?

24      A    The residents from Hammocks Community.

25 There are many there.

1          Q    Now, do all the calls get routed directly

2    through you, or would they go through various

3    security officers?

4          A    The calls go to a number that all the

5    residents know.  It's public domain, because this

6    number is published on all of the signs for public

7    safety.

8          Q    And then you get dispatched to whatever

9    the call is; is that correct?

10         A    The supervisor that is on call during that

11   shift has that number permanently.

12         Q    Which in this case it was you, correct?

13         A    It was myself on that day.

14         Q    On May 15, 2019, what was the call that

15   you received in reference to the matter we're here

16   for today?

17         A    Mrs. Marglli called over the phone.  She

18   did not identify herself.  She was nervous.  She did

19   not identify herself, and she asked me to please

20   come over to her community, because she was being

21   followed.

22         Q    And after you got this call, did you have

23   any other information given to you or was that it?

24         A    During the call she said, "I'm here

25   getting to my building," and then she said --

1          MR. FRANK:  Objection, hearsay.

2          MR. PARLADE:  Can he finish?

3          THE COURT:  Let him answer and then you

4    can object, okay?

5          Continue with your answer.

6          THE INTERPRETER:  I did not finish

7    interpreting.

8          THE WITNESS:  During the call she said

9    that she -- after she said two or three more

10   phrases, I was able to recognize the voice.

11         THE COURT:  So what's hearsay about that

12   statement?

13         MR. FRANK:  Judge, he's stating what she

14   told him.  Ms. Gallego is here.  She can testify to

15   that.  He can't testify to that.

16         THE COURT:  So you're not objecting to

17   this part of the testimony, you're objecting to the

18   first part of the testimony?

19         MR. FRANK:  I'm objecting to the part of

20   the testimony that talks about what he says she told

21   him.

22         THE COURT:  Okay.  Your response,

23   Mr. Parlade.

24         MR. PARLADE:  Your Honor, the witness just

25   testified that after hearing three or four phrases

1    from her he recognized her voice.  It's not --

2              THE COURT:  The statement before.

3    Somebody called and said, "Can you come over, I'm

4    being followed?"

5              I'm assuming that's what your objection is

6    to?

7              MR. PARLADE:  That's the previous question

8    Your Honor.  The previous answer, is that what

9    you're talking about?

10             THE COURT:  Is that your objection?

11             MR. FRANK:  He said she told him, or the

12   caller told him, before he recognized the voice.

13   Every part of that testimony is hearsay.  If he's

14   telling the Court what someone else --

15             THE COURT:  I understand what hearsay is.

16   I want to be clear which part of the testimony you

17   believe was hearsay.

18             MR. FRANK:  The part that applies to what

19   someone else told him.

20             THE COURT:  All right.  Your response,

21   Mr. Parlade.

22             MR. PARLADE:  Your Honor, in order for it

23   to be hearsay, it must be an out of court

24   declaration, in order to prove this was a matter

25   asserted.

1          The witness is not testifying as to what

2   Ms. Margllig was involved in, or the truth of the

3   matter asserted.  He was merely stating his present

4   tense impression of a call he got, in order for him

5   to do the work that he is hired to do.

6          THE COURT:  Okay.  I'm going to overrule

7   the objection.  It's coming in for what he was told

8   over the phone, not that it's true or not.

9          Go on to your next question.

10  BY MR. PARLADE:

11      Q    When were you able to respond to the call

12  you received on May 15th?

13      A    Several safety officers work in The

14  Hammocks Community, and we have divided that into

15  zones.  Then the protocol is to go to the place as

16  soon as possible, independently of who is calling.

17          Every single phone call for us is

18  important, and we have to go.  Then we find out if

19  the call is real or not.  We always investigate.

20      Q    So you prioritize the call, based on

21  whatever the call detail is?

22      A    I will repeat.  All of the phone calls are

23  important.  We have different security officers.  It

24  depends on the assigned area.  The security officers

25  will go to the place.

