1          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF FLORIDA
2

3                            Case No.:  17-20358-LMI
                             Chapter 13
4

In Re:
5
JOSUE CEPERO and LETICIA CEPERO,
6
       Debtors.
7    _____/

8

9

10                     VOLUME II

11                   CONTINUED TRIAL

12               ECF # 199, 267, 289

13                February 11, 2021

14

15

16          The above-entitled cause came on for a

17    Zoom hearing before the HONORABLE LAUREL M. ISICOFF,

18    one of the Judges of the UNITED STATES BANKRUPTCY

19    COURT, in and for the SOUTHERN DISTRICT OF FLORIDA,

20    Miami-Dade County, on Thursday, February 11, 2021,

21    commencing at or about 9:32 a.m., and the following

22    proceedings were had:

23

24          Transcribed from a Zoom recording by:
                 Helayne Wills, Court Reporter
25

Page 130

1   APPEARANCES VIA ZOOM:
2        BANKRUPTCY NOW, by
         MICHAEL J. BROOKS, ESQ.,
3        and
         LAW OFFICE OF LOUIS ARSLANIAN, by
4        LOUIS ARSLANIAN, ESQ.,
         on behalf of the Debtors
5
6        LAW OFFICES OF MIGUEL PARLADE, P.A., by
         MIGUEL F. PARLADE, ESQ.,
7        on behalf of the Hammocks Community Association
         and Marglli Gallego
8
9        JUAREGUI LAW, P.A., by
         SABINO JUAREGUI, ESQ.,
10       on behalf of Marglli Gallego
11
         ALSO PRESENT:
12       ECRO - Electronic Court Reporting Operator
         MARGLLI GALLEGO
13       JOSUE CEPERO
         LETICIA CEPERO
14       KINSELL LAMBERT, Interpreter
15                          INDEX
16   WITNESS                 DIRECT      CROSS      REDIRECT
17   MARGLLI GALLEGO
      (By Mr. Parlade)       185                    254
18    (By Mr. Arslanian)                 218
19
20                         EXHIBITS
21   DEBTORS'                                       PAGE
      Exhibit L                                     235
22
     RESPONDENT'S
23    No. 17                                        152
      No. 21                                        162
24
25

1              THE COURT:  All right.  Good morning,

2       everyone.  I hope everyone is doing well.

3              We're here this morning on the continued

4       trial of Cepero, 17-20358.  I'm going to make some

5       preliminary remarks.

6              I heard, Mr. Brooks, that your translator

7       is not here.  So I hope and assume that your clients

8       will hear and understand what I am saying, as I

9       understand they are in the room with you.

10             MR. BROOKS:  Yes.

11             THE COURT:  All right.  So for those of

12      you who are new to this, you need to know that this

13      hearing is being recorded by the Court.  It is only

14      allowed to be recorded by the Court.  Any other

15      recording is a violation of state law, and will also

16      subject the violator to sanctions by the Court.

17             When you speak, you will speak slowly and

18      clearly.  I will need to make sure that I can see

19      the witness at all times.  The only person who may

20      be in the room with any witness is the translator.

21      Witnesses may not be in the room with their

22      attorneys or any other person.

23             There are two reasons for this.  One is,

24      obviously, I need to make sure that there is no

25      interaction between the attorneys and their

1    witnesses.  But more importantly, or maybe equally

2    importantly, the echo from having more than one

3    device open on Zoom in the same room will make it

4    impossible for us to go forward.

5              Please remember not to interrupt each

6    other.  Notwithstanding that, if you are going to

7    make an objection to testimony, my law clerk will

8    keep an eye on the hands.  Mr. Parlade and

9    Mr. Arslanian, you both know how to use the hand in

10   Zoom?  Then we're going to go with the old fashioned

11   gesticulating wildly.  Okay?

12             MR. PARLADE:  Yes, Your Honor.

13             THE COURT:  When the witness is sworn in,

14   I will tell the witness that they are to -- of

15   course, I believe all the witnesses are using

16   translators anyway, so that will help, but for them

17   not to answer until I've ruled on any objection,

18   which will only be if someone has raised their hand.

19             I'm assuming that's the translator that's

20   just come in?

21             THE INTERPRETER:  Yes, ma'am.

22             THE COURT:  All right.  And the

23   translator, I'm assuming, is just there to

24   facilitate your client, and that, Mr. Arslanian,

25   your clients will not be testifying today; is that

Page 133

1    correct?

2            MR. ARSLANIAN:  I believe that Mr. Parlade

3    is going to be calling Mrs. Cepero.

4            THE COURT:  Then Mrs. Cepero will need to

5    be in a different room with the translator, and not

6    with her husband.  All right?

7            MR. BROOKS:  Say that again.

8            THE COURT:  Mrs. Cepero, when called to

9    testify, needs to be in a different room with the

10   translator.  She may not be in the room with either

11   her husband or with either of you.  Okay?

12           Just for the record, that was Mr. Brooks

13   speaking.

14           Please remember to say your name each time

15   you speak.  That will make it much easier for the

16   translator -- I'm sorry -- the transcriber, if the

17   hearing is transcribed.  Having said that,

18   obviously, if you are in the middle of questioning a

19   witness, you don't have to state your name every

20   time you ask a question.  I think that would drive

21   all of us crazy, and we would be doing this still in

22   three months.

23           All right.  Are any --

24           MR. BROOKS:  Your Honor, does Ms. Cepero

25   need to leave the room now?

Page 134

1              THE COURT:  When it is time for Ms. Cepero

2    to testify, she must be in a separate room with only

3    the translator, no one else.

4              MR. BROOKS:  And a lawyer.

5              THE COURT:  No.  The lawyer has to remain

6    in a different room.

7              MR. BROOKS:  Oh, okay.

8              THE COURT:  Let's think about this.  If

9    the client was on the witness stand, the lawyer

10   would not be standing next to the client in the

11   witness stand, correct?

12             MR. BROOKS:  Correct.

13             THE COURT:  This is the virtual

14   equivalent.  That's why you will gesticulate wildly.

15   All right?

16             Now, we will go straight through.  There

17   will not be a break for lunch, because you all need

18   to stop at 2 o'clock.  We will take a ten minute

19   break at about 11:00 and at about 12:30.  If anybody

20   needs to take a break, no details, thank you, just

21   raise your hand.

22             That reminds me.  Make sure all your

23   phones, other peripheral everything, are off.

24             We will end as close to 2:00 as possible.

25   Obviously, if we're in the middle of a witness --

1    I'm sensitive to the fact, Mr. Brooks, that your

2    colleague needs to leave at 2:30, which is why I

3    booked the end at 2:00, so if we bleed a little bit,

4    there's time.

5              MR. BROOKS:  We appreciate that.  Thank

6    you.

7              THE COURT:  This is a reminder to the

8    witnesses, and I will ask the translator to make

9    this clear.  During those two ten-minute breaks, you

10   may not discuss your testimony with anyone, no one.

11             I see the principal, and I see,

12   Mr. Parlade, although Ms. Gallego signed up to be

13   here, she's not.  So do you have any principals that

14   are attending today?

15             MR. PARLADE:  She is here, Your Honor.

16             THE COURT:  Where is she?

17             MR. PARLADE:  She's on the sign-in that

18   says Sabino Jauregui.  I don't know why their video

19   isn't on.

20             THE COURT:  Oh, okay.  I'm sorry.  That's

21   Ms. Gallego?  All right.

22             MR. JAUREGUI:  Good morning, Your Honor.

23   Sabino Jauregui on her behalf.  I'm her personal

24   attorney.  I did hear your instructions.

25             THE COURT:  Well, I'm going to take

1    appearances for a minute.  So thank you.  I did not

2    realize that was Ms. Gallego.  She needs to -- well,

3    if she's testifying, she needs to be in a separate

4    room.  All right.

5              And any representative -- I see that

6    Mr. Alfaro is just listening.  That's fine, but

7    there can be no -- of course, you attorneys, but

8    witnesses cannot chat.  You can confer with your

9    client about the case in general, but not about

10   their testimony specifically.  And that will apply

11   not only in the two 20-minute breaks, but will, of

12   course, apply during the break until we start again

13   tomorrow.

14             So with that I'm going to take

15   appearances, and we'll start with you, Mr. Brooks.

16   Please remember, you don't need to spell your last

17   name for the record, but you do need to identify

18   your client.

19             MR. BROOKS:  My name is Michael Brooks for

20   the debtors, Mr. and Mrs. Cepero.

21             THE COURT:  All right.  Mr. Arslanian.

22             MR. ARSLANIAN:  Louis Arslanian for the

23   debtors, Mr. and Mrs. Cepero.

24             THE COURT:  All right.  And Mr. Parlade.

25             MR. PARLADE:  Good morning.  Miguel

1    Parlade on behalf of Hammocks Community -- can you

2    hear me?

3              THE COURT:  Yes.  I can hear you.

4              MR. PARLADE:  Good morning, Your Honor.

5    Miguel Parlade on behalf of Hammocks Community

6    Association and Marglli Gallego.

7              THE COURT:  All right.  And Mr. Jauregui,

8    make your appearance, please.

9              MR. JAUREGUI:  Thank you, Your Honor.

10   Good morning.  Sabino Jauregui on behalf of Marglli

11   Gallego.

12             THE COURT:  All right.  And Ms. Gallego is

13   with you, and I understand that Mr. and Mrs. Cepero

14   are in the offices with Mr. Brooks and

15   Mr. Arslanian.

16             I have here a Mario (unintelligible), but

17   I don't see that person listed, so I'm going to note

18   that they are not here.  And Maria Alonso.

19             MR. BROOKS:  She's done with her

20   testimony.

21             THE COURT:  Okay.  Say your name,

22   Mr. Brooks.

23             MR. BROOKS:  I'm sorry.  Michael Brooks

24   for the debtors.

25             Ms. Alonso testified, and she's been

1   excused.

2           THE COURT:   Okay.   And don't interrupt me

3   again.

4           MR. BROOKS:   I'm sorry.

5           THE COURT:   This is a very hard process

6   for everybody, but it gets harder if we interrupt.

7   So wait until I'm done speaking, and then you can --

8   again, I'll go with the gesticulating wildly, and

9   give you guys your homework for tomorrow to figure

10  out how to raise your little blue hand.   Okay.   All

11  right.

12          I note, as I said, that Mr. Alfaro has

13  dialed in, and he's just listening.   Okay.   All

14  right.

15          So, Mr. Brooks, you suggested that you --

16  before we get started with that, let me just -- a

17  couple of other housekeeping matters on my side, and

18  then I'll hear what you all have to say.

19          I will administer the oath.   I will do the

20  interpreter's oath, and then I will do the witness

21  oath when it is time for testimony.

22          I have all the exhibit registers and

23  binders with me, the physical ones that you all

24  submitted last year, and I will go through what was

25  admitted and what was not admitted.   I note that the

1    defendants or the respondents have uploaded their

2    exhibits electronically.  I note that the debtors

3    have not.  That's not required.  It was invited.

4            That means that all witnesses are supposed

5    to have with them everything other than rebuttal

6    or -- not rebuttal -- I'm sorry.  I guess I should

7    have had another cup of coffee.  Any evidence that

8    is being used -- well, for rebuttal, which will be

9    at the end of the case, or for impeachment.

10           I want to thank my law clerk for giving me

11   the word.  That's why I have the law clerk.  Okay.

12           So I will do that.  I have created a

13   break-out room for side bars.  So if a sidebar is

14   necessary, then I will invite Mr. Parlade and

15   counsel for the Ceperos to go into side bar, if that

16   is necessary.  All right?

17           Other than that, it does not appear that

18   we have an issue regarding witnesses, because all

19   the witnesses appear to be the parties; is that

20   correct, gentlemen?  All right.

21           So Mr. Brooks, I'll start with -- yes,

22   Mr. Arslanian?

23           MR. ARSLANIAN:  We were supposed to have a

24   witness.  The witnesses right now appear to be only

25   the parties, but one of the witnesses was deposed

1    about a week or so ago regarding the Exhibit 13.

2    We've subpoenaed the witness.  She's not here.  We

3    have her deposition.  So we've got an issue with

4    that.

5              THE COURT:  Okay.  When -- first of all,

6    you're going to have to move those people, the

7    Ceperos, out of your office, because I can hear the

8    translator, and I can't have that happen.  So the

9    Ceperos will have to go somewhere.  Obviously, if

10   they need to listen, you're going to have to log in

11   on Zoom on a different -- give them a different

12   account, but I can't have that happening while I'm

13   conducting court.

14             When we get to the evidence, because we're

15   not there yet, then whatever motion you want to make

16   regarding the failure of your witness to appear,

17   you'll make that motion at that time, Mr. Arslanian.

18   All right?

19             MR. ARSLANIAN:  Yes.

20             THE COURT:  Any other preliminary matters

21   before I hear if Mr. Parlade has any preliminary

22   matters?  No?  Okay.

23             For purposes of impeachment or -- for

24   purposes of impeachment, I'm presuming that

25   everybody who's planning on impeaching documents

1   knows how to screen share.  So if you don't, oh

2   well.  You won't be able to use that document for

3   impeachment.

4           All right.  So it is my understanding that

5   we are going to start -- well, first, I'm sorry.

6   Let me go through the exhibits.  And I apologize

7   that I keep turning to the side, but that's where I

8   have the exhibit notebooks.  I will try to look at

9   you all as much as possible, but I can only do as

10  much as I can do.

11          I have on the Ceperos' side that Exhibits

12  1 through 5 were not introduced, 6 through 8 were

13  not introduced, 9 and 10 were admitted, 11 and 12

14  were not introduced.  Thirteen is the exhibit we

15  need to deal with today.  Exhibit 14 was admitted,

16  and Exhibits 15 and 16 were not introduced.  So

17  that's what I have on the Ceperos' side.

18          On the respondent's side, for Ms. Gallego

19  and Hammocks, I have Exhibits A through F were

20  admitted, and we never got past that.  So that's

21  where we are.  But A through F are admitted.

22          What is Ms. Gallego holding to her ear?

23          MR. JAUREGUI:  Judge, she's holding her

24  phone.  The translator is on the phone translating.

25          THE COURT:  Oh, okay.  All right.  Well,

1    that's good.  This is how we have a good translator.

2              This is a certified translator, Counsel?

3              MR. JAUREGUI:  Yes, Your Honor.

4              THE COURT:  Okay.  All right.  So let's

5    get started.  So we can reopen -- unless what you

6    want to do, Mr. Arslanian, is wait to reopen your

7    case until your witness shows up, and then if your

8    witness doesn't show up, I assume you're going to be

9    making a motion regarding the use of the deposition,

10   to which Mr. Parlade will either agree or object.

11   So perhaps that would make sense.

12             Do you agree, Mr. Arslanian, that we

13   should wait and see if your witness shows up, and

14   let the respondents continue with their case, or --

15   oh, no, we have -- and then you'll reopen, or do you

16   want to reopen now, do the exhibits relating to the

17   amended contempt, and you'll see if your witness

18   shows up?  What do you want to do, Mr. Arslanian?

19             MR. ARSLANIAN:  I'd rather reopen now, and

20   I don't believe -- I'm going to make a motion now.

21   I'm fairly confident that it's not tardy.  We've had

22   issues with Ms. Pico, so I don't think that she's

23   going to -- I don't think any delay is going to make

24   her appear.  She's not going to appear today, so I'm

25   making a motion regarding the deposition.

1              THE COURT:  Okay.  Let's -- so,

2    Mr. Parlade, any objection?  We're going to reopen

3    the movant's case first, and then you'll finish with

4    your case in the course of direct, and your side,

5    the amended consent, those additional exhibits.

6    Okay.

7              So I did not get an amended exhibit

8    register from you, Mr. Arslanian, but I did -- or

9    did I and I missed it?  Where would that be on the

10   docket, Mr. Arslanian, if I missed it?

11             MR. ARSLANIAN:  Mr. Brooks.

12             MR. BROOKS:  We filed notice of filing.

13   Michael Brooks speaking for the debtors.  We did

14   notice of filing, and Ms. Pico's deposition is at

15   ECF 307.

16             THE COURT:  I didn't ask you that.  Just

17   please answer the questions that I ask.

18             Did you submit an amended exhibit register

19   that adds your additional proposed exhibits to the

20   exhibit register that you submitted last February?

21             MR. BROOKS:  No.

22             THE COURT:  Okay.  All right.  You will

23   need to do that.  Okay?  Because you need to have

24   the amended exhibit register submitted.  So please

25   make sure that you do that between today and

1    tomorrow.

2              All right.  Now, the additional exhibits

3    that you filed were a notice of transcript of the

4    prior hearing, which is on the docket, so I don't

5    think we need that as an exhibit.  Then you have the

6    deposition of Ms. Pico.  We'll get to that in due

7    time.  Then we have an association letter about the

8    complaint in the docket.

9              Did you upload a bunch of other things?

10             MR. BROOKS:  We uploaded the association

11   budget, my --

12             THE COURT:  Why don't we do this?  This is

13   the problem with you failing to submit an amended

14   register.  I have no idea what of this plethora of

15   documents you wish to include as your exhibit.  So

16   why don't you walk me through the docket entry

17   number.  So right now these are just your proposed

18   exhibits.

19             MR. BROOKS:  Yes.

20             THE COURT:  And the next exhibit number

21   you have is Exhibit 17.  So what is the next exhibit

22   number that you are proposing would be Exhibit 17?

23   Give me the docket number and the description.

24             And again, right now, we're not talking

25   admission of the exhibits.  It's just about

Page 145

1    identification.

2              MR. BROOKS:  I understand.

3              THE COURT:  So, Mr. Brooks, Number 17 is

4    what?

5              MR. BROOKS:  The transcript of Diana Pico

6    at ECF 307.

7              THE COURT:  Okay.  And then what else?

8              MR. BROOKS:  ECF 304 is going to be 18.

9    That is the docket of -- what's her name --

10   Ms. Gallego, of all the cases that she has filed

11   against members of the association, as well as the

12   debtors.  That's ECF 304.

