***Tagged Opinion***
***Do not publish***



**ORDERED in the Southern District of Florida on July 17, 2021.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

IN RE:                                           Case Number: 17-20358-LMI
                                                 Chapter 13
JOSUE CEPERO and
LETICIA CEPERO,

_____ Debtors.     /

### ORDER FINDING HAMMOCKS COMMUNITY ASSOCIATION INC. AND MARGLLI GALLEGO IN CONTEMPT

This matter came before the Court on the *Debtors' Motion For Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019, [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego* (ECF #199) (the "2019 Contempt Motion") and *Debtors' Amended Motion for Contempt Against Hammocks Community*

Association Inc., and it's President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019 [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego (ECF #289) (the "Amended Contempt Motion"). For the reasons more fully outlined below, the Court finds that Hammocks Community Association, Inc. (the "Association") and Marglli Gallego ("Ms. Gallego") willfully violated this Court's orders and violated the automatic stay.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

The Debtors, Josue Cepero and Leticia Cepero (collectively the "Ceperos" or the "Debtors"), on the one hand, and Ms. Gallego, the president of the Association, and the Association on the other hand (collectively the "Respondents"), have had a contentious relationship for the last four or five years.  It is not necessary to review the history of this bitter relationship other than to note that this Court entered two orders hoping to resolve the ongoing confrontations – *Agreed Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and its President, Marglli Gallego* dated December 4, 2018 (ECF #189) (the "2018 Contempt Order") and *Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and its President, Marglli Gallego* dated December 7, 2018 (ECF #191) (the "Additional 2018 Contempt Order" and with the 2018 Contempt Order – the "Contempt Orders").

The 2019 Contempt Motion alleged that Ms. Gallego and the Association violated the Contempt Orders with respect to a confrontation that occurred on

2

May 15, 2019 and by virtue of a tree trimming flyer that was distributed to all the members of the community in which the Ceperos live, that allegedly had attached to it a written statement that included inappropriate statements about the Ceperos. The 2019 Contempt Motion was set for an evidentiary hearing and the first day of trial took place on February 26, 2020. The second day of trial was canceled when the courts became virtual due to the COVID-19 pandemic. The parties did not want to try the case virtually, so the Court directed the parties to mediation. That was unsuccessful.

After a continued trial date was set, the Debtors filed the Amended Contempt Motion, alleging that the Association and Ms. Gallego filed a lawsuit on November 20, 2020 (the "November 2020 Lawsuit") suing Mrs. Cepero for defamation and tortious interference. When state court counsel for the Association and Ms. Gallego was advised of this bankruptcy case, he immediately dismissed the November 2020 Lawsuit. The Court allowed evidence of this November 2020 Lawsuit, as well as any defense to the allegations regarding the lawsuit, to be presented at the continued evidentiary hearing.

## **ANALYSIS**

At issue before this Court is whether the Respondents violated the Contempt Orders by virtue of the May 15, 2019 altercation, and whether the Respondents violated the Contempt Orders or the automatic stay by filing the November 2020 Lawsuit.[1]

A finding of civil contempt must be based upon clear and convincing

---

[1] The Debtors failed to present evidence either at the original evidentiary hearing or the continued evidentiary hearing to support the allegations regarding the tree trimming flyer.

evidence that a person or entity violated a prior court order to which they were subject. *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1545 (11th Cir. 1996)). "This ['clear and convincing' evidence standard] is more exacting than the 'preponderance of the evidence' standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." *Id.* (quoting *Jordan v. Wilson*, 851 F.2d 1290, 1292 (11th Cir. 1988)). "Clear and convincing evidence" is evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).  To prevail on a motion for contempt, a movant must prove by clear and convincing evidence that there was a violation of a valid and lawful order; that the terms of the order were clear, definite, and unambiguous; and that the alleged violator had the ability to comply with the order. *Jove*, 92 F.3d at 1546; *In re SLK Assocs., Inc.*, 166 B.R. 985, 989 (Bankr. S.D. Fla. 1994).

