Page 305

1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
2                MIAMI DIVISION
3                          Case No.:  17-20358-LMI
                           Chapter 13
4    In Re:
5    JOSUE CEPERO and LETECIA CEPERO,
6         Debtor.
     _____/
7
8
9                     VOLUME IV
10
              ECF # 335, 354, 378, 380
11
12               December 30, 2021
13          The above-entitled cause came on for a
14   Zoom hearing before the Honorable LAUREL M. ISICOFF,
15   Chief Judge, in the UNITED STATES BANKRUPTCY COURT,
16   in and for the SOUTHERN DISTRICT OF FLORIDA,
17   remotely via Zoom Video Conference, on Thursday,
18   December 30, 2021, commencing at or about 9:30 a.m.,
19   and the following proceedings were had:
20
21
22
23        Transcribed from a digital recording by:
              Helayne Wills, Court Reporter
24
25

Page 306

1   APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2        BANKRUPTCY NOW, by
         MICHAEL J. BROOKS, ESQ.,
3        and
         LAW OFFICE OF LOUIS ARSLANIAN, by
4        LOUIS ARSLANIAN, ESQ.,
         and
5        ACE LAW, P.A., by
         ANNETTE E. ESCOBAR, ESQ.
6        on behalf of the Debtors
7
         LAW OFFICE OF MIGUEL PARLADE, P.A., by
8        MIGUEL F. PARLADE, ESQ.,
         on behalf of Hammocks Community Association and
9        Marglli Gallego
10
         ALFARO & FERNANDEZ, P.A., by
11       ELBERT R. ALFERO, ESQ.,
         on behalf of Monica Ghilardi
12
13   ALSO PRESENT VIA ZOOM VIDEO CONFERENCE:
     ECRO:  Electronic Court Reporting Operator
14   LETICIA CEPERO
     JOSUE CEPERO
15   JESUS CUE
     HENRY STORPER
16   MARIO BEOVIDES, Interpreter
     LUCILLE GRENET, Interpreter
17
18
19
20
21
22
23
24
25

Page 307

1                          **INDEX**

2

3

4    **WITNESSES                 DIRECT      CROSS       RED.**

5    **JESUS CUE**
       **(By Mr. Arslanian)     334                     360**

6      **(By Mr. Parlade)                   353**

7    **LETECIA CEPERO**
       **(By Mr. Arslanian)     368**

8      **(By Mr. Parlade)                   386**

9    **HENRY STORPER**
       **(By Mr. Parlade)       440**

10     **(By Mr. Arslanian)                 463**

11   **JOSUE CEPERO**
       **(By Mr. Arslanian)     487**

12     **(By Mr. Parlade)                   490**

13                         **EXHIBITS**

14

     **DEBTORS' IN EVIDENCE                        PAGE**

15     **No.  1                                    330**

       **No.  2                                    372**

16     **No.  3                                    473**

       **No.  4                                    373**

17     **No.  6                                    319**

       **No.  7                                    351**

18     **No.  8                                    341**

       **No.  9                                    343**

19     **No. 11                                    346**

       **No. 16                                    482**

20     **No. 17                                    482**

21

22   **ASSOCIATION'S IN EVIDENCE**

       **No. 1                                     320**

23

24

25

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

1          THE COURT:  We're going to start the

2   hearing now.  Just a few reminders.  One, please

3   keep your phones -- your videos on mute when you are

4   not speaking.  And when you are speaking, please

5   remember to unmute.

6          Please also remember that this is a

7   recorded proceeding.  Any recording by anyone other

8   than the Court is a violation of Florida law.  It is

9   a felony, and in addition, will subject the violator

10  to sanctions.

11         I am hearing an echo, so please double

12  check to make sure you do not have electrical

13  devices on.  Mr. Cue and Mr. Parlade, I see you are

14  not muted, so please mute yourself.

15         Please remember, do not interrupt each

16  other.  I will give everyone an opportunity to

17  respond.  So we will take turns.  When it is time

18  for Mr. and Mrs. Cepero and other witnesses to

19  testify, we will go over the rules regarding

20  objections, et cetera.

21         So with that we'll get started, and I will

22  take appearances.  We'll start with Mr. Brooks,

23  although that doesn't look like Mr. Brooks.  Go

24  ahead and unmute and make your appearance.

25         MR. ARSLANIAN:  Good morning, Your Honor.

1   May it please the Court.  I'm Louis Arslanian on

2   behalf of the debtors, Josue and Leticia Cepero.

3           THE COURT:  All right.  Thank you

4   Mr. Arslanian.  You definitely look more like

5   yourself than like Mr. Brooks.

6           Mr. Parlade, please make your appearance.

7           MR. PARLADE:  Good morning, Your Honor.

8   Miguel Parlade on behalf of the respondents,

9   Hammocks Community Association and Marglli Gallego.

10          THE COURT:  All right.  Is there anyone

11  else who wishes to make an appearance?

12          Mr. Alfaro, go ahead and make your

13  appearance.

14          MR. ALFARO:  Yes.  Good morning, Your

15  Honor.  Elbert Alfaro on behalf of the association,

16  on behalf of Monica Ghilardi.  She received a

17  subpoena yesterday.  She's the president of the

18  board.  However, she has COVID.

19          THE COURT:  Okay.

20          MS. ESCOBAR:  Good morning, Your Honor.

21  Annette Escobar on behalf of -- I'm counsel for the

22  Hammocks association and Marglli Gallego.

23          THE COURT:  Okay.  Thank you, Ms. Escobar.

24          Anyone else wish to make an appearance?

25          MR. CUE:  Good morning, Your Honor.  My

1    name is Jesus Cue.  I'm the controller of Hammocks

2    Community Association.

3              THE COURT:  Okay.  Thank you very much.

4              All right.  We're here this morning on the

5    evidentiary hearing on the debtor's statement of

6    damages.  We also have a few other motions set,

7    including motions in limine, motion to strike expert

8    report, and the motion to reconsider.

9              So, Mr. Arslanian, did you want to make

10   any preliminary comments before I turn to

11   Mr. Parlade for his pre-trial motions?

12             MR. ARSLANIAN:  Not at this time.  I

13   assume that we're going to do those three motions

14   before we start.

15             THE COURT:  Yes.

16             MR. ARSLANIAN:  Okay.

17             THE COURT:  All right.  Mr. Parlade, let's

18   go first to your motion in limine.  You definitely

19   need to unmute.

20             MR. PARLADE:  Sorry about that.  I was so

21   looking forward to a live hearing today, and then

22   everything changed and we're back -- I guess to this

23   point now.

24             In any case, this is the respondents'

25   motion in limine.  I have cited various matters in

1    the motion in limine and the motion to strike expert

2    witnesses.  I believe many of these matters have

3    been resolved.  I have spoken to Mr. Brooks

4    yesterday, and I believe we have an agreement.

5            They are not offering any expert testimony

6    or any testimony by any of the physicians listed, so

7    I believe that matter has been disposed of.

8            MR. ARSLANIAN:  That is correct.

9            THE COURT:  Okay.  Thank you,

10   Mr. Arslanian, but again, I appreciate your

11   interjection, but I would have asked you after

12   Mr. Parlade was done, because the problem is, as

13   I've said before, the recording can't pick up two

14   people speaking at once.  But thank you for your

15   affirmation.  I appreciate your enthusiasm.

16           Okay.  Mr. Parlade, please continue.  So

17   no expert testimony is being offered.  That might

18   explain why I don't have any doctors on the Zoom.

19           What else did you want to tell me,

20   Mr. Parlade, before I turn to Mr. Arslanian for

21   anything else he would wish to say with respect to

22   your presentation?

23           MR. PARLADE:  The only thing we also wish

24   to limit, Your Honor, is no material events or

25   materials.  This is a hearing limited to

Page 312

1    determination of damages for emotional distress and

2    punitive damages.  That is the limitation placed by

3    this Court in its trial order.

4           There is what was called a tree letter

5    that was listed as an exhibit to the debtor's

6    exhibit list.  I've spoken to Mr. Arslanian this

7    morning, and I believe he also agreed that that

8    exhibit should be stricken.

9           Lastly, we respectfully request that this

10   Court exclude any character evidence or evidence of

11   other times or acts as prohibited by the Federal

12   Rules of Evidence.

13          THE COURT:  All right.  Well, I'm going to

14   ask Mr. Arslanian in a minute regarding the tree

15   letter exhibit.

16          With respect to the final point,

17   Mr. Parlade, obviously, this is not a criminal

18   trial, and so the rules regarding prior acts are

19   somewhat different under the Federal Rules of

20   Evidence.  But if and as that testimony or that

21   evidence is presented, I will consider that

22   objection in time.  In other words, it's more

23   difficult to react to that objection in a vacuum.

24          MR. PARLADE:  Yes, Your Honor.

25          THE COURT:  So we'll do that as we get to

1    each thing.

2          So, Mr. Arslanian, I'll ask you to advise

3    with respect to the tree letter exhibit, if you have

4    anything to add, or you agree with Mr. Parlade's

5    understanding of your -- with respect to that

6    exhibit.

7          MR. ARSLANIAN:  What Mr. Parlade said is

8    correct.  Mr. Brooks -- that's been agreed to, yes.

9    That's being dropped.

10          THE COURT:  Okay.  So does that resolve,

11    Mr. Parlade, your entire motion in limine?

12          MR. PARLADE:  Yes, Your Honor.  Also,

13    there's an agreement between counsel on the motion

14    to strike the expert witnesses.

15          THE COURT:  Okay.  All right.  Then I'm

16    going to ask you to prepare orders with respect to

17    each of those motions consistent with your

18    presentation.  Share them with Mr. Arslanian before

19    you upload them.

20          MR. PARLADE:  Yes, Judge.

21          THE COURT:  Hold on.  I'm writing my

22    notes.

23          Just so that you gentlemen -- ladies and

24    gentlemen -- so nice to have -- never mind.  I'm not

25    supposed to make comments regarding attorneys, but

Page 314

1    it's always nice to have another woman.

2              In any event, I'm here in the courtroom by

3    itself.  My courtroom deputy is at home.  My law

4    clerk is at home.  I came in in case there was any

5    technical difficulties, just to make sure.  But it's

6    true.  I also was looking forward to seeing you all

7    in person, but unfortunately, the present

8    circumstances make it unsafe.

9              My son got COVID last week.  Now he's

10   fine.  He tested negative yesterday.  He'd been

11   fully vaccinated.  He wasn't very sick, but, you

12   know, we just can't take chances, because all of us

13   have people in our circle that are either

14   unvaccinated, because they can't be, young children,

15   grandchildren, or older people who are

16   immunocompromised, and we don't want to take any

17   chances with them.

18             All right.  So, Mr. Arslanian, the last

19   motion before we get to the trial is the motion to

20   reconsider, and I will save you some time and just

21   let you know that I reviewed the motion to

22   reconsider the motion to reconsider, which frankly,

23   had I seen it before it was set for hearing, I would

24   have denied it without a hearing.  I haven't altered

25   my reasons for denying the motion to reconsider, and

1    there's nothing in the motion to reconsider the

2    motion to reconsider that would change my mind.

3           Having said that, if and at such time as

4    that ruling is appealable, then I'm sure that you

5    will include that in the appeal.

6           So, Mr. Arslanian, did you have any

7    questions with respect to that?

8           MR. ARSLANIAN:  I don't have any

9    questions.  If I could just briefly state something

10   for the record on that.

11          THE COURT:  Go ahead.

12          MR. ARSLANIAN:  My position is that if

13   Mr. Brooks intentionally not kept contemporaneous

14   records, he could still submit reconstructed

15   records, and under the circumstances, where he -- I

16   think that the order denying those fees said that he

17   could have requested those records from his prior

18   law firm.

19          The Rule 60 basis is that excusable

20   neglect in that, if he did fail to do that, it was a

21   futile act anyway, because he finally did do it and

22   those records were gone.  So I think that the

23   association is getting a windfall, where I believe

24   in the law they have a case that basically says that

25   reconstructed records are permissible.

1          It's 710 So.2d 166, Cohen & Cohen, P.A.

2    versus Angrand.  It's cited by two or three other

3    courts, including the Middle District of Florida,

4    and basically holds that where attorneys have not

5    kept contemporaneous time records, it is permissible

6    for reconstruction of time being prepared.

7          Mr. Brooks did not do that.  He did keep

8    those records.  It's just that his prior law firm

9    either misplaced them, intentionally or whatever.

10   They're lost.  That's the reason why these fees are

11   being denied, and I believe that there is a legal

12   basis to award those fees, and I believe that Rule

13   60, we have -- there is excusable neglect.  Even if

14   there wasn't excusable neglect, he's allowed to

15   reconstruct the record.

16          THE COURT:  I don't want to spend a lot of

17   time on this, because I want to get to the

18   evidentiary hearing, but I want to make the

19   following observation:  I don't disagree with

20   anything that you just said, Mr. Arslanian, with

21   respect to the ability to reconstruct records.  I

22   don't disagree with that.

23          Part of the basis of my ruling last time

24   was that Mr. Brooks did not make any effort to do

25   that at all when he submitted his original

1    submission, regardless of the fact that I had made

2    very clear what was required.  That was the basis

3    for the denial of the original motion to reconsider,

4    that no effort was made to comply with my express

5    instructions at all, not even on the motion to

6    reconsider.

7              So now on the motion to reconsider the

8    motion to reconsider, that's the first time and that

9    was the basis.  So I don't disagree with you,

10   Mr. Arslanian, but I'm not persuaded by the

11   argument.  Having said that, let's see how today

12   goes, okay?

13             So with respect to the tree letter --

14   let's go to the evidence.  And the Court will take

15   care of that order.

16             With respect to the tree letter, which is

17   Exhibit 5, that's not going to be introduced.  So we

18   have that.

19             So now, Mr. Arslanian, let's go to the

20   balance of your exhibits, 1 through 12, minus 5.

21   Have you and Mr. Parlade come to any agreement with

22   respect to the admissibility of any of these

23   exhibits?

24             MR. ARSLANIAN:  Yes, we have.  First of

25   all, Number 12 is also withdrawn.

1           THE COURT:  Okay.  So that's not

2    introduced.  Okay.

3           MR. ARSLANIAN:  And I believe that Number

4    6, there is no objection, the proposed budget of the

5    Hammocks Community Association, and I believe that

6    there is no objection is to 2, 3 and 4.

7           THE COURT:  Okay.

8           MR. ARSLANIAN:  We have for 2 and 4 -- for

9    2 and 4 we have the records.  We have the custodian

10   of records affidavit from each of the doctors, and

11   we have the records attached.  We did a notice of

12   intent to rely.

13          THE COURT:  Okay.  So you have -- the

14   question was just whether you and Mr. Parlade had an

15   express agreement with respect to the admission of

16   any of these exhibits.  So you're saying that you

17   and Mr. Parlade have expressly agreed that 2, 3, 4

18   and 6 are admissible?

19          MR. ARSLANIAN:  That is my understanding.

20          MR. PARLADE:  That's incorrect.  Your

21   Honor, I --

22          THE COURT:  Well, that's fine.  We don't

23   have to go any further than that right now.

24          So, Mr. Parlade, let me skip over you for

25   a minute then.

1              MR. PARLADE:  Thank you.

2              THE COURT:  Are there any exhibits that

3    are proposed by the plaintiff to which you do not

4    object?

5              MR. PARLADE:  Your Honor, we don't object

6    to admitting Number 6, which is the Hammocks

7    Community proposed budget.

8              THE COURT:  Okay.  So that will be

9    admitted.

10             (Thereupon, Debtors' Exhibit No. 6 was

11         admitted into evidence.)

12             THE COURT:  What else?

13             MR. PARLADE:  And that is it, Your Honor.

14   I've spoken to counsel in reference to 2, 3 and 4,

15   and I said we got two declarations as to business

16   records, but we still would require and request that

17   counsel lay the foundation for the introduction of

18   these records, as they are more hearsay, unless

19   there's an exception, and that must be demonstrated

20   by counsel laying the foundation.

21             THE COURT:  Okay.  Let's go to your

22   exhibits -- your one exhibit.  It's the debtor's

23   answers to interrogatories.

24             Mr. Arslanian, do you have an objection to

25   the admission of Exhibit 1?

Page 320

1                    MR. ARSLANIAN:  I do not.

2                    THE COURT:  Okay.  So Exhibit 1 for the

3    association will be admitted.

4                    (Thereupon, Association's Exhibit No. 1

5       was admitted into evidence.)

6                    THE COURT:  Okay.  Let's go back now to

7    your supplemental exhibit.  Mr. Arslanian, I could

8    not open any of the exhibits.  So I guess they're

9    video exhibits, but I could not open any of them on

10   the docket.

11                   So, Mr. Parlade, do you have an objection

12   to the admission of any of 1, 2 and 3?

13                   MR. PARLADE:  Yes, Judge.  If you can't

14   open it, they can't be introduced as an exhibit.  I

15   initially talked to Mr. Brooks when they were

16   uploaded.  I told him I couldn't open them either.

17   He sent me three videos via e-mail.  I don't know if

18   they're the same, but I would request that they at

19   least be executable by the Court, and be able to be

20   played to be presented as an exhibit.

21                   THE COURT:  Okay.  We'll get back to that

22   in a minute.  I'm going to mark these --

23   Mr. Arslanian, on your supplemental exhibit, Exhibit

24   1 is going to be renumbered Exhibit 13, Exhibit 2 is

25   going to be renumbered Exhibit 14, and Number 3 will

1    be remarked -- renumbered Exhibit 15.  Because you

2    can't have two Exhibit 1s, two Exhibit 2s, two

3    Exhibit 3s.

4              As far as the introduction of the videos,

5    we'll take them as they come, in terms of the screen

6    share, because I don't know how else we're going to

7    be able to do that, and then you'll have to hand

8    deliver with a courier or something.  Because the

9    clerk's office is open, the actual video, since

10   Mr. Parlade did have a chance to see them in advance

11   of the trial, and I don't need to.

12             All right.  So, Mr. Arslanian, let's go

13   back, and you can begin the presentation of your

14   case.  I don't know if you have an opening

15   statement, and then we'll get to the presentation of

16   your evidence.  Okay?

17             MR. ARSLANIAN:  Yes.  Before I begin my

18   presentation, my understanding is that there's two

19   IME reports that are being submitted into evidence,

20   as well.

21             THE COURT:  I'm sorry.  Two what?

22             MR. ARSLANIAN:  IME reports.

23             THE COURT:  What are IME reports?

24             MR. ARSLANIAN:  Independent medical

25   examination reports were provided to me.

1          MR. PARLADE:  I believe he's referring to

2    the reports prepared by my expert pursuant to

3    Federal Rules of Evidence 26.  As you know, the

4    disclosure of the experts, their opinions and the

5    facts which the expert bases their opinion must be

6    disclosed prior to testimony of the expert.

7          My expert is on standby.  As this Court is

8    aware, experts, unfortunately, are paid on an hourly

9    basis.  So he's on standby and he will be

10   testifying.  Those reports are inadmissible hearsay

11   in terms of federal law, and he's going to give his

12   verbal testimony today.

13          THE COURT:  Okay.  Well, they're not

14   inadmissible hearsay.  They are hearsay, and they're

15   admissible if no party objects.  But they're not

16   listed as exhibits on your register.

17          MR. PARLADE:  Correct.

18          THE COURT:  Okay.

19          MR. PARLADE:  As a matter of housekeeping,

20   Your Honor, I need to tell the expert when he will

21   be testifying, so he's not on standby for half a

22   day.  Would it be okay with this Court and opposing

23   counsel if we set a time for him, and possibly see

24   him out of order so we can have that testimony

25   heard?

Page 323

1                THE COURT:  Mr. Arslanian?

2                MR. ARSLANIAN:  I don't have a problem.

3    How long are we going today?  I don't even --

4                THE COURT:  We're going as long as it

5    takes, but if we're not done before lunchtime, then

6    we'll have to take a break, because I have to issue

7    an oral ruling after lunch in another case.

8                MR. ARSLANIAN:  Do you want to set a

9    particular time, Miguel?

10               MR. PARLADE:  I'm sorry?

11               MR. ARSLANIAN:  Do you want to set a

12   particular time?  I don't have a problem.

13               MR. PARLADE:  Can we have him on first,

14   maybe at 10:30?  Is that okay?

15               THE COURT:  You can do it whenever you

16   want, but I'm assuming that we need to -- that's

17   fine.  All right.  10:30.  If that's okay with

18   Mr. Arslanian, that's okay with me.

19               MR. PARLADE:  Thank you, Judge.

20               THE COURT:  So, Mr. Arslanian, let's go

21   forward.  Did you wish to start with your witnesses

22   first, or what do you want to do?

23               MR. ARSLANIAN:  I would like to offer

24   Exhibits 2 and 4 into evidence, notwithstanding any

25   objection.  These are business records, and there's

Page 324

1    a business records exception.  We have the custodian

2    of the records affidavit.  I don't see any basis to

3    exclude them, Numbers 2 and 4.

4              MR. PARLADE:  Objection, Your Honor.

5    Foundation has not been laid.

6              THE COURT:  All right.  So we have a

7    business record, and you have no objection on the

8    basis that it's a business record, Mr. Parlade, but

9    that it's relevant?  I'm trying to understand.

10             MR. PARLADE:  Correct.  They're medical

11   records, so they have to lay the foundation with

12   their clients, its admissibility.

13             I don't know for what purpose it's being

14   admitted.  It's not enough to just say something is

15   a medical record and it's admitted into evidence.

16   Foundation must be laid.

17             THE COURT:  All right.  I'm a little

18   concerned.  I see both witnesses together, which is

19   fine, but they're also talking to somebody.  So I'm

20   going to ask Mr. Arslanian, where are your clients

21   located at this time, and who is the person with

22   them right now?

23             MR. ARSLANIAN:  They are located in the

24   same building, but in a different office, a

25   different room that I'm in.  Just like we did at the

Page 325

1    last hearing or whatever it was.  They are with a

2    translator.  That's probably who they're speaking

3    with.

4              THE COURT:  Okay.  All right.  I saw that

5    Mr. Cepero had a phone in front of him.  That phone

6    needs to be -- any electronic device other than what

7    is being used to convey the testimony needs to be

8    turned off.

9              THE INTERPRETER:  Judge, can you hear me?

10             THE COURT:  Yes, I can.  I can't read what

11   that says.  So you're a certified court interpreter.

12   Please identify your name for the record.

13             THE INTERPRETER:  Mario Beovides.

14             THE COURT:  And, Mr. Beovides, can you

15   please spell your name for the record?

16             THE INTERPRETER:  Sure.  Mario is

17   M-A-R-I-O, and Beovides is B as in boy, E-O-V as in

18   Victor I-D as in David E-S.

19             THE COURT:  Okay.  Thank you,

20   Mr. Beovides.  All right.

21             So what I'm going to do is -- I'm trying

22   to see whether I have my oath up here.  Okay, good.

23             Mr. Arslanian, I don't disagree with

24   Mr. Parlade that you at least have to lay a

25   foundation as to the relevancy of the business

1    records.

2              MR. ARSLANIAN:  Okay.

3              THE COURT:  Which witness do you want to

4    swear in?

5              MR. ARSLANIAN:  At this point I'll deal

6    with those afterwards.  I would have loved to have

7    started with Ms. Gallego, and apparently she's not

8    here.  I think Miguel said that he can get her

9    later.  Let's start with Jesus Cue.

10             THE COURT:  Okay.  First off, there's no

11   first names here.  We're in court.  We're a little

12   informal, but I'm going to ask the translator to

13   mute until we started taking testimony.

14             So did you subpoena Ms. Gallego to be here

15   today?

16             MR. ARSLANIAN:  Yes.

17             THE COURT:  Mr. Parlade, did I

18   misunderstand?  Did Mr. Alfaro say Ms. Gallego is

19   the person who has COVID?

20             MR. PARLADE:  Ms. Gallego does have COVID.

21   Mr. Alfaro is here for, I think, the president.  Is

22   it the president, Mr. Alfaro?

23             MR. ALFARO:  Yes, the president, Monica

24   Ghilardi.

25             THE COURT:  Okay.  And Ms. Gallego is

1    sick?

2           MR. PARLADE:  I spoke to her yesterday and

3    she was getting COVID tested last night.  That's my

4    last conversation with her.  She did sound sick on

5    the phone.  She said she has COVID.  She was at the

6    COVID testing, Your Honor.  She is sick, but she

7    never mentioned she received a subpoena, or received

8    a subpoena by opposing counsel.

9           In addition, I don't know why they would

10   have subpoenaed the president of the association,

11   Monica Ghilardi.  She is not a witness on the

12   witness list, and has not been presented as a

13   witness, so I'm not sure why they subpoenaed her.

14   I'd love to hear from opposing counsel on why.

15          THE COURT:  Okay.  Mr. Arslanian, with

16   respect to Ms. Ghilardi --

17          MR. ARSLANIAN:  Gallego.

18          THE COURT:  No, not Gallego.  The

19   president of the association.  Is her name on your

20   witness list?  Is Mr. Parlade confused?

21          MR. ARSLANIAN:  She is not on the witness

22   list.  That was an intent in serving to get the

23   person with the most knowledge of the association.

24   There was some difficulty with the service of that.

25          Mr. Cue is here, so I don't think there's

1    a problem with that.  Ms. Gallego is a respondent.

2    She's a party to this action, and we subpoenaed her.

3              THE COURT:  I understand.  You subpoenaed

4    her and she's not here.  So her failure to appear

5    and her failure to seek to be excused is something

6    that you have the right to proceed on procedurally.

7    So whatever it is that you choose to do with respect

8    to her failure to appear, you'll argue that at the

9    appropriate time.

10             She's not here and you subpoenaed her.

11   That's a problem for her.

12             MR. ARSLANIAN:  I move that she be held in

13   contempt for failing to appear.

14             THE COURT:  Okay.  I will deal with that

15   after the fact, but in terms of any evidentiary or

16   other issues to which you are entitled, if any, for

17   her failure to appear, notwithstanding the subpoena

18   and not asking to be excused, we'll deal with that

19   as appropriate.

20             MR. ARSLANIAN:  Well, because there was an

21   objection to Number 1, there are two deeds from the

22   public record that show title of two real properties

23   at the Hammocks titled in her name.  I move that

24   they be admitted in.  I was going to ask her to, you

25   know -- I don't even know the basis for the

1    objection.  They're public records and they're

2    deeds.