1      Q    How long did it take you to respond to the
2  call made by Marglli Gallego?
3      A    Less than five minutes.
4      Q    And when you arrived at the location of
5  where the incident was, who did you observe there?
6      A    I arrived at the scene.  As a supervisor I
7  have to attend to any of the assigned areas, even
8  though it's not my assigned area.
9           I was the one that was the closest.  I got
10  there first, and I was able to observe two cars that
11  had been detained.  One of them was white, and
12  Ms. Marglli was driving that car.  The other vehicle
13  was a four-door sedan, a Honda.  I don't recall the
14  tag number now, but I could identify that by one of
15  the mascots from one of the Miami universities.
16      Q    Who was driving that car?
17      A    The white one, Marglli was driving.  And
18  that car was driven by Mr. and Mrs. Cepero.
19      Q    And at the time you arrived, what was the
20  location of Ms. Gallego's car in relation to the
21  Ceperos' car?
22      A    Ms. Marglli was going the direction from
23  the east to the west, going towards her apartment
24  where she lives, facing the other vehicle, facing
25  Mr. and Mrs. Ceperos' car, a few meters away from

1    the apartment -- from Mrs. Gallego's apartment.

2        Q    How far was Ms. Gallego's vehicle from her

3    parking space?

4        A    Very close.

5        Q    Was the vehicle driven by the Ceperos

6    blocking or inhibiting the parking for Ms. Gallego's

7    unit?

8        A    That is correct.

9        Q    Was there anybody behind the vehicle

10   driven by the Ceperos?

11       A    No.  They were in total liberty to back up

12   and move.

13       Q    Okay.  What were they doing when you got

14   there?

15       A    When I arrived I started observing the

16   area.  That's part of my job.  They were inside

17   their car.  The closest person to me when I arrived

18   was Mrs. Gallego, and I asked if everything was all

19   right.

20           She tells me that she's calling the

21   police.  When I learned that the police had already

22   been notified, I did not want to get in the middle

23   of the police investigation.  As part of my job as

24   security officer I started documenting the

25   situation.  It was a cell with a video.

1      Q    Once you were taking the video, were the
2    police already present or was that prior to them
3    arriving?

4      A    Before they arrived.

5            There were several situations occurring at
6    the same time.  Mrs. Gallego was trying to get to
7    her house.  Another person approached Mrs. Gallego,
8    and I was able to hear when she told this person,
9    "Just relax, my son is safe," for her to just come
10   down, because her son was safe.

11     Q    Was her son present when you were there?

12     A    No.

13     Q    Do you know if that person was identifying
14   her child or a different child, do you know?

15     A    This person was referring to
16   Mrs. Gallego's son.

17     Q    Other than that conversation that you
18   overheard with that person remarking about
19   Ms. Gallego's son, did you recognize or hear any
20   details as to the emotional or physical condition of
21   Ms. Gallego when you arrived?

22     A    She was nervous.  She was worried for her
23   son.

24          MR. FRANK:  I'm going to object, Judge.
25   That's (inaudible).

Page 100

1          THE COURT:  Okay.  So which part are you
2     objecting to?
3          MR. FRANK:  Him saying that she was
4     nervous.  I don't even know what that means.
5          THE COURT:  I'm going to sustain the
6     objection and allow you to try to establish a
7     foundation for the opinion testimony.
8     BY MR. PARLADE:
9       Q    You just said she was nervous.  Do you
10    know why Ms. Gallego was nervous?
11      A    I concluded that to be for two reasons.
12      Q    Let me stop you.  I'm not asking you to
13    speculate or to guess.  Just listen to the question
14    and please answer based on your recollection.
15      A    The body language, the way she was
16    talking, she looked nervous.
17          THE COURT:  Mr. Frank.
18          MR. FRANK:  I'm going to object.  He's not
19    an expert.
20          THE COURT:  Okay.  I'm going to overrule
21    your objection.  I'll give it the weight that it
22    deserves when I make my findings.
23    BY MR. PARLADE:
24      Q    Did she at that time remark to you that
25    she was nervous, or why she was nervous?

1      A    Like I said before, there were several

2   situations occurring at the same time.  She was

3   asking Mr. and Mrs. Cepero why they were following

4   her.

5           Another vehicle, a Ford Escape, gold Ford

6   Escape, approached them, as well, and it was the

7   lady.  She was also arguing with her.

8      Q    Who was that lady?

9      A    The lady was Maria Alonso, the president

10  of her association.

11     Q    Okay.  And she was arguing with

12  Ms. Gallego?

13     A    Yes.

14     Q    When all this is happening, where were the

15  Ceperos?

16     A    Inside their vehicle.

17     Q    So all this is transpiring, and the

18  Ceperos never get out of their car, correct?

19     A    That is correct.

20     Q    Where is Marglli Gallego when this

21  incident is occurring?