13             THE COURT:  Okay.  State court docket from

14   Gallego lawsuits.  State court docket, summary of

15   Gallego lawsuits.

16             Okay.  What's Exhibit 19?

17             MR. BROOKS:  This is going to be the

18   homeowners association budget for 2020, the approved

19   budget, at ECF 303.

20             THE COURT:  Okay.  And Exhibit 20?

21             MR. BROOKS:  Number 20 is the attorney

22   time sheet at ECF 309.

23             THE COURT:  All right.  What else?

24   Exhibit 21?

25             MR. BROOKS:  Exhibit 21 is going to be the

1    final lawsuits of the trial at ECF 294, with a

2    docket.

3           THE COURT:  All right.  So that's the

4    lawsuit that's the subject of the amended contempt

5    motion and the docket?

6           MR. BROOKS:  Correct.

7           THE COURT:  All right.  So I have Exhibit

8    17 -- I'll just go through this again to make sure

9    that we all have it.  Again, I expect that amended

10   register with all exhibits, 1 through 21, submitted

11   by the end of the day.

12          Exhibit 17 is Diana Pico's deposition.

13   That's 307.  Exhibit 18 is the state court docket

14   summary of Gallego lawsuits.  That's ECF 304.

15   Exhibit 19 is the HOA budget, ECF 303.  Exhibit 20

16   is the attorneys' time sheet, ECF 309.  Exhibit 21

17   is the Gallego lawsuit against Mrs. Cepero and the

18   docket, ECF 294.

19          Is that correct?

20          MR. BROOKS:  That's correct.

21          THE COURT:  All right.  Who's going to be

22   representing the Ceperos, in terms of presentation

23   of evidence?

24          MR. ARSLANIAN:  Mr. Arslanian.

25          THE COURT:  Okay.  All right.

1   Mr. Arslanian, please proceed.

2              MR. ARSLANIAN:  Your Honor, at this time

3   we would ask that the -- move to admit the Pico

4   deposition, because the witness is not here.  I

5   would read from the deposition.  The whole purpose

6   of that deposition, if Your Honor will recall, was

7   to --

8              THE COURT:  I'm going to stop you.  So you

9   wish to submit the deposition as evidence, and what

10  is the evidentiary basis?

11             MR. ARSLANIAN:  She identified -- she was

12  the witness that was going to identify Number 13.

13             THE COURT:  Okay.  I'm sorry.  I apologize

14  that I wasn't clear.

15             What is the basis, the procedural basis,

16  upon which you are seeking admission of the

17  deposition in lieu of live testimony?  Unless

18  Mr. Parlade agrees, and then there's not an issue.

19             Mr. Parlade, you do not agree?

20             MR. PARLADE:  No, Your Honor.

21             THE COURT:  Okay.  So, Mr. Arslanian, what

22  is the rule on which you are relying to seek

23  admission of the Pico deposition?

24             MR. ARSLANIAN:  The witness is

25  unavailable, Judge.  She's not here.

Page 148

1              THE COURT:  Okay.  And the rule of
2    evidence, Mr. Arslanian?
3              MR. ARSLANIAN:  I'm sorry, Your Honor.
4    I'm unable to provide that to you.
5              THE COURT:  Mr. Parlade?
6              MR. PARLADE:  Your Honor, I object.  They
7    have not laid the foundation (unintelligible) of
8    this evidence, and they have -- just stating that a
9    witness is unavailable does not satisfy the
10   requirement under the Federal Rules of Evidence.
11             THE COURT:  All right.  I would suggest,
12   Mr. Arslanian, that you have someone in your office
13   get you the Federal Rules of Evidence, so that you
14   have them available for the rest of the trial.
15             Okay.  Witness unavailable.
16             MR. PARLADE:  It should be 804, Your
17   Honor.
18             THE COURT:  I'm just trying to find the --
19   okay.  "The declarant is considered to be
20   unavailable as a witness --" this is Rule 804 of the
21   Federal Rules of Evidence -- "is unavailable if the
22   declarant, one, is exempted from testifying, because
23   the Court rules the privilege applies."  No.
24             "Refuses to testify about the subject
25   matter despite a court order to do so.  Testifies to

Page 149

1    not remembering the subject matter.  Cannot be

2    present or testify at the trial because of death --"

3    not by the witness necessarily -- "is absent for the

4    trial, and a statement proponent has not been able

5    by process or other reasonable means to procure the

6    declarant's attendance," or that certain hearsay

7    exceptions apply.  Okay.

8              So the fact that she hasn't shown up,

9    Mr. Arslanian, does not appear to fall within Rule

10   804.  Do you have something more specific to state

11   with respect to Rule 804?

12             MR. ARSLANIAN:  The last subpart that you

13   read, Your Honor, we have subpoenaed her.  She's not

14   honoring the subpoena.  We've contacted her several

15   times to bring her here today or get her on Zoom to

16   appear today.  She has not responded, not only to

17   our request, but to honor the Court's subpoena.  So

18   maybe the marshals can bring her to testify, but,

19   you know, short of that -- that's all we have here.

20   We've done everything we can, including lawful

21   process, to bring her in.

22             THE COURT:  Okay.  All right.  Brief

23   response, Mr. Parlade.

24             MR. PARLADE:  Your Honor, in order for

25   process to be satisfied, they must ensure not only

Page 150

1    that a subpoena has been issued, but has been

2    served, and a certificate of service has been issued

3    with the Court, and that attempts were made to try

4    and get the witness to comply with the subpoena.  I

5    have not heard that from the attorney.

6              THE COURT:  Okay.  Mr. Arslanian.

7              MR. BROOKS:  This is Michael Brooks,

8    Judge.

9              The subpoena is on the docket.  I don't

10    have the docket entry handy, but it should be around

11    ECF 300.

12             I've contacted her by -- or attempted to

13    contact her by e-mail and phone as late as this

14    morning.  She refuses to pick up the phone.  She has

15    the Zoom information.  It was left on her door.  The

16    subpoena was filed with the Court, and she was

17    served with the subpoena.

18             THE COURT:  Okay.  I see it.  All right.

19    It says that she was personally served on

20    February 2nd at 8:15 a.m.  That's ECF 300.

21             All right.  So I think that you've

22    established that the witness is unavailable, and so

23    subject, of course, to objection for anything other

24    than the -- regarding the content of the deposition,

25    and I know there were a lot of objections to form,

1    although I think they were all on behalf of

2    Mr. Arslanian or Mr. Brooks.

3              I'll allow the deposition to be used, but

4    subject, of course, to all the other rules, other

5    than hearsay.  Okay?

6              So -- and I would just note, Counsel, that

7    when you're speaking -- yes, Mr. Parlade, go ahead.

8              MR. PARLADE:  Your Honor, just for clarity

9    sake, I know Michael Brooks is the attorney of

10   record, and Mr. Arslanian is also helping with the

11   case.

12             Are both attorneys for the debtors,

13   Mr. Brooks and Mr. Arslanian, going to be arguing

14   and providing impeachment for the debtors, or is it

15   just going to be one attorney?

16             THE COURT:  Okay.  Thank you very much,

17   Mr. Parlade.  I was focusing a little bit more on

18   the evidentiary rule, but I had already asked who

19   was going to be the attorney.

20             So, Mr. Arslanian, in the absence of

21   asking me permission to allow Mr. Brooks to respond

22   in your stead, you are to be the sole person who is

23   conducting this part of the trial.  All right?  If

24   and at such time as you and Mr. Brooks switch

25   places, then you need to advise me, and then it will

Page 152

```
 1    be Mr. Brooks, and then you can only speak if
 2    Mr. Brooks asks me permission to allow you to speak.
 3    Okay?  No double teaming.
 4                MR. ARSLANIAN:  Thank you, Your Honor.
 5                MR. BROOKS:  Thank you, Your Honor.
 6                THE COURT:  It's a little harder in
 7    this -- as we're dealing with this, so thank you for
 8    reminding me.  I had actually already said that, but
 9    in any event, I didn't say it as clearly as I should
10    have.  All right.
11                So, Mr. Arslanian, the deposition is
12    admitted.  Now what?
13                MR. ARSLANIAN:  Now, based on the
14    deposition -- the witness was for the purpose of
15    laying the foundation to admit Number 13, the letter
16    that was the subject of the initial contempt motion.
17    And she testified that she received the letter.
18    It's been referred to as the tree letter, but it
19    mentioned some derogatory information about the
20    debtors.
21                THE COURT:  All right.  Can you show me
22    in -- well, let me just write down, I've now
23    admitted Exhibit 17.
24                (Thereupon, Debtor's Exhibit No. 17 was
25          admitted into evidence.)
```

1          THE COURT:  Can you show me where he

2     identified what was marked as Exhibit 13?

3          MR. ARSLANIAN:  Yes.  Beginning on Page

4     13, starting with -- at the bottom she talked of

5     receiving cases from the association.  "I received a

6     letter from the association of the pruning of trees,

7     and attached thereto was a letter that referred to

8     Josue and Leticia Cepero.

9          Then the question was asked, "I'm going to

10    show you a copy of the letter and you can let me

11    know if this is the letter you're referring to."

12          And it continues on to the next page and

13    talks about the tree removal, and her answer was,

14    "That's the letter I'm referring to."

15          "Okay.  From what I'm understanding your

16    testimony, you received this letter, you brought it

17    to Josue Cepero; is that correct?"

18          And then she says, "This letter came with

19    an additional letter attached."

20          Continuing on to Page 15, she said,

21    "Again, I received the letter and there was

22    attachment made in the name of Josue Cepero, and it

23    appeared to me to be a personal matter.  I did not

24    like it.  That's why I went and delivered it to

25    him."

1              THE COURT:  Okay.  I'm sorry if I wasn't

2    clear, Mr. Arslanian.

3              The purpose of your seeking for me to

4    consider this deposition, which I've admitted for

5    purposes of unavailability, but solely for that

6    purpose, is to identify and seek admission of

7    Exhibit 13.  So I'm going to ask you again, can you

8    show me where in this deposition you showed Ms. Pico

9    Exhibit 13, and she affirmatively identified it as

10   this letter, because the letter that I read about in

11   the deposition is just the tree trimming letter, not

12   the letter attached.

13             So where in this deposition did you show

14   Ms. Pico Exhibit 13, and she identified it as what

15   she received?

16             Because it's also not attached to the

17   transcript of the deposition that you uploaded.  So

18   show me specifically where in the depo you showed

19   her what was marked for trial as Exhibit 13, and she

20   identifies it as the letter that she's talking to

21   Mr. Parlade about, and where is that attached to the

22   transcript, or did you forget to attach it?

23             MR. ARSLANIAN:  I didn't take the

24   deposition.  Mr. Parlade did.  At that point I

25   did -- there is a point in the deposition where I

Page 155

1    did show her the letter, but what I was reading to

2    you is where he was showing her the letter on the

3    screen share, and she specifically referenced not

4    just the tree portion, but the portion -- it was a

5    personal matter referencing -- the tree letter

6    doesn't mention Mr. Cepero.  The attachments to it

7    do.  And she's talking about that specifically on

8    Page 15, Lines 1 through 7.

9              THE COURT:  How do I -- I understand that

10   you're saying that the tree trimming letter that

11   Mr. Parlade showed her as the tree trimming letter

12   -- that's not the question I asked you.

13             Where in this deposition does the witness

14   identify Exhibit 13, the document for which purpose

15   you are submitting this deposition, where in this

16   deposition that you identified that exhibit, the

17   whole exhibit, for which you are seeking admission

18   here today?

19             MR. ARSLANIAN:  She does it, Your Honor,

20   by reference to Exhibit 13.  It was -- the problem

21   is, Judge, it wasn't known that she wasn't going

22   to -- she was there to satisfy the condition that

23   the Court made to allow her to be admitted and

24   reopen.  We had to provide the deposition.

25             He didn't put it into evidence.  I didn't

1  put it in, because I didn't think she wasn't going

2  to show.  But we were discussing the letter the

3  whole time during the deposition.  I can't

4  identify -- and it wasn't attached, it's not

5  attached, but --

6            THE COURT:  Okay.

7            MR. ARSLANIAN:  She's definitely

8  discussing not just the tree trimming portion of the

9  letter, but the personal portions of the letter.

10            THE COURT:  Okay.  All right.  Anything

11  else?

12            All right.  So what other exhibits do you

13  wish to seek admission of?  I've admitted this depo.

14  What other -- with respect to this deposition and

15  this portion of your presentation, what other

16  exhibit are you seeking for me to admit?

17            MR. ARSLANIAN:  Number 21.

18            THE COURT:  I'm sorry.  You're not going

19  to seek admission of Exhibit 13 then?

20            MR. ARSLANIAN:  I am seeking admission of

21  13.  I'm asking the Court to admit 13, based on the

22  deposition.

23            That was -- the whole purpose of the

24  deposition was to determine whether or not she

25  received the letter, and she specifically went

Page 157

1   through the letter, and she specifically testified

2   that she got the letter and she gave it to the

3   Ceperos.

4               THE COURT:  Okay.  Mr. Arslanian, all I'm

5   asking you is, I asked you what other exhibits were

6   you seeking to have admitted, based on this

7   deposition, and you went to Exhibit 20.  So that is

8   why I asked you if you were seeking admission -- if

9   you had decided not to seek admission of Exhibit 13.

10  Now you're --

11              MR. ARSLANIAN:  Yes.

12              THE COURT:  So you are seeking admission

13  of Exhibit 13?

14              MR. ARSLANIAN:  I misunderstood your

15  question.  Your Honor asked additional, and I

16  thought something separate and apart from the

17  deposition.

18              The only document that we seek admission

19  to pursuant -- regarding this deposition of Diana

20  Pico, is only Number 13.  That's the reason why that

21  deposition was held, to lay a foundation for Number

22  13.  And Mr. Parlade had ample opportunity to

23  examine her throughout the deposition, which was

24  totally about whether or not she received Number 13

25  and all the portions thereof.  And she went through

Page 158

1    each part.

2              THE COURT:  Okay.  Just to confirm, you're

3    seeking admission of Exhibit 13?

4              MR. ARSLANIAN:  Based on the deposition.

5              THE COURT:  Okay.  Mr. Parlade.

6              MR. PARLADE:  Your Honor, I object to the

7    introduction of the exhibit, based the deposition.

8    Foundation has not been laid within the actual

9    deposition.  Although I took the deposition, the

10   burden of proof is not on me.  I am not seeking to

11   introduce that, based on the deposition.  It is

12   opposing counsel's burden of proof to introduce the

13   evidence, based on the proper legal evidentiary

14   foundation.

15             The witness did not identify the whole

16   letter.  She identified the tree trimming request.

17   Moreover, in the deposition she stated that she

18   couldn't recall when she received the letter, she

19   couldn't recall the date when she got the letter,

20   she couldn't recall who gave her the letter, and she

21   didn't know who prepared the letter.

22             There has been no foundational testimony

23   given by the witness in the deposition, and opposing

24   counsel cannot overcome the burden of proof to

25   introduce this exhibit.

1          THE COURT:  Okay.  I'm going to deny

2    admission of Exhibit 13.

3               I agree with you completely,

4    Mr. Arslanian, that the purpose of the deposition

5    was not for you to lay a foundation, because as you

6    said, you didn't know that she wasn't going to show

7    up, but that being the case, I can't change the fact

8    that nowhere in this deposition did you show the

9    debtor -- I'm sorry -- did you show the witness

10   Exhibit 13 and ask her, is this -- I'm looking at

11   the deposition transcript, and I'm looking at the

12   end.  Let's see.

13          MR. ARSLANIAN:  I believe the portion of

14   the deposition where I was --

15          THE COURT:  Mr. Arslanian, do not --

16   Mr. Arslanian, stop, stop.

17               I have -- I'm looking here -- let's see.

18   I'm going to the end.  All right.  I'm looking at

19   the last page, 27.  Mr. Parlade ends, and

20   Mr. Arslanian, after Mr. Parlade asks if you might

21   have some questions, you say, "No questions."  Okay?

22               So there's no point in this deposition in

23   which you showed the witness Exhibit 13 and asked

24   her to identify it.  Therefore, you have not -- this

25   deposition does not lay the foundation for admission

Page 160

```
 1    of Exhibit 15, and I'm going to deny admission.
 2              All right.  So what else did you --
 3              MR. PARLADE:  Your Honor, you said Exhibit
 4    15.  It's Exhibit 13.
 5              THE COURT:  I thought I said Exhibit 13.
 6    I'm refusing to admit Exhibit 13.
 7              MR. PARLADE:  Perfect.  Thank you.
 8              THE COURT:  All right.  Mr. Arslanian,
 9    proceed with the balance of your proof.
10              MR. ARSLANIAN:  Your Honor, I would ask
11    that if Mr. Brooks was going to testify about time
12    spent, is Your Honor -- and Josue was going to
13    testify about the money spent, if Your Honor would
14    rather wait till the end of the case to hear that,
15    or proceed now?  I can do either one.
16              THE COURT:  I'm not sure what the purpose
17    of that testimony is.  Is that for damages?
18              MR. ARSLANIAN:  Yes, Your Honor.
19              THE COURT:  If I rule that there are
20    damages, then we'll get to the damages portion.  But
21    I will say this:  I will review attorney time.  I
22    don't need testimony as to that.  I have a procedure
23    for that.
24              But I did glance at whatever it was you
25    submitted, just because I was looking to see whether
```

1   an exhibit register had been uploaded, and I will

2   just make this aside so that you can amend your

3   submission, Mr. Brooks.

4           You don't get to charge either your

5   client, or the other side if you prevail, for the

6   time that you spent in filing a motion to ask that

7   today's trial end early so you could go get your flu

8   shot -- your COVID shot.  That's not chargeable to

9   anybody.  Okay?  All right.

10          But no, Mr. Arslanian.  We'll do damages

11  if we get to that part.  Either if we have time

12  tomorrow we'll do it then, or we'll set that for a

13  separate date, if I find that damages are

14  appropriate.  Okay?  So we don't have to do that

15  now.

16          What else would you like to seek admission

17  of, in terms of Exhibits 19 through 21, with respect

18  to -- I'm sorry -- 18 through 21, with respect to

19  your case in chief?