**The May 15, 2019 Incident**

The Debtor husband, Mr. Cepero, testified that on May 15, 2019, he and his wife drove to The Heron of the Hammocks ("The Heron"), a community made up of a cluster of buildings in the Hammocks master community, to meet with Maria Alonso, a friend who had just been elected president of the board of The Heron.  Mr. Cepero testified that while he was parked in a visitor's parking space, waiting for Ms. Alonso to be available, Ms. Gallego drove up in a car marked with the Hammocks logo and blocked him in the parking space that he had chosen.[2]

---

[2] Ms. Gallego claimed that the Debtors were near her home and that Mr. Cepero knew where she lived because he had come to her home from time to time to pick up checks.  Mr. Cepero testified he did not know where Ms. Gallego lived, and he chose to park where he parked because there was an open visitor space. Jorge Matus, the Chief Security Officer for the Hammocks, testified that the Ceperos were blocking Ms. Gallego's parking area. It is not clear how Mr. Matus knew

Mr. Cepero testified that he was able to maneuver around Ms. Gallego, but as he drove around trying to leave the area, Ms. Gallego drove around and blocked his car again with the Hammocks car. Police and community security were called at that time. Who called the police when the altercation occurred are issues in dispute, but, ultimately, who called the police when the confrontation occurred is not relevant with one exception that the Court will address shortly.

Maria Alonso testified that Mr. Cepero tried to call her several times and, when he finally reached her, Mr. Cepero told Ms. Alonso that Ms. Gallego was blocking him. When Ms. Alonso got to the scene, Ms. Gallego was out of her car, at the Debtors' car, saying something and filming the Debtors in their car. According to Ms. Alonso, Ms. Gallego's car was blocking the Debtors' car. There were two Hammocks security vehicles present also.[3]

Ms. Gallego testified that the Ceperos started everything. Ms. Gallego testified she was waiting in front of her son's school to pick him up before 4:00 p.m. when she noticed that there was a car acting strangely in the pickup line at the school. The car followed her, but she did not recognize who was following her until she noticed a device by the mirror of the car that was following her, and then she noticed that the car was being driven by Mr. Cepero.

Ms. Gallego further testified that she continued driving and sped up to try to make it home faster. Ms. Gallego testified that she was so nervous she called 911 while she was driving and told the 911 operator she was being followed and

---

this, unless he was relying on what Ms. Gallego told him, since he also testified he did not know the addresses in The Heron.

[3] Counsel for the Respondents argued that the Ceperos could have backed away from where Ms. Gallego was blocking them. However, the Court does not view this as relevant.

had been followed for an hour. Ms. Gallego testified that she told her son to duck down under the seat while Ms. Gallego remained on the phone at the instruction of the 911 operator.  Ms. Gallego testified that the 911 operator told Ms. Gallego an officer had been dispatched. Eventually, when Ms. Gallego made it home, she testified she began pulling into her parking lot and suddenly the Debtors came across her parking lot and got in front of her car. Ms. Gallego testified she was terrified for her young son who was in the car and that she had a neighbor take him. Ms. Gallego also testified that the 911 operator told her to get out of the car to check the tag number of the car that was following her.

Mr. Cepero testified that he and his wife were not at the son's school, that they do not even know where the son goes to school, and that, in fact, they went to the bank to purchase a money order to make their Chapter 13 plan payment. The Ceperos introduced into evidence a time-stamped bank slip that shows that the Ceperos purchased the money order at 4:17 p.m., at a bank that was approximately a six-minute drive from The Heron and their home. It was not possible for the Ceperos to be at the son's school in the carpool line at or before 4:00 p.m., follow Ms. Gallego for an hour, or a half hour, or at all, and then still be at the bank making a transaction that completed at 4:17 p.m.

The video evidence shows that the Ceperos were driving when all of a sudden Ms. Gallego pulled up in front of them, forcing them to stop. Ms. Gallego then got out of the car and eventually approached the Ceperos' car while talking on the phone. This video evidence directly contradicts Ms. Gallego's testimony that the Ceperos were blocking her from her parking space. If the parking space was blocked, it was a consequence of where Ms. Gallego stopped her car.