3                    I ask that Number 1 be admitted, now that

4    she's not here to identify that she owns these two

5    properties.

6                    MR. PARLADE:  Judge --

7                    THE COURT:  Mr. Parlade, I know you do not

8    need -- you don't represent Ms. Gallego, so what

9    would be your position with respect to the deeds?

10                   MR. PARLADE:  Is something happening?

11                   THE COURT:  I believe Mr. Arslanian is

12   going to screen share.  You should have given us a

13   little warning first.

14                   MR. ARSLANIAN:  I'm sorry.

15                   MR. PARLADE:  I thought my computer was

16   broken.

17                   Judge, these have never been -- I don't

18   know what warranty deeds they're referring to.

19   They've never -- neither have been submitted to

20   discovery nor listed in the exhibit list.

21                   THE COURT:  What do you mean?

22                   MR. PARLADE:  I've never gotten a copy of

23   a subpoena, I've never gotten a copy of the return

24   of service for the subpoena.

25                   If you want I can try to get Ms. Gallego

Page 330

1    on the line, and then try and have her appear on

2    Zoom, but I don't have anything from opposing

3    counsel showing a subpoena, showing return of

4    service, or these exhibits.

5              THE COURT:  The exhibits are on the

6    exhibit register that was submitted timely.  So what

7    would be the basis of your objection, Mr. Parlade?

8    Putting aside Ms. Gallego not appearing right now,

9    what would be the basis of your objection to the

10   admission of the deeds?

11             MR. PARLADE:  If Exhibit 1 is the exhibit,

12   if they're in the composite exhibit, then no

13   objection.  They're public records, and I have no

14   objection.

15             THE COURT:  Then I will admit -- is that a

16   composite exhibit, Mr. Arslanian?

17             MR. ARSLANIAN:  Yes.  It's a composite

18   exhibit of two deeds, two different properties

19   titled in the name of Marglli Gallego.

20             THE COURT:  All right.  Then I'm going to

21   admit them, but in the future, I would appreciate

22   that composite exhibit would be identified as such,

23   or that the deeds be separately listed.  Okay?  And

24   I'll note that they're a composite.

25             (Thereupon, Debtors' Composite Exhibit No.

1          1 was admitted into evidence.)

2               MR. PARLADE:  Can you please take down the

3      screen share?  I can't --

4               MR. ARSLANIAN:  I'll take it down.

5               THE COURT:  So with respect to

6      Ms. Gallego's nonappearance, Mr. Parlade, if you

7      want to text her or something.

8               In the meantime, Mr. Arslanian, when you

9      file your motion for contempt or seek whatever other

10     evidentiary presumptions to which you might be

11     entitled, you can attach a copy of the subpoena to

12     satisfy any concerns that Mr. Parlade has in that

13     regard, okay?

14              MR. ARSLANIAN:  I will.  At this point I

15     will call Mr. Cue as a witness.

16              THE COURT:  All right.  So, Mr. Cue, I'm

17     going to ask you to go on camera.  Okay, there you

18     are.

19              Mr. Cue, before I administer the oath, I

20     want to make sure that you have no electronics that

21     are open, other than the computer that you are

22     looking at.  If you have a cell phone, please turn

23     it off.  If you have an iPad, turn it off.

24              MR. CUE:  Your Honor, I'm on the phone

25     doing the Zoom, but that's about it.

Page 332

1              THE COURT:  So you're doing Zoom on your
2    phone?
3              MR. CUE:  Yes, ma'am.
4              THE COURT:  Well, definitely don't turn
5    your phone off then.  All right.
6              Then, Mr. Cue, I'm going to swear you in,
7    and then we'll talk about some logistics.  So please
8    raise your right hand.
9    Thereupon:
10                       JESUS CUE
11   was called as a witness by the Debtors, and having
12   been first duly sworn, was examined and testified as
13   follows:
14             THE COURT:  All right.  You are going to
15   be questioned by Mr. Arslanian.  If Mr. Parlade has
16   an objection -- Mr. Parlade, are you paying
17   attention?
18             MR. PARLADE:  Yes, Judge.
19             THE COURT:  If Mr. Parlade has an
20   objection, he can't stand up, because you won't
21   notice.  So he's going to do this.  And if you see
22   Mr. Parlade doing this, don't answer the question.
23             MR. CUE:  I don't see Mr. Parlade.
24             THE COURT:  You don't see Mr. Parlade?
25             MR. CUE:  No.

Page 333

```
 1                THE COURT:  Oh, dear.  Mr. Parlade, then
 2   you're going to have to say "objection" and
 3   gesticulate wildly.  I'll see the gesticulating or
 4   my law clerk will.  And we'll just manage.  We just
 5   have to manage.
 6                All right.  Mr. Arslanian, you will wait
 7   until Mr. Cue fully answers the question before you
 8   ask your next question.
 9                And Mr. Cue, there's an echo on your
10   phone.  I guess you don't have any way of dealing
11   with that.
12                Mr. Cue, you will wait until Mr. Arslanian
13   is done asking his question before you answer, even
14   if you are absolutely positive that you know what
15   the question is.  Okay?  Understood?
16                THE WITNESS:  Understood.
17                THE COURT:  Okay.  You've got to stop
18   walking, too.
19                MR. CUE:  I was just closing the door to
20   my office.
21                THE COURT:  Oh, okay.  Thank you.
22                All right.  Mr. Arslanian, if you'll go
23   ahead, you may proceed.
24                MR. ARSLANIAN:  Thank you, Your Honor.
25                     DIRECT EXAMINATION
```

Page 334

1    BY MR. ARSLANIAN:

2         Q     Mr. Cue, could you please state your full

3    name and address for the record?

4         A     My full name is Jesus Cue, and my full

5    address is 123 Romano Avenue, Coral Gables, Florida,

6    33134.

7         Q     And it is my understanding that you are

8    the person with the most knowledge regarding the

9    financial affairs of the Hammocks Community

10   Association; is that correct?

11        A     Yes.  The current financial information.

12   I came aboard roughly two and a half, three years

13   ago.  From that point on I could answer any

14   questions.

15        Q     Okay.  So you're on the board?

16        A     No, I'm not.

17        Q     What is your position in relation to the

18   Hammocks Community Association?

19        A     I'm a comptroller, accounting consultant

20   for Hammocks Community Association.

21             MR. ARSLANIAN:  I'm going to bring up,

22   Your Honor, and screen share Exhibit 6, the document

23   that was already agreed to be admitted, the proposed

24   budgets of the Hammocks Community Association.

25             THE COURT:  All right.  Exhibit 6 is

Page 335

1   already admitted, so proceed.  Go ahead.  Do the

2   screen share.  Thank you for the warning.

3   BY MR. ARSLANIAN:

4        Q    Mr. Cue, are you familiar with this

5   document, which was admitted into evidence as Number

6   6, the proposed budget of Hammocks Community

7   Association, Inc.?

8        A    Yes.  It's a proposed budget, yes.

9        Q    Okay.  And you see that for 2020, the

10  association had a budget of approximately

11  $4,255,000?

12       A    Yes.

13       Q    And you see that for the following year,

14  2021, the budget -- the proposed budget was

15  $4,279,000, approximately?

16       A    Yes.

17       Q    Now, how many units are there at the

18  Hammocks Association?

19       A    I believe roughly -- and it's not an exact

20  number, but it's around 6,500 units.

21       Q    6,500 units?

22       A    Yes.

23       Q    So the 6,500 unit owners pay in

24  maintenance fees the approximately $4.2 million

25  budgets for 2020 and 2021?

Page 336

1          A      Yes.

2          Q      And is it fair to say --

3          A      Not only assessment.  If you see the

4    breakdown of the revenues, the different items of

5    revenues are taken into account.  The assessment

6    only accounts for 3,745,928.

7          Q      And because of that there's other income

8    available to the association that meets this budget;

9    is that correct?

10         A      Yes.

11         Q      Okay.  So if I scroll down to the

12   different operating expenses, let's just say legal

13   general, one year it was $200,000, the next year it

14   was $175,000.

15                These items change year to year?

16         A      Yes, they do.

17         Q      And that affects the overall budget?

18         A      Yes, they do.

19         Q      So is it fair to say that as the items

20   change, the budget changes and the maintenance

21   charges change, so that the budget is met?  Is that

22   fair?

23         A      No.  The main assessment is a fixed

24   amount.  That is what the owners pay.  In order to

25   change that, the board has to agree and so forth and

Page 337

1    so on.  The assessment is a fixed number.

2         Q    Put it this way:  At the end of the day,

3    the budget is $4,279,000.  The board collects enough

4    maintenance to make sure that that budget is met; is

5    that correct?

6         A    Technically, yes.

7         Q    Okay.

8         A    Remember, this is a budget.  This is not

9    actual numbers.  These are estimates that are put

10   together, based on prior history and prior

11   information.  It doesn't necessarily mean that they

12   are actual numbers.

13        Q    Okay, but let me ask you this:  If all of

14   the different operating expenses increase by let's

15   say 5 percent across the board, the budget is

16   increased by that amount; is that correct?

17        A    It is increased or it's adjusted, or some

18   of the service would have to come down.  The numbers

19   would have to be resolved, but the amount that comes

20   in as an assessment is a fixed number.

21        Q    Okay.  Let me show you what I'm going to

22   screen share, Exhibit Number -- what's been marked

23   as Exhibit Number 8, please.

24             Now, does the association own various

25   units at the Hammocks Community?

Page 338

1        A     Up to that point, I'm aware in a general

2   sense that the association owns several properties.

3   I don't know the specifics.  That's basically

4   handled by our collection attorney, Yudany

5   Fernandez.  And I don't have the details as to that

6   matter.

7        Q     Well, I'm showing you a printout from the

8   Office of the Property Appraiser, showing a list of

9   25, 30 units that are all owned by -- listing the

10  owner as Hammocks Community Association, Inc.; is

11  that correct?

12       A     I see the list.  I'm on the phone, and I

13  see a list of properties, yes, I do.

14       Q     Okay.  And you don't have any doubt that

15  Hammocks Community Association, Inc., owns several

16  units?

17       A     Like I said, it owns several units, but I

18  don't know the specific unit or the specific amount

19  of units.

20       Q     But you're supposed to be the person with

21  the most knowledge of the assets and the finances

22  of --

23       A     Like I said, I came aboard three years

24  ago, and I've been organizing and establishing

25  internal controls.  Some of the matters that I defer

Page 339

1    them to the aspect, like in this case Yudany, the

2    attorney that takes care of those matters.

3         Q    Okay.

4              MR. ARSLANIAN:  Judge, at this time I

5    would ask that Exhibit 8 be admitted into evidence.

6              THE COURT:  Mr. Parlade?

7              MR. PARLADE:  Objection, Your Honor.  The

8    foundation has not been established.  The witness

9    has stated he has no knowledge of this.

10             And I also object to the question

11   characterizing this witness as the person with the

12   most knowledge of the corporation.  He has not been

13   designated as such, and neither has the association

14   subpoenaed anybody in the association with that

15   knowledge.  So it's a two part objection.

16             THE COURT:  All right.  So let's start

17   with the first.  The first was -- because I was

18   getting caught up in the second part.

19             So the objection to the exhibit itself is

20   what?

21             MR. PARLADE:  Foundation has not been

22   laid, Your Honor.  The witness has stated he has no

23   knowledge of this.

24             THE COURT:  Okay.  And that's the basis

25   for the objection?

1            MR. PARLADE:  It's to its admission as an

2    exhibit, yes.

3            THE COURT:  Okay.  That this particular

4    witness has stated he's not aware of which

5    properties are owned by the Hammocks?

6            MR. PARLADE:  Correct.  So foundation has

7    not been laid.

8            THE COURT:  Okay.  And then you made a

9    general objection with respect to the

10   characterization of Mr. Cue as the Rule 36 witness.

11   You say that he was never designated as such?

12           MR. PARLADE:  Correct.  He is a

13   representative of the association, and has never

14   been designated as the person with the most

15   knowledge as to what Mr. Arslanian is referring to.

16   I don't know what --

17           MR. ARSLANIAN:  I stand corrected on that.

18   He's listed as the comptroller.  I stand corrected.

19           MR. PARLADE:  Thank you.

20           THE COURT:  All right.  With respect to

21   the initial -- the objection to the exhibit itself,

22   Mr. Arslanian, your response.

23           MR. ARSLANIAN:  He did testify that he

24   knows that the association owns several units.  This

25   is an official printout from the Office of the

1  Property Appraiser, a reliable source, the same

2  source where I got the deeds for Ms. Gallego.

3          THE COURT:  Okay.  Anything else,

4  Mr. Parlade?

5          MR. PARLADE:  No, Judge.

6          THE COURT:  Okay.  I'm going to overrule

7  the objection on the basis upon which it was made.

8  Since that's the basis upon which it was made, I

9  will admit Exhibit 8.

10          (Thereupon, Debtors' Exhibit No. 8 was

11      admitted into evidence.)

12          MR. ARSLANIAN:  At this time I'm going to

13  screen share Exhibit 9.

14  BY MR. ARSLANIAN:

15      Q    Mr. Cue, as was shown in the budgets,

16  Exhibit 6, there are accounts receivable due and

17  owing to the association; is that correct?

18      A    Yes, it is.

19      Q    I'm going to show you a document -- I'm

20  sorry.

21          MR. ARSLANIAN:  Is this 8?  I'm sorry,

22  Your Honor.

23          Can you pull up Number 10?

24          THE COURT:  You referenced Exhibit 9.  Are

25  you seeking to ask questions on Exhibit 9 or Exhibit

Page 342

1   10?

2              MR. ARSLANIAN:  Let me ask on Number 9

3   first.

4   BY MR. ARSLANIAN:

5       Q    Is this accounts receivable of moneys owed

6   from all these unit owners?

7       A    Yes.  This is an aging, a (unintelligible)

8   report, as of December 15, 2021.

9       Q    Okay.  And I'll go all the way down to the

10  bottom.

11              THE COURT:  I'm leaning over, because my

12  exhibit display is on (unintelligible) screen, so I

13  don't want you to think that I'm doing something

14  else.  I'm just trying to get close enough to this

15  exhibit to actually read it.

16  BY MR. ARSLANIAN:

17      Q    The bottom line it shows approximately

18  $812,711 in receivables; is that correct?

19      A    Hold on.  I'm getting to it.  Give me a

20  minute.

21              Yes, $812,711.43 of receivables, of which

22  $672,299.92 is over 90 days past due, and if you see

23  the listing, the remarks to the side where it says

24  "Alfaro" and "Fernandez," those are items that are

25  in collection.

1        Q    Okay.

2        A    So more than half of the receivables are

3    basically in collection.

4        Q    Okay.

5             MR. ARSLANIAN:  At this time I would ask

6    that Exhibit 9 be admitted into evidence.

7             THE COURT:  Mr. Parlade?

8             MR. PARLADE:  No objection, Your Honor.

9             THE COURT:  All right.  Exhibit 9 is

10   admitted.

11            (Thereupon, Debtors' Exhibit No. 9 was

12        admitted into evidence.)

13            MR. ARSLANIAN:  At this time I'm going to

14   ask to screen share Exhibit 10.

15   BY MR. ARSLANIAN:

16       Q    Now, I just want to -- Mr. Cue, let me

17   show you this document.  I'm just going to ask you a

18   question.

19            Is this a printout of other accounts

20   receivables due to the association?

21       A    Hold on a second.  That doesn't -- I don't

22   have that report with me.  Hold on a second.  Give

23   me a minute to see what that report is.

24            I'm not familiar with that report at this

25   moment.  The last payment for --

Page 344

1           THE COURT:  Stop moving it, Mr. Arslanian,

2    so he can look at it.

3           THE WITNESS:  I'm not familiar with that

4    report.

5    BY MR. ARSLANIAN:

6       Q    Okay.

7       A    I am not familiar with that report.

8       Q    You've never seen it before; is that

9    correct?

10      A    I would have to see more detail.  I don't

11   know if it's possible that you could e-mail it to me

12   so that I could see the detail.  In the shared

13   screen I don't recognize that report.

14      Q    Let me just scroll down to the bottom, and

15   let me just see if you maybe recognize the bottom

16   part of it.  I'm sorry.  It looks like it's

17   foreclosure cases for the Hammocks.

18           Is that --

19      A    I'm definitely not familiar with this

20   report.  It is dated -- the transaction dated 2014,

21   way before my time.  I'm really not familiar with

22   this report.

23      Q    Are you familiar with a company called

24   Axiom Resources?

25      A    I heard of Axiom Resources.  If I'm not

Page 345

1    mistaken, that was a company that was contracted a

2    long time ago.  I don't know the specific year when

3    that company was contracted to do collection for

4    Hammocks Community Association.

5              That's the extent -- I know there has been

6    problems with collections and so forth, but I don't

7    know the details of the whole deal.

8              MR. ARSLANIAN:  I'm going to stop the

9    share.  I'm not going to move to have this one

10   admitted, Judge.  I'm going to bring up Number 11,

11   please.

12             THE COURT:  I'm going to mark Number 10 as

13   not introduced.

14   BY MR. ARSLANIAN:

15        Q    Mr. Cue, are you familiar with the fact --

16   I'm sorry.  Strike that.  Let me start again.

17             The association -- does the association

18   own various automobiles, motor vehicles?

19        A    Yes, it does.

20        Q    Okay.  Exhibit 11 shows the registrations

21   of various motor vehicles titled in Hammocks

22   Community Association, Inc.

23        A    Yes.  I do have that information in front

24   of me, yes.

25        Q    Okay.  I don't know whether it's 15 cars,

Page 346

1   18 cars, 17 cars.  Is that correct?

2        A    I don't have a list of the automobiles in

3   front of me, but I would venture it to be in that

4   neighborhood.

5             MR. ARSLANIAN:  At this time, Judge, I

6   would ask that Exhibit 11 be admitted.

7             THE COURT:  Mr. Parlade?

8             MR. PARLADE:  No objection, Your Honor.

9             THE COURT:  Okay.  Exhibit 11 is admitted.

10            (Thereupon, Debtors' Exhibit No. 11 was

11        admitted into evidence.)

12            MR. ARSLANIAN:  Thank you.

13  BY MR. ARSLANIAN:

14       Q    I'm going to pull up Exhibit Number 7 now.

15            Mr. Cue, does the association have various

16  bank accounts?

17       A    Yes, it does.

18       Q    How many, approximately?

19       A    Well, we currently operate with roughly

20  seven accounts.

21       Q    And are there any reserves kept by the

22  association?

23       A    At this moment we have no reserves.

24       Q    Is there any insurance money that's due

25  and owing to the association?

Page 347

1       A     There's no insurance money.   There was a

2    Hurricane Irma claim that was settled last year, if

3    I'm not mistaken.

4       Q     How much was it settled for?

5       A     If I'm not mistaken -- I cannot give you a

6    specific number, because I don't have that

7    information in front of me, but I would venture to

8    say between 100 and $150,000.

9       Q     Okay.   And with respect to the motor

10   vehicles, when I looked at the budget -- and we can

11   go back through it -- I don't see any auto loan

12   payments for any of those vehicles.

13      A     Three of the vehicles are being financed.

14   One of the vehicles is being financed by GM

15   Financial, which is roughly -- because they were

16   purchased recently -- 16,000, 17,000, GM Financial,

17   and the two other vehicles that are being financed

18   by Allied Financial was roughly like $32,000.

19      Q     And some of the other vehicles are owned

20   outright?

21      A     They are owned outright, and they are in

22   very bad shape.   So that's why we're replacing them

23   little by little as the budget allows.

24      Q     I'm going to show you now what's been

25   marked as Exhibit 7, which is bank balances.

1           There's a bank account at SunTrust; is

2   that correct?

3       A       Hold on.  Let me --

4       Q       I'm sorry.  I'm not going to --

5       A       Yes.  There is a SunTrust -- there's three

6   accounts in SunTrust.

7       Q       Okay.

8       A       There is one account in TD Bank, there is

9   one account on BB&T, and there is one account in CIT

10  Bank.

11      Q       Okay.

12      A       Right now other balances in that account

13  are basically very small, under $5,000.

14      Q       Well, I'm showing you a record from a

15  Total Business Account.

16      A       The account that has the biggest balance,

17  $69,620.90, which is SunTrust account ending in

18  9949, that's a payroll account.  By Monday when we

19  ran payroll, that balance has decreased roughly by

20  $60,000.

21      Q       If I go further down, there's another

22  business banking account with a balance of $19,393.

23      A       Let me see that.  Yeah, that is the same

24  account.  That's SunTrust account ending in 1020.

25  That balance today is down to roughly $3,000.

Page 349

1              Remember, you see the balance in the bank,

2    but you're not seeing the outstanding checks that

3    that account has, and as the checks clear that

4    balance decreases.

5         Q    Here's another account.  This one ends in

6    9949.  It has a balance of $69,620.

7         A    Yeah.  That's the one we just talked

8    about.  That is the payroll account.

9         Q    Is it, because -- let's just look at this

10   real quick.  It says Primary Business Checking,

11   9949.

12        A    Yes.

13        Q    Scroll back up.  That's the one that you

14   described as the payroll account, correct?

15        A    Yes.

16        Q    Okay.  So if I scroll back up to -- there

17   was another account that has a balance of

18   $69,204.42.  That is also business banking --

19             THE COURT:  Stop, stop, stop.  Mr. Cue,

20   you have to let Mr. Arslanian finish asking the

21   question before you answer.

22             Mr. Arslanian, finish asking the question.

23   BY MR. ARSLANIAN:

24        Q    Do you see that there are two different

25   accounts in this composite exhibit that show

Page 350

1   balances of over $69,000?

2       A    Let me check.  I see one for $69,620.90,

3   that ends in 9949.  I see an account that ends in

4   3020 for $19,393.  I see an account that ends in

5   1009 for $87,014.42.  I see an account that ends in

6   4034.

7           Let me see the account that you said

8   that -- the other account that you said has $69,000,

9   please.

10      Q    I'm showing it to you right now.  It's on

11  the screen right now.  It says Total Business

12  Banking 1009, and the last entry, 12-02-21, shows as

13  the balance 69,204.42.

14      A    Are you referring to account Total

15  Business Banking 1009?  That's the account you're

16  referring to?

17      Q    Let me ask you a question.

18          THE COURT:  Mr. Arslanian, he just asked

19  you, is that the account you're referring to.

20  BY MR. ARSLANIAN:

21      Q    Yes, it is.

22      A    That account has an available balance of

23  $8,714.62.

24      Q    All right.

25      A    You're looking at an old balance.

Page 351

1    Q    Okay.

2    A    The current balance of that account is

3  $8,762.

4         MR. ARSLANIAN:  At this time I would ask

5  that Exhibit 7 be admitted into evidence.

6         THE COURT:  Mr. Parlade?

7         MR. PARLADE:  No objection.

8         THE COURT:  All right.  Exhibit 7 is

9  admitted.

10        (Thereupon, Debtors' Exhibit No. 7 was

11     admitted into evidence.)

12 BY MR. ARSLANIAN:

13    Q    Now, Mr. Cue, have -- to your knowledge,

14 have the unit owners been advised of the finding of

15 contempt by the Court?

16    A    I don't understand the question.  I don't

17 know.  Could you repeat that question, be more

18 specific?

19        MR. PARLADE:  Judge, can we have this

20 document taken off the screen share, please?

21        THE COURT:  Oh, yes.  Thank you.

22        Mr. Arslanian, please.  Ask the question

23 again, Mr. Cue -- I mean Mr. Arslanian.

24 Mr. Arslanian, Mr. Cue said he didn't understand the

25 question, to please be more specific.

Page 352

1    BY MR. ARSLANIAN:

2         Q    Mr. Cue, are you familiar with why we're

3    here at this hearing today?

4         A    Yes, I am, fairly familiar.  Not to the

5    details.

6         Q    Do you understand that the Court is going

7    to determine an amount of damages that the

8    association and Ms. Gallego might have to pay to the

9    debtors for contempt of court violations?

10        A    Yes.

11        Q    My question to you is, have unit owners

12   been informed of this proceeding and the contempt

13   finding by the Court?

14        A    Not that I'm aware of.

15        Q    Do you know of any steps that the

16   association has taken to make sure that there are no

17   further contempt violations by the association?

18        A    Not that I'm aware of.

19             MR. ARSLANIAN:  I have no further

20   questions at this time, Your Honor.

21             THE COURT:  All right.  Mr. Parlade,

22   cross-examination.

23             Mr. Cue, now Mr. Parlade is going to be

24   asking questions, and Mr. Arslanian would be the one

25   that would say "objection" if he has an objection,

Page 353

1    okay?

2                THE WITNESS:  Okay.

3                THE COURT:  All right.  Go ahead,

4    Mr. Parlade.

5                     CROSS-EXAMINATION

6    BY MR. PARLADE:

7        Q    Good morning, Mr. Cue.

8        A    Good morning.

9        Q    Just a few questions.

10               You were shown what is Exhibit Number 6,

11   which is a proposed budget of Hammocks Community

12   Association, correct?

13       A    Yes, sir.

14       Q    And you have a direct knowledge of that

15   budget, correct?

16       A    Yes.

17       Q    And in that exhibit it is shown that the

18   association has approximately in revenues, which is

19   a combination of assessments and other revenues,

20   about 4,279,000, correct?

21       A    Yes.

22       Q    And that same document and other

23   documents, all of the expenses of the association,

24   which includes everything from vehicles to postage

25   to copies, technical support, all of that, correct?

1        A     Yes, sir.

2        Q     After the association pays all of its

3    necessary operating expenses, how much is left over

4    from the revenue received by unit owners?

5        A     The answer is zero, or a negative number.

6    We are a not-for-profit organization.  We don't

7    retain incomes.  We need to spend what we collect.

8    So we are not for profit.

9              Like I mentioned before, the budget is

10    basically an estimate.  The only thing that is fixed

11    is the assessment, and sometimes, like lately when

12    prices go up or the collections or receivables are

13    very difficult because of COVID and so forth, we

14    have to adjust our cash flow, adjust our expenses.

15    But the actual assessment never changes.

16        Q     Do you have knowledge as to the current

17    expenditures of 2021 for the association?

18        A     I roughly have, yes, I do.  I'm working on

19    the closing of the year and so forth, but it's been

20    a difficult year.

21        Q     Will the association have a surplus at the

22    end of the year after accounting for its operating

23    expenses?