22     A    Outside the vehicle.

23     Q    Is she stationary, is she walking about?

24     A    No.  She was moving, asking questions, and

25  calling over the phone, calling the police.

1          Q    Did at any time she try to approach or

2    open the car door of the Ceperos?

3          A    Not that I saw.

4          Q    When the police arrived, did you have any

5    communications with the police at all?

6          A    As I mentioned before, when I knew that

7    the police were going to arrive, I tried to keep

8    myself aside, not to get in the middle of the work

9    of the police.

10         Q    Did you ever mention to the police as to

11   the nature of the call you received, or that you

12   were there investigating?

13         A    In the area of the security, we constantly

14   meet police officers, of which some get in contact

15   with us and then others with the other people, and

16   then with us.  Then at the end they will ask us

17   questions.

18         Q    Was this the case in this incident?

19         A    When they arrived they talked -- there

20   were two of them, and they approached Mr. and Mrs.

21   Ceperos' vehicle.  They asked them questions.  I

22   don't know what they said.  Then Mrs. Gallego told

23   them that she was the one that had called the

24   police.

25         Q    And how long were you there, from the time

1    you arrived at the incident on May 15, 2019, until

2    the time that you left?

3         A    I was there the entire time until the

4    police finished their work and all the people left.

5         Q    And approximately how long was that?

6         A    An average of between 40 minutes --

7         Q    When you saw Maria Alonso arrive at that

8    incident, was there anything peculiar as to her

9    arrival, anything that was not of the ordinary?

10        A    Like I said before, there were several

11   situations occurring at the same time.  That was one

12   of them.  I was trying to document everything

13   through the cellphone, because another vehicle also

14   approached the place.  It was a small white car with

15   a yellow couple.  This vehicle also got to the area.

16             I want to explain the geography of the

17   area.  I don't know if there is a way.

18        Q    I have what's listed as Respondent's

19   Exhibit E.

20             THE COURT:  And Exhibit E is in evidence.

21             MR. PARLADE:  Yes.

22   BY MR. PARLADE:

23        Q    You will see on your screen it's a map of

24   Heron.

25             Can you see it?

1      A    Yes.

2      Q    You can scroll up and down, and you can

3  identify to us in terms of building numbers, what

4  you're talking about.

5            THE COURT:  I think the witness can also

6  circle -- can the witness circle, or is that no

7  longer a functionality?  Is that still a

8  functionality now.  Never mind.  We used to be able

9  to draw on the exhibits.

10            It's the very last thing on the top.  Go

11  ahead.  Don't worry if it doesn't work.  I'm

12  looking.  We're all looking.  Go ahead.

13  BY MR. PARLADE:

14      Q    Is this a map of The Heron Community?

15      A    Yes.

16      Q    And does this accurately depict The Heron

17  Community?

18      A    Yes.

19            I will add, I don't know if you could

20  observe, but when it says Southwest 103rd Terrace,

21  that is an internal street in the community of

22  Heron.  Before you approach the Building 14921,

23  there is a stop sign there.  In front of that there

24  is a small boulevard there.

25            MR. FRANK:  Since we can't circle or

1   point, I'm not --

2              MR. PARLADE:  He can highlight.

3              THE COURT:  He's telling the building

4   number.

5              THE WITNESS:  Can I continue?

6              THE COURT:  We can't highlight.  It won't

7   work.

8              THE WITNESS:  Then --

9              THE COURT:  Just try to do the building

10  numbers.

11  BY MR. PARLADE:

12       Q    Okay.  In front of the Building 14921 --

13             THE COURT:  You see that in the lower

14  left-hand corner?

15             MR. FRANK:  Yes.

16             THE COURT:  Okay.  Go ahead.

17             THE WITNESS:  That is an area -- a parking

18  area.  It does not conduct anywhere.

19             Then the white vehicle approached and

20  turned.  Mrs. Gallego was trying to take pictures

21  and a video, I don't have knowledge of which.  The

22  white vehicle hit Mrs. Gallego in her knees.  All of

23  that was happening at the same time before the

24  police arrived.

25

Page 106

1    BY MR. PARLADE:

2        Q    Just so I can understand, next to where it

3    says Building 14921, is, I guess, a rotunda?  It's a

4    circular street?

5        A    Yes.

6        Q    And it has one ingress and one egress,

7    right?

8        A    It's an oval area.

9        Q    Where's the entrance to that particular

10   road with the parking for the Building 14921?