20          MR. ARSLANIAN:  At this point, only Number

21  21, which would --

22          THE COURT:  If you gentlemen wish to

23  speak, like side bar for yourselves, you should put

24  yourself on mute, because everybody else can hear

25  you.  That's up to you, but you need to know that.

1    Okay.

2              So 21 is the lawsuit, and I believe that

3    you all stipulated that that was -- that that was

4    admissible.  But, Mr. Parlade, Exhibit 21?

5              MR. PARLADE:  That's correct, Your Honor.

6    We've already stipulated to that.

7              THE COURT:  Okay.  So I'm going to admit

8    Exhibit 21.

9              (Thereupon, Debtors' Exhibit No. 21 was

10        admitted into evidence.)

11             THE COURT:  That's ECF 294.

12             MR. ARSLANIAN:  Your Honor, may we clarify

13   21?  I'm not sure it's clear.  I think with the

14   filing, with both the lawsuit and the docket sheet,

15   showing it had been dismissed.  I believe that's --

16   I'd ask that 21 be considered as a composite of the

17   complaint and the docket sheet showing dismissal.

18             THE COURT:  Right.  That was my

19   understanding.

20             Mr. Parlade, was that your understanding,

21   as well?

22             MR. PARLADE:  Yes, Your Honor.

23             THE COURT:  Okay.  All right.  So what

24   else would you like to seek admission of in your

25   case in chief, Mr. Arslanian?

1           And you can put yourself on mute if you

2    want to consult with counsel before you respond.

3    Okay?

4               MR. ARSLANIAN:  Just Number 18, as well,

5    Judge, the docket of different lawsuits that have

6    been filed.

7               THE COURT:  Okay.  Mr. Parlade?

8               MR. PARLADE:  Objection.  What's the

9    relevance of that?

10              THE COURT:  Okay.  Your response,

11   Mr. Arslanian?

12              MR. ARSLANIAN:  The relevance is that the

13   motion for contempt had to do with violating Section

14   362 of the Code by filing lawsuits.  That docket

15   shows the different lawsuits that have been filed.

16              MR. PARLADE:  With all due -- may I

17   respond, Your Honor?

18              THE COURT:  In just a minute.

19              Whatever that is, you need to either turn

20   it off or put it on a towel.

21              Okay.  I'm sorry, Mr. Arslanian.  Other

22   than the lawsuit against Ms. Cepero, which I've

23   already admitted as Exhibit 21, what would be the

24   relevance of the other lawsuits?

25              MR. ARSLANIAN:  I believe, we're going to

Page 164

1    revisit -- I'm going to ask you to revisit Exhibit
2    Number 11, which is what was mentioned in the
3    motion.   That's another lawsuit by Ms. Gallego
4    against the Ceperos.
5                 THE COURT:  So now you're -- okay.  Again,
6    what would be the relevance of these other cases, to
7    this case?
8                 MR. ARSLANIAN:  It was the substance of
9    the motion for contempt, and it's in violation of
10   the orders that the Court previously entered, and
11   it's in violation of the stay provision.
12                THE COURT:  All these other lawsuits,
13   other than the stalking lawsuit, which I'll get to
14   in a minute, or the one that's already admitted, why
15   would the other ones be a violation?  I'm just
16   curious.
17                MR. ARSLANIAN:  I believe there's another
18   one, Case 17-027089, that was filed on 11-22-2017,
19   Involuntarily dismissed against the Ceperos on
20   December 19, 2017.  That's after the bankruptcy, as
21   well.
22                THE COURT:  I'm sorry.  I don't -- I'm
23   going to deny the admission of this exhibit, unless,
24   Mr. Parlade, you want to say something.  Go ahead.
25                MR. PARLADE:  No, Your Honor.  I believe

Page 165

1    denying the exhibit is appropriate.

2             We've limited the scope of this

3    proceeding, February 26th of last year, and the

4    pre-trial stipulation states that we're only here

5    for two incidents, an incident that happened on May

6    15, 2019, and Exhibit 13, if it got admitted.

7    Exhibit 13 was not admitted.  Therefore, we're here

8    on essentially one instance, May 15, 2019, and now

9    the new Exhibit 21, which is the 2020 lawsuit with

10   the docket, that has been admitted as an exhibit.

11            THE COURT:  Okay.  All right.  So I'm

12   going to refuse admission of Exhibit 18.  Of course,

13   that has no bearing on the admission of Exhibit 21.

14            Then, Mr. Arslanian, you said now you're

15   reopening to seek admission of Exhibit 11?  Is that

16   my understanding?

17            MR. ARSLANIAN:  Yes, it is.  Yes, we are.

18            THE COURT:  Mr. Parlade, do you have

19   Exhibit 11 in front of you?

20            MR. PARLADE:  I do not.  Let me grab it

21   from the binder.

22            Okay.  I have it in front of me, Your

23   Honor.

24            THE COURT:  Okay.  So go ahead,

25   Mr. Arslanian, make your argument.  I never ruled on

Page 166

1    this, because at the prior trial, or the first day

2    of trial, Mr. Frank had chosen not to seek admission

3    of this document.  But go ahead.

4              MR. ARSLANIAN:  Well, I'm not sure how or

5    why that happened, but in our amended motion, which

6    is Docket 289, we reincorporated the original motion

7    for contempt, and then added the paragraph about the

8    new lawsuits.

9              So the original motion specifically talked

10   about the incident on May 15th, and also that a

11   petition for injunctive relief was filed in Case

12   Number 2019-011650.  So, I mean, it's not like a

13   surprise document.  It's in the motion, and I

14   believe it was even attached to the motion.

15             THE COURT:  Okay.  I was responding that I

16   did not refuse admission before.  You hadn't sought

17   admission.

18             So you're saying that this incident, the

19   filing of this stalking complaint, was listed in

20   your original motion for contempt?  Is that my

21   understanding?

22             MR. ARSLANIAN:  Yes.  It's all related to

23   the -- yes.

24             THE COURT:  All right.  Just give me a

25   minute.  I thought I had it highlighted, but I

1    didn't.  So just give me one second.  Okay.  All

2    right.

3              Mr. Parlade, any objection to the

4    admission of Exhibit 11?

5              MR. PARLADE:  Yes, Your Honor.  Same

6    objection, relevance.  And number two, as I

7    mentioned on February 26th of last year, I know

8    Mr. Arslanian was not there, this Court, along with

9    counsel for the debtors at that time, specifically

10   limited the scope of this lawsuit, which is probably

11   one of the reasons it wasn't introduced.  It has no

12   bearing on the instances that are before this Court.

13             And it is -- it has no bearing on this

14   particular action, given the limited scope.

15             THE COURT:  Okay.  Give me one second to

16   look at the original stipulations.  Give me one

17   moment.

18             According to the stipulation that was

19   agreed to last year, the two issues were what

20   happened in the parking lot, you know, what happened

21   leading up to the parking lot, and then also the

22   tree trimming letter.  So those are the two matters

23   that the parties stipulated would be the subject of

24   the trial.

25             So I'll deny admission of Exhibit 11, but

Page 168

1    I -- well, I'm going to refuse admission.  Okay.

2              You have -- 19 and 20 are the two other

3    documents for which you listed as potential

4    exhibits.  Twenty, of course, we'll get to if we get

5    to the damages portion, okay?

6              And then does that mean you're waiving all

7    fees prior to October?  I mean, I guess I'll have to

8    go over that at some point, if we get to that point.

9    All right.  And then 19.

10             So you're not seeking admission of 19 or

11   20; is that correct?

12             MR. ARSLANIAN:  At this time.  I mean, I'm

13   not sure I can lay the foundation for the budget

14   right now.  I mean, if Mr. Parlade wants to

15   stipulate to it, then, you know --

16             THE COURT:  Okay.  I just need you to tell

17   me what you're seeking admission of.  Forget about

18   Exhibit 20 for a minute, because we're going to do

19   that later.

20             So I need to know whether you're seeking

21   admission of Exhibit 19.  Obviously, if you're going

22   to use it for impeachment, you know, you don't do

23   that right now.  You don't even ever need to admit

24   it.

25             I just need to know -- the only question I

Page 169

1   need to know, I need an answer to right now, is, are

2   you right now seeking admission of Exhibit 19?  This

3   is your case in chief that I reopened.  So are you

4   seeking admission of Exhibit 19 in your case in

5   chief, yes or no?

6             MR. ARSLANIAN:  Yes.

7             THE COURT:  Okay.  So you would like to

8   seek admission of Exhibit 19.

9             Mr. Parlade, any objection to the

10  admission of Exhibit 19?

11            MR. PARLADE:  Objection, Your Honor.

12  Number one is relevance.  Number two, foundation has

13  not been laid.

14            THE COURT:  Okay.  So, Mr. Arslanian, your

15  response regarding relevance.

16            MR. ARSLANIAN:  It is relevant, because it

17  shows a lot of money the association has, and it's

18  being used for legal expenses to fund some of these

19  lawsuits that are taking place here.

20            You know, as far as the foundation goes, I

21  mean, we'll get there.

22            THE COURT:  Well, now's the time, so the

23  admission is refused.  Okay.  All right.

24            So does that conclude your case in chief,

25  Mr. Arslanian?

1          MR. ARSLANIAN:  Other than the issues

2   about, you know, Mr. Brooks' fees and stuff like

3   that.

4          THE COURT:  All right.

5          MR. ARSLANIAN:  And they're

6   (unintelligible).

7          THE COURT:  Okay.  Well, they're not -- I

8   will -- so the record is clear for all sides, if I

9   rule that there has been sanctionable conduct, then

10  either I will reopen, for damages only, the movant's

11  case, tomorrow if we have time, and if not, we'll

12  set that at a different date.  Right now we'll focus

13  on the sanctions part.

14          All right.  So movant has rested, subject

15  to damages, Mr. Parlade, which as I said, I'll deal

16  with on another day.  So let's now go to your case.

17          When last we were together, as I said, I

18  had admitted Exhibits A through F, as in Fred, and

19  you had just -- you had concluded the testimony of

20  security guard Matus, I believe.

21          MR. PARLADE:  That's correct, Your Honor.

22          THE COURT:  All right.  So please proceed.

23  Call your next witness.

24          MR. PARLADE:  Your Honor, Hammocks

25  Community Association and Marglli Gallego hereby

1    call Marglli Gallego to the stand.

2              THE COURT:  We're going to wait for

3    Ms. Gallego's counsel to leave the room.

4              MR. PARLADE:  Thank you, Your Honor.

5              THE COURT:  Just one minute.  Okay.  We'll

6    wait until Mr. Jauregui, he gets to another room so

7    he can observe.  But I'll make some preliminary

8    comments.

9              Ms. Gallego, Mr. Parlade is going to be

10   questioning you, and if Mr. Arslanian has an

11   objection to a question, he's going to raise his

12   hand.  If you see Mr. Arslanian raise his hand,

13   don't answer the question until after I rule.

14             Now, I'm assuming that the translator is

15   watching somewhere, but I can't figure out where the

16   translator is.  So where is the translator, and how

17   is the translator hearing me?

18             THE INTERPRETER:  Yes, ma'am, I'm here.

19             THE COURT:  Oh, okay.  I need to see you,

20   because you need to take an oath.  Okay?

21             No, not Ms. Cepero's translator,

22   Ms. Gallego's translator.

23             THE INTERPRETER:  I'm sorry, ma'am.

24             THE COURT:  You can go back on mute.

25   Okay.  Great.

Page 172

1           Mr. Jauregui, where is Ms. Gallego's
2      translator?
3                 MR. JAUREGUI:  Judge, I've just been
4      informed that the translator is trying to get into
5      the Zoom, but is having difficulty.  She's not being
6      allowed in for some reason.  The pass code is not
7      working for her.
8                 THE COURT:  All right.  Well, we'll give
9      this translator a minute, because I have to swear
10     the translator in.
11                MR. JAUREGUI:  Your Honor, with your
12     permission, may I run back into my office and try to
13     resolve the interpreter issue?
14                THE COURT:  Sure.  Absolutely.  Go ahead.
15                As a matter of fact, since we're trying to
16     do that, even though I said we were going to stop at
17     11:00 for a brief break, why don't we take a
18     ten-minute break right now, and we'll give
19     technology an opportunity.
20                MR. JAUREGUI:  Thank you, Your Honor.
21                THE COURT:  We'll take a ten-minute break
22     and we'll reconvene at -- it's 10:34.  Let's call it
23     10:45.
24                (Thereupon, a recess was taken, after
25     which the following proceedings were had:)

1           THE COURT:  Do we now have -- well, let's

2    have everybody who needs to be on camera, on camera.

3    That would mean Ms. Gallego, and where's the

4    interpreter?  We need an interpreter.

5           Mr. Parlade, looks like you're the only

6    one up.

7           MR. PARLADE:  I see Ms. Gallego.  I don't

8    see a translator, Your Honor.

9           THE COURT:  No, I don't either.  And I

10   don't see Mr. Brooks or Mr. Arslanian.  Let's wait

11   for Mr. Jauregui.

12          Ms. Gallego, we have to wait until we get

13   your interpreter.

14          MR. PARLADE:  Thank you, Judge, for your

15   understanding.

16          THE COURT:  As I said repeatedly, because

17   of the challenges relating to remote hearings, we

18   all have to be flexible, in terms of interruptions

19   and technical problems.  The other day I was

20   speaking at a conference, fortunately not in a

21   trial, and my Internet just decided that it was

22   done, just stopped working.

23          MR. PARLADE:  Oh, wow.

24          THE COURT:  All right.  So --

25          MR. PARLADE:  Did --

1            THE COURT:  I'm sorry.  Go ahead,

2    Mr. Parlade.

3            MR. PARLADE:  I don't know if you saw it

4    yesterday, it was making the rounds.  There was a

5    hearing, I believe in Tennessee court, and the

6    attorney was using Zoom, and I guess their child was

7    using Zoom before then.  So the attorney appeared as

8    a cat on the screen and could not disable it.  It's

9    quite humorous.

10           MR. ARSLANIAN:  I saw that.

11           THE COURT:  I think everybody's seen that

12   now.  I think I saw it on my CNN news feed this

13   morning.

14           I have to be careful, because I use Zoom

15   to -- I have a book club with my first grade

16   granddaughter, and she and her friends with whom we

17   do the book club like to put on the pig faces and

18   things.  I don't know if you want the -- I've got to

19   be very careful about that.

20           All right.  So, Mr. Jauregui, do we have

21   an interpreter?

22           MR. JAUREGUI:  Judge, we secured another

23   interpreter.  She's logging in right now.

24           THE COURT:  Okay.

25           MR. JAUREGUI:  The first interpreter for

1  some reason is having great difficulty.  So we

2  just -- we rushed and got another one.  Should be a

3  matter of moments.

4            THE COURT:  Okay.  Also a certified

5  interpreter?

6            MR. JAUREGUI:  Also, Your Honor.

7            THE COURT:  Okay.  We'll wait another

8  couple of minutes.

9            I had a Chapter 11 case involving lawyers

10  from all over the country, and cats kept walking

11  into the frame.  So we just turned it into a cat

12  contest, who had the nicest cat.

13            MR. JAUREGUI:  Was there a winner?

14            THE COURT:  I think the cat from Rhode

15  Island was the much more beautiful cat.  Obviously,

16  cats are in the eyes of the beholder, right?

17            All right.  So we have Mr. and Mrs. Cepero

18  on with their translator.  We have Mr. Alfaro.

19  We're just waiting for Ms. Gallego's translator to

20  appear.

21            MR. PARLADE:  If you want while we're here

22  we can just do a quick little clerical --

23            THE COURT:  Go ahead.

24            MR. PARLADE:  -- clerical on my exhibits,

25  because there's a bunch of exhibits I'm not going to

1    be introducing, and we can mark them now if you

2    wish.

3                THE COURT:  Okay.  That's fine.  Why don't

4    we do that.  Let me get out your binder.

5                Okay.  What are the exhibits for which you

6    are not seeking introduction?

7                MR. PARLADE:  The exhibits starting with

8    H, all the way to the 911 call, so H through L, none

9    of those will be introduced.

10               THE COURT:  Okay.  Hold on.  All right.

11   So not introduced, H through L.  Okay.  All right.

12   Those have been marked as not introduced.

13               So that will leave Exhibit G, M and N; is

14   that correct?

15               MR. PARLADE:  I'm sorry.  M and N will

16   also not be introduced.

17               THE COURT:  Okay.  So now it will just be

18   Exhibit G, correct?

19               MR. PARLADE:  Correct, Your Honor.

20               THE COURT:  Yes, Mr. Arslanian?

21               MR. ARSLANIAN:  We're going to seek to use

22   L, M and N.

23               THE COURT:  They're not listed on your

24   exhibit register, so if you want to use exhibits in

25   your rebuttal case, then you'll -- when you upload

Page 177

1    your amended exhibit register, if you want, you can

2    list your rebuttal exhibits at that time, and

3    Mr. Parlade can deal with those when you put on your

4    rebuttal case.

5                I'm assuming that's what you're going to

6    use them for, because you've already closed your

7    case in chief.

8                MR. ARSLANIAN:  Yes.

9                THE COURT:  Okay.

10               MR. ARSLANIAN:  Unless the Court wishes to

11   allow us to reopen to have those admitted, because

12   those were put in by the -- offered by the other

13   side.

14               THE COURT:  Mr. Arslanian, how long have

15   you been practicing law?

16               MR. ARSLANIAN:  Too long, more than 30

17   years, Your Honor.

18               THE COURT:  Okay.  Then I think you

19   probably know that you can't rely on someone else's

20   proposed exhibits in your case in chief without

21   listing them as your exhibits.  You've closed your

22   case.  If you want to file a motion to reopen you'll

23   have to do that.  If you're planning on using them

24   for impeachment, you'll make your motion at the

25   appropriate time, and I'll deal with that request at

1  the time that you make it.  All right?  And if you

2  want to use them for rebuttal, then you do that

3  properly, as well.  Okay?

4          Everybody gets the same fair shake here,

5  but I follow the Rules of Civil Procedure.

6          All right.  Mr. Jauregui, what are we

7  doing here?  I still don't see the interpreter.