The police officer who came to the scene filed a report that shows he was dispatched at 4:35 p.m. and arrived on the scene at 4:40 p.m.  No other officer was on the scene.[4]  When the police officer arrived, the Hammocks security officers were already on scene.  This contradicts Ms. Gallego's testimony that the 911 operator told her an officer was dispatched while Ms. Gallego was driving. Moreover, according to the police report, Ms. Gallego told the officer the Ceperos had been following her for at least 30 minutes. But the Ceperos did not follow Ms. Gallego for 30 minutes, as Ms. Gallego told the police officer, or for 60 minutes, as she told the 911 operator. Both statements are clearly false because the Ceperos were at the bank at 4:17 p.m. and everyone was at the scene of the altercation by at least 4:35 p.m. when the police were dispatched.

Moreover, although Ms. Gallego claimed she called the 911 operator while she was driving her son home from school, the time stamp on the 911 call shows the call was made at 16:31:18 – 4:31 p.m., 30 minutes after Ms. Gallego testified she picked up her son at school. Based on all the other evidence in the case, it is clear Ms. Gallego called 911 after she had blocked the Ceperos' car.

The Court has reviewed all of the evidence, the testimony of the witnesses and the exhibits, including the video that was recorded at the time of the incident.  The Court finds that Ms. Gallego did not call the police while she was driving the car as she claims, but, rather, Ms. Gallego called the police at 4:31 p.m.  That recording makes clear that there was no previous call to the police, as Ms. Gallego testified, while she was driving home from her son's school.

---

[4] Ms. Gallego testified that there was more than one officer on the scene but there is no one else who corroborated that statement.

7

Finally, the video of what appears to be the second confrontation clearly shows that Ms. Gallego was blocking the Debtors, and, in fact, the video shows that Ms. Gallego deliberately pulled up in front of the Debtors' and blocked them from continuing in the direction in which they were driving. Additionally, although Ms. Gallego testified that she asked someone to take her son out of the car and into her home, the Association did not provide any corroborating testimony and there is nothing in the video that suggests the son was in the car when Ms. Gallego blocked the Debtors' car.

In sum, the Court finds that Ms. Gallego was untruthful, her testimony fabricated and contradicted by physical evidence. Consequently, the Court finds that all of Ms. Gallego's testimony should be disregarded.

Mr. Cepero testified he and his wife were at The Heron to see Maria Alonso. Maria Alonso corroborated that testimony. The Association and Ms. Gallego did not put on any evidence to contradict that testimony other than Ms. Gallego's untruthful testimony about her son's carpool line and being followed by the Ceperos.

Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.

**<u>The November 2020 Lawsuit</u>**

In the November 2020 Lawsuit, the Respondents sued Mrs. Cepero for a variety of acts, some of which allegedly occurred postpetition. However, the complaint clearly included allegations, and sought relief with respect to, "false

and defamatory statements over the last four years (at a minimum) about Ms. Gallego." Once advised of this bankruptcy case, state court counsel immediately dismissed the November 2020 Lawsuit.

The Respondents argue that the November 2020 Lawsuit was not prohibited by the Contempt Orders because the Contempt Orders say nothing about filing lawsuits. They also argue the Debtors never claimed the November 2020 Lawsuit was a stay violation until the Debtors filed their closing argument. Further, the Respondents argue, the filing of the November 2020 Lawsuit was not a violation of the automatic stay because (a) Ms. Gallego is not a creditor and (b) the November 2020 Lawsuit only sought relief with respect to postpetition conduct.

The Debtors counter that the November 2020 Lawsuit was clearly a violation of the Contempt Orders. The Debtors also point out that the November 2020 Lawsuit was cited as a stay violation in the *Motion to Supplement Motion for Contempt* (ECF #267), and the Amended Contempt Motion. The Court notes that while the *Joint Pretrial Stipulation* (ECF #298) did not identify whether the November 2020 Lawsuit constituted a stay violation as an issue to be tried, during the trial, Debtors' counsel repeatedly argued that the November 2020 Lawsuit was a stay violation when seeking admission of certain exhibits.