24        A     It will not.  I could guaranty you that.

25    We are actually short.  We had to borrow some money

Page 355

1   this month in order to meet some of our expenses.

2        Q    Do you know how much money was borrowed

3   this month in order to meet the expenses?

4        A    We roughly borrowed $375,000 in a

5   short-term loan that in six months -- eight months,

6   short-term loan.

7        Q    As we sit here today, do you know how much

8   is being held in association bank accounts?

9        A    I don't have -- I cannot give you an exact

10  number, but I can tell you it is under $10,000.

11       Q    Do you know if the association has

12  suffered a shortfall or has suffered any kind of

13  decrease in revenues due to homeowners paying less

14  assessments due to the COVID pandemic?

15       A    Yes.  Not less revenue.  Remember, we're

16  an accrual basis.  The revenues are the same, but

17  the collection of that receivable is what has

18  suffered.  So what has suffered is the cash flow of

19  the association.

20            Meaning, as you look at -- I don't know

21  which exhibit it is, exhibit number, but it's an

22  aging report of account receivable, which has an

23  outstanding account receivable of $812,000, where

24  roughly $673,000 are in collection.

25       Q    So --

Page 356

1          A     And out of that, only $102,000 is current.
2     We call it current.  Today is December 30th.  That
3     line should be zero.  Everything should be
4     collected.  So yes, we have a very difficult time
5     collecting.
6          Q     What is the approximate collection rate of
7     these accounts receivables or accounts that are
8     coming in collection?
9          A     Well, if you look at the report you see
10    there, I mean, collections -- I don't have the
11    statistics, but roughly we're collecting between 60
12    and 75 percent of the receivables.  As of today you
13    have $812,000 of receivables, and you have 673,000
14    in collection, which -- so 82 percent of my
15    receivables today is in collection.
16         Q     And --
17         A     If you refer to that report, that exhibit,
18    you'll see on the side, the right-hand side, Alfaro
19    and Fernandez, which is the collections collecting
20    attorney.  You'll see the amounts are very
21    significant.
22         Q     We've also been shown Debtors' Exhibit
23    Number 8, which is a list of properties that are
24    under the association's name, correct?
25         A     Yes.

 1       Q    As you are aware, do you know if those

 2   properties have mortgages or any other type of lien

 3   or --

 4       A    I think that --

 5            THE COURT:  Mr. Cue, wait until

 6   Mr. Parlade is done with his question.

 7            THE WITNESS:  Okay.  I'm sorry, Your

 8   Honor.

 9            THE COURT:  Go ahead, Mr. Parlade.  Please

10   finish the question.

11   BY MR. PARLADE:

12       Q    Do you know if any of the properties on

13   that list have any kind of lien mortgage or any type

14   of debt attached to it at all?

15       A    I would have to refer you to Yudany

16   Fernandez, because I don't have that detail.

17       Q    As you sit here today, if the association

18   were to incur debt in excess of the amount contained

19   in the bank accounts, how would the association pay

20   for it?

21       A    The only way that the association --

22   there's no way the association could pay

23   immediately.  They would have to resolve some of the

24   expenses and decrease some of the expenses that we

25   currently incur in order to make a cash flow for

Page 358

1    that.

2            As it is, that cash flow is very, very --

3    I mean, very tight.  That $350,000 that we borrowed

4    this month, we have to pay that weekly at a rate of

5    $8,500 a week.  It's very difficult.  Unless

6    collections are very good in January, we're going

7    through a very tough time.

8        Q    (Inaudible) increase the expenditures,

9    would additional assessments be required of the

10   Hammocks Community Association?

11       A    It would have to be that that would be up

12   to the board.  I cannot really answer you that

13   question.  The board would have to meet and

14   determine if they want to do a special assessment or

15   anything of that sort.  I cannot answer you that

16   question.

17       Q    Now, opposing counsel asked you a few

18   questions, as well, in reference to the knowledge as

19   to any preventive measures or steps taken by the

20   association to ensure the matters that (inaudible)?

21       A    Correct.

22       Q    Do you have any knowledge within your

23   (inaudible) to the association to be aware of these

24   preventative measures or other policies in the

25   association, as far as what was asked of you?

Page 359

1        A     This is not under my responsibilities.

2   That's why I'm not aware of any measures, because I

3   basically deal with financial matters.

4        Q     You would have no direct knowledge of

5   these -- if anything were to happen, you would have

6   no direct knowledge, correct?

7        A     Correct.

8        Q     As to the vehicles that were introduced by

9   debtors' attorney that the association owns, do you

10  know what those vehicles are worth?

11       A     I tell you that they're not worth very

12  much.  They're very high mileage, they're very old.

13            We had -- like I mentioned to the previous

14  attorney, we had to decommission three automobiles

15  last year, because it was costing more to repair

16  than to buy new ones, and we had to get three new

17  ones and finance them, which it was difficult to

18  finance.  It was at a very high rate, because the

19  credit rating of Hammocks Community Association is

20  very low.

21            MR. PARLADE:  I have no further questions,

22  Your Honor.

23            THE COURT:  All right.  Any redirect,

24  Mr. Arslanian?

25            MR. ARSLANIAN:  Yes, Your Honor, if I may.

Page 360

1           THE COURT:  Go ahead.

2           MR. ARSLANIAN:  Thank you.

3                 REDIRECT EXAMINATION

4    BY MR. ARSLANIAN:

5      Q     Mr. Cue, do you have any documentation

6    regarding the $375,000 loan that you testified to?

7      A     Yes.  I have -- I do.

8      Q     Did you bring it with you today?

9      A     No, I don't.  I have it at Hammocks

10   Community Association's office.  I don't have it in

11   my office.

12     Q     Are you an owner at Hammocks?

13     A     No, I'm not.

14     Q     You were asked about how to pay, and there

15   was some mention of a special assessment.

16           If there was a special assessment of $50

17   per unit, how much money would that raise?

18     A     First of all, that would be up to the

19   board to approve.  The community, I could definitely

20   tell you, cannot afford -- you have the numbers.

21   You have roughly 6,500 units at $50 apiece.

22     Q     So it would be over $300,000, wouldn't it?

23     A     I would say so.

24           MR. ARSLANIAN:  I have nothing further.

25           THE COURT:  All right.  Thank you,

Page 361

1    Mr. Cue.  You may put your silence back on.  You are
2    done testifying.

3              Oh, Mr. Parlade.

4              MR. PARLADE:  Not for Mr. Cue, Your Honor.
5    Just to inform the Court that Dr. Storper is on the
6    line, and as per the Court's instructions and the
7    agreement of opposing counsel, we can hear him out
8    of order if the Court will allow.

9              THE COURT:  Okay.  We're going to take a
10   five-minute break, and then we'll come back and have
11   your expert.

12             Is your expert the person who's appearing
13   under the name Sabino Juaregui?

14             MR. PARLADE:  No, Judge.  I believe it's
15   the one that's by phone.  My expert texted me that
16   his Internet is down, so he's appearing by phone.
17   So it should be the one that says (305)608-4968.

18             THE COURT:  Okay.  Your expert is going to
19   need to figure out how to work the video on his
20   phone.  I can't listen to testimony by phone.

21             MR. PARLADE:  Okay.

22             THE COURT:  We'll take a five-minute break
23   and see what your expert can do.  Since Mr. Cue
24   managed -- it's a little limiting, but since Mr. Cue
25   managed, we'll have to try to do it that way.

1           Five-minute break.  Mr. Cue, you can put

2    yourself on mute and we'll take a five-minute break.

3           Just remember, for anybody that's on Zoom,

4    if you don't put yourselves on mute, you will

5    continue to be recorded, because the court recording

6    machine is running.  So no attorney/client privilege

7    communications without turning your mute buttons on.

8           Okay.  Five minutes.

9           (Thereupon, a recess was taken, after

10   which the following proceedings were had:)

11          THE COURT:  All right.  So while we wait

12   for Mr. Arslanian to rejoin us, Mr. Parlade, I do

13   not see your expert back on yet.  What are we going

14   to be doing?  You can unmute.

15          MR. PARLADE:  Judge, I don't see him on

16   here either.  I told him to download the Zoom app on

17   his phone and connect.  If you want we'll proceed

18   with Mr. Arslanian's case until such time as the

19   expert connects, and hopefully we can resolve it at

20   that time.  I don't anticipate long testimony from

21   him.

22          THE COURT:  Okay.  All right.

23   Mr. Juaregui, can you tell me who you are?

24          MR. JUAREGUI:  Yes, Your Honor.

25          THE COURT:  Good morning.

1          MR. JUAREGUI:  I didn't want interrupt

2   earlier.  Good morning.

3          I represent Marglli Gallego.  I'm her

4   criminal attorney, Judge.  I'm here just observing.

5   I did hear Mr. Parlade earlier about my client being

6   very ill, and she is.  I spoke to her yesterday.

7   She did not sound well.  I spoke to her again this

8   morning.  That is the reason she's not online.

9          When I spoke to her she said that if Your

10  Honor really needs to see her she'll get online so

11  you can see her make whatever determination you want

12  to make, but she is very ill.

13          Now, I am hearing about a subpoena.  I was

14  not aware she had been served with a subpoena so if

15  there's proof of service of that subpoena I'd like

16  to know that, because I was not notified that she

17  was subpoenaed to be here this morning, Your Honor.

18          THE COURT:  Okay.  All right.

19  Mr. Arslanian, Mr. Juaregui -- did I say that

20  correctly?

21          MR. JUAREGUI:  Yes, thank you, Your Honor.

22          THE COURT:  Mr. Juaregui is Ms. Gallego's

23  criminal counsel.  So if you would later today send

24  Mr. Juaregui a subpoena, and then, the subpoena, if

25  in fact that it has been the case, Mr. Juaregui,

Page 364

 1   then I assume you will be filing some kind of

 2   emergency motion to excuse your client's compliance.

 3              MR. JUAREGUI:  Correct, Judge.  Because --

 4   I'm sorry.  I didn't mean to interrupt, Judge.

 5              She does have an open felony case.  She's

 6   currently being charged in Miami-Dade County with

 7   two felonies, one an organized scheme to defraud,

 8   and one a grand theft.  So of course, I would not

 9   allow her to testify under any circumstances at this

10   hearing, and she would be pleading the Fifth.

11              THE COURT:  Okay.  Well, that's helpful to

12   know anyway.  So may I make a note of that for the

13   record, then, Mr. Juaregui?

14              MR. JUAREGUI:  Yes, Judge, for the

15   purposes of her invoking the Fifth Amendment, yes.

16              MR. ARSLANIAN:  In order to comply, Judge,

17   can I just have Mr. Juaregui provide me his e-mail

18   address so that we can --

19              THE COURT:  How about this, so that we

20   don't take up any more time.  Mr. Juaregui, you are

21   a member of the Florida Bar, right?

22              MR. JUAREGUI:  Yes, Your Honor.

23              THE COURT:  All right.  Mr. Arslanian,

24   have your assistant write down the spelling, and if

25   you go to flabar.org, I'm going to guaranty that

 1   Mr. Juaregui's e-mail is going to be right there.
 2   That's how I've been finding people.  You can't hide
 3   from me anymore, because I found flabar.org.
 4            We don't have Mr. Parlade's expert.  What
 5   I'm going to suggest, Mr. Parlade, would it be
 6   better if we just -- oh, no.  Here he goes.
 7            Doctor Alfaro, that's your expert?
 8            MR. PARLADE:  No, Judge.
 9            THE COURT:  Oh, no.  That's the lawyer.
10   Sorry, Mr. Alfaro.  Sorry.  Too many things --
11   people popping up on the screen.
12            We are going to clearly have to go into
13   the afternoon.  Would it be better just to say to
14   your guy to be available at 2:30 or 2 o'clock?
15            MR. PARLADE:  Yeah, that's fine.
16   Hopefully that will give him the opportunity to
17   resolve his Internet issues.
18            THE COURT:  Mr. Arslanian, does that make
19   more sense?
20            MR. ARSLANIAN:  Yeah, but I think that
21   time probably doesn't, because I don't have too much
22   more, and I don't know --
23            THE COURT:  Okay.  Forget I said that.
24   Have him go.  I'm just trying to accommodate
25   everybody.

1              MR. ARSLANIAN:  I understand.

2              THE COURT:  Mr. Arslanian, let's go to the

3    next thing you would like to do.

4              MR. ARSLANIAN:  Okay.  At this time I

5    would call Leticia Cepero.

6              THE COURT:  Okay.  Mrs. Cepero, we're

7    going to unmute, and here's what we're going to do.

8    I'm going to swear in your interpreter.

9              Not yet, not yet, not yet.  Wait, wait,

10   wait.  Un momento por favor.

11             Where did I write down the interpreter's

12   name?  Mr. Beovides.

13             THE INTERPRETER:  May I ask for one second

14   to let you know.  I have another interpreter that is

15   going to replace me, because unfortunately, my wife

16   is at Mercy Hospital.  She has a problem with

17   eating.  Just so you know, another certified

18   interpreter, her name is Lucy Grenet who is going to

19   replace me.  YYY

20             THE COURT:  Okay.  Is that happening right

21   now?  I'm so sorry to hear about your wife.

22             THE INTERPRETER:  No.

23             THE COURT:  So let's go forward with as

24   much as you can.

25             I don't need to see Mr. Beovides, I just

1    need to hear his voice.  I need to see you,

2    Mrs. Cepero.  So move the camera a little bit.

3              I also need to see your husband.  The

4    reason is because you're in the same room, and I

5    want to make sure that you are not looking at your

6    husband when you're answering my question.

7              Put your mask back on.  No, no,

8    Mr. Cepero -- there you go.

9              Now, next, Mrs. Cepero, just like before,

10   even if you understand my question, you must let the

11   interpreter ask the question and then answer.

12             THE WITNESS:  Okay.

13             THE COURT:  And the same with

14   Mr. Arslanian and then Mr. Parlade.  Remember the

15   rules.  Wait until the interpreter finishes.  And

16   most importantly, no long dialogues.  Give the

17   interpreter time to interpret.  So shorter

18   sentences, or take a breath.

19             So now I'm going to swear in the

20   translator, and Mr. Beovides, when your substitute

21   comes -- and I hope and pray your wife feels better

22   soon --

23             THE INTERPRETER:  I do appreciate it,

24   Judge.  She will, thank God.

25

Page 368

1    Thereupon:

2                        MARIO BEOVIDES

3    an interpreter, having been first duly sworn,

4    translated from English to Spanish and from Spanish

5    to English to the best of his ability.

6              THE INTERPRETER:  I do, Judge.

7              THE COURT:  Now, Mrs. Cepero, raise your

8    right hand.

9    Thereupon:

10                       LETICIA CEPERO

11   was called as a witness by the Debtors', and having

12   been first duly sworn, was examined and testified as

13   follows:

14             THE WITNESS:  Amen, I swear.

15             THE COURT:  Mr. Arslanian, go ahead.

16             MR. ARSLANIAN:  Thank you, Your Honor.

17                     DIRECT EXAMINATION

18   BY MR. ARSLANIAN:

19        Q    Could you please state your name and

20   address for the record?

21        A    Leticia Cepero, 9541 Southwest 148th

22   Place, Miami, Florida, 33196.

23        Q    Ms. Cepero, as a result of the incident

24   that occurred on May 15, 2019, did you seek medical

25   assistance from a Dr. Pena?

1        A     My female doctor, Frances Pena, yes.

2        Q     Okay.  And she provides counseling for you

3    and services for you?

4        A     She gave me advice, counseling.

5        Q     And as a result of the incident occurring

6    on May 15, 2019, did you also seek any assistance

7    from a Dr. Pozo?

8        A     Danilo Pozo, yes.

9        Q     And what kind of doctor is he?

10       A     M.D.  He's a psychiatrist.

11       Q     And what kind of doctor is Dr. Pena?

12       A     He's a licensed clinical social worker.

13   He's a counselor of Jackson Memorial Hospital.

14            MR. ARSLANIAN:  Your Honor, at this time I

15   would ask, based on the foundation objection that

16   was laid, we admit Exhibits 2 and 4, the medical

17   reports of Frances Pena, and the progress notes from

18   Dr. Oscar Pozo.

19            THE COURT:  Let's take them one at a time.

20   Mr. Parlade, with respect to Exhibit 2.

21            MR. PARLADE:  Judge, to both exhibits,

22   Your Honor, counsel has not laid the foundation with

23   the witness as to the introduction of these

24   exhibits.

25            THE COURT:  All right.  Explain to me.

1          Mrs. Cepero, I'm going to ask the

2    interpreter to put it on mute while we have this

3    discussion.

4          So, Mr. Parlade, your objection was

5    foundation.  Mrs. Cepero has now laid the foundation

6    that she went to see Ms. Pena, which she identified

7    as doctor, but not a doctor, but a clinical social

8    worker, and Dr. Pozo.  Why is that not sufficient

9    foundation to submit the business records for

10   purposes of relevancy?

11          MR. PARLADE:  Judge, the record has not

12   been shown to the witness.  They have not been

13   visibly corroborated by the witness that these are

14   the records as to the medical treatment, and as to

15   the treatment she received with the aforementioned

16   doctor.

17          It's not enough to just say, "I went to

18   the doctor, let's submit the record."  It requires a

19   few more steps.

20          THE COURT:  Is that the basis of your

21   objection?

22          MR. PARLADE:  Yes, Judge.

23          THE COURT:  Mr. Arslanian, anything from

24   you?

25          MR. ARSLANIAN:  The client is not

1    qualified to testify about the records that were

2    kept by Francis Pena.  Frances Pena provided an

3    affidavit saying these are her business records.

4              I mean, originally the objection was,

5    maybe these are doctor's records that have nothing

6    to do with anything.  I think that I've tied why

7    they're important.  I've gotten the doctor to swear

8    that these are -- testify under oath that these are

9    her business records of her interactions with --

10             THE COURT:  So your response is that this

11   witness would not be qualified to identify the

12   business records of the treating professional, and

13   the treating professional -- we're talking about

14   Exhibit 2 right now -- has submitted an affidavit,

15   correct?

16             MR. ARSLANIAN:  Correct.

17             THE COURT:  Okay.  So, Mr. Parlade, I'll

18   let you --

19             MR. PARLADE:  Judge, as I mentioned,

20   although the doctor said these are business records,

21   we have no way to correlate what the actual witness

22   is stating, that this was her doctor, that these are

23   the records of her dates of treatment with the

24   doctor.

25             All we have is a blanket statement, "I saw

1    the doctor for treatment after the incident," and

2    that's it.  I have an affidavit from the doctor

3    saying these are business records.

4            I think at the very least, to establish

5    the exception to -- the hearsay exception, that

6    counsel should establish foundation, that these are

7    the records that pertain to these treatments that

8    the witness went to the doctor to see.

9            THE COURT:  Okay.  I'm going to overrule

10   your objection with respect to Number 2, and admit

11   Number 2.  I don't know how much more information,

12   as far as these are the business records related to

13   Mrs. Cepero's treatment that you would need.

14            (Thereupon, Debtors' Exhibit No. 2 was

15       admitted into evidence.)

16            THE COURT:  Let's go to Number 4.  So what

17   do we have for Number 4, Mr. Arslanian?

18            MR. ARSLANIAN:  Same type of medical

19   records, same affidavit.

20            THE COURT:  Where is that affidavit?

21            MR. ARSLANIAN:  Was it filed?  I'm being

22   told that it was filed yesterday.  I'm looking at

23   it, an affidavit signed by Oscar Danilo Pozo, dated

24   December 29, 2021.

25            THE COURT:  All right.  Hold on.  And the

Page 373

1   attachment to the affidavit are the same documents

2   that are in Exhibit 6 -- I'm sorry, Exhibit 4?

3              MR. ARSLANIAN:  Yes, Your Honor.

4              THE COURT:  All right.  Mr. Parlade.

5              MR. PARLADE:  Judge, I've got declarations

6   from Pena.  I think I received one yesterday from

7   Pozo.  I don't have one for Marjorie Caro.

8              THE COURT:  That's not being requested for

9   admission.

10             MR. PARLADE:  So for Pena and Pozo I

11  received yesterday.

12             THE COURT:  Okay.  All right.  And that

13  was the reason why Dr. Pozo is not here today,

14  Mr. Arslanian, because he submitted the affidavit in

15  lieu of appearance?

16             MR. ARSLANIAN:  Yes.

17             THE COURT:  All right.  I'm going to

18  overrule the objection with respect to Number 4 for

19  the same reason.  If the basis is foundation,

20  Mr. Parlade, then the witness's testimony that she

21  went to see both these medical professionals is

22  sufficient to overcome that objection, and the

23  objection is overruled.

24             (Thereupon, Debtors' Exhibit No. 4 was

25        admitted into evidence.)

1              THE COURT:  Okay.  Let's go on.  I'm going

2    turn Mrs. Cepero back on.

3              MR. ARSLANIAN:  Wait, wait.  Can I ask you

4    something?  I see Mr. Storper is here.  I don't mind

5    taking him.  Depending on how long he goes, I don't

6    think I'm going to have too much more.

7              THE COURT:  Okay.  That's fine.

8    Mr. Parlade, would you like to go to Dr. Storper

9    now?

10             MR. PARLADE:  Yes, Judge, respectfully.

11             THE COURT:  Okay, great.  And I'm glad

12   Dr. Storper, yes?  Is it Dr. Storper?

13             Dr. Storper, I'm going to ask you to click

14   the thing at the bottom that says "audio" and take

15   off the red line.  If you click on it you'll be able

16   to speak and we'll be able to hear you.

17             Thank you for downloading zoom so I can

18   see you.  In the bottom left-hand corner there

19   should be a microphone.  Now you've switched the

20   picture.  You have a lovely study.

21             No, that's Mr. Alfaro.  Dr. Storper, I

22   hear you.  Okay.  (Inaudible).  I can't understand

23   what he's saying.

24             THE COURT:  We're going to put

25   Mr. Storper -- Dr. Storper on mute.  Put yourself

Page 375

1    back on mute, Dr. Storper.

2              Does Dr. Storper have a separate cell

3    phone that he can dial in?

4              MR. PARLADE:  That's what we're trying to

5    coordinate right now, Judge.  He does have a

6    separate cell phone, so we're trying to set up so at

7    least the verbal part is on a separate cell phone.

8              THE COURT:  So have him put the video back

9    on mute.  Worst comes to worst you can just put

10   Dr. Storper on speaker.  Why don't we just do it

11   that way?

12             We lost Dr. Storper.  Not the camera,

13   Dr. Storper, just the video.  Put the camera back on

14   and turn off the audio.

15             This is one of the many reasons why I

16   really wanted us to be in person.

17             MR. PARLADE:  Me too, Your Honor.

18             MR. ARSLANIAN:  I still think -- with the

19   glitch, I still think we're going to get finished by

20   12:30.  I really do.  Let's just work through this

21   glitch, and I think we're going to be fine.

22             THE COURT:  The bottom line is, we have

23   all day, other than my delivering an oral ruling at

24   1:30.  Again I apologize.  I don't have control over

25   this virus.  This one, it seems to be getting the

Page 376

1   people that are vaccinated.

2              So I'm going to put Dr. Storper on mute,

3   but I can't turn his video back on.  I think I can

4   put him on mute.  Hold on.  No.  I can ask him to

5   start the video.  I can't mute him.

6              Mr. Parlade, you're going to have to walk

7   him through turning the microphone off.  We lost

8   him -- no, there he is.

9              MR. ARSLANIAN:  He's still there.

10             THE COURT:  In the meantime -- good.  Now

11  Dr. Storper's microphone is off, but he needs to

12  turn his video on.  Mr. Parlade, tell him to turn

13  the camera on.

14             Okay, great.  We're good.

15             MR. PARLADE:  I'm going to put the phone

16  on speaker so we can hear him by phone.

17             THE COURT:  Just try to get the phone as

18  close -- what's going to have to happen, though,

19  Mr. Parlade, you're going to have to put it on mute

20  when you're asking the question, and unmute it when

21  you're done asking the question, so we don't have an

22  echo.  Got it?

23             MR. PARLADE:  You got it, Judge.

24             THE COURT:  Oh, wait.  What happened to

25  him?

Page 377

1              MR. PARLADE:  Oh, no.

2              THE COURT:  Oy vey.  We can't go forward,

3     because Mr. Parlade has to pay attention.

4              MR. PARLADE:  Judge, I apologize.  I

5     instructed him to drop out and log back in.  Let's

6     continue with the witnesses until we can work

7     everything out with him.

8              THE COURT:  Let's do that then.  Let's

9     unmute Mrs. Cepero, and Mr. Parlade, put yourself on

10    mute for now.  If you have someone that can help you

11    from your office, Mr. Parlade, that maybe can help

12    Dr. Storper while you focus.

13             We had already gotten in 2 and 4.

14    Mrs. Cepero, unmute.  Mr. Arslanian, continue with

15    your questioning.

16             MR. ARSLANIAN:  Thank you, Your Honor.

17    BY MR. ARSLANIAN:

18        Q    Ms. Cepero, are you preoccupied with the

19    events of May 15, 2019?

20        A    Extremely so.

21        Q    And do those events and issues with the

22    association dominate your life?

23        A    A lot.

24        Q    And are they --

25             THE INTERPRETER:  Hold on, Counselor.

1   She's crying.  She's crying.  Hold on.  Can you give

2   it a little bit of time here?

3               THE WITNESS:  I am very concerned, very

4   worried, because they fired two gunshots at me and

5   they have my --

6               THE COURT:  Wait, wait.  I'm having

7   trouble hearing the interpreter.

8               THE INTERPRETER:  She's crying, Judge.

9   She said, "The neighbor is harassing me."

10              THE WITNESS:  I was in very serious

11  condition.  I was in intensive therapy.  My

12  condition was very serious.

13              And I'm desperate to get to the board,

14  because my neighbor is cutting off my plants in my

15  garden, and they have fired two gunshots in front of

16  my house.  Demelsa (phonetic), Ghilardi's best

17  friend, and Michael has the evidence.  He has the

18  proof.

19              THE COURT:  I'm going to stop you.  I'm so

20  sorry you're upset, Mrs. Cepero, but I cannot

21  understand what the interpreter is saying.  It's

22  very important that I understand.

23              THE WITNESS:  It's been very sad.

24              THE COURT:  I'm going to back up.

25  Mr. Interpreter, I did not understand anything after

Page 379

1   the neighbor is cutting down the plants, and fired

2   the gun in front of her house.  Everything after

3   that I did not hear what you said.