11       A    On 103rd Terrace, then going around the

12   oval to go back.  Then you make a left and then you

13   continue to 150th Place.

14       Q    Okay.  I see.  So there's only one

15   entrance and one exit to that parking for those

16   buildings?

17       A    In that area of the community, yes.

18       Q    In which building does Marglli Gallego

19   live?

20       A    At 14921.

21       Q    Now, we heard Josue Cepero today say he

22   was waiting by Building 16.

23            Do you know which building he's referring

24   to?

25       A    Exactly number 16, that does not

1    correspond to the area where we were investigating.

2         Q     So in this particular community, there is

3    no Building 16, correct?

4         A     Okay.  I am going to try to explain.  As I

5    said before, we are divided into zones.  I know that

6    you could observe there are many buildings.  I know

7    there is a Building Number 7, 6, 24, but by now I do

8    not recall the location and whether it does exist in

9    number 16.

10        Q     That's fine.  If you don't recall, don't

11   know that, it's perfectly fine.

12              The building numbers, do they usually

13   correspond to the last two digits of whatever the

14   entire building number is or are they different?

15        A     They're different.

16        Q     Okay.  Thank you for clarifying.

17              Now, the incident that occurred on May

18   15th, was that within the rotunda in the parking

19   next to 14921?

20        A     Yes, sir.

21        Q     Did you see any incident where Marglli

22   Gallego was parked behind the Ceperos' car as they

23   were trying to get out of the parking?

24        A     No.  Behind their car it was free.

25        Q     At any time during this incident did you

1  see Marglli Gallego try to approach or physically
2  contact either Josue Cepero or Leticia Cepero?
3        A    During the time that I was present I did
4  not see that.
5        Q    Has anyone, whether it be your employer,
6  friend or family member, ask you to change your
7  testimony or to not testify truthfully here today?
8        A    Nobody.
9             MR. PARLADE:  Nothing further.
10             THE COURT:  Okay.  Cross-examination.
11                     CROSS-EXAMINATION
12  BY MR. FRANK:
13        Q    Good afternoon, sir.
14        A    Good afternoon.
15        Q    You just testified that you don't know if
16  there's a Building 16 or not?
17        A    There are 6,000 units at The Hammocks.
18  You cannot ask me to recall the placement of a
19  specific building.
20        Q    If I were to show you a map that shows
21  Building 16 refers to the address of 14913, would
22  that refresh your memory?
23        A    Let me see if I understand the question.
24  You're asking me if I see the Building 14913, and
25  that would be Building 16?  Is that what you're

1    asking me?

2        Q    That's correct.

3        A    It would be very difficult for me to

4    answer that.

5        Q    I'm looking at this map that's in front of

6    you.  You see where it says 14913?

7        A    Yes, sir.

8        Q    If I were to show you a map that shows

9    that corresponds to Building 16, would that refresh

10   your memory?

11       A    It is logic if you show me a property with

12   the same, it would be obvious that it would be the

13   number that is there.

14            THE COURT:  Okay.  Show Mr. Parlade what

15   you would like to show the witness.

16            MR. PARLADE:  Objection, Your Honor.

17   (inaudible) his best recollection.  He may never

18   know the numbers of the buildings.

19            THE COURT:  That's not what he said.  Your

20   objection is overruled.  Show him the map.

21            And then, Mr. Parlade, you have the right

22   to determine whether you would like that map

23   admitted into evidence.

24            THE WITNESS:  What do you want me to see?

25

1   BY MR. FRANK:

2       Q    Does that refresh your recollection that

3   Building 16 is 14913?

4       A    It does not refresh my memory, no, because

5   I repeat, there are many properties for one to be

6   able to know all of them.

7       Q    You're looking at the map.

8            THE COURT:  The answer is no.  Take the

9   map back.  You also have rebuttal available to you,

10  so I guess you'll just have to wait, which by the

11  way, is not going to be today.  We're going to

12  finish this witness and then have a conversation

13  about when we finish this trial.

14            By the way, you guys know this was set for

15  one hour, right?  Didn't you guys put it on the

16  Chapter 13?  Wasn't this Chapter 13 evidentiary day?

17  Anyway, I gave you the whole afternoon, but it's

18  going to take more than the afternoon.

19            Okay, let's finish with this witness.

20  BY MR. FRANK:

21      Q    Looking at that map where it says 14913,

22  and see where it says Southwest 103rd Terrace?