8          MR. JAUREGUI:  Judge, we've sent her the

9  Zoom information.  She should be logging in any

10  minute now.  She had to basically get dressed, comb

11  her hair, and she's going to be on any second, Your

12  Honor.

13          I basically rushed and I got another

14  interpreter.  We've got her.  She should be here any

15  minute.  I apologize.  I don't know what happened

16  with the first interpreter.

17          THE COURT:  It happens, but for future

18  trials remember, just like in any trial, the

19  interpreter has to be sworn in as a witness.  So the

20  interpreter has to be on the -- well, they would be

21  in the courtroom, right, and they have to be in this

22  virtual courtroom.

23          Just like I had to explain to people who

24  have shown up at the court in shirts with no ties

25  and no jackets.  Unless that's the way you were

Page 179

```
1    going to dress in court, that's not the way you
2    dress when you go to Zoom court, which is why I'm
3    wearing a robe.
4            Okay.  So any other -- wait a minute.  Do
5    we have a -- no.  Right now I just see --
6            MR. JAUREGUI:  I think this may be it,
7    Judge.
8            MR. PARLADE:  We have a translator here
9    we'd offer to use if you want to use the bar
10   translator, who is sitting in the office right now.
11           THE COURT:  No.  I appreciate that, but
12   we'll wait.
13           Mr. Parlade, we have only until 2 o'clock.
14   What else besides Ms. Gallego's testimony are you
15   going to be seeking to do today?
16           MR. ARSLANIAN:  I don't think he heard
17   you.
18           THE COURT:  Mr. Parlade?
19           MR. PARLADE:  I apologize.  My screen just
20   froze all of a sudden.  I didn't hear anything that
21   happened.
22           THE COURT:  I asked whether -- we can't go
23   forward -- good news, bad news.  My CRD has to
24   connect back in, so while we're waiting for the
25   translator -- we'll wait.  I don't want to say
```

```
 1   anything, because there's no record right now.
 2   There's no record right now, because my CRD lost
 3   connection, so just wait a moment.
 4           MR. JAUREGUI:  Here she is, Judge.  Thank
 5   you.
 6           THE COURT:  Okay.  We can't do anything
 7   until the CRD reconnects, so we'll just wait.
 8           THE INTERPRETER:  Good morning.  Kinsell
 9   Lambert, Spanish interpreter.
10           THE COURT:  Okay.  Good morning,
11   Ms. Lambert.  Hold on.  Our courtroom deputy lost
12   connection, so we're on pause now until she can
13   rejoin.  Okay?  I'm going to turn off my video for a
14   second, because I need to take care of something.
15           All right.  My courtroom deputy is still
16   trying to reconnect, so I apologize for the
17   inconvenience.  If anybody would like to put their
18   cameras off while we wait for Ms. Sanabria to
19   reconnect us, fine.  I apologize for the delay.
20           Mr. Arslanian, I suggest you put yourself
21   on mute, unless you would like us all to hear your
22   conversations with Mr. Brooks.
23           MR. ARSLANIAN:  Sorry about that.
24           MR. BROOKS:  I mean, we're in our 50s.  We
25   don't know how to do this.
```

Page 181

```
 1            THE COURT:  All right.  I'll ask everybody
 2   to put their cameras on.  I'll ask all parties to
 3   put their cameras on, please.
 4            Mr. and Mrs. Cepero, you don't need to put
 5   your cameras on right now.  I'm talking about the
 6   folks who are supposed to be participating.
 7            All right.  We're missing Mr. Brooks and
 8   Mr. Arslanian.  Here's Mr. Arslanian.  All right.
 9            MR. ARSLANIAN:  Can you hear me?
10            THE COURT:  Yes, I can hear you,
11   Mr. Arslanian.
12            All right.  And again, Mr. and Mrs.
13   Cepero, you may leave the camera off if you wish.  I
14   just need to see Ms. Gallego, the translator and the
15   attorney.
16            All right.  So, Ms. Lambert, I'm going to
17   ask you to please raise your right hand.
18   Thereupon:
19                    KINSELL LAMBERT
20   an interpreter, having been first duly sworn,
21   translated from English to Spanish and from Spanish
22   to English to the best of her ability.
23            THE INTERPRETER:  I do, Your Honor.
24   Kinsell Lambert, Certification Number 15-00391.
25            THE COURT:  All right.  Thank you very
```

1    much.

2               All right, Ms. Gallego, please raise your

3    right hand.

4    Thereupon:

5                    MARGLLI GALLEGO

6    was called as a witness, and having been first duly

7    sworn, was examined and testified as follows:

8               THE COURT:  What I'm going to do,

9    Ms. Gallego -- you can put your hand down.

10              Just as you saw in the court when we had

11   the hearing last year -- unbelievable it's been a

12   year -- Ms. Gallego, even if you understand

13   something that I say, do not answer.  You've chosen

14   to use a translator, which is fine, and I understand

15   that, but you have to let the translator translate,

16   both to questions that are asked and your answers.

17   Okay?

18              Now, as I explained before -- I'm sorry.

19   Go ahead.

20              THE WITNESS:  Yes.

21              THE COURT:  All right.  So again,

22   Mr. Parlade, is going to be questioning you, and

23   Mr. Arslanian -- raise your hand, Mr. Arslanian --

24   will be cross-examining you.  While Mr. Parlade is

25   questioning you, if Mr. Arslanian has an objection,

```
 1    he's going to raise his hand.  If you see
 2    Mr. Arslanian raise his hand, please wait to answer
 3    until I have ruled.
 4              THE WITNESS:  That's fine, yes.
 5              THE COURT:  I'm hearing an echo.  Maybe,
 6    Ms. Gallego, you can put yourself on mute, because
 7    the translator will be translating for you.
 8              THE WITNESS:  The microphone muted, yes,
 9    okay.
10              THE COURT:  And, Ms. Lambert, I'm assuming
11    you can hear Ms. Gallego speak without her
12    microphone on?
13              THE INTERPRETER:  Actually, I can call her
14    and have her on the phone so that I can do that, if
15    that is okay with you, Your Honor.
16              THE COURT:  Whichever you prefer.
17    Otherwise, then we'll just leave Ms. Gallego on --
18    the echo is not coming from her anyway, so
19    Ms. Gallego, you can take yourself off mute.
20              THE INTERPRETER:  Actually, Your Honor,
21    it's been my experience that it moves a lot smoother
22    and it's a lot easier and I don't have to interrupt
23    so much if I have her on the phone, and that way I'm
24    still connected to Zoom and so is she, and that way
25    it's a little less disruptive, if that's okay with
```

1    you.

2              THE COURT:  Okay.  Make your phone call

3    while I ask Mr. Arslanian whether he's got two

4    devices going in his office.

5              Do you have two devices on in your office,

6    Mr. Arslanian?

7              MR. ARSLANIAN:  One in this room, and

8    there's another one in the other room where the

9    Ceperos are.

10             THE COURT:  Okay.  That's fine.  I'm just

11   trying to figure out what the echo is.  That's all.

12             MR. ARSLANIAN:  I'm by myself in an

13   office.  There's nobody around me.

14             THE COURT:  Okay.  I was just trying to

15   figure out -- oh, it went away.  Whoever fixed it,

16   thank you.  It was very distracting.

17             All right.  Ms. Lambert, do you have

18   Ms. Gallego on the phone now?

19             THE INTERPRETER:  I do, Your Honor.

20             THE COURT:  All right.  Again, when

21   Mr. Arslanian is questioning you, then if

22   Mr. Parlade raises his hand, please wait to answer

23   until I rule.

24             And then, Mr. Parlade and Mr. Arslanian,

25   again, be sensitive to the fact that we have a

Page 185

1    translator.  So please remember, both of you, to

2    allow the translator to translate, even if you

3    understand -- actually, because Ms. Gallego is on

4    mute, this way we can at least we can avoid that

5    part.  Okay.  All right.

6              So, Ms. Gallego, are you ready?  You have

7    to unmute --

8              THE WITNESS:  Yes.

9              THE COURT:  All right.  Mr. Arslanian, are

10   you ready?

11             MR. ARSLANIAN:  Yes, I am, Your Honor.

12             THE COURT:  And Mr. Parlade?

13             MR. PARLADE:  Yes, Your Honor.

14             THE COURT:  All right.  Then please

15   proceed.  Okay.  Go ahead.

16                    DIRECT EXAMINATION

17   BY MR. PARLADE:

18        Q    Would you please state your name for the

19   record?

20        A    Marglli Gallego.

21             THE COURT:  Ms. Gallego, you can leave

22   yourself on mute.  The translator is going to

23   translate for you.

24             Go ahead.

25             MR. PARLADE:  Thank you, Your Honor.

Page 186

1   BY MR. PARLADE:

2        Q    Ms. Gallego, what is your current address?

3        A    14921 Southwest 104th Street, Miami,

4   Florida 33196.

5        Q    And is that within the Hammocks Community?

6        A    Yes.

7        Q    Who is --

8        A    Could you tell him that I -- no, no, no.

9   It's all right.  Never mind.

10            THE COURT:  Go ahead, Mr. Parlade.

11  BY MR. PARLADE:

12       Q    Who is your current employer?

13       A    Ruby Express.

14       Q    Okay.  Are you also an officer of the

15  Hammocks Community Association?

16       A    Yes.

17       Q    And what is your position with the

18  Hammocks Community Association?

19       A    I'm president.

20       Q    And how long have you been president of

21  the Hammocks Community Association?

22       A    Two years.

23       Q    Prior to becoming president of the

24  Hammocks Community Association, were you an officer

25  or employee of the association in some other

Page 187

1    capacity?

2        A    I was treasurer.

3        Q    And when were you treasurer of the

4    Hammocks Community Association?

5        A    Since 2015.

6        Q    So from 2015 until approximately 2019, you

7    were the treasurer of the Hammocks Community

8    Association?

9        A    Well, yes.  '18, '19.

10       Q    Okay.  Now, have you ever heard of or do

11   you know Josue and Leticia Cepero?

12       A    Yes, I know them.

13       Q    And how do you know them?

14       A    Through the association, and because on

15   several occasions I shared meals at their home.

16       Q    Okay.  When did you get to first meet

17   either Josue Cepero or Leticia Cepero?

18            THE COURT:  Wait, Mr. Parlade.

19            THE INTERPRETER:  I apologize,

20   Mr. Parlade.  There was a delayed response.

21            THE WITNESS:  And because he also did jobs

22   for the association.

23   BY MR. PARLADE:

24       Q    Approximately when did you first meet

25   either Josue Cepero or Leticia Cepero?

A In 2015, but I don't remember the exact month.

Q Who did you meet in 2015? Was it Josue Cepero or Leticia Cepero?

A Both.

Q Now, after you met Josue and Leticia Cepero in 2015, is it correct to say you were already the treasurer of the association at that point?

A Yes.

Q Okay. And your meeting with the Ceperos, would that have been connected with association business or was it personal?

A I'm sorry. The first time -- can you repeat the question?

THE COURT: Mr. Parlade. Mr. Parlade.

MR. ARSLANIAN: He looks frozen.

THE COURT: Oy vey. Yes, this is the joy of -- are you back?

MR. PARLADE: I apologize, Your Honor. This is probably the most frustrating process anyone can go through. I apologize.

THE COURT: Okay. Repeat your question, please.

Page 189

1    BY MR. PARLADE:

2        Q    In 2015 when you met Josue and Leticia

3    Cepero, were you already treasurer of the

4    association at that point?

5        A    Yes.

6        Q    And did either Josue Cepero or Leticia

7    Cepero conduct any work for the association while

8    you were treasurer from 2015 to 2018, 2019?

9        A    Yes.

10       Q    Okay.  And what did they do for the

11   association?

12           THE COURT:  What is your objection,

13   Mr. Arslanian?

14           MR. ARSLANIAN:  Relevance.

15           THE COURT:  I'm sorry?

16           MR. ARSLANIAN:  Relevance.

17           THE COURT:  Oh, okay.  All right.  So,

18   Mr. Parlade, what is the relevance of that?

19           MR. PARLADE:  Your Honor, this is

20   establishing background info in reference to the

21   relationship with the debtors, to the association

22   and to my client, and as to the nature of the

23   relationship.

24           THE COURT:  Okay.  I'll overrule the

25   objection for now and allow it as background.

Page 190

1              Go ahead.  You may answer.

2              THE WITNESS:  Yes.  He did several jobs

3     for the association, repairs, electrical work.

4     BY MR. PARLADE:

5         Q    And did they get paid by the association?

6         A    Yes.  The association paid them.

7         Q    Okay.  Now, we're here for an incident

8     that occurred on May 15, 2019, in the actual parking

9     lot of the Hammocks Association.

10             Are you aware of this?

11        A    Of course, yes.  It took place in the

12    parking lot of my residence, where I live, Heron of

13    the Hammocks.

14        Q    Heron is H-E-R-O-N?

15        A    Yes, H-E-R-O-N.

16        Q    Okay.  We're going to go into that

17    incident in a second.

18             Prior to May 15, 2019, did you ever have a

19    run in, either with Josue or Leticia Cepero, where

20    you became aware that there was not a good

21    relationship between you two?

22        A    We had a very good relationship until

23    2016.

24        Q    What happened in 2016?

25        A    After Mr. Cepero -- well, it was after

1  Mr. Cepero was no longer given any more projects or

2  jobs for repairs, and he was upset.  He was upset,

3  because there was a fence that he wanted to repair,

4  and it was unnecessary.  The petition was denied by

5  the board, and after that they were -- they became

6  upset.

7      Q    So after this happened in 2016, the

8  relationship between the Ceperos and yourself grew

9  sour; is that correct?

10     A    That is correct.

11          THE COURT:  Did we lose him again?

12  Mr. Parlade?

13          MR. ARSLANIAN:  Your Honor, he's frozen.

14          THE COURT:  Oy vey.

15          MR. ARSLANIAN:  He's moving again.

16          THE COURT:  All right.  We've got you

17  back, Mr. Parlade.  So, Mr. Parlade, you're going to

18  have to invest in better Internet.

19          Go ahead.  Ask your next question.

20          MR. PARLADE:  I will.  Thank you, Your

21  Honor.

22          I didn't hear her answer.  Could her

23  answer be read back?

24          THE COURT:  You didn't hear the answer

25  about the fence?

Page 192

1          Wait, we lost you again, Mr. Parlade?  Can

2    you hear us?

3          MR. PARLADE:  I can hear you.

4          THE COURT:  Okay.  There's no such thing

5    as reading back, because we don't have a live court

6    reporter.  I can tell you, and I'll read what I

7    wrote in my notes, and then Ms. Gallego can let me

8    know if she thinks I have not accurately repeated

9    the answer.

10          There was a very good relationship until

11    2016, after Mr. Cepero was no longer given any more

12    projects.  He was an upset, because there was a

13    fence he wanted to repair and the board said it

14    wasn't necessary.

15          Is that accurate?

16          THE WITNESS:  Yes, that is correct.

17          THE COURT:  All right.  Ask your next

18    question, Mr. Parlade.

19    BY MR. PARLADE:

20     Q    Now, after this happened in 2016, did

21    either the association or yourself get into any

22    incidents with the Ceperos?

23          MR. PARLADE:  I'm just going to rephrase,

24    "incident."  The word should be "altercation," not

25    "incident."

```
1              THE WITNESS:  Yes.
2    BY MR. PARLADE:
3         Q    When was that?
4         A    Well, yes.  Physical altercation, the
5    incident was in 2019, when they followed me as I was
6    picking up my son from school, followed me to the
7    house, and then the incident occurred.
8         Q    We're going to get to that in a minute.
9              Prior to May 15, 2019, was there any other
10   incident where you were followed or you felt in
11   danger, by either Josue Cepero or Leticia Cepero?
12        A    Well, yes.  Yes, on several occasions
13   before 2019, occasions where at the board meeting I
14   was attacked by them, where they gathered outside of
15   the clubhouse, also.
16        Q    What do you mean they gathered outside the
17   clubhouse?
18        A    They were outside of the Hammocks
19   Association's office, holding up signs and claiming
20   that there was wrongdoing.
21        Q    Okay.
22        A    And they were also protesting.
23        Q    But they never followed you before,
24   correct?
25        A    Not that I was aware of.
```

1      Q    So tell us, on May 15, 2019, you just

2    testified that you were followed to your son's

3    school.

4              What exactly happened on that day when you

5    were followed by the Ceperos?

6      A    Okay.  So I headed out to pick up my son.

7    The pickup area for my son is only one way.  It's a

8    roundabout, a cul-de-sac, so you wait in line.

9              So when I arrived at the school I see my

10   son.  He is on school grounds, but within the --

11   he's behind the fence.  He can't see me, so I get

12   out of the car to call him over.  I open the door

13   for him to get in, and when I opened the door I see

14   that there's a car that gets out of the line.  I

15   found that to be quite strange, because most cars

16   just stay in line.

17             So once again, I thought that was pretty

18   strange, but I stood waiting to see what the car was

19   going to do, if the car was going to drive by or if

20   they were going to just stay there or keep going,

21   because I had to open the door to get into my car.

22             Quite honestly, I couldn't really see,

23   because of the sun, but the car just remained there.

24   So I drive off, and when I get to the stop sign I

25   cross over so that I can get on to 120th.  Quite

Page 195

1    honestly, I wasn't really aware that I was being

2    followed at that moment.  I did notice that there

3    was a car that was following pretty close behind me.

4              So when I get to the stoplight, because

5    the light was red, I noticed that the car is still

6    behind me, but I thought it was pretty strange that

7    there was some device by the mirror, and I noticed

8    that it was a phone.  So I paid closer attention,

9    and when I did, I realized that I recognized the

10   people.

11             So when I reach 104th I turned, but I

12   made -- after that I made a lot of turns to see if I

13   was actually being followed or if it was just a

14   coincidence.  When I realized that I was being

15   followed I got nervous.  I called 911.  When I was

16   on the phone with 911 I was pretty worked up.  I was

17   pretty nervous.  It was because my son was in the

18   car with me, and he was actually pretty nervous,

19   also.