Whether the November 2020 Lawsuit was a violation of the stay or of the Contempt Orders, the parties agreed to try the issue of whether the November 2020 Lawsuit was wrongful as part of the continued evidentiary hearing. The Court agrees with the Respondents that the November 2020 Lawsuit does not

violate the Contempt Orders.[5]

However, the Court finds that the November 2020 Lawsuit was a knowing violation of the automatic stay. The Court does not understand the argument that Ms. Gallego is not a creditor. Perhaps Ms. Gallego did not file a claim in the bankruptcy case, but the November 2020 Lawsuit was clearly an act "to recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. §362(a)(1). While there are certain instances in which acts to recover on claims that arise postpetition are not a stay violation, the Court does not have to address those exceptions here because the November 2020 Lawsuit included relief relating to alleged prepetition claims. The Respondents argued that Ms. Gallego did not know that she could not file the November 2020 Lawsuit. However, the Respondents filed a postpetition lawsuit in 2017 against the Debtors and others, seeking similar relief for prepetition acts. That lawsuit was dismissed as to the Debtors as a violation of the automatic stay. Ms. Gallego testified she did not remember that lawsuit, but, in light of Ms. Gallego's false testimony on other issues in this case, the Court does not believe that Ms. Gallego did not remember.

Accordingly, the Court finds that the Respondents knew that they could not file any lawsuit against the Ceperos at least with respect to matters that occurred before the bankruptcy case was filed, and were on notice that filing any lawsuit while the bankruptcy case was pending might be prohibited. Thus, the Court finds the Association and Ms. Gallego willfully violated the automatic stay

---

[5] If the allegations regarding Mrs. Cepero's postpetition conduct are true, Mrs. Cepero's actions violated the Contempt Orders.

by filing the November 2020 Lawsuit.

## DAMAGES

The Amended Contempt Motion seeks attorney fees and reimbursement of costs (including those associated with the November 2020 Lawsuit), punitive damages, and damages for emotional distress. The Debtors did not cite any statute or common law basis for the sanctions they seek leaving it to the Court to guess why they are entitled to recovery. However, the Court specifically advised the parties that the Court would consider evidence of damages after a determination of liability, if any. Having found that the Association and Ms. Gallego violated the Contempt Orders and the automatic stay, the Court will ask the Debtors to file their specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages.  The request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support.  If the Debtors intend to seek emotional damages, that claim will have to be set for evidentiary hearing, *if* the basis for damages claimed allow a claim for emotional damages.

After the damages statement is filed, which must be filed no later than 21 days from the date of entry of this order, the Association and Ms. Gallego will have 21 days to file an objection to the amounts requested, and include any arguments that the nature of damages claimed are not permitted under the theory cited by the Debtors.  However, for purposes of objecting to any damages,

the Association and Ms. Gallego may not include objections to this Court's finding of liability.  Any objections to those findings must be made through the procedurally appropriate pleading.

## **CONCLUSION**

Ms. Gallego needs to stay away from the Ceperos. The Ceperos need to stay away from Ms. Gallego. The Contempt Orders made clear that the Association and Ms. Gallego on the one hand, and the Ceperos on the other hand are not to talk about each other or interact with each other.  While the Contempt Orders terminate upon the Ceperos obtaining their discharge, this Court urges the parties to continue to stay away from each other for so long as either of them lives in the Hammocks. If there must be some interaction, it should be only through an intermediary. The Association must take whatever steps necessary to make sure that Ms. Gallego understands her limitations and her potential liability if she violates this Court's orders again. The Ceperos must also remember their responsibilities under the Contempt Orders. This needs to stop.

# # #

Copies furnished to:
Miguel Parlade, Esq.
Michael Brooks, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*