4               THE WITNESS:  My neighbor is a friend of

5   Monica Ghilardi, who's the president of the board.

6   They have taken photographs of my lot, Demelsa Perez

7   Trajillo (phonetic), Perez Sello (phonetic).  And

8   Ana Martinez was trying to open my lock to the door,

9   pretending that she was going to place a document.

10              I was in my office and I saw that they

11   were opening up my lock.  I thought it was my

12   husband.  I ran to the window and I saw that it was

13   Martinez that was trying to open my lock.  And there

14   are police reports, and the police told me that they

15   were going to arrest her for trespassing.

16              And they purchased five cars in the

17   security, small ones, small ones, and one of them

18   spent ten minutes in front of the door of my house.

19   This happens every day.  So I am weak.  I've been

20   affected by this.  I'm very upset.  I do not sleep,

21   because of real things.  I have not gone crazy,

22   because of the psychological help that I've been

23   receiving, and my family and friends that give me

24   their support, and psychological and psychiatric

25   treatment that I had to go ahead and have done.  I

Page 380

1    don't sleep at night.

2    BY MR. ARSLANIAN:

3         Q    Ms. Cepero, prior to --

4              THE COURT:  Wait just a minute,

5    Mr. Arslanian.  I think the interpreter is --

6              THE INTERPRETER:  The last thing that she

7    said, Judge, was, "I brought --"

8              THE COURT:  I cannot hear you,

9    Mr. Beovides.

10             THE INTERPRETER:  The last thing she said

11   was, "My blood platelets went down, were lower.  I

12   was in intensive therapy, because I lost almost all

13   my blood.  I suffer from the condition that is

14   called IPD.  It's urological.  When I suffer a lot

15   of stress I cannot control it.

16             THE COURT:  I'm going to let Mr. Arslanian

17   ask his next question.  I thought that the

18   interpreter was communicating with someone.

19             Mr. Arslanian, ask your next question.

20             MR. ARSLANIAN:  Thank you.

21   BY MR. ARSLANIAN:

22        Q    Ms. Cepero, prior to having any incidents

23   with the Hammocks Community Association board in

24   this case, did you have any history of any type of

25   psychological issue?

Page 381

1      A      Not ever.

2      Q      And I know that you just talked about

3  certain things.  I'm going to ask you about those in

4  a second, but I want you to focus on the May 15,

5  2019 incident.

6      A      Okay.

7      Q      Please describe to the Judge the type of

8  feelings that resulted in the problems, if any, that

9  it caused you.

10     A      To me it has been a horrible movie, terror

11  movie.  It has completely changed my life.  I live

12  worried, thinking about what are they going to do to

13  me tomorrow.

14     Q      Now, Ms. Cepero, you mentioned something

15  about cutting a plant or hedges in your front yard

16  and cars in front of your place.

17            Did that occur before Judge Isicoff made

18  her finding of contempt or after she found contempt

19  earlier this year?

20     A      That was after the Judge found her in

21  contempt.

22     Q      Okay.  All right.  And after the May 15,

23  2019 incident, would you please tell the Court what

24  affect it has on your ability to sleep, and overall

25  in your marriage with Josue?

1      A    I do not sleep.  And I'm going to talk

2  very clearly, with respect, because I want to be

3  honest according to the subjects.

4           My marriage, intimately I have no desire

5  to do anything.  I have no motivation, nothing.

6      Q    I just have a couple of more questions for

7  you.

8           First of all, can you recall appearing

9  before a Dr. Henry Storper on December 13th, for an

10 examination by him?

11     A    I do remember that, yes, because I was in

12 very serious condition.

13     Q    And did he ask you during your examination

14 whether or not -- did he ask you if you followed

15 Marglli Gallego in the vehicle on May 15, 2019?

16          THE COURT:  Wait, stop.  What is the

17 objection, Mr. Parlade?

18          MR. PARLADE:  Hearsay, Your Honor.

19          THE COURT:  I'm sorry, what?

20          MR. PARLADE:  Hearsay.  He's asking what

21 the doctor asked her.

22          THE COURT:  I'm going to overrule the

23 objection.

24 BY MR. ARSLANIAN:

25     Q    Leticia, during that examination, did the

1    doctor ask you if you blocked Marglli Gallego's

2    vehicle?

3        A    Yes, directly.  And I admitted.

4            MR. ARSLANIAN:  I have no further

5    questions.

6            THE WITNESS:  Thank you.

7            THE COURT:  All right.  So now,

8    Ms. Cepero, it's Mr. Parlade's turn.  Same rules

9    apply.  Wait until Mr. Parlade is finished, let the

10   interpreter interpret.

11           Do you need a moment, Mrs. Cepero?

12           THE WITNESS:  Yes, a moment.

13           THE COURT:  We'll wait one second.

14           In the meantime, if you'll go on mute,

15   Mr. Interpreter, so we can -- I see that

16   Mrs. Storper is back on, so before we go to

17   cross-examination, shall we try this one more time

18   with Dr. Storper?

19           MR. PARLADE:  Let's give it a shot, Your

20   Honor.

21           THE COURT:  Mrs. Storper, thank you for

22   being your husband's technical director.  So if you

23   could put your husband in front of the camera and

24   turn the camera on.  And I hope that we can turn --

25   I don't know.  Maybe they left.

Page 384

1                 Do you want to call him?

2                 MR. PARLADE:  Yes, Judge.  Give me one

3       second.

4                 DR. STORPER:  I guess we're going to keep

5       trying things, right?

6                 THE COURT:  We have audio.  No, now we

7       don't have audio.  We had audio, but we didn't have

8       video.  Now we have -- we can hear you, but we can't

9       see you.  We need the camera turned back on, please.

10                DR. STORPER:  We're doing the best we can.

11      Our Internet totally crashed, and we can't --

12                THE COURT:  Well, the good news is that we

13      can hear you clearly, but I do need --

14                DR. STORPER:  It says the video stopped.

15      I'm on safe driving mode.  We didn't do anything to

16      do that.  This is on the Zoom app.

17                THE COURT:  Are you in the car?

18                DR. STORPER:  Can you hear me?

19                THE COURT:  Are you in the car?

20                DR. STORPER:  No one can hear me now.

21      Hello.

22                THE COURT:  If they're in the car the

23      video won't work, because it's safe driving.  I know

24      this because my granddaughters try to FaceTime me in

25      the car all the time.

Page 385

1          Mr. Parlade, I'm going to mute Dr. Storper

2     right now.  I see Mrs. Cepero back.  I'm going to

3     put him on mute while they get out of the car.  I'll

4     ask the interpreter to unmute and -- is the

5     interpreter back?  Maybe we're getting a new

6     interpreter.

7          Mr. Parlade, while we're waiting for the

8     interpreter, if you want to call Dr. Storper and see

9     if he's in a car, and if he is in a car, let them

10    know that the video will not work in the car, which

11    is why it says, "safe driver mode," and that they

12    need to pull over somewhere.

13          MR. PARLADE:  Okay.  Let me call him now.

14    Sorry about that, Judge.

15          THE COURT:  No, no.  It's -- one day we're

16    all going to laugh about this, God willing.

17          MR. ALFARO:  It actually said, "safe

18    driver mode"?

19          THE COURT:  That's what Dr. Storper said,

20    that it said, "safe driver mode," Mr. Alfaro.  So

21    that means -- I mean, that's what happens when my

22    granddaughters FaceTime me in the car.  For safety

23    reasons, apparently the video turns off.  Which is a

24    good thing, I must say.

25          MR. ARSLANIAN:  It also prevents me from

```
 1   watching football games when I'm driving, I suppose.
 2              THE COURT:  Thank God.
 3              MR. ARSLANIAN:  It disables all that
 4   stuff.
 5              THE COURT:  I know that in the old days I
 6   would be on 95 and see someone with a newspaper
 7   propped up on the steering wheel while they were
 8   driving on the highway.  Like, hello.
 9              Okay, interpreter is back.  I see his
10   hands.  I'll wait until Mr. Parlade is ready.
11              Mrs. Cepero, I need you to move just a
12   little.  We're just waiting for Mr. Parlade.
13              Mr. Parlade, the witness is yours.
14              MR. PARLADE:  Thank you, Judge.
15              THE COURT:  Go ahead.
16                     CROSS-EXAMINATION
17   BY MR. PARLADE:
18        Q    Good afternoon, Ms. Cepero.
19        A    Good afternoon.
20        Q    I represent Hammocks Community
21   Association.  Ms. Cepero, I have a few questions for
22   you.
23              Your attorney had mentioned before in
24   reference to any past psychological conditions, and
25   you mentioned you never had one prior to the
```

Page 387

1    incident on May 15, 2019?

2         A    I never had any mental issue.  I've had a

3    lot of surgeries, but not that.

4         Q    You've never had problems with anxiety?

5         A    No.  Sometimes the surgeries cause me to

6    be a little bit concerned, because they were big

7    surgeries.  However, I have been a person that

8    emotionally has been very stable.

9         Q    You know your attorneys provided me with

10   copies of all your medical records for the past five

11   years, correct?

12        A    Yes.

13        Q    And this includes the records of Sanitas

14   Medical Center?

15        A    Yes.

16        Q    And at Sanitas Medical Center, your

17   primary physician is Dr. Reinaldo Hernandez; is that

18   correct?

19        A    Yes.

20        Q    Okay.  Now, would it surprise you if in

21   November 16, 2017, Dr. Hernandez stated that you

22   were diagnosed with anxiety?

23        A    In what year?

24        Q    2017.

25        A    In 2017 my father passed away.

1                  Could you repeat the date again, please?

2         Q     This was November 16, 2017.

3         A     Imagine, my father passed away one month

4    prior.  And I was his only daughter, and to me my

5    father was the biggest thing in the world.

6         Q     So you -- unfortunately, your father died,

7    and my condolences.  I know that must have been

8    tough, but --

9         A     Very tough.  And I spoke to him and I told

10   him that I was undergoing that process of losing the

11   person, and the thing that you feel.

12        Q     So in 2017, you were suffering from

13   anxiety, correct, after your father died?

14                  THE COURT:  I'm going to remind you,

15   Mrs. Cepero --

16                  THE WITNESS:  Can you repeat it,

17   Counselor?

18   BY MR. PARLADE:

19        Q     In November 16, 2017, your father had

20   passed, and you were going through some anxiety; is

21   that correct?

22        A     I did not have anxiety.  I went to see

23   Reinaldo, because it was uncontrollable for me that

24   I had not been able to say good-bye to my father.

25   He died of cancer.  It was a very strong cancer.

1          And when he spoke to me he started crying

2    and he said that he was not able, he couldn't see

3    me.  He died in Cuba at 7 o'clock in the morning

4    from cancer.  Then when I regained a little bit of

5    my strength I went to my doctor, Dr. Reinaldo.

6          I did cry a lot.  I did cry a lot.  I know

7    him.  He is from my province.  He found that I was

8    suffering a lot.  My mother was uncontrollable,

9    because they had been married for over 60 years.

10          MR. PARLADE:  Judge, just an objection to

11   the narrative response we were given.  I understand

12   Ms. Cepero is going through a lot, but I request the

13   Judge issue a limiting response.

14          THE COURT:  Yes.  Mrs. Cepero, I need to

15   remind you to listen to the question and answer the

16   question.  Okay?

17          THE WITNESS:  Yes, Your Honor, yes.

18          THE COURT:  Okay, Mr. Parlade, your next

19   question.

20          MR. PARLADE:  Thank you.

21   BY MR. PARLADE:

22      Q    On November 16, 2017, you went to your

23   primary physician, Dr. Hernandez, because, as you

24   just stated, you were suffering?

25      A    Yes.

1      Q     You were in a state of sadness; is that
2  right?
3      A     Yes.
4      Q     Were you depressed, as well?
5      A     I was going through the normal issues when
6  you lose somebody.
7      Q     And you were going through anxiety?
8      A     No.  I had sadness.
9      Q     Would it surprise you if Dr. Hernandez
10 noted in your records from November 16, 2017, that
11 you had noticed that you had -- you were suffering
12 from anxiety?
13           THE COURT:  Wait, wait.  Don't answer the
14 question.
15           Mr. Arslanian, unmute and tell me what you
16 want to tell me.
17           MR. ARSLANIAN:  Objection.  It's a hearsay
18 reference.  The document is not in evidence.  It
19 hadn't been offered in evidence.
20           THE COURT:  I'm going to overrule the
21 objection.  It's not hearsay.
22           Go ahead, Mrs. Cepero.  You can answer the
23 question.
24           THE WITNESS:  What was the question again?
25

Page 391

1    BY MR. PARLADE:

2        Q    Would it surprise you if on November 16,

3    2017, when you went to see your primary care

4    physician, Reinaldo Hernandez, if he had assessed

5    that you were suffering from anxiety?

6        A    The thing is that I have never suffered

7    from anxiety, no.

8        Q    You've never taken any anxiety medication?

9        A    No.

10       Q    Up to this date you've never taken anxiety

11   medication?

12       A    Right now I am taking medication for

13   anxiety.  Right now I'm taking anxiety medication,

14   antidepressants.

15       Q    When did you start taking that anxiety

16   medication?

17       A    I do not remember.

18       Q    Was it within the past year?

19       A    I believe it's a little bit prior.

20       Q    Could it have been last year?

21       A    It could have been, but I do not remember.

22       Q    When you were living in Cuba, did you ever

23   take anxiety medication?

24       A    Not ever.

25       Q    On April 1, 2019, do you remember seeing

Page 392

1    Dr. Reinaldo Hernandez at the Sanitas Medical

2    Center?

3              THE INTERPRETER:  What was the name of the

4    medical center?

5              MR. PARLADE:  Sanitas Medical Center.

6              THE WITNESS:  I see him periodically, yes,

7    but I don't remember the date.

8    BY MR. PARLADE:

9        Q    Okay.  Do you remember if he ever

10   diagnosed you on that day with having generalized

11   anxiety disorder?

12       A    I do not remember, no.  He knew that my

13   father passed away, that my father died.

14       Q    You had told me your father died back in

15   2017.

16       A    Yes.

17       Q    So what does that have to do with your

18   visit to Dr. Hernandez in 2019?

19       A    Because of my condition, hypertension,

20   every month they do blood tests and I have to have

21   checkups.

22              THE INTERPRETER:  Judge, the other

23   interpreter just got here.  Can we take a two-minute

24   recess so she can replace me?

25              THE COURT:  Yes.

1           THE INTERPRETER:  Thank you.

2           THE COURT:  We're going to put this on

3  mute for just a moment.  Mrs. Cepero, you may not

4  discuss your testimony with anybody, okay?

5           I see we lost Dr. Storper again.  I'm

6  going to reiterate that we have the entire

7  afternoon.  If you want to schedule him for 2:00 or

8  2:30 we can do that.

9           MR. PARLADE:  I have no issues with that,

10  Judge.  I think the only issue is Mr. Arslanian

11  couldn't be here at that time, but I have no issues.

12  I'm at this Court's disposal.

13          THE COURT:  Why wouldn't you be able to be

14  here?  We have the whole day for the trial.

15          MR. ARSLANIAN:  I'll be here.  I'm dealing

16  with -- you don't know what I'm dealing with, and

17  you don't want to know.

18          I take care of a 91 and a 93 year old.  At

19  3 o'clock in the morning I was summoned to pick up

20  the 93 year old by the 91 year old.

21          THE COURT:  I understand.  Aging parents

22  can be a challenge.

23          MR. ARSLANIAN:  They live with me.

24          I'm available.  I'll be here.

25          THE COURT:  Here's what we're going to do.

Page 394

1    I'm reading a ruling into the record at 1:30.  There

2    might be some argument at the end of the reading of

3    the rule.  So that nobody is sitting around waiting

4    and listening, although I'm sure you all would be

5    fascinated by personal property and rejected

6    commercial leases, why don't we say that at 2:30 we

7    will start Dr. Storper, and by then Dr. Storper will

8    either have found somewhere with a working Internet,

9    or he will have figured out how to work the phone.

10   That's what we'll do.

11             MR. PARLADE:  I appreciate that.

12             THE COURT:  So 2:30 we'll do a Dr. Storper

13   regroup.

14             We're still waiting for the interpreter to

15   switch out, so we'll just take another couple of

16   minutes.

17             MR. PARLADE:  Did you want to break for

18   lunch before then, Your Honor?

19             THE COURT:  No.  Let's finish Mrs. Cepero.

20             MR. PARLADE:  I mean before the 1:30

21   hearing.

22             THE COURT:  Oh, yes.  We will eat lunch.

23   It is against my religion not to eat now that I'm no

24   longer a practicing attorney.  When I was a

25   practicing attorney I ate a bag of almonds and

1   apricots out in the hallway for a five-minute break.

2   I don't do that anymore.

3           MR. CUE:  Your Honor.

4           THE COURT:  Yes, sir.

5           MR. CUE:  This is Jesus Cue.

6           THE COURT:  Yes, sir.

7           MR. CUE:  I would like to ask you if I can

8   disconnect.

9           THE COURT:  That's totally up to you and

10  Mr. Parlade and Mr. Alfaro.  You're always welcome

11  to stay, but your testimony is finished, unless

12  Mr. Parlade will be calling you in his case.

13          MR. PARLADE:  Judge, I don't anticipate

14  calling him, so I have no problem.

15          THE COURT:  All right.  So, Mr. Cue, thank

16  you.  Have a wonderful rest of your day, and please

17  keep safe.  Keep your mask on when you're inside.

18          MR. CUE:  Thank you, Your Honor.  Happy

19  New Year.

20          THE COURT:  Happy New Year.

21          Do we have an interpreter switch out yet?

22          THE INTERPRETER:  Your Honor, this is

23  interpreter Lucille Grenet, a certified --

24          THE COURT:  So, Ms. Grenet, thank you.  If

25  you would please spell your name for the record.

Page 396

```
 1                THE INTERPRETER:  Yes, Your Honor.
 2    L-U-C-I-L-L-E, Lucille, Grenet, G-R-E-N-E-T.
 3                THE COURT:  All right.  Thank you,
 4    Ms. Grenet.  I'm going to ask you to raise your
 5    right hand, and I'll administer the translator's
 6    oath, okay?
 7                THE INTERPRETER:  I'm raising my right
 8    hand, Your Honor.
 9    Thereupon:
10                      LUCILLE GRENET,
11    an interpreter, having been first duly sworn,
12    translated from English to Spanish and from Spanish
13    to English to the best of her ability.
14                THE COURT:  I previously swore in the
15    witness.  So, Mr. Parlade, please continue with your
16    cross-examination.
17                THE INTERPRETER:  I'm sorry, Your Honor.
18    I just stepped in, and I'm just trying to find out
19    their surnames.
20                THE COURT:  So Mr. Parlade is the attorney
21    for the homeowners association who is conducting a
22    cross-examination of Mrs. Cepero.
23                THE INTERPRETER:  Cepero.  Got it.
24                THE COURT:  And Mr. Arslanian is the
25    attorney representing Mrs. Cepero, and he just
```

Page 397

```
 1   concluded his direct examination.

 2                 So, Mr. Parlade, if you'll continue with

 3   your cross.

 4                 MR. ALFARO:  Your Honor, if I may ask a

 5   question.  You stated that -- basically --

 6                 THE COURT:  For the record, this is

 7   Mr. Alfaro speaking.

 8                 Yes, Mr. Alfaro, what is it?

 9                 MR. ALFARO:  My client got served

10   yesterday, but I heard that she was not on the

11   witness list.  Do you anticipate her being served --

12   I mean being -- because you said you were excused,

13   that we didn't have to be here.

14                 THE COURT:  I was talking to Mr. Cue.

15   Mr. Arslanian, if Ms. Ghilardi was not on your --

16   Ghilardi, that was her name, yes?

17                 MR. ALFARO:  Yes.

18                 THE COURT:  Mr. Arslanian, where are we

19   going with that?

20                 MR. ARSLANIAN:  I don't intend to call

21   her.  I think that she was served as part of the

22   issue with getting the comptroller to make sure that

23   someone was here from the association to testify to

24   the matters.  I don't intend to call her.

25                 MR. ALFARO:  She was the one served
```

Page 398

1    yesterday, not Ms. Gallego.

2              MR. ARSLANIAN:  Ms. Gallego was served,

3    also.

4              THE COURT:  We're not going to spend any

5    more time on this.  Mr. Alfaro, it's up to you

6    whether you want to stay or you want to leave.

7    That's totally your call.

8              MR. ALFARO:  Thank you.

9              THE COURT:  All right.  Thank you, but

10   please put yourself on mute.

11             Okay, Mr. Parlade, please continue with

12   your cross-examination.

13             MR. PARLADE:  Thank you.

14   BY MR. PARLADE:

15        Q    Ms. Cepero, just a few minutes ago before

16   we took a break I had asked you about your visit

17   April 2019 with your primary care physician,

18   Reinaldo Hernandez, and I asked, would it surprise

19   you that he diagnosed you with generalized anxiety

20   disorder on that date, and you answered --

21        A    I do remember having told him everything

22   that was going on at the Hammocks, and it was on

23   that day that he referred me out to the

24   psychiatrist, because he said that I was just going

25   through way too much torment, and that I needed

Page 399

1    help.  And he also prescribed two medications for me

2    to take.

3              It's not easy to remember, but I do go

4    there periodically.  I do remember.

5         Q    And this would have been prior to the

6    incident in May 2019 with Marglli Gallego in the

7    parking lot of the Hammocks, correct?

8         A    That took place in May of 2019, because

9    there were way too many events that had taken place.

10   I couldn't take it anymore.

11        Q    I don't understand.  Are you saying there

12   are other events prior to May 2019 with the Hammocks

13   Community Association?

14        A    Yes, many.  That's why we're here in this

15   court, in a bankruptcy.

16        Q    How far back did these events with the

17   Hammocks Community Association start?

18        A    Three to four months after Marglli Gallego

19   took over the association.

20        Q    Do you remember what year that was?

21        A    Four to five years.  Well, I don't really

22   know.  Either 2014 or 2015.  I don't know.  She had

23   held about three to four meetings, and it was there

24   where she attacked me.

25        Q    What do you mean she attacked you?

Page 400

1        A     Verbally, you see, because she told me

2   that she was going to call the police on me or that

3   she was going to kill me and cut my neck.  But she

4   never did so, because she didn't have -- because she

5   said she did have someone that could do that.

6        Q     This would have been in public, or this

7   would have been a private conversation with you?

8        A     No, it was in public.  It was after we

9   concluded a meeting.

10        Q     Was she the only one that threatened you

11   at those meetings?

12        A     Well, not just me, but yes, she would

13   threaten me, because she knew that we had decided to

14   proceed to take things that she had done to -- we

15   went to the police, a group of us, and we went ahead

16   and filed a report.

17        Q     What kind of report?

18        A     We were concerned that at the Hammocks we

19   couldn't receive or get any information at the

20   meetings.  We were a large group.

21        Q     What exactly were the charges that were

22   brought against Marglli, or was it the association

23   at that time?

24        A     They didn't put any charges on them,

25   because first they hear you out, and if it merits an

Page 401

1    investigation then they open one.

2            All their people continued to go, though,

3    giving more in-depth information.  These are people

4    that I don't know.  And then the investigation was

5    opened.

6    Q    I'm asking you, why did you open an

7    investigation at that time?

8            THE INTERPRETER:  Your Honor, this is the

9    interpreter.  I would like to instruct the witness

10   that if we're using an interpreter, to not ignore

11   the presence of the interpreter, and wait for my

12   translation.

13           THE COURT:  Mrs. Cepero, before Ms. Grenet

14   got here, I did tell you that even if you

15   understand, you are not to -- you must wait for the

16   interpreter.  You can't have it both ways.

17           THE INTERPRETER:  And to listen to my

18   Spanish interpretation when I'm speaking, not what

19   she believes she heard in English.  Please, Your

20   Honor.

21           THE COURT:  Right.  This is very important

22   for your own benefit, Mrs. Cepero.  You have a

23   translator, because your English is not good.  I

24   even have business people who conduct business in

25   English, that notwithstanding that, have

1    interpreters when they come to trial, because they

2    want to make sure that they absolutely clearly and

3    correctly understand the questions that are being

4    asked.

5            So I must remind you again to wait until

6    the interpreter has finished interpreting, and then

7    respond.  That's for your protection and your

8    benefit.  All right?

9            THE INTERPRETER:  And the question, I

10   believe was, "I am asking you why you filed a

11   report," correct, Mr. Attorney?

12           MR. PARLADE:  That's correct.

13           THE WITNESS:  Well, because they had fired

14   about 11 workers that had been working there for

15   about 20 years.  We were no longer having the

16   activities that we used to have, and we were not

17   getting the information that we should receive, not

18   holding the monthly meetings that we were also

19   having before.

20           THE COURT:  I'm going to stop you for a

21   minute.  I see that Dr. Storper is here.

22           Would you like to try one more time, and

23   is that okay with you, Mr. Arslanian, if we do that?

24           MR. ARSLANIAN:  Yes.

25           THE COURT:  Mrs. Cepero, we're going to

Page 403

1    try to get Dr. Storper done.  So again, do not

2    discuss your testimony with anyone, and we'll get

3    back to you in just a few minutes.  If you want to

4    stand up and stretch your legs, that's fine.  Just

5    no chatting about your testimony.

6              Let's try this again.  Oh, no.  What

7    happened to Dr. Storper?  He was just here.

8              MR. PARLADE:  I think he just closed the

9    lid.

10             THE COURT:  Mrs. Storper, please unclose

11   the lid.  Open the lid.  Oh, no.

12             Okay.  If this happens again, Mr. Parlade,

13   you just need to text him and say, "We'll see you at

14   2:30," because I can't keep doing this.

15             MR. PARLADE:  Your Honor, I think I'm

16   going to need psychological treatment after doing

17   this.  This is very much.  I apologize.

18             MR. ARSLANIAN:  Mr. Parlade, just text

19   him.

20             MR. PARLADE:  One minute.

21             THE COURT:  They hung up again.  Oy vey.

22   We're not getting him to come back.  2:30, that's

23   it.  Tell him do not dial back in.

24             MR. PARLADE:  I just spoke to him.  He got

25   on, but he saw my text about 2:30 and he logged off.

1   He's going to log right back on now.

2           THE COURT:  No, no, no.  Let's finish with

3   Mrs. Cepero.

4           MR. PARLADE:  Hold on.  Let me tell him

5   not to log back on.  One second.