23  Isn't that a line of parking spaces?

24      A    There is a street and parking spaces, as

25  well.

1          Q    And I think you testified that the only

2     way in and out is through Southwest 103rd Terrace

3     and Southwest 150th Place, correct?

4          A    I will clarify.  When I say that it is the

5     only one to go in or out, it's with regard to the

6     specific area of the parking space in front of

7     Mrs. Gallego's property.

8          Q    Now, you also testified that when you

9     arrived you viewed two automobiles in front of

10    14921, correct?

11              THE INTERPRETER:  Could you repeat, 149 --

12              MR. FRANK:  14921.

13              THE WITNESS:  Yes.  One in front of the

14    other.

15    BY MR. FRANK:

16         Q    Okay.  This is a street, correct?

17         A    No.  In that area it's parking spaces.

18         Q    But if you look at Southwest 150th Place,

19    that is a street, correct?

20         A    That is a street before the area where the

21    vehicles are.

22         Q    And you said -- let me see if I can do

23    this.

24              Were the cars front to front in that

25    parking area?

1      A      The white car was looking for a parking

2    space, and the Honda was blocking the white car.

3      Q      Okay.  So which car was closest to

4    Southwest 150th Place?

5      A      A small portion of the white car -- I am

6    going to repeat.  The white vehicle was closest to

7    its parking space than the street.

8      Q      That wasn't my question.  I asked you, out

9    of the two cars, which car was closest to Southwest

10   150th Place?

11     A      The one that was closest was the white

12   one, the rear area.

13     Q      So the white car, I assume you mean

14   Ms. Gallego's car?

15     A      Yes, sir.

16     Q      That was closest to Southwest 150th Place?

17     A      Yes.

18     Q      And Southwest 150th Place is an exit from

19   Heron, correct?

20     A      No, sir.

21     Q      Are you telling me if I head down

22   Southwest 150th Place, make a right turn down to

23   Southwest 103rd Lane, I can't get out of Heron?

24            MR. PARLADE:  Object, Your Honor, form.

25            THE COURT:  Okay.  Form is not an

1    objection at trial, but if you don't understand the

2    question, Mr. Matus, you can ask that it be

3    reexplained.

4                THE WITNESS:  Could you clarify that,

5    please?

6    BY MR. FRANK:

7        Q    Take a look at the map.

8                THE COURT:  Mr. Frank, you're getting

9    excited.

10                MR. FRANK:  It's getting late.

11                THE COURT:  I understand.

12    BY MR. FRANK:

13        Q    Look at the map and tell me, and you can,

14    I guess, use the addresses of the buildings, which

15    is the way out?

16                THE COURT:  Can the witness move the

17    little hand around or is it just you guys?

18                MR. FRANK:  Is it moving around now?

19                THE COURT:  It's moving -- mine is moving

20    around.  Is the witness' -- Madam Interpreter, is

21    there a little hand moving around?

22                THE INTERPRETER:  We're going to try.

23                THE COURT:  I'm just wondering, how are

24    you manipulating that hand?  Do you have a mouse?

25                MR. FRANK:  The last time I did this we

1   were able to circle and color.

2           THE COURT:  I want you to take the mouse

3   and draw a picture of the question you're asking the

4   witness.  Maybe that will help the witness.  You're

5   asking the witness --

6   BY MR. FRANK:

7       Q    Looking at the map, how do you get out of

8   The Heron development?

9       A    Heron has two entrances or two exits,

10  whichever you want, however you want to call it.

11      Q    How do you leave The Heron Community?

12      A    That is your option for you to use either

13  which entrance you want to use or which exit you

14  want to use.

15      Q    Okay.  Looking at the map, you've got

16  different streets laid out here.  Tell me what

17  street I take to exit the community.

18      A    I repeat, you have many options.

19      Q    Show me them all.

20          THE COURT:  I'm going to direct the

21  witness to come by the mouse.  I think this is the

22  easiest.  Yes, we all agree?  Yes.  Go around to

23  where Mr. Frank is and show us all the different

24  exits.

25          Do we all agree that's a good way to do

1    this?

2              MR. FRANK:  Sounds good to me.

3              THE COURT:  Ms. Stone, remember to tell IT

4    we need to be able to draw pictures.  We used to be

5    able to draw pictures.

6    BY MR. FRANK:

7         Q    Show me with the hand how to get out.

8              THE COURT:  With the mouse.  Show him how

9    to use the mouse.  Okay.  There you go.  Show us all

10   the exits.