20             So I remained on the phone with 911.  I

21   told them that I was being followed.  The operator

22   asked if I knew who it was that was following me.  I

23   said I wasn't exactly sure, but I had an idea of who

24   it might be.  My son was also asking questions,

25   asking me what was going on, what was happening.  So

Page 196

1    at the same time I was talking to the operator and

2    to my son.   I told my son to get down and under the

3    seat.

4              I continued driving.   I tried speeding up

5    to see if I could make it home faster.   So the

6    operator told me not to hang up, that they

7    dispatched an officer, to just remain on the phone.

8    I kept driving, I kept driving.   That span between

9    the light and getting home, there's many things that

10   I didn't really notice, you know, because so much

11   was going on.   And that's what -- I continued

12   driving.   I kept driving around and around, just to

13   see.

14             I finally made it home.   I came around to

15   my entrance, because Heron has two entrances.   I

16   came into my parking lot, and that's when they

17   came -- they were in front of me, or they came

18   across.   That's when I realized that there was

19   actually a second car behind me.

20             So at that moment, that's when the

21   operator tells me to get out of the car, because I

22   wasn't able to see the tag number, and she was

23   asking me what type of car it was, what model, the

24   tag number.   So I did as she instructed.   That's

25   when I got out of the car to check the tag number.

1      I was really, really nervous, so I guess I

2  must have been speaking loudly.  That's when my

3  neighbor came out, and Judith also came out from the

4  other building.  That's when Judith walked over.

5  She takes my child with her into the office.  And at

6  that very moment, that's when the two security

7  guards arrived.  They actually arrived before the

8  police arrived.

9      Q    Did you --

10          THE COURT:  I'm sorry.  Wait just a

11  minute, Mr. Parlade.  There may be some ambient

12  noise.  Anybody who is not one of the lawyers or the

13  translator, please make sure you're on mute.

14          Go ahead, Mr. Parlade.  Go ahead.

15  BY MR. PARLADE:

16      Q    Did you ever at a point in time prior to

17  stopping back at your house on May 15, 2019,

18  recognize the people who were following you?

19      A    The driver, yes.

20      Q    And at what point did you recognize the

21  driver on May 15th?

22      A    On 120th.

23      Q    By 120th, you're referring to 120th

24  Street?

25      A    Yes, 120th Street.

Page 198

1        Q    And who was the driver that you
2   recognized?
3        A    Josue Cepero.
4        Q    Now, other than the driver, did you
5   recognize or see any other occupants of the vehicle
6   on May 15, 2019, before the vehicles stopped or came
7   to rest close to your residence?
8        A    No, because as I mentioned, in the
9   passenger's side there was a large -- a large white
10  device recording, so I couldn't make out who the
11  passenger was.
12       Q    Okay.  Now, once you head back to your
13  house after coming back from your son's school, and
14  the 911 operator tells you to get out of the car and
15  take video of the car, did you at that time
16  recognize the occupants of that car?
17       A    Yes.
18       Q    And who were the occupants of that car?
19       A    The driver was Josue Cepero and the
20  passenger was Leticia Cepero.
21       Q    Now, we've heard from various witnesses
22  that when the incident occurred on May 15, 2019,
23  this was in the parking location immediately in
24  front of your unit within the Hammocks Community; is
25  that correct?

Page 199

```
 1              MR. ARSLANIAN:  Objection.
 2              THE COURT:  What's the objection,
 3  Mr. Arslanian?
 4              MR. ARSLANIAN:  The lawyer is testifying.
 5              THE COURT:  Okay.  So the objection is
 6  that the question is leading?
 7              MR. ARSLANIAN:  Leading and improper,
 8  based on a narrative of prior testimony.
 9              THE COURT:  Okay.  Is the objection that
10  the question is leading?
11              MR. ARSLANIAN:  Yes.
12              THE COURT:  All right.  The objection is
13  sustained.
14              Mr. Parlade, reask the question and let
15  the witness testify.
16              MR. PARLADE:  Yes, Your Honor.
17  BY MR. PARLADE:
18       Q    On May 15, 2019, after the car driven by
19  the Ceperos stopped, and you got out of your car to
20  record the tag and take video of their car, what
21  location was it where that happened?
22       A    In front of my residence.
23       Q    And by in front of your residence, in
24  terms of distance, how far was that car from your
25  front door?
```

Page 200

1         A     They were blocking my parking space, and a
2    few feet from the entrance of my home.
3         Q     Now, by "parking space," are you referring
4    to your assigned parking space in that community?
5         A     Yes, exactly.
6         Q     Now, up until that point, from the time
7    you left your son's school to the time you came to
8    the parking space in front of your residence, was
9    there ever a point where you either drove by or were
10   in close proximity to the residence of the Ceperos?
11        A     No.  It's not located anywhere near any of
12   those streets.
13        Q     Okay.  But you do know where the Ceperos
14   live, correct?
15        A     Yes.
16        Q     In the past had you been to their
17   residence?
18        A     Yes, on several occasions.
19        Q     Okay.  Now, was there any way for the
20   Ceperos to know where you lived, on May 15, 2019?
21        A     Yes, of course, yes, because Josue came to
22   my house on several occasions to pick checks up.
23        Q     When did Josue Cepero come to your house
24   to pick up checks?
25        A     It was on one occasion that he was doing a

Page 201

1    job.  It was a job on 104th, and he asked if he

2    could come by.  This was -- I don't remember exactly

3    if it was 2015 or 2016, but it was quite a while

4    ago.

5            Q    So there was only one time?

6            A    No.  It was several times.

7            Q    And in all of those times were they always

8    to pick up checks?

9            A    Yes.

10               Actually, there was another time where

11   they came by to see how my son was doing, the same

12   son that was involved in that incident on the 15th

13   of May.  They came by to see how he was doing,

14   because my son had developed a tumor on his knee,

15   and there was a long wait list to have him treated

16   by a doctor.  They have a nephew who works in the

17   orthopedic department at Miami Children's, and they

18   helped to get my son treated faster.

19           Q    So both Josue Cepero and Leticia Cepero

20   knew exactly where you lived on May 15, 2019,

21   correct?

22           A    Yes.

23           Q    Okay.  On May 15, 2019, you testified that

24   you were followed from your son's school as you were

25   picking up your son, and you had mentioned you tried

1    driving faster to try and get to your house quicker,

2    and once you get to your house you made -- you were

3    still on the phone call with the operator, and she

4    told you to take video of the tag and of the

5    vehicles, correct?

6         A    Yes.  And the operator also instructed me

7    to give her the make, model and tag number of the

8    car, and for me to recognize the passengers or the

9    people that were in the car.

10         Q    Once you got out of the car in front of

11    your residence where you live, and you're still on

12    the phone with the operator did you ever remark to

13    the Ceperos and say, "Why are you following me?

14    What's going on?"  Did you ever try to make contact

15    with them?

16         A    I never made contact with them.  I never

17    communicated with them, because the operator

18    instructed me not to, and instructed me just to

19    gather that information that she was asking me for.

20              But aside from that, they never put their

21    windows down and they never tried to say anything to

22    me.  And when I tried recording them, they were

23    putting something up against the window so that I

24    couldn't see their face.

25         Q    Okay.  I'm going to show you a picture

Page 203

1    that's already been admitted into evidence, to see

2    if you can describe what we're seeing.

3              THE COURT:  Can you please identify for

4    the record what exhibit it is, Mr. Parlade, the

5    exhibit number?

6              MR. PARLADE:  Hello?

7              THE COURT:  Mr. Parlade, you need to

8    identify the exhibit number.

9              MR. PARLADE:  I'm sorry.  I'm referring to

10   Respondent's Exhibit F.  It's identified as picture

11   of debtor's vehicle holding up letters, taken on

12   May 15, 2019.

13             THE COURT:  All right.  You're not sharing

14   the exhibit, Mr. Parlade, you're just sharing

15   your -- I guess your folder.

16             MR. PARLADE:  It's opening.  Just like my

17   Internet connection, my computer, as well, is slow.

18   Okay.  It opened.

19   BY MR. PARLADE:

20       Q    Ms. Gallego, can you see the --

21             THE COURT:  It did not open, Mr. Parlade.

22   BY MR. PARLADE:

23       Q    -- pictures on the screen --

24             THE COURT:  Mr. Parlade, why don't you

25   close out the screen and then try sharing what you

Page 204

1    opened.

2              MR. PARLADE:  Okay.  Let's try again.

3              Do you see it now?

4              THE WITNESS:  All right, yes.  I see it.

5    BY MR. PARLADE:

6         Q    Perfect.  Now can you identify -- there's

7    two photos in this exhibit.  One is a photo of them

8    holding up a letter, and the second, it looks like a

9    closeup of the letter.

10             Can you identify who took these pictures?

11        A    The pictures were taken by me, and I

12   thought it was very strange that they were holding

13   this up to the window.

14        Q    Now, what is that that they were holding

15   up to the window?

16             You can see a little bit more clearly on

17   the second photo that's now on the screen.  Some of

18   the words are visible from the letter.

19             What is that letter?

20        A    That is the letter that was sent out to --

21   well, that letter was sent out in April to all of

22   the owners at Heron.  That is a letter that states

23   that Marglli Gallego and the board members are

24   committing fraud.

25        Q    I'm going to show you what's been marked

Page 205

1    as Respondent's Exhibit G, which is identified as

2    letter from Heron board.  Hold on one second.  Okay.

3    Here we go.

4              This is listed as Exhibit G.  Is this the

5    letter that you're referring to?

6         A    Yes.

7              THE COURT:  You're not showing the debtor

8    the entire -- the witness the entire exhibit,

9    Mr. Parlade.  Unless you only wish this portion of

10   the letter to be considered by the Court, I would

11   suggest that you show the witness the entire

12   exhibit.

13             MR. PARLADE:  Yes, Your Honor.  I'm going

14   to scroll through it right now.

15   BY MR. PARLADE:

16        Q    This is the first page, and it starts

17   with, "This is an open criminal investigation

18   against Marglli Gallego," and it continues.

19             This is the second page.  It continues,

20   starting with, "Marglli Gallego has paid

21   thousands -- attorneys thousands of dollars to sue."

22   And at the end of the second page it says, "Most

23   importantly, the Heron is financially in the best

24   shape than it has been in many years.  Your Heron

25   board."

Page 206

1              Here we go to the third page, which

2       appears as Attachment 1.  This is a public record

3       request made by the Florida State Attorney's Office.

4              Here we go to what would be the fourth

5       page, and it's Attachment 2.  This is a -- it looks

6       like responses given in a separate lawsuit.

7              As we go to Page 5, it appears to be

8       translated into Spanish.  It appears that the letter

9       was sent in English, and was also attached with

10      translated pages.  Here is Page 5 and 6.  And as you

11      see, Page 6, it appears to be the same signature

12      line as the English page.  The attachments were not

13      translated and attached.  So this is the entire

14      exhibit.

15             Have you ever seen this letter before?

16      A    Yes, I've seen it.  I received it in the

17      mail, along with all of the other owners.  Not only

18      did I receive it in the mail, but then the other

19      owners sent it to me via e-mail, and the first page

20      of this letter is what Leticia and Josue Cepero put

21      up against the glass.

22      Q    Now, if we look at what is the second

23      photo of Respondent's Exhibit F, we can make out a

24      few of these paragraphs in here, correct?

25             Let me go back to Exhibit F.  Hold on a

1    second.

2            THE COURT:  I think you have to wait to

3    share until after you open the exhibit, Mr. Parlade.

4            MR. PARLADE:  Okay.  All right.  I thought

5    I had stopped share.

6    BY MR. PARLADE:

7        Q    So here we are in Exhibit F --

8            THE COURT:  No, we are not.  That's okay.

9    I don't even know how to do a share, so you're two

10   steps ahead of me.

11           MR. PARLADE:  I apologize, Your Honor.

12   Thank you so much.

13           MR. ARSLANIAN:  We need a teenager here.

14   BY MR. PARLADE:

15       Q    Here we go.  Here's the second photo of

16   Exhibit F.  You can make out, and it looks like --

17   whose hand is that holding up that letter?

18       A    That is Leticia Cepero's hand.

19       Q    Okay.  And we can make out some of the

20   paragraphs.  It says, Marglli --" it looks like,

21   "Marglli Gallego hired a criminal attorney.  The

22   Hammocks master also hired.  Why is Marglli Gallego

23   and the Hammocks --" it looks like we can make out a

24   bunch of the paragraphs which appear on Exhibit G,

25   what we just remarked about as the letter received

Page 208

1    by you, correct?

2        A    Yes, yes.

3        Q    When did --

4             THE COURT:  Mr. Parlade, we have a limited

5    amount of time, so that, what you just did, that's

6    something for me to determine if, in fact, this

7    letter is admitted into evidence, which you have not

8    yet sought.

9             I just want to make -- I just want you to

10   concentrate.  I'm going to say this to both you and

11   Mr. Arslanian.  Don't use your witnesses for

12   argument, okay?

13            MR. PARLADE:  Okay.  Thank you.

14   BY MR. PARLADE:

15       Q    And when was the letter from Heron that is

16   Respondent's Exhibit G, when was it received by you?

17       A    It was received before the Heron

18   elections.  So the elections were to take place on

19   the 10th of May, and the letter was received in

20   April.

21       Q    Okay.  So other than Ms. Cepero holding up

22   this letter on May 15, 2019, there was no other

23   communication between you or any of the Ceperos; is

24   that correct?

25       A    I have never contacted them.  They are the

Page 209

1    ones that showed up at my son's school.  They are

2    the ones that at the parking lot or in the parking

3    lot held up this letter.  They're the ones that

4    contacted me.  I never contacted them.

5                  MR. PARLADE:  Your Honor, Hammocks

6    Community Association, Marglli Gallego, respectfully

7    request to introduce Respondent's Exhibit G as an

8    exhibit.

9                  THE COURT:  I think we lost Mr. Arslanian.

10   We're going to have to wait.  I'll ask you to stop

11   screen sharing if you don't mind.  It's taking away

12   my ability to watch the witness.  We have to wait

13   for Mr. Arslanian to get back on.

14                  MR. ARSLANIAN:  I'm back on.

15                  THE COURT:  Maybe between today and

16   tomorrow everyone will get better Internet.

17   Although I told you I had a problem with my

18   Internet, and my Internet got better after that.

19                  I'm hoping that's Mr. Arslanian.  Yes.  He

20   found some young person, at least somebody who looks

21   young with their mask on.

22                  Mr. Arslanian, we did notice you were

23   gone, but we're not quite sure if we noticed right

24   away.  So where did we lose you?

25                  We need you to take off mute.  So have

Page 210

 1    that nice person who's helping you unmute you.
 2    There we go.
 3            So where did we lose you, Mr. Arslanian?
 4            MR. ARSLANIAN:  We were talking about
 5    Exhibit G, a paragraph or something within Exhibit
 6    G, and Exhibit G itself.
 7            THE COURT:  Okay.  All right.  So you
 8    didn't miss anything other than me scolding
 9    Mr. Parlade about using -- oh, no.  Ms. Parlade
10    asked Ms. Cepero -- I'm sorry -- Ms. Gallego if she
11    had had any communication with the Ceperos, prior to
12    that day.
13            Is that correct, Mr. Parlade?  Am I
14    remembering correctly?
15            MR. PARLADE:  No, Your Honor.  I asked her
16    if she had any -- other than them holding up the
17    letter, was there any communication between the two,
18    between the Ceperos and Ms. Gallego.
19            THE COURT:  Okay.  Then Ms. Gallego said
20    no.
21            MR. PARLADE:  Correct.
22            THE COURT:  So now, Mr. Arslanian, I think
23    you're up to speed, other than, Mr. Parlade is
24    seeking admission of Exhibit G.
25            MR. PARLADE:  Correct.

1           THE COURT:  So, Mr. Arslanian, your

2   response to the request to admit Exhibit G.

3           MR. ARSLANIAN:  I don't believe it's

4   relevant, Your Honor.

5           THE COURT:  Okay.  Because?

6           MR. ARSLANIAN:  Because we filed a motion

7   for contempt.  I don't know how that letter in any

8   way, shape or form excuses anything that we've done.

9   It may well be that -- I don't know.  It has nothing

10  to do with the issues presented here today.

11          THE COURT:  Okay.  So, Mr. Parlade, why is

12  this letter relevant?

13          MR. PARLADE:  Your Honor, the letter was

14  the only communication between the debtors and my

15  client on May 15, 2019.  As she remarked, there was

16  no communication between them.  The debtors refused

17  to put down the window.  The only thing that was

18  shown to them was a letter.

19          The letter is being shown as showing the

20  communication.  It's not being shown for the truth

21  of the matter asserted.

22          THE COURT:  Well, the objection was not

23  hearsay.  I think that Mr. Arslanian understood

24  that.  The objection was relevancy.

25          So I'm trying to understand, what is

Page 212

1    relevant about the letter?

2              MR. PARLADE:  Well, it's relevant, because

3    it was the only communication the debtors tried to

4    relay to my client.  So it's the only contact, other

5    than being in front of my client's car, being

6    followed by the debtors, the only thing the debtors

7    showed to her was that letter.

8              It signifies something to them, and

9    possibly -- and showing it to them, but it relates

10   to my client's state of mind as to what she

11   apprehended from reading that letter and seeing that

12   relayed to her.

13             THE COURT:  Okay.  Final response,

14   Mr. Arslanian.

15             MR. ARSLANIAN:  I didn't hear anything

16   that established any relevance.  Her state of mind

17   because this is the entire document?  It's not

18   relevant.

19             THE COURT:  Briefly, Mr. Parlade.

20             MR. PARLADE:  It is relevant, because my

21   client has now been followed from her son's school

22   to her house.  She has no communication with the

23   debtors.  The only thing the debtors hold up is a

24   letter.

25             It is, to say the least, unusual.  It is

Page 213

1    not what a reasonable person would have done at that

2    time.  And because of the fact that it's so unusual,

3    because (unintelligible) communication are even very

4    relevant.  Their actions in trying to communicate

5    with my client, and their lack thereof, are relevant

6    to this Court's fact finding mission.

7              THE COURT:  Okay.  Here's what I'm going

8    to do.  I'm going to admit it.  I don't -- it seems

9    that the relevancy is tenuous at best, but I always

10   say to people that the benefit of a bench trial is

11   that I can determine the weight and relevancy.