6           THE INTERPRETER:  We're ready on this end

7   again, Your Honor.

8           THE COURT:  Thank you so much.

9           THE INTERPRETER:  You're quite welcome.

10          MR. PARLADE:  Thank you so much.

11          THE COURT:  Mr. Parlade, your next

12  question to Mrs. Cepero.

13  BY MR. PARLADE:

14     Q   So in 2014, 2015, you filed criminal

15  charges, and this was, as you have stated, because

16  you had mentioned there were a number of workers

17  that had been let go by the association, and that

18  you were not getting access to documents from the

19  association; is this correct?

20          MR. PARLADE:  Hold on a second.

21  Mr. Cepero is just passing her some notes he's

22  written on a notebook.

23          THE COURT:  No, no.  Mr. Cepero, that is

24  not permitted.  You are not permitted to --

25          THE INTERPRETER:  Your Honor, this is the

Page 405

```
1  interpreter.  I'm going to remove this and put it
2  next to me.  Is that okay?
3           THE COURT:  Yes, thank you.
4           Mr. Cepero, I thought I was very clear.
5  You may not coach or communicate with your wife
6  while she's testifying.  This is her testimony, not
7  yours.
8           MR. CEPERO:  Yes, Your Honor.
9           MR. PARLADE:  Judge, respectfully, we'd
10 like to invoke the rule of sequestration.
11          THE COURT:  Well, he's a client, but what
12 we're going to do is, Mr. Cepero, I'm going to ask
13 you to leave the room, and you can either go and sit
14 with Mr. Arslanian or out in the hallway, but you
15 may not stay in the room with Mrs. Cepero.  Thank
16 you.
17          I guess we'll just have the interpreter
18 start again.  And that was just affirmation that
19 Mrs. Cepero said that the reason that she reported
20 Mrs. Gallego to the police was because of the
21 removal of 11 workers and not getting any
22 information.
23          Is that a correct repetition of your
24 question, Mr. Parlade?
25          MR. PARLADE:  Yes, Judge.
```

Page 406

1          THE COURT:  Madam Interpreter, Ms. Grenet,

2    if you would repeat the question to ask Ms. Cepero

3    to confirm that that was her prior testimony, and

4    then let's move on.

5          THE WITNESS:  Yes, but at the time they

6    didn't file any of those criminal charges.  It was

7    really more like we went there to consult with them.

8          THE COURT:  Okay.  I'm going to ask,

9    Mrs. Cepero, for you to go a little bit closer to

10   the camera, or go to the left a little so I can see

11   you better.  Great.  Thank you.  Okay.  Thank you.

12          Mr. Parlade, your next question.

13   BY MR. PARLADE:

14        Q    By consult with them, by "them" do you

15   mean the police?

16        A    Well, yes, but you see, the thing is, we

17   consulted as to charges that we saw on the credit

18   card that were exaggerated amounts, and also because

19   after the hurricane, my fence had been damaged and

20   they were not repairing it.  And we knew that we had

21   had 5 million in reserves, and at this point we had

22   zero dollars.

23          THE COURT:  Okay.  I'm going to stop for a

24   second.

25          Mr. Parlade, if these questions are not

1    relevant to the emotional distress, and you're

2    trying to revisit issues raised in the contempt

3    motion, then I'm going to ask you to move on.

4    Otherwise, tie in whatever these questions are

5    relevant to the medical issues, okay?

6              MR. PARLADE:  Judge, the witness has

7    stated, and the witness's counsel has stated that

8    they suffered emotional distress as a result of the

9    incident on May of 2019.

10             THE INTERPRETER:  I'm trying to get her to

11   turn off the microphone so I can translate what you

12   said.

13             THE COURT:  Okay, good.

14             Yes, I understand that.

15             MR. PARLADE:  The witness has stated that

16   this was a relationship and instances that go far

17   beyond that, from 2014, 2015.  So I'm trying to

18   inquire, number one, as to the history of this, as

19   to the culmination and development of symptoms.

20             THE COURT:  That's fine.  I'm just

21   reminding you that it has to focus on the medical

22   issues, okay?

23             MR. PARLADE:  Yes, Judge.

24             THE COURT:  All right.  Go ahead.  Ask

25   your next question.

1    BY MR. PARLADE:

2        Q    Now, in 2014, 2015, when, as you stated,

3    you went to the police and Marglli Gallego

4    threatened you, did you develop any real fear at

5    that time that you were going to be hurt, or did you

6    have any repercussions to yourself psychologically?

7        A    In reality, I began to get to know

8    Marglli.  I really didn't know up to what point she

9    could go, and I had no fear.

10       Q    So as you just stated, Marglli threatened

11   to cut your head off, she threatened to make you

12   disappear, because she knew people that could do it,

13   she threatened to ruin you, but you had no fear of

14   that; is that true?

15       A    No, I was not afraid at all.  Nobody would

16   ever pay attention to her.  I just thought that --

17       Q    Did she ever try to kill you?

18       A    No.

19       Q    Did she ever try to physically harm you?

20       A    Well, there was one incident where these

21   motorcyclists chased me down, but the police caught

22   them.  The thing is that I have no enemies.  Well,

23   at this time, no.

24       Q    I don't understand.  What do you mean that

25   motorcyclists chased you down?

Page 409

1          A      That on 184th, when I made a left turn,
2    some Colombian motorcyclists chased myself and my
3    husband down.  But I called the police, and I
4    screamed and screamed and screamed.  A police
5    officer was traveling not far behind.
6               At the traffic light he would say to me,
7    "If you get in front of me I'm going to kill you,
8    I'm going to kill you."
9               I said out loud, "Officer, he wants to
10   kill me, officer, he's going to kill me."
11              The policeman then ordered all of us to
12   make a right-hand turn, and told us to leave and
13   detained the motorcyclists.
14        Q      Do you believe that either Marglli Gallego
15   or the association was involved with those
16   motorcyclists?
17        A      I do believe -- I called the prime police
18   officers and I told them everything, but I have no
19   proof.
20        Q      And were you psychologically impacted by
21   that incident?
22        A      No.  I wasn't the kind of person to be
23   afraid that easily.
24        Q      So no depression, no anxiety, nothing?
25        A      No, sir.

Page 410

1        Q    Do you remember when that might have been,

2   that incident?

3        A    I believe it was sometime in 2015, because

4   it was recently, after a group of us had gone to the

5   police to go ahead and file the -- at that point

6   there were many of us, and by then she already knew,

7   she was aware.  Everyone took their evidence to the

8   police.  Many people went, but many of those people

9   I did not know.

10       Q    Now, to clarify, who did you believe was

11  responsible for the motorcyclists?  Was it Marglli

12  Gallego, Hammocks Community Association, or both?

13       A    At that point I thought it could be

14  Marglli Gallego, but I don't know.  I do not know.

15       Q    You also previously mentioned in testimony

16  that there were other instances where you believe

17  you were targeted, for example, when the neighbor

18  was cutting plants on your property; is that

19  correct?

20       A    I already explained that to you.

21       Q    Do you believe Marglli Gallego was behind

22  that, as well?

23            THE COURT:  Put your phone down.

24            THE WITNESS:  Yes.  And I have a letter

25  here in which the association authorizes that.

Page 411

1    BY MR. PARLADE:

2         Q     Authorizes your neighbor to cut down your

3    tree?

4         A     Yes.

5         Q     And you believe the association was behind

6    all that?

7              THE INTERPRETER:  I'm sorry, Counsel?

8              THE COURT:  I couldn't hear you,

9    Mr. Parlade.  What did you just say?

10   BY MR. PARLADE:

11        Q     And you believe the association was

12   responsible for that, correct?

13        A     Well, the letter is here.

14        Q     What letter are you referring to?

15        A     I believe you have it.  It is the letter

16   that states that if I cross from here to over there,

17   that it will be considered to be vandalism, and that

18   the neighbor is being authorized to cut the plant.

19        Q     This is directed specifically at you?

20        A     It was tendered to me by the neighbor in

21   the presence of the police.  The association had

22   given it to her, had granted it to her.  Also --

23        Q     What year was this?

24              THE INTERPRETER:  I'm sorry, Counsel?

25

1   BY MR. PARLADE:

2        Q    What year was this?

3        A    Last year.

4        Q    You had also mentioned that someone fired

5   shots at you in front of your house; is that

6   correct?

7        A    Two shots.

8        Q    Was your house struck, were you struck?

9   What happened?

10       A    Well, it was either May 2nd or 3rd,

11  between 8:00 and 9:00 p.m.  I was sitting in my

12  office.  My husband was cleaning the hallways.

13            All of a sudden I hear these shots and I

14  scream out, "Josue, Josue," calling out to my

15  husband.

16            And it was then recorded on video when

17  this man in a van stops in front of my home and

18  shoots two shots up into the air.  And my husband

19  then said that he saw when that man stepped out of

20  the van and enters into the home of the neighbor.

21       Q    Do you believe Marglli Gallego or the

22  association was responsible for that?

23       A    I do not have any enemies.

24       Q    You don't believe they're responsible?

25       A    I don't know.

Page 413

1              THE COURT:  I can't see you, Mrs. Cepero.

2              THE INTERPRETER:  The answer was, I don't

3    know.

4    BY MR. PARLADE:

5        Q    Did you report it to the police?

6        A    There's a detective assigned by the State

7    Attorney.

8        Q    And did you tell him you believed it was

9    Marglli Gallego responsible for that?

10       A    Well, I told him where the shot came from

11   and where the man went to.  I didn't involve

12   anybody.

13       Q    Were you in any way affected?  At that

14   time did you become afraid and say, "Okay, this is

15   serious, I'm going through a period of anxiety"?

16   Did you have repercussions psychologically, thinking

17   that you had been targeted?

18             THE COURT:  Madam Interpreter, finish your

19   interpretation, and then, Mrs. Cepero, do not

20   answer.  Go ahead.

21             THE WITNESS:  Yes, my anxiety increased

22   and I had panic attacks.

23             THE COURT:  Wait, wait.  Stop.  I said not

24   to answer it.

25             THE INTERPRETER:  Oh, I'm sorry.

Page 414

```
 1                THE COURT:  Okay.  I'm going to strike
 2   everything after the interpretation of the question.
 3                Mr. Arslanian, what is your objection?
 4                MR. ARSLANIAN:  It was about five
 5   questions in one question.
 6                THE COURT:  So it was a compound question?
 7                MR. ARSLANIAN:  That's all.
 8                THE INTERPRETER:  I'm sorry, Your Honor.
 9   I didn't hear your instruction, and I didn't hear
10   the objection either.  So please forgive me for
11   that.
12                THE COURT:  That's okay.
13                Mr. Arslanian, I did not understand you.
14   Did you say that's your objection, that it's a
15   compound question?
16                MR. ARSLANIAN:  Yes.
17                THE COURT:  I'm going to sustain the
18   objection, and ask you, Mr. Parlade, to break it
19   down into different sections.
20   BY MR. PARLADE:
21        Q    When that incident happened earlier this
22   year with the two shots being fired, did this affect
23   you psychologically?
24        A    Yes.  And it increased.
25        Q    Increased what?
```

```
 1        A     Anxiety.
 2        Q     Now, was there also an incident that
 3   happened earlier this year when you mentioned
 4   someone tried to open your door?
 5        A     Yes.
 6        Q     And was this an employee of the
 7   association?
 8        A     Yes.
 9        Q     And this employee, had she left a paper on
10   your door?
11        A     Yes.
12        Q     And do you remember approximately when
13   that was this year?
14        A     Approximately a month and a half or two
15   months ago.  I called the police.  There is a police
16   report.
17        Q     Do you remember, other than the paper,
18   what happened after they left the paper on your
19   door?
20        A     Yes.  Well, the police read the note, and
21   about five security guards came over in the new
22   security cars that they recently purchased.  They
23   parked in front of my home.
24              There's one security guard that I know.
25   Well, I can't remember his name right now, but I do
```

Page 416

1   know him from before.  He asked me for the paper.

2   It states that I have to paint my driveway.  They

3   said they knew that I was going to be redoing my

4   driveway in order to broadened it, to widen it.

5            So then the security guard came over.  He

6   had lots of tattoos.  I can't remember his name.  I

7   told Ana not to come into my home again.  I didn't

8   even want her in my yard.

9        Q    Who is Ana?

10       A    Ana Martinez.  She's the one that collects

11  the votes for the association.  I told her that we

12  pay for mail there, and to, as before, to send

13  everything to me by mail.

14           So this security guard, he took the paper

15  away from me, and many patrol cars came.  And all of

16  them took off scene.  Thank goodness the police was

17  able to detail what she read.

18           I called the security office and I said to

19  them, "You took the document away from me," and they

20  did not wish to return the document to me.  I said,

21  "It doesn't matter.  The police know what that paper

22  said."

23           THE COURT:  Okay, stop.

24           Mr. Parlade, your next question.

25           MR. PARLADE:  Thank you.

Page 417

1    BY MR. PARLADE:

2        Q    Do you remember the person who brought

3    that notice and left it on your door?  Do you

4    remember who that was?

5        A    Ana Martinez.  I saw her through the

6    window.  And she was also trying to open my door,

7    like putting the paper there.  I could hear from my

8    office how she turned the key -- lock.

9        Q    Do you remember chasing Ms. Martinez on

10   your property?

11       A    Yes, I did.  I chased her and I said, "Do

12   not ever come into my property again.  Do not do

13   this again.  You have made me tired of this."

14       Q    As a matter of fact, you chased

15   Ms. Martinez into a tree, correct?

16       A    She got into a security guard's car and

17   left with the security guard.

18       Q    You weren't psychologically impacted when

19   Ms. Martinez put that note on your door, were you?

20       A    Everything happened so quickly.  I thought

21   it was my husband that was trying to open.

22            MR. PARLADE:  Judge, she's being

23   unresponsive.  Can you renew the limiting

24   instruction?

25            THE COURT:  Stop.

Page 418

1            Mrs. Cepero, I'm going to ask you again,

2    listen to the question, answer the question.

3    Mr. Parlade has allowed you to say quite more each

4    time, but we're going to stop at 1 o'clock for a

5    break, and I would like to try to get through some

6    of your testimony.  That's not going to be helpful

7    if you don't answer the questions that you're asked,

8    okay?

9            Mr. Parlade, your next question.

10   BY MR. PARLADE:

11       Q    Were you psychologically affected by that

12   instance when they left a letter on your door, yes

13   or no?

14       A    Yes.

15       Q    Did it increase your anxiety?

16       A    Of course.  A person that has anxiety and

17   is already under treatment, event after event after

18   event.

19       Q    And as you mentioned in your testimony,

20   you can't sleep at night, correct?

21       A    I don't sleep.

22       Q    You feel it's something daily going on

23   with the association or Marglli Gallego?

24       A    I am not delusional.  All it is is that I

25   am cautious.  I know they are a danger.  I'm living

Page 419

1    in reality.

2         Q    Again, Ms. Cepero my question was, you

3    previously stated you are in daily fear that you are

4    being persecuted by the association or Mrs. Gallego.

5    You said that.

6         A    Well, not that they're persecuting me, but

7    that the securities have chased me down while I've

8    been in my car, several times, several times.  About

9    a month and a half you they're calmer, they've

10   calmed down.

11        Q    This started back in 2014, 2015?

12        A    Sir, in 2015, that's when the situation

13   aggravates with the incident, when the Judge

14   declares --

15             THE INTERPRETER:  She's using a word that

16   I cannot understand, this is the interpreter, in

17   context or in contest.  I don't know.  I need her to

18   write it out.  I don't know what she's saying.

19             THE COURT:  Let's go back to the question.

20   The question was, Mr. Parlade -- go ahead and ask

21   the question.

22   BY MR. PARLADE:

23        Q    You just testified that in addition to the

24   incidents we just talked about, there's also been

25   many instances where the security for the Hammocks

Page 420

1    has chased you or followed you, correct?

2        A    A long time ago, yes.

3        Q    What I'm trying to get at is, are you

4    saying as of 2014, 2015, you also, in addition to

5    the instances we just discussed, you've also been

6    followed by security in their cars, correct?

7        A    Well, sir, it is in 2015 on forward, that

8    is when the situations get worse.  They aggravate.

9            THE COURT:  I'm going to stop for just a

10    minute.

11            Mr. Parlade, how many more questions do

12    you have?

13            MR. PARLADE:  I have about six questions,

14    Your Honor.

15            THE COURT:  We're going to stop, because I

16    need to take a break before my 1:30 hearing,

17    including getting ready for my 1:30 hearing.  We're

18    going to come back at 2:15.  By then I should be

19    done with my 1:30 matter.

20            At 2:15 we'll continue with Mrs. Cepero's

21    cross-examination.  Then we'll do redirect,

22    Mr. Arslanian, maybe after Dr. Storper, if God

23    willing, he's able to do what it is he has to do.

24            After Mrs. Cepero's testimony,

25    Mr. Arslanian, what else do you have in your case in

Page 421

```
 1   chief?
 2              MR. ARSLANIAN:  Just the testimony of
 3   Josue, and that's it.
 4              THE COURT:  And then, Mrs. Parlade, after
 5   Mr. Arslanian rests, with respect to your case in
 6   chief, other than Dr. Storper, what other evidence
 7   will you have?
 8              MR. PARLADE:  That's it.
 9              THE COURT:  All right.  So what we'll do
10   is, we're going to take a break.
11              Mrs. Cepero, this is very, very important.
12   You may not discuss your testimony with your husband
13   or with Mr. Arslanian or with anyone else.  You can
14   talk about the weather, your health, but not your
15   testimony.
16              THE WITNESS:  I'll stay in the office, but
17   I would like to speak to my attorney.
18              THE COURT:  We're going to terminate the
19   hearing.  I'm going to turn off the Zoom so you all
20   can do whatever you want until 2:15, except talk
21   about your testimony.
22              THE INTERPRETER:  Did you say, Your Honor,
23   not even with her attorney?
24              THE COURT:  Not the testimony.  She can
25   discuss the case in general, but not her testimony.
```

Page 422

1              THE WITNESS:  I won't be speaking to

2    anybody.

3              THE COURT:  Anything else before we

4    conclude the morning?

5              MR. ARSLANIAN:  No, judge.

6              THE COURT:  Please stay safe.  Don't do

7    anything crazy during lunchtime.

8              Mr. Parlade, you get with Dr. Storper and

9    get us all in a happy place.

10             MR. PARLADE:  I'm working on it.  I

11   apologize, Your Honor.

12             THE COURT:  Look, this is what it is,

13   right?

14             I will see you all at 2:15.  If you log on

15   earlier, because it's going to be on the same Zoom

16   thing, just please remember to keep yourselves on

17   mute and your cameras off until I've concluded the

18   other matter.  But I'm going to do my best to be

19   done before 2:15.

20             Thank you very much.  That concludes the

21   morning.

22             (Thereupon, a lunch recess was taken,

23   after which the following proceedings were had:)

24             THE COURT:  Let's go back to the matter of

25   Cepero.  I see I have Mr. Arslanian, and now I have

Page 423

1    Mr. Brooks.

2              So, Mr. Brooks, if you'd like to make your

3    appearance, whether it's by talking or waving or

4    both, but you need to take yourself off mute.

5              MR. BROOKS:  Good afternoon, Judge.

6    Michael Brooks for the debtors, B-R-O-O-K-S.  Nice

7    to join you.

8              THE COURT:  Okay, thank you.

9              All right.  I see Mr. Parlade,

10   Ms. Escobar.  I know Mr. Juaregui and Mr. Alfaro are

11   just listening, and Mr. Juaregui, I'm going to write

12   your name down because I forgot to do it this

13   morning.

14             Oh, there you are.  When you turn the

15   camera on you move, and then I get all confused.

16   Okay.  All right.

17             MR. JUAREGUI:  Yes, Your Honor.

18             THE COURT:  Now, I am missing the

19   witnesses.  I had turned the video off because they

20   had the video on when I had my other hearing and it

21   was distracting me.

22             MR. ARSLANIAN:  There's an assistant going

23   into the other room to try to straighten it up.

24             THE COURT:  Okay, great.  They may turn

25   their video on if they would like.  We need them to

Page 424

1    do that so Mr. Parlade can finish his

2    cross-examination, and then God willing the doctor

3    will figure out how to do this correctly and we

4    won't have another 20 minutes of technology hell.

5              I'm not allowed to say that on the record.

6    Technology challenges.  How's that?

7              MR. BROOKS:  Do I get a credit for

8    technology on this?

9              THE COURT:  Were you the one doing the

10   screen sharing, Mr. Brooks?

11             MR. BROOKS:  Yes, I was.

12             THE COURT:  I didn't think so.  No.  You

13   all get credit for finding someone who knows how to

14   do the screen sharing.

15             MR. BROOKS:  Exactly.  It's 20 years

16   younger, 30 years younger.

17             THE COURT:  At least.  We're waiting for

18   the witnesses.  If you all can get -- oh, we have

19   Dr. Storper.  So maybe while we're waiting for those

20   witnesses to get connected, we'll just go to

21   Dr. Storper.  Let's just do that.

22             We've got video.  Now we just need audio.

23   Thank you, Mrs. Storper.  We just need the audio to

24   go on.

25             Dr. Storper, if you could unmute.  Okay.

Page 425

1    Now turn the volume up so we can hear you.

2                    I want to go back to when I didn't even

3    know what Zoom was.

4                    MR. PARLADE:  Me too, Judge.

5                    THE COURT:  We're still having trouble

6    hearing Dr. Storper.  Mrs. Storper is going to try

7    to fix it.

8                    While we do that, I'm going to ask the

9    witnesses -- Mr. Brooks or somebody, if you can get

10   your witnesses to turn back on.

11                   Mr. Parlade, maybe they can keep the audio

12   off, and Dr. Storper can call in on his phone with

13   the same Zoom link.

14                   MR. PARLADE:  Okay.

15                   THE COURT:  That ought to work.  You can

16   tell him we have a few minutes.  Wait.  I'm hearing

17   some noises, so maybe they just need to turn the

18   volume up more.

19                   MR. PARLADE:  Can you say something, Fred?

20                   MR. ARSLANIAN:  We're working in the other

21   room right now to get the witnesses up.

22                   If you recall, at the last evidentiary

23   hearing we had, Miguel kept freezing up and we had

24   to stop the hearing.  He turned into a statue.

25                   THE COURT:  I will say this:  It appears

Page 426

1    that all the professionals have gotten their

2    Internet issues under control.  As I say, probably

3    ad nauseam at this point, there should not be a

4    lawyer in this country that doesn't have the best

5    possible Internet speeds at their home or office at

6    this juncture, right?

7              MR. PARLADE:  That's very true.

8              MR. BROOKS:  Is it possible that it's

9    something on your end that you turned them off,

10   because they're not able to log on?

11             THE COURT:  I turned off the video, but it

12   says, "Ask to unmute and ask to start video."  So

13   they just need to turn their camera on, and they

14   need to turn their video on.

15             I see a person.  I see Mrs. Cepero.  So

16   why don't we unmute Mrs. Cepero?  I'll just confirm

17   Mrs. Cepero is still there, and do I still have --

18             THE INTERPRETER:  Ms. Cepero and I, the

19   interpreter, Ms. Grenet, are present.

20             THE COURT:  Okay, great.

21             So, Mr. Parlade, if you want to continue

22   with your cross-examination while Dr. Storper and

23   his wife try to get audio.  Go ahead.

24             MR. PARLADE:  If you would be so kind to

25   just remind the witness that they are still under

Page 427

1    oath that was given earlier today.

2            THE COURT:  Yes, thank you.

3            Mrs. Cepero, you are still under oath from

4    this morning.  Again, the same rules apply.  Wait

5    until the interpreter finishes interpreting, and

6    allow the interpreter to interpret your response and

7    we'll get through this, okay?

8            Remember, answer the question that you're

9    asked yes or no, and then a brief explanation.  If

10   you want to say more, then Mr. Arslanian will ask

11   you that on your redirect, okay?

12           Go ahead, Mr. Parlade.

13   BY MR. PARLADE:

14       Q    Ms. Cepero, when was the first time you

15   noticed having any type of psychological symptoms as

16   a result of your interactions either with Marglli

17   Gallego or the association?

18       A    Immediately after the incident,

19   immediately.

20       Q    What incident are you speaking about?

21       A    The one in which she closes up in the

22   herrand (phonetic).

23       Q    Are you referring to the incident of May

24   the 15th of 2019?

25       A    Yes.

Page 428

1      Q    Now, that was the first time you ever felt
2   in fear or anxious?
3      A    Anxious, yes.  I saw that to be very
4   serious.
5      Q    So you were anxious, but not afraid?
6      A    How could I not be in fear of a person
7   that has no respect for anyone?
8      Q    So you were in fear?
9      A    How am I not going to be afraid of a
10  person that doesn't respect what a Judge ordered in
11  a court.
12     Q    But you weren't in fear back in 2014 and
13  2015 when Marglli Gallego allegedly said to you,
14  "I'm going to cut your head off, I'm going to make
15  you disappear, I'm going to kill you, I know people
16  who can do it;" is that correct?
17     A    Well, sir, she said that in a public
18  meeting.  As a matter of fact the meeting was being
19  recorded.  That recording still exists in my phone,
20  and no, I was not afraid of that.
21     Q    And you weren't in fear in 2015 when you
22  said you saw some Colombians on motorcycles
23  following you and telling you they were going to
24  kill you, correct?
25     A    Well, that wasn't in 2015, though, no.

Page 429

1    That was last year.  Many events.  That took place

2    last year, and yes, I was afraid and I screamed out.

3    I yelled.

4              I called 911, and it was right then that a

5    police officer was passing by.  And the police took

6    control of the situations.

7        Q    So when you testified a few minutes ago

8    that you weren't afraid, and that you believed

9    Marglli Gallego and the association were responsible

10   for these motorcyclists, that was incorrect?

11       A    But just the same, I told you that I did

12   yell out.  I screamed lots in the car, and I

13   screamed out, "Josue, Josue."  And I called --

14       Q    So when you said you weren't afraid, that

15   wasn't correct or that was correct?

16       A    Sir, I was afraid.  I called the police.

17   I called 911.

18       Q    Is it true you weren't afraid when you

19   said, back in 2014, 2015, you started being followed

20   by security guards of Hammocks throughout the

21   property?

22       A    Well, let me tell you, I can tell you who

23   these people were driving these security cars.  And

24   by the way, that was not in 2014, it was in 2015.