11   BY MR. FRANK:

12        Q    I'm asking for where all the exits are.

13        A    I repeat, there are many options.  Do you

14   want me to show you two or three?

15        Q    I want you to show me from here

16   (indicating) -- pick any exit and show me how to get

17   out.

18              THE COURT:  It's not showing up on the --

19              MR. PARLADE:  When he says, "from here," I

20   don't know what he's referring to.

21              MR. FRANK:  Where the hand is.  See the

22   hand?

23              THE COURT:  Just so that the record --

24   because nobody but us can see the hand.  For the

25   record, the witness has the hand starting closer to

1    Building 14919, but also in front of Building 14921.

2                Go ahead, Mr. Matus.  Show us some ways

3    out.

4                THE WITNESS:  Okay.  If you, for example,

5    leave, it's 14925, and then you take 150th Place.

6    You could come out this way behind the building,

7    14919, 14913, et cetera.

8                If you continue this way you can go out

9    the other exit.  If you are at 14921, you have to go

10   out this way behind this building.  If you are at

11   14921, you do not need to exit this area.

12               THE COURT:  Okay.

13   BY MR. FRANK:

14        Q    You stated in your testimony --

15               THE COURT:  Mr. Frank, would it be easier

16   for you to use that mic?  Is that better for you?

17   No.

18               Okay.  Just move the microphone back to

19   you.  It won't break.  If it does, you'll buy it for

20   me.

21   BY MR. FRANK:

22        Q    You stated earlier that approximately here

23   is where the two cars were, the white car and the

24   Honda, right?

25        A    Yes.

1          Q    And you said the closest car, the white

2     car, was --

3               THE COURT:  When she's answering for

4     him --

5     BY MR. FRANK:

6          Q    You stated that the two cars were here,

7     and the closest car was the white car, and that was

8     approximately here?

9               THE COURT:  Put the microphone next to the

10    translator now.  There you go.

11              THE WITNESS:  It's difficult for you to

12    understand me geographically of how that area is of

13    this place.  I will have --

14              THE INTERPRETER:  Could you repeat that?

15              THE WITNESS:  You will have to explain to

16    me what you're referring to when you say the

17    closest.  For example, the Building 14921, it's

18    close to the 14951.  I don't know what you're

19    referring to when you say "closest."

20              THE COURT:  Mr. Frank, turn the --

21    Mr. Matus, remember.  You don't need to be near the

22    microphone, just the interpreter.

23    BY MR. FRANK:

24         Q    You already testified that Ms. Gallego's

25    car was the closest car to Southwest 150th Place.

Page 118

1    And you also testified that the way out from here is

2    to go this way and then that way, correct?

3        A    The way to get out for whom?

4        Q    For anybody.

5        A    If you don't live at 14921 you don't need

6    to be there.

7            THE COURT:  I'm going to direct you,

8    Mr. Matus, to listen to the question and to answer

9    the question.  So now I'm going to ask you the

10   question.

11           When you observed the two cars -- let's

12   take it step by step.  When you observed the two

13   cars, where were they, using the hand?  Show me on

14   the picture.  Where were they, over there, right

15   there?

16           THE WITNESS:  Here, between 14921 and the

17   oval area.

18           THE COURT:  And which direction was the

19   Ceperos' car facing?  Use the hand to show me.  And

20   which direction was Ms. Gallego's car facing?

21           THE WITNESS:  It was here.  They were

22   trying to get to their apartment.

23           THE COURT:  I don't want you to guess what

24   you think they were doing.  I want you to tell me

25   physically where the cars were.

1          Where were they and what direction were

2    they facing?

3          THE WITNESS:  Ms. Gallego, east to the

4    west, and Mr. and Mrs. Cepero, on the opposite

5    direction.

6          THE COURT:  In this picture, is 14921 to

7    the east, west, north or south of the hand?

8          THE WITNESS:  I would say to the west.

9          THE COURT:  Okay.  So Ms. Gallego's car is

10   facing away from her building?

11         THE WITNESS:  The vehicle of Mrs. Gallego

12   was facing the Building 14921.

13         THE COURT:  Okay.  And the Ceperos'

14   vehicle was facing away from the building?

15         THE WITNESS:  That is correct.

16         THE COURT:  Okay.  All right.  Any other

17   questions, Mr. Frank?

18   BY MR. FRANK:

19     Q    So the only time you saw those two

20   vehicles were where you said they were, correct?