12             I don't necessarily disagree with

13   Mr. Arslanian, but because I'm going to give you the

14   opportunity to tie everything up, I'm going to admit

15   it, but if I give any weight to it at all, it will

16   be very clear in my ruling.  And I will -- so that,

17   Mr. Arslanian, your objection will be preserved, if

18   that turned out to have any weight.  Okay?

19             MR. PARLADE:  Yes, Your Honor.

20             THE COURT:  Okay.  Go ahead.

21   BY MR. PARLADE:

22        Q    Ms. Gallego, at any time after Ms. Cepero

23   brought up the letter that's been introduced, at any

24   time after that, did they ever try and get out of

25   the car to speak to you, or did you ever try to

Page 214

1    speak to them?

2        A    I didn't communicate with them and they

3    didn't communicate with me, because at that very

4    moment, that's when the police arrived.

5        Q    Okay.  Now, we're also here for another

6    incident that's already been admitted as an exhibit,

7    which was a lawsuit, I believe, filed by you on

8    November 30, 2020; is that correct?

9            THE INTERPRETER:  I'm sorry, Mr. Parlade.

10   Could you please repeat the year for the

11   interpreter?

12           MR. PARLADE:  2020.

13           THE INTERPRETER:  Thank you.

14           THE WITNESS:  A lawsuit that I filed in

15   November of 2020?  I don't understand the question.

16           THE COURT:  Mr. Parlade, did you freeze

17   again?

18           MR. ARSLANIAN:  Yes, he did.

19           THE COURT:  Mr. Parlade?  Still frozen.

20   Maybe we can see if the cats do any better.

21           Mr. Parlade?  Still frozen.  Well, wait.

22   I see a head moving.  He's alive.

23           Mr. Parlade, can you speak?

24           MR. ARSLANIAN:  He's not moving.

25           THE COURT:  He was moving.  I definitely

Page 215

1    saw him moving.  There he goes.  See, he's moving.

2              MR. ARSLANIAN:  He's the gray phone

3    symbol, I think.

4              THE COURT:  No, no.  I'm looking right at

5    Mr. Parlade.

6              Mr. Parlade, can you speak?  No, no.  Now

7    unmute yourself.  Mr. Parlade, unmute.  Okay, there

8    we go.

9              Now, Mr. Parlade, can you hear me?

10             MR. PARLADE:  I can hear you.

11             THE COURT:  And we can hear you.

12             So Ms. Gallego asked you, she said she did

13   not understand your question regarding the

14   November 30, 2020 lawsuit.  So see if you can help

15   your client.

16             MR. PARLADE:  Okay.  On November 30, 2020,

17   a lawsuit was filed against you by Leticia Cepero --

18             THE COURT:  Mr. Parlade, I'm sorry to

19   interrupt you, but you said a lawsuit was filed

20   against Ms. Gallego.  That's not what you meant to

21   say, is it?

22   BY MR. PARLADE:

23        Q    Oh, okay.  No.  It was a lawsuit filed by

24   you, Marglli Gallego, against Leticia Cepero, in

25   November 2020.

1           Are you aware of that?

2      A    There were several lawsuits that were

3  going to be filed for defamation against several

4  people.

5      Q    Now, was one of the people Leticia Cepero?

6      A    Yes, but the attorney withdrew that

7  lawsuit.

8      Q    Okay.  And do you know, was the

9  attorney -- I guess the attorney was Napoleon Hilton

10  (phonetic) in that case; is that correct?

11      A    Yes.

12      Q    And I believe the lawsuit was filed

13  November 30, 2020; is that correct?

14      A    I don't remember the exact date, but I do

15  know that it was near the end of 2020.

16      Q    Okay.  Now, it was immediately withdrawn,

17  correct?

18      A    Yes.

19           MR. PARLADE:  Okay.  Nothing further, Your

20  Honor.

21           THE COURT:  All right.  It's now 12:23, so

22  I'm going to suggest that notwithstanding our

23  technical interruptions, that we take our next

24  ten-minute break and come back at, I'll call it

25  12:35.  So, Ms. Gallego, stretch your legs.

1   Everybody stretch your legs.

2           Ms. Gallego, what you cannot do is discuss

3   your testimony with anybody.  Do you understand?

4   Okay.  All right.

5           So I'm going to turn off my camera and

6   turn off my microphone and we will -- I'm sorry.

7   Ms. Lambert, did you wish -- was there something to

8   be said?

9           THE WITNESS:  Yes, understood.  I'm going

10  to go to the bathroom.

11          THE COURT:  Okay.  Well, we'll strike that

12  part from the record.

13          In any event, whatever you do during this

14  ten minutes, as long as everybody comes back fully

15  clothed, it's all good.  I'll see you all at 12:35.

16          (Thereupon, a recess was taken, after

17  which the following proceedings were had:)

18          THE COURT:  Okay.  Let's make sure we have

19  everybody back.  There's Mr. Arslanian, Mr. Parlade.

20  We have the witness.  Okay.  I think we're good.

21          So, Ms. Gallego, it's now time for

22  Mr. Arslanian to cross-examine you.  Same thing.

23  Try to remember if Mr. Parlade waves his hand -- and

24  if I don't see you, Mr. Parlade, you can do what

25  Mr. Arslanian did and just say, "Your Honor."

1              Because I've got Ms. Gallego on the big

2     screen, and so it's hard for me to -- I can see you

3     all, but I'm focusing on Ms. Gallego's face.

4              MR. PARLADE:  Okay.

5              THE COURT:  So, Mr. Arslanian, are you

6     ready?

7              MR. ARSLANIAN:  Yes, I am, Your Honor.

8              THE COURT:  Ms. Gallego, are you ready?

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  And Mr. Parlade?  Uh-oh.  He's

11    frozen again.  All right.  We'll wait.  Wait.  He

12    moved.

13             Mr. Parlade, are you back with us?

14             MR. PARLADE:  I'm back.  (unintelligible).

15             THE COURT:  All right.  Mr. Arslanian,

16    please proceed with your cross-examination.

17             MR. ARSLANIAN:  Thank you, Your Honor.

18                     CROSS-EXAMINATION

19    BY MR. ARSLANIAN:

20        Q    Ms. Gallego, the address that you gave to

21    the Court, how long have you lived at that address?

22        A    I lived there for -- well, several years.

23        Q    How long is several?

24        A    Off the top of my head, I don't remember.

25        Q    Were you living there in 2005?

1    A    No.

2    Q    2010?

3    A    I don't remember.

4    Q    2015?

5    A    Yes.

6    Q    When did you first begin to live at that

7    address?

8    A    In '99.

9    Q    In 1999?

10   A    Yes.  No, no.  Yes, yes.  1999.

11   Q    But you didn't live there in 2000, 2005 or

12   2010?

13   A    I don't remember.

14   Q    Where else were you living between 2000

15   and 2015?

16   A    With my in-laws, when I had my children.

17   Q    Where do they live?

18   A    In Country Walk.

19   Q    Did you own the house that you testified

20   about at the beginning of your testimony, since

21   1999?

22   A    No.  That house belongs to my in-laws.

23   Q    So how do you know you were there in 2015?

24   A    Because I was living there in 2015.

25   Q    Okay.  Do you have a driver's license?

Page 220

1        A     Yes, sir.

2        Q     What is the address listed on your

3    driver's license?

4        A     The address 14921 Southwest 104th Street,

5    Apartment 106.  And I have the driver's license

6    right here with me.

7        Q     When was it issued?

8        A     Well, I don't have the exact date.  I

9    would have to look at the driver's license, which is

10   in my purse.

11       Q     You can go in your purse and look at it,

12   because you just said you had it with you.

13            MR. PARLADE:  Objection, Your Honor.

14            THE COURT:  What is your objection,

15   Mr. Parlade?

16            MR. PARLADE:  He's providing instructions

17   to the witness, not asking a question.  And what is

18   the relevance of any of this?

19            THE COURT:  Okay.  Let's start with the

20   relevance.

21            So, Mr. Arslanian, what is the relevance

22   of the question?

23            MR. ARSLANIAN:  My understanding is that

24   there was testimony that my clients know where this

25   woman lived, because of some checks that were picked

Page 221

1    up in 2015 at her house.  I'm trying to figure out
2    if she really lived at this place that she's talking
3    about in 2015.  She's a little bit evasive.
4              THE COURT:  Okay.
5              MR. PARLADE:  Objection to the
6    characterization, "evasive."
7              THE COURT:  Okay.  I understand.  All
8    right.
9              So, Mr. Arslanian, the debtor -- the
10   witness has said she doesn't remember.  Are you
11   asking her if there's something that would help her
12   refresh her recollection?
13             MR. ARSLANIAN:  Yes, I am.
14             THE COURT:  Okay.  And my question
15   regarding the relevancy, is the relevancy where she
16   lived, or what was the address where the checks were
17   picked up?
18             MR. ARSLANIAN:  Yes.  The relevance is, is
19   it the same place as where the incident happened, as
20   where the checks were picked up in 2015, 2016.
21             THE COURT:  Do you perhaps want to ask
22   that question instead?  I'm just asking.
23             MR. ARSLANIAN:  Okay.
24             THE COURT:  I'm just asking, or do you
25   want to ask her about refreshing her recollection?

Page 222

1           I just need to understand what it is -- if
2    you're concerned regarding the relevancy --
3    Mr. Parlade is concerned about the relevancy, I
4    agree that if you have some concern regarding the
5    address consistency, then that's relevant.  But I'm
6    asking you -- I agree with Mr. Parlade.  You can't
7    tell her to go look in her purse for her driver's
8    license.
9           So I'm trying to help you.  I'll ask you
10   what you want.  Because I'm going to sustain the
11   objection as to telling the witness to go into her
12   purse.  Okay?
13           MR. ARSLANIAN:  I didn't -- I'm sorry.  I
14   didn't volunteer that, "I have my driver's license
15   right here with me."  That's what prompted me to ask
16   my next question.  I figured that she was reading
17   the address off her license as she was testifying.
18   And so I just want to know when it was issued,
19   because I --
20           THE COURT:  Okay.  So would you like to
21   ask the witness if there's something that would
22   refresh her recollection?
23           Ms. Gallego, what would help you refresh
24   your recollection about the date your driver's
25   license was issued?

Page 223

```
 1              Ms. Lambert, did you ask the witness?
 2              THE INTERPRETER:  I did, Your Honor.  I'm
 3    waiting for a response.
 4              THE WITNESS:  I'm sorry.  May I look at
 5    it?  I do have it close by, and if you allow me I
 6    can take a look at it.
 7              THE COURT:  Any objection, Mr. Parlade?
 8              Uh-oh.  He froze.
 9              MR. PARLADE:  I'm here, Your Honor.
10              THE COURT:  Okay.  We thought you were
11    frozen.
12              Ms. Gallego, do you have your driver's
13    license with you?
14              THE WITNESS:  I do, Your Honor.  2013.
15              THE COURT:  Okay.  So that's your answer,
16    Mr. Arslanian.  What's your next question?
17    BY MR. ARSLANIAN:
18         Q    Just to be clear for the record, the
19    address that's listed on the driver's license that
20    was issued in 2013, is the address where you say
21    this incident happened in May of 2019?
22              THE COURT:  Thank you, Ms. Gallego, but
23    it's too far to see.  Just tell us.  Is the address
24    on your driver's license the 14921 Southwest 104th
25    Street?
```

Page 224

1              THE WITNESS:  Yes, it is.

2              THE COURT:  Okay.  All right,

3    Mr. Arslanian.  What's your next question?

4    BY MR. ARSLANIAN:

5         Q    You mentioned something about your son

6    having an issue with his knee.

7              When did that happen?

8         A    2016.  I don't remember the exact date,

9    but there are medical records at Miami Children's,

10   and it was an emergency.

11        Q    Is that before or after there were no more

12   jobs for Josue at the condominium?

13        A    It was before or after?

14        Q    I believe -- correct me if I'm wrong, but

15   after there were no more jobs, did you and Josue no

16   longer get along?

17        A    I don't have any issue with them, none at

18   all.

19        Q    Now, you mentioned in describing the

20   incident -- how far is the school from your home?

21        A    I don't know if I'm correct.  As far as

22   distance, I don't know, but I think it's maybe five,

23   eight minutes away.

24        Q    Okay.

25        A    With no traffic.

Page 225

1      Q     Was there traffic that day?

2      A     I don't remember.

3      Q     Now, you testified that you were pretty

4   worked up and nervous; is that correct?

5      A     I was nervous, yes.

6      Q     You were speaking loudly?

7      A     I don't remember, because I was so

8   nervous.

9      Q     Do you remember testifying just a few

10  minutes ago that you were speaking loudly to the 911

11  operator?

12     A     What I said was that I was nervous.  At

13  that moment -- I remember everything that was going

14  on at that moment, with my son screaming and

15  everything going on, so I was very nervous.

16     Q     Do you remember testifying just a few

17  minutes ago that you were speaking loudly?

18     A     What I said was that I was nervous, and I

19  didn't know if I might have been speaking loudly

20  because I was nervous.

21     Q     You called the 911 operator while you were

22  driving home?

23     A     Yes.

24     Q     You didn't call the 911 operator when you

25  were already in the parking lot?

Page 226

1       A     No.  I was on the phone with them.

2       Q     Did you tell them that you had been

3   followed by someone for an hour?

4       A     I don't know.  I don't remember, because I

5   was so nervous.

6       Q     Was anybody following you for an hour?

7       A     I don't remember.  I was nervous, and I

8   made many, many, many turns before reaching my

9   house.

10      Q     If I was to play the 911 tape, would that

11  refresh your recollection as to whether or not you

12  told the 911 operator that you had been followed for

13  an hour?

14      A     I don't understand the question.

15      Q     Do you want me to change the question

16  again?

17      A     Could you be a bit more specific so that I

18  can understand it?

19      Q     If I was to play the 911 tape, would that

20  refresh your memory as to whether or not you told

21  the 911 operator that someone had been following you

22  for one hour?

23      A     The truth is that I don't remember.  The

24  truth is I don't remember.  I was very nervous.  My

25  son was screaming, and I drove around for a long

1   time.

2           MR. ARSLANIAN:  I move to strike as

3   nonresponsive, Your Honor.  It's a very limited

4   questioning that I'm asking.

5           THE COURT:  I'll strike it after she

6   doesn't remember, and that she was very nervous.

7   Okay?

8   BY MR. ARSLANIAN:

9       Q    Do you recall telling the police that

10  arrived at the scene that you had been followed by

11  someone for 30 minutes, or approximately 30 minutes?

12      A    I remember -- I remember when the police

13  arrived there at the parking lot, and the first

14  thing that they said was, "Did somebody call the

15  police?"

16      Q    Let me --

17          THE INTERPRETER:  I'm sorry.

18          THE COURT:  Mr. Arslanian, please let the

19  witness finish answering the question, and then you

20  may ask -- then you may speak.

21          Please, Ms. Lambert, finish with the

22  debtor's -- I'm sorry -- the witness' response.

23          THE WITNESS:  So because there were so

24  many cars there, the police had to ask.  And also,

25  the security guards were there.

Page 228

1    BY MR. ARSLANIAN:

2         Q    Let me ask my question again.

3              Do you remember telling the police, yes or

4    no, that you had been followed by someone for

5    approximately 30 minutes?

6         A    What I told the police was that I had been

7    followed from my son's school -- that I was being

8    followed since I was at my son's school.  And I told

9    the officers that arrived, I told them that.

10        Q    Did you tell them specifically that you

11   were followed by someone for approximately 30

12   minutes?

13             THE COURT:  Before you respond,

14   Ms. Gallego, you need to answer the question that

15   was asked.  If you want to explain after you answer,

16   that is fine, but it calls for a yes or no answer.

17   And now this is the third time that Mr. Arslanian is

18   asking you, so please answer the question.

19             THE WITNESS:  I don't remember.  I just

20   don't remember.

21   BY MR. ARSLANIAN:

22        Q    Now, if I showed you the police report

23   that was already admitted into evidence as Exhibit

24   10, or if I read to you what was in there, would

25   that refresh your recollection?

1        A    So, I don't know exactly what police

2   report you're referring to, because it was two

3   officers, two police officers showed up.  And that's

4   why I mentioned to you before that the first thing

5   that they did when they arrived was ask if anybody

6   had called the police, because one of the police

7   officers came up to me and said to me that I had not

8   called the police.

9            THE COURT:  Mr. Arslanian, I'm going to

10  say to you the same thing I said to Mr. Parlade,

11  which may have been when you were knocked off.

12            To the extent that you already have a

13  document in evidence, and you're -- you have to ask

14  whatever questions you believe are necessary, but

15  don't use a witness to do something that you're

16  going to use in closing argument.  But in having

17  said that, if that's a question you need to ask, you

18  need to get her to read the report or whatever, the

19  police report says what it says and she says, she

20  doesn't remember.

21            Having said that, if you believe you have

22  a follow-up question or you want to show the witness

23  the police report, go right ahead.  But as I did

24  with Mr. Parlade, I said since we've only got a day

25  and a half, we want to make sure we don't use up our

Page 230

1    time when we don't need to.  Okay?

2              So go ahead, Mr. Arslanian.  What's your

3    next question?

4    BY MR. ARSLANIAN:

5         Q    What time did you go to school that day to

6    pick up your son?

7         A    I left to go pick him up, I'd say, about

8    3:40, 3:43.

9              MR. ARSLANIAN:  Now, Your Honor, at this

10   time I would like to play what was marked as Exhibit

11   L, the 911 phone call, for impeachment purpose.

12             THE COURT:  Okay.  Mr. Parlade.

13             MR. PARLADE:  Objection, Your Honor.

14   Without proper foundation, I don't know exactly why

15   or what this Exhibit L --

16             THE COURT:  You don't know what your

17   Exhibit L is?

18             MR. PARLADE:  It's my exhibit?

19             THE COURT:  Yes.  It's your Exhibit L, and

20   Mr. Arslanian would like to use it for impeachment

21   purposes.

22             MR. PARLADE:  He'd like to play the 911

23   call?  Sure.  Go for it.  No objection.