25   It was Santiago in car number two --

Page 430

1           MR. PARLADE:  Judge, respectfully --

2           THE COURT:  I'm going to stop you,

3    Mrs. Cepero.  That's not the question.

4           What's your next question, Mr. Parlade?

5           MR. PARLADE:  She never answered that one,

6    Your Honor.  I just want to know, was she afraid.

7    She's been followed for years, she said, by the

8    association, by security guards.  Was she afraid?

9           THE WITNESS:  At first we just thought

10   they would be there for about a year, that they'd be

11   leaving, that all this would conclude.  Everybody

12   there was in contact and reporting all of the

13   incidents.

14          MR. PARLADE:  Your Honor, again,

15   respectfully --

16          THE COURT:  Yes.  Mrs. Cepero, please

17   answer the question.  Were you afraid when you were

18   being followed by the security guards, then or at

19   any time?

20          THE WITNESS:  Yes.  And I did confront

21   them.  I even have a video there of my confronting

22   them.

23          THE COURT:  Okay.  What's your next

24   question, Mr. Parlade?

25

1    BY MR. PARLADE:

2        Q    So this wasn't an isolated incident that

3    you're claiming contributed to your anxiety and your

4    fear, correct?

5              THE INTERPRETER:  I'm sorry, Counsel.

6    This is the interpreter.  I did not understand.  You

7    said this was an insulated incident or was not?

8              THE COURT:  I also did not understand your

9    question, Mr. Parlade.  So why don't you reask it in

10   a more clear manner?

11   BY MR. PARLADE:

12       Q    So this wasn't an isolated incident that

13   contributed to your fear and anxiety over the

14   situation with Marglli Gallego, correct?

15       A    My anxiety began on the 15th when I saw

16   what Marglli Gallego was capable of doing.

17       Q    What she was capable of doing was cutting

18   you off in a car in the parking lot of her house,

19   correct?

20       A    Not in her parking area.  Aside from that,

21   she didn't live there either.  We looked into that,

22   and there are witnesses.  At no time did I ever park

23   in her space.

24             THE COURT:  Okay.  We're not going there.

25   Mr. Parlade, any other questions?

Page 432

1              MR. PARLADE:  You said we're not going

2      there for what you thought my next question was

3      going to be?

4              THE COURT:  I'm not going into what I've

5      already ruled or not ruled, okay?

6              MR. PARLADE:  Judge, I don't want to go

7      into that, as well.  However, she just mentioned

8      something, a statement that contradicts testimony by

9      her husband on the stand, on stating they had no

10     clue where she lived.  They had no clue where she

11     was at, and they had no clue if she was there when

12     they went there.

13              Now she's saying something different,

14     saying they had investigated where Marglli lived.

15     This possibly opens up another witness to perjury.

16              THE WITNESS:  Sir, may I answer?

17              THE COURT:  I'm going to ask a question.

18     Because I don't want to go down this bunny trail if

19     it is, in fact, a bunny trail.

20              Mrs. Cepero, when did you investigate

21     where Ms. Gallego lives?

22              THE WITNESS:  About a month ago the

23     president of the advisor to the owners, she told us

24     that she did not live there.

25              THE COURT:  Okay.  Do I understand what

1    you're saying is, you investigated after the May

2    15th incident or before the May 15th incident?

3              THE WITNESS:  No.  The thing is, I wasn't

4    the one that investigated it.  I never have known

5    where she lived.  A neighbor in the area is the one

6    that told me.

7              THE COURT:  When?

8              THE WITNESS:  Anywhere between 15 or 20

9    days ago, possibly even 25 days ago.  I don't know.

10             THE COURT:  That's enough.  Mr. Parlade,

11   do you want to continue with this line of

12   questioning or can we move on?

13             MR. PARLADE:  Let's move on, Your Honor.

14   BY MR. PARLADE:

15        Q    Is it your contention here today that you

16   suffered any injuries as a result of the lawsuit

17   that was filed in November 2020?

18        A    You mean the lawsuit that she filed?

19        Q    You mean the lawsuit by Marglli Gallego?

20        A    You mean to us?

21        Q    Yes.

22        A    At first I did get nervous, and then when

23   I spoke to Michael he explained it to me and I got

24   calm.  No problem.

25        Q    From what I understand, there were no deep

Page 434

1    psychological issues that resulted therefrom,

2    correct?

3        A    Well, that's what you understand, but

4    you're not a professional nor a doctor.

5            MR. PARLADE:  Judge, I'm asking a simple

6    question.  If she knows she knows, if she doesn't

7    she doesn't, but she's not responsive.

8            THE COURT:  Ms. Cepero, two things.  One,

9    answer the question that you're asked, and number

10   two, don't argue with the lawyer.

11           THE WITNESS:  Okay.

12           THE COURT:  Ask the question again,

13   Mr. Parlade.

14           Please listen carefully, Mrs. Cepero, and

15   answer it if you know the answer.

16   BY MR. PARLADE:

17       Q    As a result of the November 2020 lawsuit

18   filed by Marglli Gallego and Hammocks Association,

19   did you undergo any changes to your psychological

20   condition that you are now claiming caused you

21   emotional distress?

22       A    The thing is, I'm not clear right now as

23   to what does the lawsuit filed in 2020 have to do

24   with?

25           MR. PARLADE:  Judge --

Page 435

1          THE COURT:  Mr. Parlade, that's your

2    answer.  Just move on.

3          MR. PARLADE:  Thank you, Judge.

4    BY MR. PARLADE:

5      Q    It seems that many of the instances you

6    had occur to you were at the hands of Marglli

7    Gallego; is that correct?

8      A    Yes, I believe so.

9      Q    Is it your understanding that on May 15,

10   2019, when the incident happened, was this an

11   incident that was either approved or directed by the

12   Hammocks Community Association?

13          MR. ARSLANIAN:  Wait, wait, wait.

14   Objection.

15          THE COURT:  Let the interpreter interpret

16   the question and then I'll hear the objection.

17          So, Madam Interpreter, after you interpret

18   the question, tell Mrs. Cepero, do not answer, okay?

19          THE INTERPRETER:  Okay.

20          THE COURT:  Okay.  What is your objection,

21   Mr. Arslanian?

22          MR. ARSLANIAN:  My objection is that that

23   question goes to matters that you already ruled on

24   in your initial contempt order.  She's been found in

25   contempt, the association was found in contempt, and

Page 436

1    now they're trying to go backtrack and say it was

2    only Marglli that should have been held in contempt.

3                    They've got an appeal going on this issue,

4    and it has nothing to do with the emotional distress

5    issue that's being presented here today.  She was

6    the president.  She was in the car at the time.

7                    MR. PARLADE:  Judge, if I may briefly

8    respond?

9                    THE COURT:  Very briefly.

10                    MR. PARLADE:  Judge, this is more than

11    emotional distress.  This is also a claim for

12    punitive damages.  In punitive damages, the actual

13    knowledge, and if there's any malice on the parties

14    when they committed the act is, of course, at issue

15    in determining the amount of punitive damages, if

16    issued punitive damages.

17                    So it does come into play to the damages

18    part.  It has nothing to do with whom it was.

19                    THE COURT:  I'm going to sustain the

20    objection and let me just be clear, however, what

21    you can ask.  If you wish to ask a question, if

22    there's any independent acts by the association

23    other than those that I have already ruled on, then

24    you're free to ask that question.

25                    But with respect to the issue of

Page 437

1    Mrs. Gallego, et cetera, you are free to argue in

2    your closing argument why you believe that the

3    association should not be assessed punitive damages

4    on account of the behavior of Ms. Gallego, and then

5    I'm sure Mrs. Escobar will be robustly arguing the

6    underlying vicarious liability or whatever.  I'm

7    talking off the top of my head right now, whatever

8    the arguments are to the underlying liability for

9    contempt.

10            But I agree with Mr. Arslanian that with

11   respect to that issue, that's been resolved.  So if

12   you have a question regarding any independent acts,

13   you may ask that question, but that's it.

14            MR. PARLADE:  Okay.

15   BY MR. PARLADE:

16       Q    Ms. Cepero, do you know of any independent

17   either acts or communications that would tend to

18   prove or disprove that the association sanctioned

19   the acts of Marglli Gallego on May 15, 2019?

20            THE COURT:  Okay.  Don't answer the

21   question.

22            Yes, Mr. Arslanian?

23            MR. ARSLANIAN:  Same objection.  You

24   instructed Mr. Parlade to talk about other acts.

25   He's going directly to the same acts that you

Page 438

1    already found both of them liable for.

2              THE COURT:  I'm going to overrule the

3    objection.  I don't agree that that's the correct

4    characterization of the question.

5              But to overcome any question of doubt,

6    just make sure, Mrs. Cepero, that you understand

7    that the question relates to actions other than

8    those that were directly by Ms. Gallego on May 15th.

9              MR. PARLADE:  Let me just voice my quick

10   objection.  The translation she said (speaking in

11   Spanish) --

12             THE INTERPRETER:  No, sir.  I never said

13   (speaking in Spanish).

14             MR. PARLADE:  What did you say?

15             THE INTERPRETER:  Why don't you ask your

16   question entirely again, because now I've forgotten

17   it.  But I didn't use the word "ordered."  (Speaking

18   in Spanish) possibly.

19             MR. PARLADE:  That's right.  That's the

20   word you used.

21             THE INTERPRETER:  Which is "reprimand."

22   Please repeat your question so that the interpreter,

23   myself, could translate properly.

24   BY MR. PARLADE:

25        Q    Ms. Cepero, do you know of any events,

1   acts or communications, either before or after the

2   event on May 15, 2019, by Hammocks Community

3   Association, that would tend to either prove or

4   disprove that they approved of that incident that

5   happened?

6           THE COURT:  Okay.  That I will sustain the

7   objection.  That is not the question that I told you

8   you could ask.

9           MR. PARLADE:  I'll withdraw the question.

10  I have nothing further, Your Honor.

11          THE COURT:  All right.  Before we go to

12  redirect, I'll ask the interpreter to put Ms. Cepero

13  on mute for right now.

14          Dr. Storper, please say something.  Is

15  608-49 -- is that you, Dr. Storper?

16          DR. STORPER:  Hi.  Can you hear me?

17          THE COURT:  Yes.  Okay.

18          DR. STORPER:  I'm unmuted.  Usually the

19  only one who mutes me is my wife.

20          THE COURT:  As it always should be.  Okay.

21          So we're going to -- we all just want to

22  have a celebration here.  Okay.

23          So we're going to take Dr. Storper out of

24  turn while the technology gods are with us.

25  Mr. Parlade, I'm going to ask you to please increase

Page 440

```
 1    the volume on your computer.  I'm having a little
 2    bit of difficulty, and perhaps Dr. Storper will as
 3    well.
 4            Now, Mr. Parlade, I will ask you to go
 5    ahead and start with Dr. Storper.
 6            MR. PARLADE:  Thank you.
 7                    DIRECT EXAMINATION
 8    BY MR. PARLADE:
 9        Q    Could you please state your name for the
10    record?
11        A    Henry Storper.
12        Q    Is it Dr. Storper?
13        A    My name is Henry Storper, Henry Michael
14    Storper.
15        Q    What is your occupation?
16        A    I'm a doctor.
17        Q    Thank you.  What is your specific
18    occupation?
19        A    I'm a physician and a board certified
20    psychiatrist.
21        Q    Okay.  And what is your educational
22    background, Dr. Storper?
23        A    Starting from where?
24        Q    Starting from 1970.
25        A    Well, okay.  I went to college at NYU, and
```

Page 441

```
 1    I went to George Washington Medical School.  I got
 2    an M.D.  Then I spent a year as an intern in
 3    Hartford Hospital.  Then I did three years of
 4    psychiatric residency at New York Hospital Cornell
 5    Medical Center.
 6              Then I entered the Army, where I was a
 7    major in the Army stationed at Fort Bragg, where I
 8    ran the general psychiatric unit for a year, and I
 9    directed the substance abuse program for a year.
10              After I left the Army I came to Miami,
11    Florida, where I started a private practice, was
12    hired as director of a substance abuse program
13    called St. Luke's Center.  I left there to work at
14    the Community Mental Health Center, CHI.  After
15    being there for three years I became the medical
16    director at CHI.  I was medical director there until
17    1972, when I left to go into full-time private
18    practice.
19              In addition to the private practice, I,
20    with three other psychiatrists, started an inpatient
21    psychiatric unit at what was then Miami-Dade
22    Hospital, now is known as Jackson South.  I served
23    in various capacities in the hospital, director of
24    the psychiatric unit, director of the partial
25    hospitalization program, and I was also chief of
```

Page 442

```
 1    staff for one year of the hospital.
 2              Then I've been in private practice since,
 3    doing outpatient psychotherapy.  I did inpatient
 4    psychotherapy until right before the pandemic
 5    started.  Then I had a medical legal practice, as
 6    well, for a number of years.
 7         Q    And what organizations are you now a
 8    member of?
 9         A    Now?
10         Q    Yes.
11         A    I'm just a member of the American
12    Psychiatric Association.
13         Q    Are you also a member of the Florida
14    Psychiatric Society?
15         A    I'm not sure if my membership is current.
16    I'd have to check.
17         Q    Are you an member of the American Board of
18    Psychiatry and Neurology?
19         A    Well, the American Board of Psychiatry and
20    Neurology is a certifying organization that gives
21    examinations to determine board certification.  So
22    I'm certified by that board.
23         Q    Okay.  Approximately how many cases do you
24    think you handled regarding either psychiatry or
25    anything related to that field?
```

Page 443

1      A     How many cases in what period of time?

2      Q     I would say in your career, an

3   approximation.

4      A     I don't think anyone ever asked me that

5   question.  No one.

6            That would be hard to say.  Certainly

7   thousands and thousands of people.

8      Q     Perfect.  Thank you so much, Doctor.

9            Now, this case involves an allegation that

10  there are some individuals that underwent emotional

11  distress as a result of acts by not only the

12  association, but by an individual, Marglli Gallego.

13           What about emotional distress would

14  require the testimony of a person with your

15  qualifications?

16     A     Well, to make an assessment of what their

17  level of psychiatric illness is, what your diagnosis

18  is, to review all of their medical records, both

19  psychiatric and non-psychiatric, interview each

20  person for an appropriate amount of time, and then

21  to offer an opinion on that topic.

22     Q     Okay.  And what is about issues with

23  emotional distress that a layperson with no

24  background in this field might not be able to

25  understand?

Page 444

1        A    Well, emotional distress is a rather large

2   topic.  I wonder if we could be a little more

3   specific.

4             I mean, anyone can have emotional distress

5   and they don't need treatment or assessment.  It's

6   only when your emotional distress becomes

7   symptomatic and interferes with the functioning of

8   daily life, activities of daily living, work,

9   school, things like that, that they require care, if

10  they choose to get it.  Many people don't choose to

11  get help.

12             THE COURT:  Dr. Storper, I'm going to ask

13  you to move the camera -- tilt your camera just a

14  little bit forward so I can see your entire face.

15  Right now I can only see you from the nose up.

16             Okay.  I think we're doing better now.

17  Thank you.

18             THE WITNESS:  I'm sitting outside on the

19  patio to get my neighbor's Internet.

20             THE COURT:  We can see that, and we thank

21  your neighbor.

22             Go ahead, Mr. Parlade.

23             MR. PARLADE:  Thank you.

24  BY MR. PARLADE:

25        Q    Dr. Storper, do you believe your testimony

Page 445

1    today will aid the Judge in understanding the facts

2    in this case?

3           A    Yes.

4           Q    And how so?

5           A    Well, this is a chance to have a

6    psychiatric opinion, to review the care.  The only

7    opinions that we have are the treating therapists.

8           Q    Have you examined both debtors, both Josue

9    Cepero and Leticia Cepero?

10          A    I have.

11          Q    Okay.  Now, if we can first turn to your

12   examination of Josue Cepero, if you could please

13   remark as to what you reviewed prior to examination,

14   and what the results of that examination were.

15          A    Yes.  Well, I created a report, which has

16   been provided, I believe, to all counsel and to the

17   Judge, as well as to you, about my examination.

18               I reviewed all the medical records that

19   were provided to me, and I was able to review mental

20   health records of Dr. Caro.  I did not have any

21   medical records for Dr. Suarez, his current family

22   doctor, nor with Dr. Pedro Caro, his prior family

23   doctor, who is the father of Marjorie Caro, his

24   psychiatrist.

25          Q    Doctor, the other Dr. Caro, who's the

Page 446

1    father of Marjorie Caro --

2        A    Pedro Caro.  I did not see any records

3    from him, nor do I have his current -- the current

4    records of his family doctor, who evidently is

5    prescribing some psychotropic medication for him.

6              THE COURT:  Dr. Storper, I'm going to have

7    to ask you again.  I'm sorry.  I keep losing your

8    face.  Is there any way to tilt the iPad a little

9    bit?  Are you using an iPad?

10             THE WITNESS:  No.  I'm using a laptop.

11             Is this better?

12             THE COURT:  That's much better.  Thank you

13   so much.

14             Go ahead, Mr. Parlade.

15             MR. PARLADE:  Thank you.

16   BY MR. PARLADE:

17       Q    Upon review of the records provided to you

18   by Josue Cepero's attorneys prior to your

19   examination, did you form a preliminary assessment?

20       A    No.

21       Q    Okay.  Now, upon your examination with

22   Josue Cepero, what was the result, and did you

23   arrive at an assessment or a diagnosis?

24       A    I'm not sure how much detail we want to go

25   into, but essentially I'll summarize it, which is

Page 447

1    this:

2           He went to see Marjorie Caro, the

3    psychiatrist, on October the 3rd, 2018.  He denies

4    any history of prior psychiatric treatment before

5    that time.  And at that time, according to the

6    medical records provided to me, he complained of

7    multiple financial distress, including the fact that

8    his disability check was not enough to cover his

9    needs.  He was on disability because of two torn

10   rotator cuffs.

11          He reports having difficulty with his wife

12   with regard to intimate relationship, and reports

13   that he felt defeated physically and emotionally.

14   He was pessimistic about his future.  His main

15   complaint is noted as insomnia and feeling tired

16   during the day.  These symptoms have been present

17   for approximately one year prior to his examination

18   by Dr. Caro.

19          He also reported feelings of -- that he

20   reported feelings of worthlessness, helplessness and

21   rumination, with poor insight into his illness.

22          THE COURT:  I'm going to stop for a

23   minute.

24          What is it, Mr. Arslanian?

25          MR. ARSLANIAN:  I just want the record to

Page 448

1    reflect that the witness is reading from a report.

2    He's not testifying.  He's been looking down and

3    reading the entire time.

4              I just want to make sure, because I intend

5    to question him regarding that report, and I intend

6    to offer them into evidence, because he is reading

7    -- he is literally reading from the report.

8              THE COURT:  Okay.  Mr. Parlade, you made

9    the decision not to -- although I will tell you

10   this:  Admitted or not, normally the expert reports

11   are listed on the exhibit register, but be that as

12   it may, I don't think you have any dispute with the

13   fact, putting aside whether Mr. Arslanian has the

14   right to put the report into evidence, you certainly

15   don't argue that Mr. Arslanian has the right to

16   cross-examine Dr. Storper with respect to his

17   report, regardless of whether Dr. Storper is reading

18   directly from the report or otherwise; isn't that

19   true?

20             MR. PARLADE:  That is true, Your Honor.

21   And I have no objection if Mr. Arslanian wants to

22   move it in as an exhibit, and they've been provided

23   the report with anticipation.  I have no problem

24   with it.

25             MR. ARSLANIAN:  The only reason why it

Page 449

1    wasn't on the exhibit register, Your Honor, is that

2    we got it on 12-23, and honestly, I thought that it

3    was on his exhibit list.  That's why I didn't have

4    any problem.

5            If there's no issue with it, we've had

6    them scanned in, and we would ask that they be

7    admitted as Exhibits 16 and 17.

8            THE COURT:  Okay.  Well, let's finish with

9    Dr. Storper, and then we'll -- but right now,

10   Dr. Storper, you were saying that in your

11   examination of Mr. Cepero, you looked at the report

12   that was prepared by Dr. Marjorie Caro; is that

13   correct?

14           THE WITNESS:  I looked at her medical

15   records, yes.

16           THE COURT:  Okay.  Mr. Parlade, do you

17   have another question?

18           MR. PARLADE:  Yes.

19   BY MR. PARLADE:

20       Q    After reviewing her medical records, did

21   that help you in the examination of Josue Cepero?

22       A    Of course, yes.

23       Q    How so, Doctor?

24       A    Do you want me to continue?

25       Q    Yes, Doctor.

Page 450

1          A      All right, fine.

2                 As I was saying, she noted that there were

3     no current medications ordered for him.  He was

4     prescribed clonazepam one milligram, and given a

5     prescription for 30 tablets.  Clonazepam is a mild

6     antianxiety drug.

7                 He returned on July the 30th, 2019, so

8     there was quite a hiatus between visits, again

9     experiencing feelings of sadness, worthlessness,

10    despair, insomnia.  Essentially the same symptoms

11    that are noted, lack of concentration.  She also

12    noted, related to issues in the Hammocks.

13                She continued to prescribe the same

14    clonazepam for anxiety, and added mirtazapine, 7.5

15    milligrams at bedtime for depression and insomnia.

16    Mirtazapine is an extreme -- is used for depression

17    and insomnia, and she prescribed an extremely small

18    dosage of it.  The dosage range goes up to

19    60 milligrams a day.

20                He was seen again the following month, in

21    August, and he had the same symptoms.  He was not

22    able to start the medication, because the insurance

23    didn't cover that dosage strength.

24                He was seen again then in October, early

25    October of 2019, feeling worse.  He had tried the

Page 451

1    mirtazapine, stopped due to severe nausea and

2    vomiting.  He's upset about this severe illness of

3    his father.  The mirtazapine was discontinued,

4    citalopram 10 milligrams per day is started.

5    Trazodone 50 milligrams is offered at bedtime.

6    That's for sleep.  Clonazepam is continued.

7                He was next seen on --

8                THE COURT:  Dr. Storper, I'm sorry.  I

9    don't mean to stop you, but I don't -- unless,

10   Mr. Parlade, especially if Mr. Arslanian is going to

11   enter this into evidence, do we need to have this

12   kind of detail with respect to the medications for

13   Dr. Storper to render his opinion?

14               MR. PARLADE:  No, Judge, and no objection

15   as to -- I could agree to enter both of the reports

16   as an exhibit.  So if debtors' counsel wants to

17   upload them as 16 and 17, I have no objection to it.

18               THE COURT:  So Dr. Storper wrote two

19   reports?

20               MR. PARLADE:  That's correct, Your Honor.

21   One for the debtor, Josue Cepero, and one for the

22   debtor, Leticia Cepero.

23               THE COURT:  All right.  So, Dr. Storper,

24   only because of the interest of time, what --

25   Mr. Parlade, I believe you had asked Dr. Storper a

Page 452

1    question.  I wasn't sure that Dr. Storper had

2    answered it yet.

3    BY MR. PARLADE:

4        Q    Doctor, after reviewing the patient's

5    medical records and the history where Dr. Caro had

6    noted problems with anxiety and depression on

7    October 2018, did you see any indication in the

8    medical records or anything presented to you as an

9    exacerbation or some increasing of those symptoms

10   subsequent to that date?

11       A    No, I did not.

12       Q    Did you provide a mental status exam of

13   Mr. Cepero?

14       A    I did, during my examination.

15       Q    And what exactly is the mental status

16   exam?

17       A    A mental status examination is a tool that

18   mental health professionals use to assess the

19   mentation of the patient, much like a family doctor

20   does a physical examination.

21       Q    And what was the result of that exam?

22       A    Well, I don't know how much detail.  I'll

23   just summarize the high points.

24            The patient was anxious but generally

25   pleasant, except when speaking about the conflict

Page 453

1    with Ms. Gallego.  Then he becomes very agitated and

2    angry and speaks at length.  It was difficult for me

3    to get him to stop.

4              There were no ideas of harm or violence to

5    himself or anyone else.  His thoughts were

6    circumstantial and tangential, and he has

7    significant obsessive ruminations when we're on the

8    topic of the current conflict between he and the

9    homeowners association, or his ruminations about the

10   welfare of his wife and how she has changed.

11             There's no evidence of auditory or visual

12   hallucinations.  There's no evidence of a thought

13   disorder.  He does present with paranoid persecutory

14   ideations, in which he feels Ms. Gallego and the

15   homeowners association is out to get him and to harm

16   him.

17             He states that he feels like he's being

18   watched and is the object of special scrutiny in his

19   environment.  He believes that neighbors have turned

20   against him, because they were fearful of the power

21   of the homeowners association, or their minds had

22   been poisoned against him.  His sensorium, which is

23   orientation to time, place and person, was generally

24   intact.

25             My diagnostic impression was major

Page 454

1  depressive disorder with obsessive ruminations and

2  generalized anxiety disorder.

3      Q    As we sit here today, is it your belief

4  that the incident that happened in May of 2019 to

5  Josue Cepero was the cause of his emotional

6  distress?

7      A    No.  What I said, my opinion is that

8  there's ample documentation in the contemporaneous

9  medical records that in his initial visit to

10  Marjorie Caro on October 3, 2018, is essentially

11  identical to the symptoms that he has continued to

12  complain of.  So there's no change as far as that

13  goes.

14          There's no increased frequency of visits,

15  there's no significant alteration in medication.

16  There's nothing to indicate any exacerbation, based

17  upon my examination and the records that I reviewed.

18      Q    Thank you, Doctor.

19          And if we could turn now to your

20  examination of Leticia Cepero.

21      A    Yes.

22      Q    Were you able to examine her medical

23  records and medical history prior to the examination

24  of Leticia Cepero?

25      A    Yes.

Page 455

1      Q    And what were the results of that

2 examination of her past medical history?

3      A    Well, as far as that goes, she had an

4 extensive medical history.  Her primary care

5 physician is Reinaldo Hernandez.

6           She has been prescribed the following

7 medication:  Metoprolol, thyroid, losatan-k, HCTZ,

8 omeprazole and calcitrol.

9           She has a history of thyroid surgery, as

10 well as removal of two malignant colonic polyps.

11 She was treated for hypertension, and also reports

12 thrombocytopenia.  She also noted that she had some

13 surgery with regard to her lymph nodes.

14           Some of these I had records for and some

15 of these I just recorded what she told me.

16      Q    Were you able to examine her psychiatric

17 history prior to the exam?