21     A    I did not understand the question.

22         THE COURT:  Put the microphone in front of

23   the interpreter when she's speaking, please.

24         THE INTERPRETER:  The witness said he did

25   not understand the question.

1                THE COURT:  Okay.  If you have no more

2    questions for the witness that she needs to play

3    with the mouse, we're going to put him back on the

4    stand.

5                Actually, I have one more question for the

6    witness before he sits down.  I'm sorry, but I'm the

7    trier of fact and I just need to get this done.

8                I want you to show me on this map where

9    the guest parking is for that area.  Can you show

10   me?  Use the hand.

11               THE WITNESS:  The communities are

12   different guest parking.

13               THE COURT:  Okay.  Show me where on

14   Southwest 103rd Terrace there's guest parking on

15   that street.

16               THE INTERPRETER:  What street, Your Honor?

17               THE COURT:  Southwest 103rd Terrace.

18               THE WITNESS:  I don't have knowledge of

19   the exact location, because there are many.

20               THE COURT:  You have no idea where there's

21   guest parking in that area?

22               THE WITNESS:  Not exactly, no.

23               THE COURT:  Okay.  That's fine.

24               Are you done with the map with the

25   witness?

1          MR. FRANK:  Yes, Judge.

2          THE COURT:  You may go back over there.

3          Mr. Parlade, obviously, your redirect can

4     direct my questions, as well.

5          How many more questions do you have,

6     Mr. Frank?  I'm just trying to do this for the

7     purposes of the staff.  I already said we were going

8     to be running a little late, but I don't want to

9     stay too late.  It's an imposition on their time.

10    BY MR. FRANK:

11         Q    Sir, who pays your paycheck?

12         A    Hammocks Association.

13         Q    And who is your boss?

14         A    The manager of Public Safety.

15         Q    And who is that?

16         A    Mr. Fabien (phonetic).

17         Q    That's the manager of The Hammocks

18    Association?

19         A    The manager of the Public Safety

20    Department.

21         Q    You stated that the first time you saw the

22    two cars was in front of 14921, correct?

23         A    In the area in front of 14921.

24         Q    So you weren't there when the Ceperos were

25    parked in a visitor parking space, were you?

1      A    I said that when I arrived, the vehicle of

2  Mr. and Mrs. Cepero was in front of the vehicle of

3  Mrs. Gallego.

4      Q    So the question was, you did not see them

5  parked in the visitors' parking space, did you?

6      A    No, sir.

7           MR. FRANK:  Thank you.  I have nothing

8  further.

9           THE COURT:  Okay.  Redirect?  And of

10  course, as I said, Mr. Parlade, that will include my

11  questions for the witness, as well.

12                    REDIRECT EXAMINATION

13  BY MR. PARLADE:

14      Q    Mr. Matus, for clarity sake, does every

15  building have parking for guests and reserved?

16      A    I am going to answer the question, but I

17  would like to have some water.

18           THE COURT:  There's water right there.

19           THE WITNESS:  The Community of Hammocks,

20  local association with Heron, they have their own

21  rules and regulations.  When it comes to the parking

22  spaces, that is not being managed by the Public

23  Safety Department.  We don't have knowledge of if

24  there are assigned parking spaces for the visitors

25  or the residents.

1    BY MR. PARLADE:

2        Q    So you're not privy to that information,

3    as security supervisor for The Heron Community

4    Association, correct?

5        A    No.  I don't have knowledge of how many

6    are and what is the location.

7        Q    But if I drive in to any of the parking in

8    The Hammocks Community, am I going to find a

9    staggered number of both visitors and reserved, or

10   is there just one big parking for visitors and one

11   big parking for reserved?

12           THE COURT:  Remember, only the interpreter

13   needs to be in the microphone.  You can relax.

14           THE WITNESS:  It's usual in most of the

15   communities you have to drive around and find a

16   space that will not be assigned.

17   BY MR. PARLADE:

18       Q    And these are staggered, as I mentioned,

19   correct?

20       A    Some communities have numbers or there's

21   zones.

22       Q    That's why it's difficult for you to say

23   today exactly where the visitor parking spaces are,

24   correct?

25       A    That is correct.  There's more than 30

1   something communities, and more than -- almost 6,000

2   units.

3             MR. PARLADE:  Nothing further, Your Honor.

4             THE COURT:  No further redirect?  Okay.

5   All right.

6             Thank you so much, Mr. Matus.  You're an

7   excellent mouse person.  We're going to try to fix

8   that.  Note to Felix.