24             THE COURT:  All right.  How are you going

25   to do this, Mr. Arslanian?

1           MR. ARSLANIAN:  Through screen share, I

2    suppose.  I've got my tech here, so --

3           THE COURT:  All right.  So just to be

4    clear, this is Respondent's Exhibit L, marked for

5    identification as Exhibit L, correct?

6           MR. ARSLANIAN:  Yes.

7           THE COURT:  All right.

8           (Therefore, a 911 call was played that was

9    unintelligible for transcription purposes.)

10          MR. PARLADE:  Is it over?

11          MR. ARSLANIAN:  I guess it is.

12          THE INTERPRETER:  I'm sorry, Your Honor.

13   The interpreter is having a hard time hearing the

14   recording clearly, and Ms. Gallego told me the same

15   thing.

16          THE COURT:  I'm having trouble hearing it,

17   as well.

18          MR. PARLADE:  Same here.

19          THE COURT:  Is there anything else,

20   Mr. Arslanian, that we should be looking to?

21          MR. ARSLANIAN:  At this point, no, Your

22   Honor.

23          THE COURT:  Okay.  So why don't we

24   terminate the screen share.

25          Okay.  We've played the tape.  Now what do

Page 232

1    you want to do?

2              MR. ARSLANIAN:  Ms. Gallego -- I want to

3    ask her a question first, and then I'm going to move

4    to admit it.

5    BY MR. ARSLANIAN:

6         Q    Ms. Gallego, was that your phone call to

7    911?

8         A    I did call 911, but I can't hear that

9    recording, or at least it's not clear.  If you would

10   allow me to -- if you would allow me to hear the

11   recording and I could actually hear it, then I could

12   let you know.

13             THE INTERPRETER:  And for the record also,

14   Your Honor, I'm sorry.  Interpreter wasn't able to

15   interpret the full recording, because I couldn't

16   make out what it said, but I didn't want to

17   interrupt.

18             THE COURT:  Okay.  So since Ms. Gallego,

19   if that was, in fact, her, which I assume it is,

20   because since it was Respondent's Exhibit L, its

21   authenticity is admitted.  It was done in English,

22   so presumably Ms. Gallego understood English well

23   enough to have that conversation.

24             But having said that, it was difficult to

25   hear some of the things on the recording, but not

Page 233

1    the recording itself.

2             So, Mr. Arslanian, Ms. Gallego has asked

3    if she could listen to the recording again in order

4    to confirm it was her.  If you wish to do that, that

5    is up to you.

6             MR. ARSLANIAN:  We could play it again, or

7    if she's at Mr. Parlade's office, I'm sure he could

8    play his Exhibit L.  We could go off for a minute so

9    she could hear it, his Exhibit L.

10            At this point I am going to be moving it

11   into evidence.  I don't think there is a question

12   about the authenticity or relevance or any other

13   issues.

14            THE COURT:  All right.  If it is -- so are

15   you withdrawing your question with respect to the

16   witness?  I need some guidance here, Mr. Arslanian.

17   There's an open question here.

18            MR. ARSLANIAN:  I think at this point I

19   was just trying to get her -- I thought she could

20   hear it and just say, "That was me speaking," but,

21   you know, I didn't get that answer.  I still think

22   the question notwithstanding, it should be admitted

23   into evidence, especially since the source of it

24   comes from -- it's Respondent's Exhibit L.

25            The address was the address that she

1    was -- it's her voice.

2              THE COURT:  Mr. Arslanian is requesting

3    that Exhibit L be admitted as impeachment.  Your

4    response.

5              MR. PARLADE:  Your Honor, it's already

6    been admitted as to authenticity.  I object as to

7    impeachment.

8              Number one, the quality of the audio has

9    already been stated by the person who is alleged to

10   be the declarant, was unable to be heard by her.  He

11   has not established a foundation in order to

12   introduce it as impeachment evidence.

13             THE COURT:  Those are two different

14   things.  It was your exhibit.  Therefore,

15   authenticity is established.  That is red letter

16   law, period, done.  So you can't -- just because the

17   witness could not hear it right now as well as she

18   wanted, doesn't change its authenticity.

19             So your argument is, there's no valid

20   foundation as impeachment testimony?

21             MR. PARLADE:  Correct, Your Honor.

22             THE COURT:  Your objection is overruled.

23   I'll admit Exhibit L for impeachment purposes, and

24   I'll note that it was admitted by the movant.

25             MR. ARSLANIAN:  Thank you, Your Honor.

Page 235

1              (Thereupon, Respondent's Exhibit L was

2         admitted into evidence.)

3    BY MR. ARSLANIAN:

4         Q    Ms. Gallego --

5              MR. ARSLANIAN:  Are you ready, Your Honor,

6    to proceed?  I'm sorry.

7              THE COURT:  Go ahead.

8              MR. ARSLANIAN:  Thank you.

9    BY MR. ARSLANIAN:

10        Q    Ms. Gallego, did you ever claim to the

11   police or the security guards that you were being

12   blocked in by the Ceperos?

13        A    Yes.

14        Q    Isn't it true that when the cars finally

15   stopped, that your car came in front of the Ceperos

16   and blocked them?

17        A    No, because I was heading towards my

18   parking space.

19        Q    So you didn't block them?

20        A    They blocked me.

21             MR. ARSLANIAN:  Judge, at this time I

22   would like to play video that's been marked as the

23   Respondent's Exhibits N and M, that show when the

24   cars stopped, for impeachment.

25             MR. PARLADE:  I object.  The foundation

Page 236

1    hasn't been laid.

2              THE COURT:  I'm going to agree.

3    Mr. Arslanian, you can save those for your rebuttal

4    case.  All right?

5              MR. ARSLANIAN:  Okay.

6              THE COURT:  That's not impeachment

7    testimony.

8              Now, I will say this, before I forget.

9    Exhibit L does not exist anywhere in the universe,

10   as it were, so you're going to have to figure out

11   how to put that on the court docket, or do

12   something.  You're going to have to figure out now

13   how -- I may have it, because last year you all gave

14   me your exhibits.

15             I may have the Exhibit L.  I will let you

16   all know.  But if not, you're going to have to

17   figure out, Mr. Arslanian, how technologically to

18   get it filed.  I'll see, though, if I have it on the

19   thumb drive that you gentlemen -- well, not you,

20   Mr. Arslanian, but Mr. Parlade, I have a thumb drive

21   from you.  Perhaps those documents are on them.  I'm

22   not going to take the time now to look.

23             But as far as your request regarding the

24   videos, Mr. Arslanian, that will be for your

25   rebuttal case.

Page 237

1          Okay.  So what else do you have for this

2    witness, Mr. Arslanian?

3    BY MR. ARSLANIAN:

4        Q    Ms. Gallego, how is it that you were able

5    to take a picture of the license tag of the Ceperos,

6    who were following you?

7        A    Once the cars stopped.

8        Q    When you were speaking with the 911

9    operator, you were driving the car; isn't that

10   correct?

11       A    I was on the phone with the operator while

12   I was driving, but I was also on the phone with the

13   operator once I was stopped, once the car was

14   stopped, because the operator instructed me to

15   remain on the phone until the police officers

16   arrived.

17          And I took the pictures using my son's

18   cellular phone.

19       Q    Isn't it true you didn't mention your son

20   once during the 911 phone call?

21       A    I don't remember.

22       Q    All right.  Let me ask you about the

23   lawsuit that was filed, which is -- I believe now

24   they've admitted it.  I think it's 21.

25          THE COURT:  Exhibit 21.

Page 238

1              MR. ARSLANIAN:  It is 21.  Okay.  I'm

2    sorry, Your Honor.

3    BY MR. ARSLANIAN:

4        Q    You're aware of the court orders that were

5    entered in December of 2018, regarding refraining

6    from any contact with the Ceperos; isn't that

7    correct?

8        A    I do remember the order.  I don't remember

9    the exact date of the order, but they couldn't have

10   any contact with me and I couldn't have any contact

11   with them.

12       Q    Do you remember what caused those orders

13   to be entered?

14       A    Honestly, I don't -- I don't know or I

15   don't remember the exact reason, but I do know that

16   it had something to do with bankruptcy.

17       Q    Do you remember it having anything to do

18   with calling the Ceperos thieves, and making

19   physical threats against them, and filing a lawsuit

20   in 2017?

21       A    Could you be a bit more specific?  What

22   lawsuits?

23       Q    The prior lawsuit that you had filed in

24   November of 2017 against the Ceperos for slander,

25   defamation?

Page 239

1          A     I do remember that there have been

2     defamation lawsuits against them, but I don't

3     remember the exact dates, or if it is that one that

4     you're referring to.  I do ask you to remember that

5     there have just been so many issues with them.

6          Q     You don't remember anything about physical

7     threats made upon Leticia Cepero by you, and that

8     led to these orders being entered by Judge Isicoff?

9               MR. PARLADE:  Objection, Your Honor.

10    Counsel is misstating testimony, and is assuming

11    facts that are not in evidence.

12              THE COURT:  I'll sustain the objection.

13              You don't have to answer that question,

14    Ms. Gallego.

15    BY MR. ARSLANIAN:

16         Q     Ms. Gallego, you know that you can't file

17    any lawsuits against Mr. and Mrs. Cepero while

18    they're in bankruptcy, don't you?

19              THE INTERPRETER:  I'm sorry.  Could you

20    repeat that, please?

21    BY MR. ARSLANIAN:

22         Q     Ms. Gallego, you're aware that you cannot

23    file any lawsuits, or the Hammocks, against the

24    Ceperos while they're in bankruptcy; isn't that

25    correct?

Page 240

1              MR. PARLADE:  Objection, Your Honor.

2    Counsel is testifying.  He's also misquoting

3    evidence in this case.

4              THE COURT:  The objection is overruled.

5              You may answer, Ms. Gallego.

6              THE WITNESS:  So what I'm aware of is that

7    during the bankruptcy they cannot receive any

8    letters or calls mentioning the money that is owed

9    by them, or charging them -- trying to collect on

10   that money.

11   BY MR. ARSLANIAN:

12       Q    Let me ask the question again.

13            Are you aware that you or the Hammocks are

14   not allowed to file a lawsuit against either or both

15   of the Ceperos while they are in bankruptcy?

16            MR. PARLADE:  Objection.  Asked and

17   answered.

18            THE COURT:  I'm going to overrule the

19   objection, but perhaps this requires a little

20   explanation.

21            Ms. Gallego, I need to remind you again,

22   you have to answer yes or no, and then you can

23   explain.  I think you said something, that maybe

24   that's your explanation, but you did not say yes or

25   no.

1           So please answer the question whether you
2    know, or you knew, that you weren't supposed to file
3    a lawsuit against Mr. or Mrs. Cepero while they're
4    in bankruptcy.  Okay?  Yes or no.
5              THE WITNESS:  No.
6              THE COURT:  All right.  There's your
7    answer, Mr. Arslanian.  Please continue.
8              MR. ARSLANIAN:  Okay.
9    BY MR. ARSLANIAN:
10       Q    When the lawsuit that's been admitted into
11   evidence as Number 21, when you and the association
12   sued Leticia Cepero, did you tell your lawyer that
13   Leticia was in bankruptcy?
14             MR. PARLADE:  Objection.
15             THE COURT:  What's the objection?
16             MR. PARLADE:  Do not answer.  That's
17   privileged.  Any conversations between the attorney
18   and Ms. Cepero are attorney/client privilege.
19             THE COURT:  Okay.  I'll sustain the
20   objection.
21             You don't have to answer that,
22   Ms. Gallego.
23   BY MR. ARSLANIAN:
24       Q    Do you know why your lawsuit was filed,
25   Number 21?

Page 242

1              MR. PARLADE:  Same objection, Your Honor.

2    It may intrude on any communications between

3    Ms. Cepero and the attorney.

4              Now, if she's doing it from knowledge

5    outside of the communications, I don't think they're

6    protected, but anything within those communications

7    are absolutely protected.

8              THE COURT:  So, Ms. Gallego, if you can

9    answer the question without disclosing conversations

10   you had with a lawyer, please answer the question.

11   Okay?

12             THE INTERPRETER:  Could you repeat the

13   question?  Because I didn't hear it, because of the

14   objection.

15             THE COURT:  Go ahead, Mr. Arslanian.

16   BY MR. ARSLANIAN:

17        Q    Why did you file the lawsuit against

18   Leticia Cepero in November of 2020 for defamation or

19   (inaudible)?

20        A    For defamation?

21        Q    Yes, for defamation.  Why did you file

22   that lawsuit, ma'am?

23        A    It's a lawsuit for defamation.

24        Q    And why did you dismiss it about 20 days

25   after it was filed?

Page 243

1              MR. PARLADE:  Same objection, Your Honor.

2    As long as she's not testifying as to privileged

3    matters.

4              THE COURT:  All right.  So, Ms. Gallego,

5    you may answer as long as you do not disclose

6    attorney/client communications.  As long as you can

7    do so without disclosing what your lawyer said to

8    you.

9              THE WITNESS:  I can't go into details

10   about what I discussed with my attorney.

11             THE COURT:  Okay.

12   BY MR. ARSLANIAN:

13        Q    Did you know that the lawsuit was

14   dismissed on December 10, 2020?

15             MR. PARLADE:  Same objection, Your Honor.

16             THE COURT:  Overruled.

17             THE WITNESS:  Yes, I was aware.

18   BY MR. ARSLANIAN:

19        Q    Did you know that filing that lawsuit was

20   against federal law and bankruptcy law?

21        A    No, I did not.

22        Q    Did you know that filing that lawsuit was

23   in violation of two court orders entered by Judge

24   Isicoff back in December 2018?

25             MR. PARLADE:  Objection, Your Honor.

```
 1    Asked and answered.
 2              THE COURT:  Sustained.
 3    BY MR. ARSLANIAN:
 4        Q    Did you file any other lawsuits against
 5    the Ceperos while they were in bankruptcy?
 6        A    No.
 7              MR. ARSLANIAN:  I didn't hear the answer.
 8    Sorry.
 9              THE WITNESS:  No.
10              MR. ARSLANIAN:  Okay.  One second, Your
11    Honor.
12    BY MR. ARSLANIAN:
13        Q    Do you remember filing a (inaudible)
14    lawsuit in Case Number 2017 -- for defamation
15    against the Ceperos?
16              MR. PARLADE:  Objection, relevance.
17              THE COURT:  All right.  What is the
18    relevance of that question, Mr. Arslanian?
19              MR. ARSLANIAN:  It goes to her knowledge
20    of whether filing suit against people who are in
21    bankruptcy are permitted or not.  I can lay a
22    foundation with this prior lawsuit.
23              THE COURT:  I'm going to sustain the
24    objection, absent your laying a foundation for this
25    lawsuit.  You haven't given the date of the lawsuit.
```

Page 245

1   So as of right now, the relevancy is not

2   established.

3                MR. ARSLANIAN:  Just for the Court to

4   note, the bankruptcy was filed, I believe, in August

5   of 2017.

6   BY MR. ARSLANIAN:

7        Q    Ms. Gallego --

8                MR. PARLADE:  Objection, Your Honor.

9   Counsel is testifying.

10               THE COURT:  Yes.  I'm looking at the

11   docket, Mr. Arslanian.  That's why I stated I

12   sustained the objection.  Lay a foundation regarding

13   your question about the 2017 lawsuit.

14   BY MR. ARSLANIAN:

15       Q    Do you recall, Ms. Gallego, filing a

16   lawsuit on November 22, 2017, Hammocks Community

17   Association, Incorporated, against Josue Cepero,

18   Leticia Cepero, Maria Alonso, Gail Sharp and Yasser

19   Martinez?

20               THE INTERPRETER:  I'm sorry, Counselor.

21   Could you please repeat the last name on the list?

22   I missed it.  Yester?

23               MR. ARSLANIAN:  Yasser, Y-A-S-S-E-R,

24   Martinez.

25               THE INTERPRETER:  Thank you.

1          MR. PARLADE:  Your Honor, before she

2    answers, objection.  Same objection, relevance.

3    Foundation has not been established.  And it's

4    confusing, because he is interposing both

5    Ms. Gallego and the association.

6          MR. ARSLANIAN:  They're both --

7          THE COURT:  Wait, wait, wait.  I'm going

8    to overrule your objection.  If you believe that

9    your witness is confused, then you can ask her on

10   redirect.

11         MR. PARLADE:  Okay.

12         THE COURT:  All right.  Mr. Arslanian, the

13   question was, does Ms. Gallego, does she recall a

14   lawsuit filed by the association against those named

15   parties in November 2017?

16         MR. ARSLANIAN:  That's the question.

17         THE COURT:  So, Ms. Gallego, answer yes or

18   no, and then you can explain if you need an

19   explanation.  Okay?

20         THE WITNESS:  I think so, yes.

21   BY MR. ARSLANIAN:

22    Q    Do you recall dismissing that lawsuit, or

23   having the Hammocks Community Association dismiss

24   the lawsuit against Mr. and Mrs. Cepero, less than a

25   month after it was filed, on December 19, 2017?

1       A       No.

2       Q       If I showed you the docket sheet, would

3   that refresh your recollection as to when Mr. and

4   Mrs. Cepero were dismissed from the lawsuit?

5       A       You mentioned so many lawsuits.  I'm

6   confused.  You mentioned lawsuits and different

7   dates and three years ago, four years ago.  I'm

8   confused.

9       Q       Isn't it true that you dismissed the 2017

10  lawsuit that was filed in November of that year,

11  because you knew that you couldn't proceed against

12  the Ceperos while they were in bankruptcy?

13              MR. PARLADE:  Objection.  Asked and

14  answered.

15              THE COURT:  Overruled.

16              THE WITNESS:  I don't remember.  There's

17  been so many different things.  I don't remember.

18  BY MR. ARSLANIAN:

19      Q       I'm going to show you the docket so we can

20  refresh your recollection on that.

21              MR. PARLADE:  Objection, Your Honor.

22              THE COURT:  Okay.  What's your objection?

23              MR. PARLADE:  Foundation has not been

24  laid, her recorded recollection.