18      A    Yes, I was.  I had records from the two

19 mental health professionals who were treating her.

20 She sought psychiatric help from Oscar Pozo, who's a

21 psychiatrist, on June 23, 2020, which is over a year

22 from the episode that we're talking about.  She saw

23 him again February 19, 2021, and August 3, 2021.  So

24 there's about eight months between the first visit

25 and six months between the second.

1              She'd been prescribed Effexor XR, 37.5

2    milligrams, which is a low dose of an

3    antidepressant, an antianxiety drug, klonopin, one

4    milligram twice a day, as well as melatonin in low

5    dosage.  She states that she'd been offered other

6    medications, but rejected them, as she does not

7    believe that, "medicine is good for you."  She's

8    concerned about dependency issues.  She has no prior

9    psychiatric history.

10             In addition, she saw Francis Pena, a

11   clinical social worker for ongoing psychotherapy.

12   She saw Ms. Pena in April 2020, and continued to see

13   her through July 2021.  She has been diagnosed with

14   adjustment disorder and PTDS by Ms. Pena.

15             Dr. Pozo's diagnosis was acute stress

16   reaction, major depression (inaudible) -- there's a

17   helicopter passing by.

18             Did you hear me when I said Dr. Pozo's

19   diagnosis is acute stress reaction, major depression

20   recurring, and generalized anxiety disorder?  Was

21   everyone able to hear me?

22             MR. PARLADE:  Yes.

23             THE COURT:  Yes.

24             THE WITNESS:  I just would make one point.

25   Doctor Pozo's diagnosis of major depression

Page 457

1    recurrent implies a prior episode of major

2    depression, although there's no record of that in

3    Dr. Pozo's medical records that he provided to me.

4    So I'm unclear if there's a prior history of mood

5    disorder for which records are not available.

6            Should I continue?

7    BY MR. PARLADE:

8        Q    Is it significant that there has been no

9    psychiatric, no psychological treatment for over a

10   year after the incident they're complaining caused

11   emotional distress, which was May of 2019?

12       A    Yes.  I find that extremely significant.

13   That does not imply any severe or significant

14   severity of illness.

15           Someone in acute distress, they'd go back

16   to their doctor and say, "I feel terrible, I can't

17   sleep, I can't eat," whatever their symptoms happen

18   to be.  They wouldn't wait, or I don't understand

19   why somebody would wait such a long period of time

20   to get further symptom relief.

21       Q    As you reviewed the past medical history,

22   was there any doctor at all that had come to the

23   conclusion that the incident in May of 2019 was the

24   cause of the psychological or emotional distress?

25       A    No.  There was no evidence of that

1    conclusion.

2        Q    Now, based on the examination of the prior

3    medical records, you then conducted a medical status

4    exam of Leticia Cepero; is that correct?

5        A    Yes, of course.

6        Q    And what was the result of that medical

7    status exam?

8        A    Well, she was initially quite cooperative,

9    but as she began to talk her speech became very loud

10   and hyperverbal.  She becomes agitated, very

11   agitated when recounting the dispute with the HOA.

12   I asked her several times to modulate to her volume,

13   to let me speak.

14            In regard to affect, it was labile,

15   anxious, angry and irritable, as described above.

16   There's no evidence of harm to self or others.

17            With regard to her thoughts, they were

18   circumstantial and tangential, with long periods of

19   verbalization that are quite tangential to the

20   question.  Something that we have seen today in her

21   testimony.

22            It's extremely difficult for her to answer

23   questions directly without becoming hyperverbal,

24   circumstantial and tangential.  There are persistent

25   excessive ruminations about the conflict.  She

Page 459

1   manifests significant paranoid persecutory

2   ideations, in which she believes that she and her

3   family would be harmed or possibly killed by

4   employees of the homeowners association, and by

5   Ms. Gallego in particular.

6               There are no auditory or visual

7   hallucinations or ideas of reference.  She's

8   concerned about suspicious items in her

9   neighborhood, such as the gunshots going off, and

10  the fact that her peacock was killed by a dog, which

11  she hints at assigning blame for, but never quite

12  completes the accusation.

13              With regard to her sensorium, attention

14  span and concentration were reduced.  She's unable

15  to abstract and do serial sevens.  But it was

16  generally okay.  Then I formed a diagnosis for her.

17      Q    And what was your diagnosis?

18      A    It was acute situational reaction,

19  generalized anxiety disorder with significant

20  obsessive ruminations, mood disorder, unspecified.

21      Q    And based on your medical -- I'm sorry --

22  mental status exam and your examination of

23  Ms. Cepero's records, do you believe the incident

24  that happened on May of 2019 exacerbated or cased

25  her present emotional condition, and causes her

Page 460

1    emotional distress?

2         A    I do not.

3         Q    I've heard twice that term you used with

4    both Josue Cepero and Leticia Cepero of obsessive

5    ruminations.

6              Could you please describe that to the

7    Court?

8         A    Obsessive ruminations are a consistent

9    preoccupation with a thought or an idea.  In the

10   case of the Ceperos, the preoccupation is that

11   they're being harmed, they're going to be harmed,

12   they're going to be injured by Ms. Gallego and the

13   homeowners association.  That's their belief, and

14   they worry about it and worry and worry and worry.

15             There's normal worry and there's extra

16   worry.  So the extra worry are characterized as

17   obsessive ruminations.  There's an unusual extra

18   preoccupation with a concern or a problem.

19        Q    Now, as we sit here today, do you believe

20   the event of May 15, 2019 caused Ms. Cepero

21   emotional distress?

22        A    I think she had an acute situational

23   reaction, but she had already had preexisting issues

24   and conflicts the same.  I think that the problem

25   with Ms. Cepero is that she had a variety of

Page 461

1    symptoms which had been inadequately treated, in
2    part due to the patient's lack of cooperation with
3    accepting proper care.
4           She had a severe sleeping problem, for
5    which she refuses effective treatment, using tiny
6    dosaging of klonopin, a small dosage of melatonin,
7    which of course are inadequate to help her.
8    Therefore, she's up at night thinking, thinking,
9    thinking, ruminating, which make all of her symptoms
10   worse.
11          The other part is that I disagree with the
12   diagnosis of posttraumatic stress disorder.  That
13   she had that severe situational difficulty with the
14   other party on May 15, 2019, did not materially
15   change it.  In fact, she felt worse with the further
16   helplessness and inability to participate in
17   appropriate care.
18          She believes her life may be threatened.
19   There's no evidence of any threats to her physical
20   well-being or harm, and she has an obsessive
21   preoccupation with these events and conflicts, which
22   have come to dominate her existence and is causing
23   her significant distress.
24          I don't think the events of May 15th
25   materially altered what was clearly a preexisting

1    condition and preexisting conflict, which had gone

2    untreated prior to that time.

3         Q    Now, just a final question.

4              Would a person who suffers from excessive

5    ruminations have problems with reference to

6    perception of events?  Would that alter perception?

7         A    The answer is, it can alter perception.

8         Q    In what way?

9         A    Well, it can make you distort the reality

10   of your existence.  If you think someone is going to

11   harm you, then you may not be very friendly to them

12   when you see them, and then, of course, they have a

13   response to that.  It can alter your behavior.  It

14   depends on the particular rumination.

15             A common rumination might be, I'm worried

16   did I lock my door, so I have to go pack and check

17   multiple times.  So that's both a rumination and a

18   compulsion.  The compulsion is the behavior, the

19   rumination is the thought.

20             MR. PARLADE:  Okay.  Thank you.  I have

21   nothing further.  Thank you, Doctor.

22             THE COURT:  Mr. Arslanian, your

23   cross-examination.

24             MR. ARSLANIAN:  Thank you, Your Honor.

25

Page 463

1                    CROSS-EXAMINATION

2    BY MR. ARSLANIAN:

3        Q    Dr. Storper, the labels that you applied

4    in your own analysis of each of the debtors, that's

5    as a result of their interaction with the

6    association and Ms. Gallego; isn't that correct?

7                MR. PARLADE:  Objection to form.  Vague.

8                THE COURT:  Objection to form is not an

9    objection at trial.  What is the objection?

10               MR. PARLADE:  It's vague.  The term

11   "labels" is -- he said "your labels," and that's a

12   vague terminology without specifying.  The witness

13   will not be able to determine what exactly that term

14   refers to.

15               THE COURT:  Okay.  If Dr. Storper doesn't

16   understand the question, I have complete faith, as

17   long as the question doesn't involve how Zoom works,

18   to be able to tell Mr. Arslanian that he does not.

19               I assume, Mr. Arslanian, you already know

20   Dr. Storper, so your introduction was not necessary.

21               MR. ARSLANIAN:  I'm sorry, I don't.  I

22   don't know him.

23               THE COURT:  Then why don't you introduce

24   yourself to Dr. Arslanian first -- I mean,

25   Dr. Storper, so he knows who you are.

Page 464

1    BY MR. ARSLANIAN:

2        Q    Dr. Storper, my name is Louis Arslanian.

3    I'm the attorney for the debtors, and I'll be asking

4    you some questions based on your testimony and the

5    reports that you provided to us.

6        A    Okay.

7             THE COURT:  Now ask your question, whether

8    you want to restate it in a less vague way, or just

9    reask your question, Mr. Arslanian.

10            MR. ARSLANIAN:  Okay.

11   BY MR. ARSLANIAN:

12       Q    In each report, in your testimony you

13   ascribed certain conditions to each of Josue Cepero

14   and Leticia Cepero; isn't that correct?

15       A    I used psychiatric terminology to describe

16   my interview with them, yes.

17       Q    You described -- you used that psychiatric

18   terminology to describe the condition that you

19   observed present in them; isn't that correct?

20       A    Well, I wonder if we could use a specific

21   example, because the question is a little vague to

22   me.

23       Q    You said, as far as Josue, in your report,

24   diagnostic impression, and this was the label that I

25   was talking about.  You wrote, "major depressive

Page 465

1    disorder with obsessive rumination, generalized

2    anxiety disorder."

3            Are those the conditions that you observed

4    to be attributed to Mr. Cepero, based on your

5    interview?

6        A    Well, that was based on my interview and

7    the review of all of the medical records that I

8    received.

9        Q    And isn't it true that those particular

10   conditions, major depressive disorder with obsessive

11   ruminations, generalized anxiety disorder, are all

12   rooted in Mr. Cepero's relationship with the board

13   and Marglli Gallego?

14       A    I couldn't disagree more.

15       Q    Okay.  It has nothing to do with the board

16   or Marglli Gallego?

17       A    You said, the question was, they were all

18   rooted in that, and the answer to that is no, I

19   don't think that.

20       Q    What are they rooted in then?

21       A    Well, he was seen by a psychiatrist in

22   May 2018, who had very clear records describing his

23   symptomatology, none of which has changed from her

24   initial evaluation throughout.  So it's rooted in

25   his primary illness that was diagnosed by Marjorie

Page 466

1    Caro.

2        Q    I'm going to screen share Exhibit 3, Dr.

3    Caro's records.

4            THE COURT:  What Exhibit 3?  Exhibit 3

5    is -- oh, from Dr. Caro, okay.  What's been marked

6    for identification as Exhibit 3.

7            MR. ARSLANIAN:  Correct.

8    BY MR. ARSLANIAN:

9        Q    Do you recognize this?

10           Can you see the document, sir?

11       A    Yes, I can.

12       Q    Do you recognize this as the records of

13   Dr. Caro?

14       A    Yes.

15       Q    Initial psychiatric evaluation on

16   October 3, 2018?

17       A    Yes.

18       Q    And it specifically says that he has

19   financial stressors, and he had difficulty with his

20   wife, and feels defeated physically and emotionally.

21           Now, this is before the incident on

22   May 15, 2019, correct?

23       A    Yes.

24       Q    Okay.  So then you reviewed his next

25   visit, which was on July 30, 2019, correct?

Page 467

1      A      Yes.

2      Q      That's after the incident?

3      A      Yes.

4      Q      Okay.  Now, it says here, "The patient

5  came in today for a follow-up appointment.  He

6  mentioned that he has been experiencing persistent

7  and worsening feelings of sadness, worthless,

8  despair, insomnia, hopeless, helpless, abandoned,

9  lack of concentration, anorexia, related to the

10  issues in the place where he is living."

11           Is it your testimony that that history

12  that I just read is the same history of Mr. Cepero

13  prior to the May 15, 2019 incident?

14      A      Well, what added to the history, of

15  course, is the issue with where he's living, but

16  what's also important to remember, it's been nine

17  months since he visited the doctor, number one.  And

18  number two, the doctor did not treat him with

19  appropriate medication, so he couldn't possibly have

20  gotten better.  So he was getting no benefit, and

21  there was no contact evidently between he and the

22  doctor.  I'm puzzled why there was such an extensive

23  hiatus between his visits.

24           So I would not attribute those symptoms to

25  being caused by the incident with the homeowners.

Page 468

1   If you're depressed and you don't feel well and you

2   have an untreated mood disorder, which he did, and

3   then something more happens, then you're going to

4   feel a little worse.  That would be normal.

5         Q    So the May event definitely exacerbated

6   his condition; isn't that correct?

7         A    Well, it could exacerbate his condition,

8   but don't forget, he wasn't being treated

9   adequately, so he has all his prior symptoms.  So

10  he's extremely vulnerable to anything that happened.

11        Q    Let me ask you something about your

12  understanding about the May 15, 2019 incident,

13  because you wrote in your report that there are

14  different versions as to what occurred.

15             Do you recall writing that in your report?

16        A    Oh, yes.  There are different versions.

17        Q    And isn't it true that you asked Mr. and

18  Mrs. Gallego why they blocked in Marglli Gallego?

19             MR. PARLADE:  Objection as to --

20             THE COURT:  Wait, wait.  What is the

21  objection, Mr. Parlade?

22             MR. PARLADE:  That's a confusing question.

23  He said wasn't it true that you had asked Mr. and

24  Mrs. Gallego as to the blocking of Marglli Gallego.

25             MR. ARSLANIAN:  Let me rephrase the

Page 469

1    question.

2    BY MR. ARSLANIAN:

3         Q    Isn't it true that during each of their

4    examinations, you asked Mr. and Mrs. Cepero why they

5    blocked in Marglli Gallego?

6         A    I don't recall that.  I think they thought

7    that they were blocked in, and I asked them about

8    that.  That's my recollection.

9         Q    Do you understand that the Judge has

10   already heard the version of the association and

11   Marglli Gallego, and concluded that it was totally

12   fabricated?

13             MR. PARLADE:  Objection.

14             THE WITNESS:  I don't know a thing about

15   that.

16             THE COURT:  Okay, Dr. Storper, I'm sorry.

17   I should have made it clear.

18             If Mr. Parlade objects -- and again, we

19   don't have the benefit of seeing him stand up,

20   because how would you know he was standing up unless

21   you were staring at his belt buckle, so we have to

22   say "objection."  Mr. Parlade objected to the

23   question, so your answer is going to be struck.  Let

24   me hear what Mr. Parlade's objection is.

25             MR. PARLADE:  Beyond the scope.

Page 470

1              MR. ARSLANIAN:  He's been asked all about

2       the May 15, 2019 incident.  I want to know what his

3       understanding of what it was is.

4              THE COURT:  Okay.  And how is that

5       relevant to Dr. Storper's report?

6              MR. ARSLANIAN:  Because he writes that

7       there are different versions, as if my clients'

8       version was just a version of what happened, and the

9       association has its own version, and that might be

10      reality.

11              I want to make it clear that there is only

12      one version here, and the version of the association

13      was, in fact, found to be a fabrication.

14              THE COURT:  I'm going to sustain the

15      objection in part.  If the nature of your question,

16      Mr. Arslanian, is that you want to know whether

17      Dr. Storper's opinion would be impacted by the fact

18      that I found that the Ceperos' version of events was

19      what occurred, then you may ask that question, but

20      other than that, I don't see why it matters what

21      Dr. Storper's opinion or knowledge is as to what I

22      found.

23              If you want to ask it in the context of

24      his opinion, that's one thing.  Otherwise, it's not

25      relevant.

Page 471

1    BY MR. ARSLANIAN:

2        Q    Dr. Storper, would your opinion as to the

3    conclusion that you reached about the May 15, 2019

4    incident be changed if you knew that the Court has

5    already concluded that the association and Marglli

6    Gallego's version of what happened was fabricated?

7        A    Well, it would lead me to ask a number of

8    questions, which may alter my opinion or may not.

9        Q    Would your conclusions about the May 15,

10   2019 incident change if you knew that Judge Isicoff,

11   in 2018, had entered two different orders

12   prohibiting the association and Ms. Gallego from

13   having any contact with the Ceperos?

14       A    I was aware of that.

15       Q    So basically, you're aware that there are

16   orders to stay away, and that the association and

17   Ms. Gallego violated those orders, and then came to

18   court and fabricate a story that the Ceperos had

19   been following Ms. Gallego?

20       A    Is that a question?

21       Q    Yes.  Are you aware of all of that?

22       A    Well, can we ask it in parts?

23            I'm aware of the stay away order.  I'm not

24   aware of any fabrication.

25            THE COURT:  Okay.  So that's your answer,

Page 472

1    Mr. Arslanian.  And Dr. Storper already answered

2    your previous question.

3                What else do you want to ask?

4                MR. ARSLANIAN:  Fair enough.

5    BY MR. ARSLANIAN:

6        Q    Now, with regards to this exacerbation by

7    the May 2019 incident, you see in Dr. Caro's report

8    it says, "Since last visit have symptoms worsened,"

9    and you found yes, they have?

10               MR. PARLADE:  Objection, Your Honor.

11               THE COURT:  What is the objection?

12               MR. PARLADE:  Counsel is characterizing

13   exacerbation, which is not a term used by the doctor

14   in his report and his testimony.  This is a

15   mischaracterization by counsel.

16               THE COURT:  Okay, noted.  Mr. Arslanian,

17   the objection is sustained.  Use a different word.

18               MR. ARSLANIAN:  I'll move on.

19               Before I take this off, I ask that -- I

20   move that Dr. Caro's medical records, Exhibit 3, be

21   admitted into evidence.

22               THE COURT:  Mr. Parlade.

23               MR. PARLADE:  Objection, Your Honor.  He

24   did not lay the foundation with the witnesses as to

25   its introduction.

Page 473

1           THE COURT:  Okay.

2           MR. ARSLANIAN:  Your own witness relied on

3    it.

4           THE COURT:  Dr. Storper -- I'll ask you to

5    scroll through, Mr. Arslanian, all of Exhibit 3, so

6    Dr. Storper can look at it.

7           THE WITNESS:  All done.  Wait.  Can we go

8    back?

9           THE COURT:  Start at the beginning,

10   Mr. Arslanian.  Keep going.

11          Dr. Storper, I'm only asking Mr. Arslanian

12   to scroll through, because the question I'm going to

13   ask you, is this a report that you examined in

14   connection with the preparation of your expert

15   report?  That's all I want to know.

16          THE WITNESS:  The answer is yes.

17          THE COURT:  Then, Mr. Parlade, I'm going

18   to admit Exhibit 3 on the basis that the Federal

19   Rules of Evidence allow me to enter into evidence

20   hearsay testimony -- I'm sorry -- hearsay that was

21   relied upon by a testifying expert with respect to

22   rendering his or her opinion.  That's the basis upon

23   which I'm admitting Exhibit 3.

24          (Thereupon, Debtors' Exhibit No. 3 was

25      admitted into evidence.)

Page 474

1          MR. ARSLANIAN:  Thank you, Your Honor.

2          THE COURT:  Any other questions?  Go

3  ahead.

4  BY MR. ARSLANIAN:

5      Q    Now, with regard to Leticia, you relied

6  upon the records of Dr. Pena and Dr. Pozo; isn't

7  that correct?

8      A    It's Ms. Pena, not doctor.

9      Q    Okay, I'm sorry.  Ms. Pena and Dr. Pozo?

10     A    They were part of my -- of the information

11  I need to produce an evaluation.

12     Q    And isn't it true that Leticia first

13  sought help from Dr. Pozo in June of 2020?

14     A    Yes.

15     Q    And that she saw Ms. Pena commencing in

16  April of 2020?

17     A    Yes.

18     Q    And you also noted that she has no prior

19  psychiatric history?

20     A    That's what she told me, yes.

21     Q    Well, you haven't seen any records showing

22  prior psychiatric history that you saw, right?

23     A    Well, I do have one piece of information

24  that I mentioned.  Should I mention it?

25     Q    Mention away.

Page 475

1      A     Okay.  Dr. Pozo diagnosed her as major

2   depression recurrent.  So recurrent implies prior

3   episodes.

4      Q     Okay.  But that was in -- I'm sorry, but

5   that was in 2020.

6      A     Well, he saw her for the first time in

7   2020, but a recurrent episode means he must have

8   identified a prior episode.  We don't know when it

9   is.

10     Q     Did you ask Leticia about that during your

11  interview?

12     A     She said she had no prior history, so I

13  did not ask -- I asked her if she had prior history

14  and she said no.

15     Q     Okay.  On direct examination you were

16  asked specifically whether the May 15, 2019 incident

17  exacerbated Leticia's condition and you said no.  I

18  want to know what the basis is for that.

19           Let me ask you, did you see any medical

20  record of Leticia concurrent with either just prior

21  to May 15, 2019 or after May 15, 2019?

22     A     I don't have any independent recollection

23  at this time in answer to that question.  I know I

24  saw some medical records, but I don't recall

25  specifically the answer to that.

1      Q     Okay.  And you obviously didn't examine

2  Leticia in or around May of 2019, did you?

3      A     No.

4      Q     So since there's no medical record

5  available prior to May 2019, the psychiatric nature

6  regarding Leticia, nothing until April of 2020, how

7  is it that you can conclude, based on a review of

8  medical records, that the May 15, 2019 incident did

9  not exacerbate her condition?

10      A     Well, what I did was, I read the

11  depositions that were taken, and it's been noted a

12  significant amount of history of conflict between

13  the Ceperos, the HOA and Ms. Gallego.  So there's

14  quite a bit of detail of prior difficulty, number

15  one.

16           Number two, Ms. Cepero's rendering of the

17  history was, I think, a little bit exaggerated.  You

18  know, she said she was kept prisoner for many hours.

19  She couldn't get out of the car.  When, in fact, I

20  questioned her on that quite closely, she was able

21  to get out of her car, but chose not to.  I think

22  she believed that she was going to be harmed.  That

23  was her belief.

24           And so I think that if you -- I'm sorry.

25  Can I finish?

1        Q     Absolutely.  I thought you were finished.

2   I'm so sorry.

3        A     So I said, if you carry with you the

4   belief that you're living in a community in which

5   people are out to harm you, the administration is

6   out to harm you, it skews your perception of

7   reality, and makes things that might be normal to

8   most of us quite frightening or threatening.

9             I think she operated on that belief system

10  for a while, based upon the depositions that I

11  reviewed, even though there are no medical records,

12  and it was supported by Dr. Pozo's diagnosis of

13  recurrent depression.  And after all, any one of us

14  who's being in an environment where we lived where

15  we thought it was hostile to us, we would be upset.

16  It would be normal to be upset.  That's what I based

17  it on.

18        Q     Okay.  And with regards to Leticia, your

19  diagnostic impression.  These were the labels again

20  that I started with.  You found her to be in acute

21  situational reaction, generalized anxiety disorder

22  with significant obsessive rumination, mood

23  disorder, unspecified.

24             That's what I see in your report.

25        A     Yes, that's what's written.

Page 478

1          Q    Isn't it true that each of those

2    conditions is solely attributable to her interaction

3    with the homeowners association and Marglli Gallego

4    and nothing else?

5          A    I don't know that.

6          Q    Well, based on your review of the

7    depositions and the medical records, did you find

8    anything else other than problems with the home

9    owners association and Marglli Gallego?

10         A    I think what I said was, the depositions

11   were full of conflict.  The examination of Leticia

12   Cepero was extremely difficult, because she had a

13   real problem answering the questions, would go on

14   long circumstantial verbalization, paragraphs and

15   paragraphs and paragraphs.  It was very hard to get

16   her to answer the question.  She had a translator.

17              I could have examined her for another

18   bunch of hours, but I thought -- I decided it was

19   hard for her to be examined.  She was very upset,

20   became extremely agitated very easily, started to

21   yell quite a bit through the exam.  It was a

22   difficult exam.  So --

23         Q    Sir, the question is a simple one.

24              THE COURT:  Excuse me, Mr. Arslanian.  Do

25   not interrupt this witness.

Page 479

1          MR. ARSLANIAN:  I'm sorry.

2          THE COURT:  Finish what you were saying,

3    Dr. Storper, and then Mr. Arslanian will ask the

4    next question.

5          THE WITNESS:  So my answer is, her chronic

6    difficulties with the HOA and Ms. Gallego have had a

7    lot to do with the symptoms that she displayed.

8    BY MR. ARSLANIAN:

9       Q    But in your total review of the

10   depositions and the medical records and your

11   interview, you didn't find anything contributing to

12   these conditions, such as a bad incident in a

13   restaurant, being abused as a child, or some other

14   incident, other than interaction with the homeowners

15   association and Marglli Gallego?

16      A    Well, the answer is that there wasn't time

17   to try and get all of that information, because of a

18   lack of cooperation in answering my questions

19   directly and within a relatively -- with some

20   brevity, so that we could move on to the next

21   question.

22          She was so agitated through the exam.  I

23   did the best I could.  I didn't wish to upset her

24   any further.  I tried to be considerate of her

25   feelings.  So there was some limitations on the

1    exam.

2              Further, there's no evidence that A causes

3    B, meaning mental health symptoms are multifactorial

4    and have many, many causes.  So, for example -- and

5    I don't know this, since you can't tell -- but

6    people who tend to overthink and overworry, when

7    they're placed in a situation of great stress, tend

8    to exacerbate -- self-exacerbate, although not their

9    choice, their symptomatology.

10             So the answer is, it's a part, but I would

11   not say it's all of it.

12        Q    Did you perform any kind of test on

13   either -- any kind of objective test on either Mr.

14   or Mrs. Cepero?

15        A    By objective test, what do you mean?

16        Q    Any kind of psychological test, like the

17   Minnesota Multiphasic Personality Inventory Test or

18   any kind of test like those?

19        A    (Inaudible).

20             THE COURT:  I'm sorry, Dr. Storper.  I

21   didn't understand your answer.

22             THE WITNESS:  Yeah, I got cut off.

23             I'm a psychiatrist.  I don't do any type

24   of psychological testing.