9             So we are not going to finish today,

10  because I'm not going to ask the staff to stay much

11  later.  So, Mr. Parlade, how much more for your case

12  do you have?

13            I'll just remind you what documents you

14  already have in evidence.  You already have in

15  evidence Exhibits A through E and F.  So those

16  documents are already in evidence.  A through E, and

17  F.

18            So how many more witnesses do you have?

19            MR. PARLADE:  One.

20            THE COURT:  And that's going to be

21  Ms. Gallego?

22            MR. PARLADE:  That's correct.

23            THE COURT:  All right.  And then how many

24  witnesses are you going to have on rebuttal,

25  Mr. Frank?  Understanding that you haven't heard

1   Ms. Gallego's testimony yet, but I'm sure you have

2   an idea of what it will be.

3            MR. FRANK:  I can't imagine more than

4   Ms. Alonso and Mr. Cepero.

5            THE COURT:  Okay.  So probably two.

6            Okay.  So let me ask you, considering the

7   fact that we did have the Kendrick matter somewhat

8   weaving in and out, we've been here for let's call

9   it three hours.  Realistically, are you going to

10  need a day to finish or a half a day to finish?

11  Should I give you a day?

12            MR. PARLADE:  I don't know how long --

13            THE COURT:  Okay.  I tell you what we're

14  going to do.  Here's what we're going to do.  You

15  guys are going to talk when you get downstairs, so

16  that they can lock up the floor.  You're going to

17  try to decide between the two of you how much time

18  you realistically think you need.

19            I'll give it to you.  It's not a problem.

20  What I don't want to have happen is for this to drag

21  out six months.  That's not in anybody's best

22  interest and it's not helpful.  Decide how much time

23  you need.  Call Ms. Sanabria tomorrow.

24            Mr. Frank, I am talking to you.

25            MR. FRANK:  Sorry.

1            THE COURT:  Call Mrs. Sanabria tomorrow,

2    tell her how much time you need.  Tell her any dates

3    within the next 30 days that your client, your

4    witnesses are not available.  And then Ms. Sanabria

5    will do her best to give you a half day or full day,

6    whatever it is that you believe that you need, as

7    soon as possible.  Of course, that will depend on

8    your schedules, as well.  All right?

9            You need to take all of your things with

10   you, including your flash drives.  No.  Do not take

11   your flash drives.  Ms. Stone will tackle you.

12   Okay.

13           Your witness books, you can take your

14   witness books back so they don't get lost.  I will

15   keep the exhibit binders that you gave to me.

16           MR. FRANK:  I'll bring it back to you

17   written.

18           THE COURT:  That would be a good idea.  I

19   will see you on the date that you all get from

20   Ms. Sanabria.

21           Are there any questions before we

22   conclude.  Mr. Parlade?

23           MR. PARLADE:  Will we be on time for the

24   closing?

25           THE COURT:  I think you should plan on

1    doing the closing verbally.  This is not one of

2    these cases that has complicated legal issue.  This

3    is really a fact driven case.  So I think you should

4    both presume -- so maybe taking that into account,

5    figure a full day.

6              MR. PARLADE:  Okay.

7              THE COURT:  And then just get back to

8    Ms. Sanabria with dates that either or both of you

9    are not available on a full day, or any critical

10   witness is not available.

11             Any other questions?  No?  Thank you all

12   very much.  Mr. Parlade, next time make sure that

13   you read the pre-trial order carefully.

14             MR. PARLADE:  I will, Your Honor.

15             THE COURT:  I sanctioned some lawyers a

16   hundred dollars each last time they did it.  You get

17   the one time break.

18             All right.  Court is adjourned.

19             (Thereupon, the hearing was concluded.)

20

21

22

23

24

25

Page 128

1                    CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY   OF   DADE:

5

6              I, HELAYNE F. WILLS, Shorthand

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing proceedings were taken by electronic

10   recording at the date and place as stated in the

11   caption hereto on Page 1; that the foregoing

12   computer-aided transcription is a true record of my

13   stenographic notes taken from said electronic

14   recording.

15             WITNESS my hand this 7th day of

16   August, 2020.

17

18

19   _____

                    HELAYNE F. WILLS
20           Court Reporter and Notary Public
          In and For the State of Florida at Large
21        Commission No:  GG123092  Expires 8/2/2021

22

23

24

25