25              THE COURT:  That's not what he was asking.

1    He was asking to refresh her recollection, not a
2    recorded recollection.
3           MR. PARLADE:  I'm sorry, Your Honor.
4    Foundation has not been laid to refresh her
5    recollection.
6           THE COURT:  She said she doesn't remember.
7    That's a foundation.  Okay.
8           Mr. Arslanian, before -- and I'm not sure
9    how to do this.  I can put you both in a breakout
10   room.  You can hold up the picture, because you have
11   to show the document to Mr. Parlade if he wants to
12   see it.
13          Mr. Parlade, do you need to see the docket
14   that states the 2017 action (inaudible) Ms. Gallego.
15          MR. ARSLANIAN:  I have it here.
16          MR. PARLADE:  I haven't seen it.  That
17   would be helpful.
18          THE COURT:  No cross talk.  No cross talk.
19          Okay, so I'm going to put both of you in a
20   breakout room, and then, Mr. Arslanian, you can show
21   it to Mr. Parlade.  Okay?  So I'm going to put you
22   into breakout room two.
23          Let me see if I do this correctly.  This
24   is the first time I'm doing this, gentlemen.  If I
25   lose you, it was nice knowing you.

1          Okay.  I'm now moving you both to that

2     breakout room.  No, no.  Wait a minute.  Well, it's

3     okay.  It doesn't matter.  You're the only people in

4     there.  I was going to put you in two.

5          Oh, my gosh.  This is just too

6     complicated.

7          Well, you're both sent to the same room so

8     let's see if that works.  Nope.  Well, did you get

9     an invitation to go to those rooms?

10          MR. ARSLANIAN:  No.

11          THE COURT:  Okay.  I'm really trying here

12     guys.  Wait, I did it.  No.  Let's see if that

13     works.  No.

14          Okay, it says, "move to," but it

15     doesn't -- all right.  Never mind.  Okay.  Just show

16     the picture.  I can't get this to work.  I'm going

17     to have to practice.  All right, guys.

18          MR. PARLADE:  I can't --

19          MR. ARSLANIAN:  We can screen share it.

20          MR. PARLADE:  I'm getting the invitation

21     now.

22          THE COURT:  All right.  Go into your room.

23     Go into your room.  Work it out.

24          Mr. Parlade -- there we go.  Okay.

25          I wonder how they go back.  How do they go

Page 250

1    from the breakout room?  I'm told them 20 seconds,
2    so -- all right.  Let's see if they come back.
3            Oh, it says they're given 60 seconds to
4    come back.  All right.  Like I said, this is my
5    first time doing this.
6            Ms. Gallego, if you want to put your phone
7    down for a minute, if you're more comfortable.  If
8    your hand is getting tired you can do that.
9            I think they get a signal that says,
10   "Leave breakout room."  Okay.  We have Mr. Parlade
11   back.  Hopefully Mr. Arslanian came back.  He's
12   coming back.
13           MR. PARLADE:  He'll be coming back soon.
14   The room was about to close.
15           THE COURT:  Yes, he's back.  Okay.  He's
16   back.  Whoever that person is, don't leave this man
17   for too long.  He has no idea what he's doing.  I
18   don't either.
19           He's frozen.  Okay.  There we go.
20           Yes, I need him.  I need him.
21   Mr. Arslanian, you have to unmute.
22           Mr. Parlade, Mr. Arslanian has shown you
23   the document he wishes to refresh the witness'
24   recollection.  Any further objection, other than the
25   one you've already made?

1          MR. PARLADE:  The one I've made.  It's not

2     enough that she says she can't remember.  She's got

3     to actually state on the record that an exhibit or

4     an item will refresh her recollection.  So just

5     saying that she don't remember something is not

6     foundation for a refreshed recollection.

7          THE COURT:  You're absolutely correct,

8     Mr. Parlade.  Okay.

9          So, Mr. Arslanian, if you'll ask that last

10    question, and then if -- and I should have done that

11    beforehand, but this is a great way for me to

12    practice the breakout room.

13         So, Mr. Arslanian, if you'll that.

14         MR. ARSLANIAN:  I think I did ask her that

15    question.  I asked her, "If I showed you the docket,

16    would that refresh your recollection?"  She said, "I

17    don't remember," so that's I want to show her the

18    docket.

19         THE COURT:  I'm going to allow you to show

20    her the docket.  Go ahead.  Now screen share it, or

21    let the person that knows what she's doing.

22         MR. ARSLANIAN:  Scroll down to when the

23    lawsuit was filed.

24    BY MR. ARSLANIAN:

25         Q    Ms. Gallego, as you can see, this

Page 252

1    lawsuit --

2              THE COURT:  Just show Ms. Gallego the

3    information that you believe is going to potentially

4    refresh her recollection, and ask her if it

5    refreshes her recollection regarding whether she

6    dismissed -- whether she was aware that the case

7    against the Ceperos was dismissed.  Okay?

8              MR. ARSLANIAN:  This docket shows a

9    complaint filed on November 22, 2017.  Then if you

10   scroll up --

11             MR. PARLADE:  Objection.  Counsel is

12   testifying.

13             THE COURT:  Right.  Mr. Arslanian, just

14   show the witness the part of the docket you want to

15   show her, and ask her if that refreshes her

16   recollection as to whether the case was dismissed

17   against the Ceperos.

18   BY MR. ARSLANIAN:

19       Q    Does that first page there, describing the

20   case with the local case number, and then title,

21   Hammocks Community Association versus Josue Cepero,

22   et al., is that the case that we were talking about,

23   the 2017 lawsuit?

24             MR. PARLADE:  Your Honor, I don't know if

25   they're translating, but I object to the question.

Page 253

1    Again, he's not laying the foundation as to whether

2    this is refreshing the witness' recollection.

3              THE COURT:  I agree.  I'm going to

4    disallow this.  The record will stay as it stands,

5    that she does not remember, or she's not aware that

6    it was dismissed.  Take down the screen share and

7    let's move on.

8              MR. ARSLANIAN:  Can I have a moment to

9    confer with Mr. Brooks?

10             THE COURT:  Absolutely, but please put

11   yourself on mute, unless you want us all to be with

12   you.  Okay, good.  Mr. Arslanian -- okay, there you

13   go.  Okay.

14             (Discussion off the record.)

15             MR. ARSLANIAN:  I have no further

16   questions, Your Honor.

17             THE COURT:  Okay.  It's ten to 2:00.  I

18   believe the witching hour is 2:30, right,

19   Mr. Arslanian?  I said a soft 2:00.

20             Mr. Parlade, how long do you think your

21   redirect is going to take?  Will it take us past

22   2:30?  I don't want to get started if --

23             MR. PARLADE:  No way.  It's going to be

24   short.

25             THE COURT:  Okay.  All right.  Let's do

Page 254

1    redirect.

2              Ms. Gallego, so you understand, what

3    redirect means is that Mr. Parlade can ask you

4    follow-up questions relating to what Mr. Arslanian

5    asked you during his turn.  Okay?

6                    REDIRECT EXAMINATION

7    BY MR. PARLADE:

8        Q    Ms. Gallego, opposing counsel just

9    mentioned a lawsuit brought in 2017 by Hammocks

10   Association against Josue Cepero.

11             Were you aware when the actual association

12   got notice of the bankruptcy that was filed that

13   same year by the debtors?

14       A    No.  I don't know -- I don't know the

15   dates, because that actually -- it's actually the

16   accounting department that gets that.

17       Q    Now, opposing counsel also played a 911

18   call, which was played back.  I understand some of

19   it was heard, some of it was not heard, but what I

20   understood from the 911 call was, it was made at the

21   time that both yours and the Ceperos' car were

22   parked in front of your residence on May 15, 2019;

23   is that correct?

24       A    So I wasn't able to hear the call or to

25   make out what was being said on the call, but the

Page 255

1    phone call was not made in front of my house.

2         Q    Did you hear when it was made?

3         A    No, I didn't hear it.

4         Q    Okay.  You had previously testified that

5    you had noticed someone following you when you went

6    to pick up your child at his school at around 3:45

7    to 3:49 on May 15, 2019, correct?

8              MR. ARSLANIAN:  Your Honor, objection.

9              THE COURT:  What is the objection?

10             MR. ARSLANIAN:  That's improper -- it's

11   not proper redirect.

12             THE COURT:  Okay.  I'm going to overrule

13   the objection.

14             THE INTERPRETER:  I'm sorry.  Could you

15   repeat the question?

16   BY MR. PARLADE:

17        Q    You had previously testified that when you

18   went to pick up your son at his school on May 15,

19   2019, at between 3:45 to 3:49 p.m., you had first

20   noticed somebody following you, correct?

21        A    I don't remember the exact time, and I

22   don't remember the exact time I made the call.

23             THE INTERPRETER:  I'm sorry.  Did

24   everybody here me?

25             MR. ARSLANIAN:  Yes.

Page 256

1          MR. PARLADE:  Everybody froze for a

2   second.

3          THE COURT:  I'm here.  Mr. Arslanian,

4   you're there?

5          MR. ARSLANIAN:  Yes.

6          THE COURT:  We're all here.  Go ahead.

7          THE INTERPRETER:  Did you hear my

8   translation, Mr. Parlade?

9          MR. PARLADE:  I did not.

10          THE INTERPRETER:  Would you like me to

11   repeat it, or would you like me to ask her again?

12          MR. PARLADE:  Just repeat it for me,

13   please.

14          THE INTERPRETER:  "I don't remember the

15   exact time, and I don't remember the exact time of

16   the call."

17   BY MR. PARLADE:

18      Q    But do you remember the time you went to

19   pick up your son?

20          THE COURT:  What's the objection,

21   Mr. Brooks -- I mean, Mr. Arslanian?

22          MR. ARSLANIAN:  It was asked and answered.

23   I already asked her that question and we got the

24   answer.

25          THE COURT:  I'm going to sustain the

Page 257

1    objection.  You don't have to answer the question,

2    Ms. Gallego.

3                And, Mr. Arslanian, the fact that you may

4    have asked a question does not preclude it being

5    asked on redirect, okay?

6                All right.  Mr. Parlade.

7    BY MR. PARLADE:

8         Q     Would it be safe to say that you went to

9    pick up your son on May 15, 2019, before 4:00 p.m.?

10        A     Yes.

11        Q     Okay.  Now, from what we've seen, and it

12   has been admitted as Debtor's Exhibit 11, there is

13   an incident report, and that incident report states

14   that the officers arrived at 4:40 p.m.; is that

15   correct?

16        A     I don't have the report.

17        Q     Would it surprise you if the officers

18   arrived after 4:30 p.m. on the day of the incident?

19        A     No.

20        Q     Okay.  So almost an hour transpired from

21   the time you went to pick up your son to the time

22   the actual police arrived in front of your -- at

23   your house on May 15, 2019; is that correct?

24                MR. ARSLANIAN:  Objection, Judge.

25                THE COURT:  What's the objection, sir?

1            MR. ARSLANIAN:  First of all, even if it's

2    redirect, you can't lead.

3            MR. PARLADE:  Leading is --

4            THE COURT:  Mr. Parlade, stop.  You made

5    it sound like you had more to say, Mr. Arslanian, so

6    finish what you were saying first.

7            MR. ARSLANIAN:  It mischaracterizes her

8    testimony already about an hour.

9            THE COURT:  I'm going to sustain the

10   objection.  One, Mr. Parlade, you cannot lead on

11   redirect, and number two, you're absolutely

12   mischaracterizing the witness' testimony, unless you

13   were trying to get her to change her testimony.

14           MR. PARLADE:  I'm not trying to get her to

15   change her testimony, Your Honor.

16           THE COURT:  Okay.  Then you are

17   mischaracterizing the testimony.

18           MR. PARLADE:  Thank you.  I'll withdraw

19   that question, Your Honor.

20           THE COURT:  I also want to note for the

21   record that you identified the police incident

22   report as Exhibit 11, but that is a document that --

23   I can speak English, sorry -- an exhibit that was

24   refused admission.  The incident report is actually

25   Exhibit 10.  I just wanted to correct the record.

1             MR. PARLADE:  My apologies.

2             THE COURT:  All right.  Mr. Parlade, do

3    you have any other redirect that you wish to ask the

4    witness?

5             MR. PARLADE:  Nothing further, Your Honor.

6             THE COURT:  Okay.  All right.

7    Ms. Gallego, believe it or not, your testimony is

8    done.  Don't hang up the phone, because we're not

9    done yet today.  We're almost done.

10            Ladies and gentlemen, we are not going to

11   start another witness today, so let's talk about

12   tomorrow.

13            Mr. Parlade, other than the Ceperos or --

14   was it both Ceperos or just one Cepero, I don't

15   remember, on your witness list?

16            MR. PARLADE:  I'm not going to be calling

17   either one of them, Your Honor.

18            THE COURT:  Oh, okay.  All right.  So what

19   do you have left in your case in chief?

20            MR. PARLADE:  That's it.  I'm done.  I can

21   rest.

22            THE COURT:  Okay.  So you're resting.  So

23   then tomorrow, Mr. Arslanian, we'll start with your

24   rebuttal case, okay?

25            Now, you already told me that you wish to

1    introduce -- I'm sorry -- M and N that were

2    submitted as exhibits, but not introduced by the

3    respondent.  So I'm going to -- I have more court

4    this afternoon.  When I'm done I'm going to look at

5    the drive that Mr. Parlade gave me last year, okay,

6    and I will see if I have Exhibit H -- I'm sorry.

7              MR. ARSLANIAN:  M and N.

8              THE COURT:  Exhibit L, which I admitted

9    today, but it was a little difficult to hear, not

10   impossible, but parts of it were, and then M and N.

11             I will let you gentlemen know.  I will

12   have my courtroom deputy e-mail you both so that you

13   know whether I have it on my flash drive.  Okay?

14   That doesn't mean I'm going to be the one sharing

15   it.  Today I did the breakout room.  That's probably

16   it for me for this trial.  That's about as exciting

17   as I can get.  All right?  So we'll figure something

18   out.

19             So tomorrow -- but, Mr. Arslanian, you

20   will not go home tonight without uploading your

21   amended exhibit register, which includes,

22   irrespective of whether I admitted them or not, all

23   your new exhibits that you identified, or that

24   Mr. Brooks identified this morning, as well as your

25   Exhibit L, the M and the N.  Okay?

Page 261

1              MR. ARSLANIAN:  Yes.  With regard to M, at

2    the prior hearing, the first hearing, on Page 67 I

3    can see where Mr. Parlade tried to play that video,

4    and I don't know what happened.  It was a recess and

5    it didn't get played, but I think the Court may have

6    it.

7              MR. BROOKS:  Judge, Michael Brooks.  We're

8    going to upload everything from scratch.  So you

9    don't have to go through your drive.  I'll make sure

10   that it's attached to the exhibit register.

11             THE COURT:  Okay.  Then let me hear from

12   Mr. Parlade.  Yes, Mr. Parlade?

13             MR. PARLADE:  Judge, my client is going to

14   be here tomorrow, but do I still have to have a

15   translator on Zoom, considering I'm not going to

16   have her testify anymore?  Can she just have a

17   translator on the phone?  Is that okay?

18             THE COURT:  Absolutely.

19             MR. PARLADE:  Thank you.

20             THE COURT:  Although I do want to

21   commend -- although I couldn't hear what the debtor

22   was -- I'm sorry, I keep saying debtor, I

23   apologize -- the witness was saying, Ms. Lambert did

24   a great job.

25             Ms. Lambert, you wish to say something?

1          THE INTERPRETER:  If I may ask,
2   Mr. Parlade, I mean, I don't know if it's going to
3   be me interpreting for you tomorrow or someone else,
4   but if I could just request, I mean, if it is me, I
5   will keep myself muted and I won't interrupt at all,
6   but I can hear a lot better when I am on Zoom and on
7   the phone.
8          MR. PARLADE:  Oh, okay.
9          THE INTERPRETER:  That way I can hear
10  everything that everyone is saying, and then I can
11  just interpret for her.  I promise that I will keep
12  my mute on the entire time.
13         MR. PARLADE:  Perfect.  Whatever makes it
14  easier for you.  Thank you so much.
15         THE COURT:  So, Mr. Arslanian, anything
16  else from you before tomorrow?
17         MR. ARSLANIAN:  (Inaudible).
18         THE COURT:  I'm sorry, Mr. Arslanian.  You
19  broke up, so I didn't realize you were speaking.
20         MR. ARSLANIAN:  I was just saying that
21  hopefully we will get done rather quickly tomorrow.
22  It looks like there's not much left to do, but, you
23  know, I thank the Court for this whole thing,
24  because it's like pulling teeth how slow it goes.
25  But we did pretty good, I thought.

Page 263

1            THE COURT:  It is not the best way, but
2    I'm very grateful, and I've said this to many
3    people, I'm very grateful that we all are in a
4    business or profession and have the technology that
5    makes it possible for the Court to do its work even
6    though we can't be together.
7            So I appreciate everybody's patience.  I
8    know that Mr. Parlade is going to go out immediately
9    and upgrade his Internet.  I wish you all a good
10   afternoon.  Stay safe, stay well.  And,
11   Mr. Arslanian, I hope that you and Mr. Brooks
12   doesn't suffer too much when you get your shots this
13   afternoon.
14           I think we're starting at 9:30 again; is
15   that correct?  Okay.  I'll see you all at 9:30
16   tomorrow morning.
17           MR. PARLADE:  Is it the same link or will
18   we be receiving a different link?
19           THE COURT:  No, you'll use the same link
20   to sign in again in the morning.
21           MR. PARLADE:  Perfect.
22           THE COURT:  You all take care and stay
23   safe.
24           (Thereupon, the hearing was adjourned.)
25

Page 264

1                          CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6                  I, HELAYNE F. WILLS, Shorthand

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing proceedings were taken by electronic

10   recording at the date and place as stated in the

11   caption hereto on Page 1; that the foregoing

12   computer-aided transcription is a true record of my

13   stenographic notes taken from said electronic

14   recording.

15                  WITNESS my hand this 22nd day of

16   February, 2021.

17

18

19          _____

                     HELAYNE F. WILLS
20              Court Reporter and Notary Public
             In and For the State of Florida at Large
21           Commission No:  GG123092   Expires 8/2/2021

22

23

24

25