25

Page 481

1  BY MR. ARSLANIAN:

2      Q    And you base all your conclusions just on

3  review of medical records and an interview?

4      A    And review of the depositions.  I always

5  ask everybody to provide me all of the records that

6  are available, physical records, psychiatric

7  records, depositions, summary of legal proceedings,

8  whatever I can get.

9      Q    I want to show -- can we pull up -- I'm

10  going to pull up what we're going to submit -- it's

11  not numbered yet, but it's --

12          THE COURT:  I've already marked on your

13  supplemental exhibit register, which you're going to

14  show me a pretty copy of later -- Exhibit 16 --

15  what's going to be marked as Exhibit 16, as

16  Dr. Storper's report of Josue Cepero, and what will

17  be marked as Exhibit 17 as Dr. Storper's report of

18  Leticia Cepero.

19          So what you're showing now then is

20  Leticia?

21          MR. ARSLANIAN:  Correct.

22          THE COURT:  So it would be marked for

23  identification as Exhibit 17.

24          MR. ARSLANIAN:  Well, I ask that they both

25  be admitted.  I think there's already been no

Page 482

1    objection.

2              THE COURT:  I think that was correct.

3    Correct, Mr. Parlade?

4              MR. PARLADE:  That's correct, Your Honor.

5              THE COURT:  So Exhibits 16 and 17 are

6    admitted.

7              (Thereupon, Debtors' Exhibit Nos. 16 and

8         17 were admitted into evidence.)

9              THE COURT:  So with respect to Exhibit 17,

10   ask your question.

11   BY MR. ARSLANIAN:

12        Q    On Page 4, carrying over to Page 5, you

13   wrote, "She does have strong obsessive preoccupation

14   with these events and with these conflicts, which

15   has come to dominate her existence and is causing

16   her significant stress."

17              You wrote that, correct?

18        A    It sounds like me.  I'd like to find it.

19   What part of the report -- it sounds like near the

20   end, right?

21        Q    Near the end, bottom of Page 4, continuing

22   to the top on Page 5.

23        A    I see it.  I have it in front of me.  I

24   wrote it.

25        Q    So you believe that she has a strong

Page 483

1    obsessive preoccupation with the events, and the
2    events include the May 15, 2019 altercation; isn't
3    that correct?
4        A    That's correct.
5            MR. ARSLANIAN:  I have no further
6    questions.
7            THE COURT:  Okay.  So any redirect,
8    Mr. Parlade?
9            MR. PARLADE:  No, nothing further.
10            THE COURT:  Okay.  So, Dr. Storper, I'm
11    sure you're devastated that you're going to have to
12    sign off now, but thank you very much for your
13    patience, thank you very much for your time.  I'm
14    sorry that there were such problems getting you on.
15            The reason I'm sitting in an empty
16    courtroom is because I have experienced Internet
17    problems at my home, notwithstanding that I do have
18    the best Internet in terms of speed, et cetera, et
19    cetera.  But when Comcast or AT&T or whatever it is
20    decides that you're not going to have Internet that
21    day, then you don't have Internet that day.
22            So thank you very much for persevering,
23    and I hope you have a very happy and healthy new
24    year.
25            THE WITNESS:  Judge, can I say one thing?

Page 484

1              THE COURT:  Absolutely, as long as it's

2    not related to testimony.

3              THE WITNESS:  Not at all.  Thank you for

4    your forbearance, and that we all stuck with it and

5    we all worked together and it worked out.

6              THE COURT:  That's right.  That's because

7    Mr. Arslanian and Mr. Parlade are both consummate

8    professionals, even though they both drive me crazy

9    once in a while.  So happy and healthy new year.

10             THE WITNESS:  I would never imagine that

11   they would be capable of doing that.

12             THE COURT:  All right.  You take care,

13   Dr. Storper, and thank Mrs. Storper, as well.

14             MR. ARSLANIAN:  This is just living proof

15   of the adage that the 21st time can be the charm.

16             THE COURT:  All right.  I'm going to stop

17   Dr. Storper's video, and then I will also hang up

18   for him so he doesn't have to worry about that.  Oh,

19   he did it himself.

20             Now we're going to go back to

21   Mrs. Cepero's redirect.  I believe that's where we

22   were.

23             Yes, Mr. Arslanian?

24             MR. ARSLANIAN:  Can we take a brief

25   recess?

Page 485

1              THE COURT:  Yes.  We may take a brief
2    recess.  Let's take a recess until 4:00 p.m.  Then
3    the parties -- that's six minutes instead of five --
4    and the parties will reconvene at that time.  I'm
5    going to mute the courtroom, but again, please put
6    yourselves on mute so you don't inadvertently share
7    attorney/client communications.  And remember, no
8    discussing Mrs. Cepero's testimony.
9              MR. ARSLANIAN:  Thank you, Judge.
10             (Thereupon, a recess was taken, after
11   which the following proceedings were had:)
12             THE COURT:  All right.  We're just waiting
13   for Mr. Arslanian -- we have Mr. Arslanian.  Okay.
14   Mrs. Cepero, unmute yourself.
15             MR. ARSLANIAN:  Actually, I have no cross
16   of Ms. Cepero.
17             THE COURT:  You mean no redirect?
18             MR. ARSLANIAN:  No redirect, I'm sorry, no
19   redirect.
20             THE COURT:  All right.  Never mind,
21   Mrs. Cepero.  Gracias.
22             So I'm assuming we need Mr. Cepero?
23             MR. ARSLANIAN:  And then we're going to be
24   done.
25             THE COURT:  I saw Mr. Brooks's arm and

Page 486

1   half of his ear.  If Mr. Brooks is there, if you can

2   please get Mr. Cepero so we can continue.

3              MR. ARSLANIAN:  He went to the restroom.

4   He's going into the other witness room.

5              THE COURT:  I'm going to get a tissue.

6   Somebody keeps moving my tissues.  It's very

7   annoying.  The courtroom is empty, so I don't know

8   who's moving my tissues.

9              I'm not suggesting anything, but the

10  evidence shows that the tissue box was next to my

11  law clerk's desk in the courtroom.

12             Does Mr. Cepero need the translator?

13             MR. ARSLANIAN:  Yes.  I'm not sure whether

14  he knows how to -- he's going to do it.  He's

15  unmuting himself.

16             Can you unmute yourself, Josue?

17             THE COURT:  There we go.  (Speaking in

18  Spanish).

19             All right.  The translator is already

20  sworn in.  So, Mr. Cepero, I'm going to ask you to

21  raise your right hand.

22  Thereupon:

23                     JOSUE CEPERO

24  was called as a witness, and having been first duly

25  sworn, was examined and testified as follows:

Page 487

1          THE COURT:  Proceed, Mr. Arslanian.

2          MR. ARSLANIAN:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MR. ARSLANIAN:

5          Q    Could you please state your name and your

6    address for the Court?

7          A    Josue Cepero, 9541 Southwest 148th Place,

8    Miami, Florida 33196.

9          Q    Now, Mr. Cepero, I want to ask you, your

10   bankruptcy was filed in 2017.

11              At any time prior to the filing of your

12   bankruptcy, did you or your wife have any problems

13   or issues with the homeowners association or Marglli

14   Gallego?

15         A    No, sir.

16         Q    Are you aware of any threats by the

17   association or Marglli Gallego made in 2014 or 2015?

18         A    No, sir.

19         Q    Now, you observed your wife testifying

20   during today's hearing, didn't you?

21         A    Yes, sir.

22         Q    And the behavior that she exhibited during

23   her testimony, is that something that you see on a

24   normal basis?

25              THE COURT:  Let the translator finish,

Page 488

1    Mr. Parlade.

2              I'm sorry, Madam Translator.  Please

3    finish.

4              Mr. Parlade, your objection?

5              MR. PARLADE:  Relevance, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  Could you explain your

8    question more to me?

9              THE COURT:  Mr. Arslanian.

10   BY MR. ARSLANIAN:

11       Q    The behavior that you saw your wife

12   exhibit during her testimony, is that something that

13   you normally see from her?

14       A    At this time, yes.

15       Q    When you say "at this time," do you mean

16   in the last few months, the last year?  What is it

17   that you mean?

18       A    In the last four years.

19       Q    And prior to 2017, did she exhibit

20   behavior like she exhibited today?

21       A    No, sir.

22       Q    Please described the type of woman she was

23   before all of these problems with the association

24   and Marglli Gallego started.

25       A    Okay.  An incredible wife, mother and

Page 489

1    friend.  She would always receive us jolly, in a

2    jolly manner at all times.  A very normal conduct in

3    her activities, her relationships.  And a person

4    that had an excellent relationship with all of her

5    neighbors.

6         Q    And so when Dr. Storper wrote that Leticia

7    has a strong obsessive preoccupation with these

8    events and with these conflicts, which has come to

9    dominate her existence and is causing her

10   significant distress --

11             THE COURT:  Wait, wait, stop.  Madam

12   Interpreter, Mr. Arslanian had not finished the

13   question.

14             THE INTERPRETER:  I need him to break it

15   up.  I thought he had stopped.

16             THE COURT:  Remember what I said at the

17   beginning.  This is an excellent translator, but

18   even she cannot -- except she's doing a really good

19   job when I do it, because I keep forgetting.

20             If you could start again.  I apologize.

21             MR. ARSLANIAN:  I'm going to at this time

22   withdraw the question.

23   BY MR. ARSLANIAN:

24        Q    How is all of this behavior, the change in

25   behavior you just described, how has it affected you

Page 490

1    in your marriage?

2        A    In a very negative manner, because all of

3    those problems that she has, that she reflects, that

4    she manifests, the one that is bearing the load of

5    carrying all of them is I.

6             MR. ARSLANIAN:  I have no further

7    questions, Your Honor.

8             THE COURT:  Mr. Parlade, your

9    cross-examination.

10            MR. PARLADE:  Thank you.

11                 CROSS-EXAMINATION

12   BY MR. PARLADE:

13       Q    Mr. Cepero, good afternoon.  I am Miguel

14   Parlade.  I am the attorney for Hammocks Community

15   Association and Marglli Gallego.

16       A    Good afternoon.

17       Q    Just a few questions.  You just mentioned

18   that the problems with your wife's behavior started

19   about four years ago, correct?

20       A    Give or take.

21       Q    And that prior to the bankruptcy in 2017,

22   you had no issues with either the association or

23   Marglli Gallego; is that correct?

24       A    Correct.

25       Q    So there was never an instance at an

Page 491

1    association meeting where your wife and Marglli
2    Gallego got into some kind of exchange and things
3    got heated back in 2014, 2015?
4         A    No, sir.
5         Q    And you also testified that you never saw
6    your wife being threatened by Marglli Gallego prior
7    to 2017; is that correct?
8         A    Prior to 2015.
9         Q    Okay.  Now, did you witness any threats by
10   Marglli Gallego to your wife after 2015?
11        A    After 2016, or possibly in 2016.
12        Q    And that would have been prior to your
13   bankruptcy in 2017?
14        A    That is correct.
15        Q    We heard your wife testify that in 2014,
16   2015, I guess there was a police complaint against
17   Marglli Gallego and the association?
18        A    No, sir.
19        Q    You said Marglli Gallego and the
20   association?
21        A    I haven't said that.
22        Q    In 2014, 2015, was there an attempted
23   criminal proceeding against Hammocks Community
24   Association?
25        A    No, sir.  We met Marglli Gallego for the

Page 492

1    first time in November of 2015.

2              MR. PARLADE:  I have nothing further.

3              THE COURT:  Any redirect, Mr. Arslanian?

4              MR. ARSLANIAN:  No, Your Honor.

5              THE COURT:  All right.  Gracias,

6    Mr. Cepero.  And thank you, Madam Translator.

7              THE INTERPRETER:  Thank you, Your Honor,

8    and all of you have a wonderful and safe new year.

9              THE COURT:  Thank you.

10             Let's talk about what's going to happen

11   next.  I need two more exhibits uploaded.  Those are

12   going to be marked as Exhibits 16 and 17.  Let me go

13   over the exhibits that I have admitted, and then you

14   all will have a certain amount of time to submit

15   closing -- yes, Mr. Parlade?

16             MR. PARLADE:  Judge, I know it's within

17   your discretion.  I know we didn't get a chance to

18   do a verbal opening.

19             Would the Court be amenable to a verbal

20   closing today?

21             THE COURT:  Not today.

22             MR. PARLADE:  On any other day?

23             THE COURT:  I would be amenable to a

24   verbal closing if that's what you both want.  That's

25   fine.  But here's the problem with a verbal closing.

Page 493

1              In order for me to make findings of fact

2    and conclusions of law I need record citations.  So

3    you can do your verbal closing, but then you're

4    still going to have to submit proposed findings of

5    fact and conclusions of law.

6              The reason that I normally say just wrap

7    it all up in a bow is because I recognize the

8    costing associated with attorney's fees, and the

9    fact that you have to prepare for a verbal closing.

10   It may be verbal, but you still have to prepare for

11   it.  Because as I said, if I'm making findings of

12   fact and conclusions of law, except in the most

13   simplest of cases, I have to have the citations for

14   the record.  And I know that in and of itself causes

15   an expense, but there's nothing I can do about that.

16             So that's up to you all, but it's not

17   really necessary, because I'm going to focus on the

18   findings of fact and conclusions of law which can be

19   wrapped up in the closing.

20             So let's go over the exhibits that I've

21   admitted.  With respect to your exhibits,

22   Mr. Parlade, it was Exhibit 1.

23             MR. PARLADE:  Correct.

24             THE COURT:  Mr. Arslanian, with respect to

25   your exhibits, we have 1, 2, 3, 4, 6, 7, 8, 9 and

Page 494

1    11.  And I have that 5, 10 and 12 were not

2    introduced.

3              Going with what is now called the

4    supplemental exhibit register, which is going to

5    just become one exhibit register, you're going to

6    resubmit a new one tomorrow or -- not tomorrow,

7    that's the holiday -- next week some time.  We all

8    know what we're talking about here.

9              I have that 13, 14 and 15, none of which I

10   have copies of anyway, were not introduced.  And 16,

11   which is Dr. Storper's report of Josue Cepero, is

12   admitted, and Exhibit Number 17, Dr. Storper's

13   report of Leticia Cepero, was admitted, both of

14   which you are going to scan and upload with that.

15             So yes, Mr. Parlade?

16             MR. PARLADE:  Obviously there's a

17   misinterpretation.  I had voiced no objection to the

18   admission of 13, 14 and 15, as long as they e-mail

19   video copies.  I have no objection to it.

20             MR. ARSLANIAN:  Oh, okay.

21             THE COURT:  That would be fine if I

22   actually had the exhibits.

23             MR. ARSLANIAN:  So then we have

24   another task of getting you --

25             THE COURT:  Here's what I'm going to

Page 495

1    suggest with respect to that then.  With respect to
2    16 and 17, you'll scan those in the normal way.
3    With respect to 13, 14 and 15, with a copy to
4    Mr. Parlade, so it is not an ex parte communication,
5    either in three separate e-mails to chambers box, or
6    in one e-mail to chambers box, you can send the
7    videos.
8             I'm thinking three separate ones, and the
9    only reason is because I work for the government,
10   and the government has an awesome firewall.  So if
11   you send them in three separate ones, maybe the
12   firewall won't get too agitated, or maybe it will
13   get overstimulated.  I don't know, but I have really
14   good IT guys.
15            That can be done next Monday or Tuesday,
16   so that people don't need to worry about -- because
17   the court is going to be closed tomorrow.
18            Thank you, Mr. Parlade, for making that
19   observation.  That's what I have.
20            I also have the testimony of Dr. Storper,
21   Mr. and Mrs. Cepero.  Is there any other evidence
22   that I have omitted that has been submitted, or that
23   you wish to submit?
24            I'll start with Mr. Arslanian.
25            MR. ARSLANIAN:  No, Your Honor.

Page 496

1              THE COURT:  Mr. Parlade?

2              MR. PARLADE:  No, Your Honor.

3              THE COURT:  Okay.  Just to put you both on

4    notice, to make clear what I said this morning, I'm

5    going to take a further look at the motion to

6    reconsider.  I don't think that there's anything

7    different, but I will take a look at it one more

8    time, only because I'm being told that even though

9    nobody normally does motions to reconsider motions

10   to reconsider, I will take a look at it.  It doesn't

11   mean I'm changing my mind, but I don't want anybody

12   to be surprised if I do.

13             All right.  So with respect to -- but

14   that's neither here nor there.

15             So with respect to the closing statement,

16   I know you have to order the transcript of today's

17   hearing, so that normally takes on a non-rush basis,

18   what, three weeks?

19             My courtroom deputy said we have to stop.

20   There must be a technical problem.  Let's discuss

21   the weather or whatever it is until -- I don't know

22   why I didn't notice that.  We have a system where we

23   can communicate directly, but sometimes I don't see

24   it because I'm paying attention to the trial, which

25   is what I should be doing.

1               (Discussion off the record.)

2               We're back.  All right.  So much for the

3    niceties.

4               It takes three weeks to get a transcript

5    on a non-rush basis.

6               Ms. Sanabria is typing again.  I want to

7    make sure she's not going to tell me to stop talking

8    again.  The good old days when we had a court

9    reporter.  Okay.  All good.

10              Three weeks, and then how long do you guys

11   need to submit your competing findings of fact and

12   conclusions of law?  Three weeks after that, two

13   weeks after that?

14              MR. PARLADE:  I would say three weeks

15   after that, just to make sure we get the transcript

16   on time.

17              MR. ARSLANIAN:  Three and three?

18              THE COURT:  We're going to do what we did

19   last time, which is, each of you will submit your

20   proposed findings of fact and conclusions of law

21   three weeks after the transcript is available.  So

22   we're going to say six weeks to give you guys

23   definitive dates.  And then you'll each have two

24   weeks, no more, to file responses to each other's

25   findings of facts and conclusions of law.

Page 498

1           Don't repeat what's in your original one.

2      You can just say, "As I stated or as was stated in

3      the proposed findings of fact and conclusions of

4      law," whatever you entitle your document, "See page

5      such and such," and then just do a short sentence,

6      so you don't have to cut and paste the same law.

7      I'm hoping that will also cut down on the expenses

8      associated and the time.

9           So what I'm going to look for is, we're

10     going to set six weeks from -- let me get my

11     calendar out.  Wouldn't it be nice if then we can be

12     all in person again?  Every time I say that

13     something happens, so pretend I didn't say that.

14          I know I have tentative plans to see my

15     granddaughters, and my daughter says they have to be

16     tentative, because everything changes.

17          Let's see.  Both of you must submit your

18     closing arguments, unless extended by motion,

19     February 11th, which is a Friday.  So Friday,

20     February 11th, your written proposed findings of

21     fact and conclusions of law are due.  And then your

22     responsive pleadings to each other are due no later

23     than February 25, 2022, the two year anniversary of

24     the original trial.

25          Okay.  And that will just be on today's

Page 499

```
 1   issues, which are the emotional distress and the
 2   punitive damages.  In other words, the calculation,
 3   both in terms of entitlement and in terms of ability
 4   to pay.
 5              In terms of the multiplier, I will just
 6   tell you that now that having done exhaustive
 7   research on this when I entered the Lyubarsky
 8   opinion, there is no mathematical multiplier.  So
 9   you're welcome in your punitive damages argument to
10   argue what you believe I should exercise in
11   discretion with respect to the multiplier.
12              And I would commend both of you, if you
13   have not read it already, to read my Lyubarsky
14   opinion, so that at least you have an idea of what
15   I've previously ruled not so far in the past.  I
16   think it was in the last six months to a year on the
17   issue of damages.  Maybe that will help.
18              Any questions, Mr. Arslanian?
19              MR. ARSLANIAN:  Just one.
20              THE COURT:  Yes, sir?
21              MR. ARSLANIAN:  Attorney's fees for this
22   proceeding.
23              THE COURT:  Well, you'll put in your
24   statement of attorney's fees.  You can do that, you
25   don't have to wait for the transcript, and then
```

Page 500

1    Mr. Parlade will have the option -- the opportunity,

2    not the option -- the opportunity to raise

3    objections to the request for attorney's fees.

4              MR. ARSLANIAN:  That's a separate thing

5    though?

6              THE COURT:  Well, it all gets folded in to

7    the damages calculation.  Submit your attorney's

8    fees and costs and do a notice of filing.  Send it

9    to Mr. Parlade.

10             Then, Mr. Parlade, you'll have the option

11   to file a written objection to the amount -- the

12   same as last time -- to the amount, hourly rate, but

13   not entitlement.  Because this is part of the

14   entire -- that will be just one more thing for

15   Ms. Escobar to put on her to do list.

16             Mr. Parlade, any questions for you?

17             MR. PARLADE:  Just for the interest of

18   priority, Judge, I don't think it was made clear by

19   debtors' counsel.  We are -- the proceedings today

20   were limited to emotional distress and punitive

21   damages.  However, it is my understanding from both

22   conversations with debtors' counsel and the

23   discovery being sought, that the emotional distress

24   claim is being limited to the May 15, 2019 incident,

25   is that correct, or are you also claiming emotional

Page 501

1    distress damages from the filing of the lawsuit in

2    2020?

3              MR. ARSLANIAN:  I think we claimed both.

4    And there was some testimony.  I would concede,

5    based on the testimony presented, that it wasn't as

6    great, but I'm not --

7              THE COURT:  How about this?  You'll both

8    refer back to my order.  That will frame the issues,

9    in terms of what the emotional damages can conclude.

10   You can argue, Mr. Parlade, what you believe they

11   include, and the evidence, because as Mr. Arslanian

12   conceded, there's not a whole lot of testimony today

13   on the November 2020 lawsuit.  And that's where we

14   are.

15             MR. PARLADE:  And lastly, the punitive

16   damages issue, I've spoken before to Mr. Brooks.

17   I'm not sure how this happened, but from my initial

18   conversations with Mr. Brooks and discovery, it was

19   conceded that his damages claim was going to be

20   sought mainly as to the association and not Gallego.

21             Is that still the case, or are you

22   proceeding in going against both --

23             THE COURT:  That's something you can have

24   a conversation with Mr. Arslanian offline.  My order

25   stands as it's written.

1               MR. PARLADE:  Okay.

2               THE COURT:  You can have a conversation

3    with Mr. Arslanian offline, but the order stands as

4    written.

5               MR. BROOKS:  I have one substantive

6    question, and that is, when do you think they're

7    going to be opening up court?  Do you have any idea?

8               THE COURT:  Well, that would have been two

9    months ago, Mr. Brooks.  I want you to know that I

10   had live court last Monday.

11              MR. BROOKS:  You're kidding.

12              THE COURT:  No.  I had people in my

13   courtroom last Monday, and then I went home and my

14   vaccinated son had COVID.  And in the meantime, as

15   you all know, and I actually mentioned this in

16   court.  I said that I probably was going to go

17   hybrid, and then, of course, I had no choice.

18              I mean, I was negative, thank God, me and

19   my husband, but as I did tell people in court last

20   Monday, we watch the numbers at the courthouse,

21   because we want to protect the members of the

22   public, as well as our own staff.  So the numbers in

23   Miami were going like this, in the Southern District

24   of Florida, like this, and last Monday, literally

25   like that.

Page 503

1             MR. BROOKS:  The three of us, Mr. Parlade,

2    Mr. Arslanian and I weren't infected in the last

3    week.  We fought it, because were in close contact

4    with people.

5             THE COURT:  The thing I'm trying to say is

6    that we don't know.  South Africa says they're now

7    seeing a dropoff.  Remember in July when we all

8    thought life was normal again?  And then we thought

9    in November or early December when we thought life

10   was normal again.  And now here we are, virtual at

11   least until the end of January, and probably until

12   the numbers start going down again, again, to

13   protect the members of the public.

14             And in that regard, I'm not quite sure, so

15   I can't answer for you whether the View From the

16   Bench is going to be live or it's going to be

17   switched to virtual.  I don't know, because that's

18   beyond my pay grade.

19             MR. BROOKS:  Actually, it's actually your

20   pay grade, because you're the head.

21             THE COURT:  I'm not in charge of View From

22   the Bench.  I can choose not to show up, but I'm not

23   in charge of it.

24             MR. BROOKS:  Even when court starts, are

25   we going to be allowed to appear virtually?

Page 504

1          THE COURT:  What my rule was for those

2     brief shiny moments when we thought life was normal

3     again, I was allowing virtual appearance under the

4     same circumstances that I allowed telephone

5     appearances.  In other words, not for evidentiary

6     hearings.

7          Everybody would have been here today, but

8     for COVID.  Not that we didn't enjoy the whole

9     Dr. Storper interlude, but we might have saved an

10    hour or 45 minutes otherwise.  But that was my

11    normal rule.  That's what we went back to, except

12    we're using Zoom now, either telephonic or video,

13    because it doesn't cost people money, and people

14    were complaining about the cost of CourtSolutions

15    and CourtCall.

16          There are still some judges that are using

17    CourtSolutions.  I am not.  I'm trying to do this

18    experiment to help, again, our members of the

19    public.

20          So the answer is yes, virtual appearance

21    will continue to be allowed for those matters in

22    which I allowed telephonic appearances before, which

23    is not evidentiary hearings.  I will say this,

24    though, as I've said before:  When you have a

25    complicated legal argument, it's always better to be

Page 505

1    in court, right?

2              So that's it.  Sorry I can't give you more

3    information.  Stand by.  Stay safe.  Wear your masks

4    indoors.  Don't rely solely on your vaccines to keep

5    you healthy, because apparently they are not.  They

6    just keep you out of the hospital and keep you from

7    dying, which is great news, right?

8              My son was sick for two days, and then the

9    biggest problem I had was trying to convince a 31

10   year old he shouldn't go out anywhere.

11             So please be careful and have a very happy

12   and healthy new year.  I wish all of you much --

13   many good things in the year to come.

14             (Thereupon, the hearing was concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 506

CERTIFICATION

STATE OF FLORIDA:

COUNTY  OF  DADE:


I, HELAYNE F. WILLS, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were taken by electronic recording at the date and place as stated in the caption hereto on Page 1; that the foregoing computer-aided transcription is a true record of my stenographic notes taken from said electronic recording.

WITNESS my hand this 31st day of January, 2022.


_____
HELAYNE F. WILLS
Court Reporter and Notary Public
In and For the State of Florida at Large
Commission No:  HH157788  Expires 8/2/2025