**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                                            Case Number: 17-20358-LMI
                                                                  Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

                    Debtor(s)         /

### RESPONDENTS', HAMMOCKS COMMUNITY ASSOCIATION INC. AND MARGLLI GALLEGO, CLOSING ARGUMENT ON ORDER ON SANCTIONS AND SETTING FURTHER EVIDENTIARY HEARING (ECF 339)

Respondents, HAMMOCKS COMMUNITY ASSOCIATION INC. and MARGLLI GALLEGO, hereby submit their Closing Argument and Incorporated Memorandum of Law pursuant to this Court's Order after hearing on December 30, 2021 on this Court's Order on Sanctions and Setting Further Hearing (ECF 339), and further states:

1.      At issue before this Court are the Debtors' claim for emotional distress damages and the

Debtors' request for punitive damages as to both Marglli Gallego and Hammocks Community Association, Inc. *(D.E. 339).*

## I. PROCEDURAL BACKGROUND

*2.*   On July 17, 2021, this Court entered an Order finding Respondents in contempt for violating its Orders dated December 3, 2018, and December 6, 2018 *(ECF 189 and ECF 191, respectively)*; and on Debtor's Amended Motion for Contempt *(ECF 289). (ECF 328).*

3.   Specifically, this Court determined whether Respondents violated the aforementioned orders in reference to an event that occurred on May 15, 2019 between Marglli Gallego and Debtors in the Hammocks parking lot, and whether the filing a lawsuit by Respondents against the debtors on November 2020 also violated the contempt orders. *(ECF 328).*

4.   This Court held that Respondents violated this Court's stay away orders (ECF 189 & 191) during the May 15, 2019 incident )("Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.")*(ECF 328, p. 8),* but that the lawsuit filed November 2020 did not violate these contempt orders. However, this Court found that the filing of the lawsuit on November 2020 was a violation of the automatic stay. *See, ECF 328.*

5.   This Court bifurcated the issue of damages until after a determination of liability had been made. ("The Amended Contempt Motion seeks attorney fees and reimbursement of costs (including those associated with the November 2020 Lawsuit), punitive damages, and damages for emotional distress. The Debtors did not cite any statute or common law basis for the sanctions they seek leaving it to the Court to guess why they are entitled to recovery. However, the Court specifically advised the parties that the Court would consider evidence of

damages after a determination of liability, if any. Having found that the Association and Ms. Gallego violated the Contempt Orders and the automatic stay, the Court will ask the Debtors to file their specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages.") *(ECF 328, p. 11).*

6. Upon receiving and reviewing Debtors' Statement of Damages *(ECF 335)* and Respondents' Objection to the Statement of Damages *(ECF 337),* this Court entered an Order on Sanctions and Setting Further Evidentiary Hearing on October 27, 2021. *(ECF 339).*

7. This Court specifically found that that "[D]ebtor's are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress" *(ECF 339, p. 2).*

8. Further, this Court also found that "[D]ebtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress." *(ECF 339, p. 2).*

9. This Court further stated "The Court finds that Ms. Gallego acted recklessly and carelessly when she deliberately cut off the Debtors with her car, and then called the police with her manufactured story about the Debtors following her. The Court also finds that Ms. Gallego acted recklessly and callously when she initiated the November 2020 Lawsuit, knowing that Mrs. Cepero was still in bankruptcy, and knowing she could not sue Mrs. Cepero while she was in bankruptcy. At a minimum Ms. Gallego should have advised state court counsel about the bankruptcy so that state court counsel could assess whether and to what extent relief could be sought in state court absent a stay relief order from the bankruptcy court." *(ECF 339, p. 8-9).*

10. This Court found the Association guilty of violating its contempt orders by virtue of the fact that Mrs. Gallego was driving an association vehicle at the time of the May 15, 2019 incident. *(ECF 328, p. 6)* ("Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.")

11. This Court found that the November 2020 was not a violation of its contempt orders, but it was a violation of the automatic stay provisions of the Bankruptcy Code. *(ECF 339).*[1]

12. The Court ordered an evidentiary hearing that was held on December 30, 2021 "to hear evidence on emotional distress damages and the ability of Ms. Gallego and the Association to pay punitive damages." *(ECF 339, p. 11)*

## II. Findings of Fact

### A. Respondents' Ability to Pay Punitive Damages

13. Debtors called Jesus Cue, the comptroller of Hammocks Community Association, during the December 30, 2021 hearing. *(Tr. at 334:4 – 334:20)*

14. Mr. Cue testified as to the resources of the Hammocks Community Association and the Association's revenues, budget, and assets. *(Tr. at 334 – 360).*

15. Debtors counsel also attempted to call Marglli Gallego as a witness, but Mrs. Gallego's criminal counsel, Sabino Jauregui, informed this Court that Mrs. Gallego was sick with Covid 19 and that he was was unaware that she had been subpoenaed for the hearing. *(Tr. at*

---

[1] Although this Court mistakenly stated that the November 2020 was "agreed" to be tried along with the May 15, 2019, the undersigned counsel objected to the November 2020 being tried as part of the May 15, 2019 lawsuit. (ECF 328, p. 9)("Whether the November 2020 Lawsuit was a violation of the stay or of the Contempt Orders, the parties agreed to try the issue of whether the November 2020 Lawsuit was wrongful as part of the continued evidentiary hearing.") See Respondents' Response to Motion to Supplement Motion for Contempt (ECF 288) and Order Granting Motion to Reopen Direct Examination (ECF 293)(" Further, in consideration of the matter that is the subject of Debtors' Motion to Supplement Motion for Contempt – the filing of a Complaint in state court against the Debtor Leticia Cepero – the Court finds, in the interest of judicial economy, to allow Debtors to Reopen to present said matter during evidentiary hearing set for February 11, 2021 and February 12, 2021.")

4

*363:1-17).*2

**B. Emotional Distress Claims of Leticia Cepero**

16. The Debtor, Leticia Cepero, testified as to her psychological treatment as well as her conflict with Marglli Gallego.

*17.* When asked if she was "[p]reoccupied with the events of May 15, 2019?" *(Tr. at 377:18-19)* under direct examination by her counsel, Mrs. Cepero testified that she was very concerned, very worried, because they fired two gunshots at me and they have my--" *(Tr. at 378:3-5).*

18. She further elaborated, "I was in very serious condition. I was in intensive therapy. My condition was very serious. And I'm desperate to get to the board, because my neighbor is cutting off my plants in my garden, and they have fired two gunshots in front of my house." *(Tr. 378: 10-16).*

19. Mrs. Cepero kept elaborating and said, "My neighbor is of friend of Monica Ghilardi, who's the president of the board. They have taken photographs of my lot. Demelsa Perez Trajillo (phonetic), Perez Sello (phonetic). And Ana Martinez was trying to open my lock to the door pretending that she was going to place a document. *(Tr. 379: 4-9).*

20. She then went on to say that the association is watching her on daily basis and that because of that she has been very affected, weak, and upset. *(Tr. 379:16-21).*

21. Upon cross-examination, the Debtor stated she did not have any past psychological conditions prior to the incident on May 15, 2019. *(Tr. 386:23 to 387:3).*

22. However, when asked if her physician had ever diagnosed her with anxiety on November

---

2 Subsequent hearing on Debtors Motion for Contempt and Relief (ECF 398) against Marglli Gallego for failure to appear at the December 30, 2021 hearing was denied on various grounds including the witness' sickness and the inability of Debtors' counsel to personally serve Mrs. Gallego within a reasonable time prior to the hearing. (ECF 400).

16, 2017, Mrs. Cepero stated "I did not have anxiety. I went to see Reinaldo, because it was uncontrollable for me that I had not been able to say good-bye to my father. He died of cancer. It was a very strong cancer." *(Tr. 387: 20-22 and Tr. 388:22-25).*

23. She stated that Dr. Reinaldo "found that I was suffering a lot", and then she admitted that she was in a state of "sadness". *(Tr.389: 7-8 and Tr.390:1-8).*

24. During cross examination, Mrs. Gallego was asked, "Ms. Cepero, just a few minutes ago before we took a break I had asked you about your visit April 2019 with your primary care physician, Reinaldo Hernandez, and I asked, would it surprise you that he diagnosed you with generalized anxiety disorder on that date, and you answered—" *(Tr. 398:15-20).*

25. Mrs. Cepero answered, "I do remember having told everything that was going on at the Hammocks, and it was that day that he referred me out to the psychiatrist, because he said that I was just going through way too much torment, and that I needed help. And he also prescribed two medications for me to take. It's not easy to remember, but I do go there periodically. I do remember." *(Tr. 398:21 to 399:4).*

26. Mrs. Cepero then said that there were many events that had taken place prior to May 2019 with the Hammocks Association going as far back as 2014 or 2015. *(Tr. 399:11-22).*

*27.* During Mrs. Cepero's cross-examination, Mr. Cepero was admonished by the Court for coaching or communicating with his wife while she was providing her testimony. *(Tr. 404:14 to 405:7).*

28. Upon further cross examination Mrs. Cepero made various accusations against Marglli Gallego that include:

    a) The accusation that in 2014 or 2015 Marglli Gallego was going to call the police on her or kill her life and cut her neck. *(Tr. 399:21 to 400:3).* However, the Debtor

6

stated that she had no psychological consequences of this accusation because she "had no fear". *(Tr. 408:2-16)(See also, Tr. 428:12-20).*

b) The accusation that in sometime in 2015 "Colombian" motorcyclists chased her on 184 Street and said, "If you get in front of me I'm going to kill you, I'm going to kill you", which she believed at the time have been under the direction of Marglli Gallego. *(Tr.409:1 to 410:14).* However, the Debtor stated that she had no psychological consequences of this accusation because she's "not the kind of person to be afraid that easily". *(Tr. 409:20-25).* Although later, Mrs. Cepero changes her testimony and admits she was afraid. *(Tr. 429:7-17).*

c) The accusation that the association and Marglli Gallego directed Mrs. Cepero's neighbor to cut her trees at sometime during 2020. *(Tr.410:15 to 411:4 and Debtors' Exhibit No. 14).*

d) The accusation that a van stopped in front of the Cepero's home and discharged gunshots that was recorded on video. *(Tr. 412:4 -20 and Debtors' Ex. No. 13).* However, the video provided by Debtors' counsel as Exhibit No. 13 does not corroborate this claim. The video shows a van driving in the street of Debtors' residence with some background noise and no evidence of a weapon being used or discharged.

e) The accusation that someone from the association was trying to open her door about a month and half prior to the December 30, 2021 hearing "pretending that she was going to place a document" *(Tr. 379:4-15 and Debtors' Exhibit No. 15). (See also, Tr. 415:2 to 417:21).* The video submitted by Debtors' counsel as Exhibit No. 15 does not corroborate this claim. It shows someone walking up to the door of a

residence and taking a picture of the front door. It does not demonstrate that someone was trying to break into the Debtors' house as alleged by Mrs. Cepero.

    f)    The accusation that going back as far as 2015 there has been many instances where the security for the Hammocks chased or followed the Debtors. (Tr. 419:23 – 420:8). Debtor stated that she was afraid after being followed by the security guards in 2015. *(Tr. 429:18-430:22)*.

29. Notwithstanding the foregoing, Mrs. Cepero states that it was the event on May 15, 2019 that caused her anxiety. *(Tr. 431:12-16)*

30. *The medical records offered into evidence by Debtor for Leticia Cepero do not support the assertion that the event on May 15, 2019 was the cause of the psychological or emotional distress by the Mrs. Cepero. (Debtors' Ex. No. 2 and Ex. No. 4)(See also, Tr. 457:21 to 458:1)(Citing Dr. Henry Storper's review of the Debtors' past medical history that shows none of the medical professionals concluded that the May 2019 event was the cause of the psychological or emotional distress.)*

31. In fact the earliest medical record of Leticia Cepero relating to psychological treatment is not until May 25, 2020 in an assessment by licensed clinical social worker, Francis Pena. *(Ex. No. 2, Pg. 18)*.

32. No medical testimony was offered on behalf of the Debtors.

33. Dr. Henry Storper, the medical expert testifying on behalf of the Respondents was asked, "It is significant that there has been no psychiatric, no psychological treatment for over a year after the incident they're complaining caused emotional distress, which was May of 2019?" *(Tr. 457:8-14)*.

34. Dr. Storper replied "Yes, I find that extremely significant. That does not imply any

severe or significant severity of illness.  Someone in acute distress, they'd go back to their doctor and say, "I feel terrible, I can't sleep, I cant eat," whatever their symptoms happen to be.  They wouldn't wait, or I don't understand why somebody would wait such a long period of time to further symptom relief." *(Tr. 457:8-20)*.

35. Dr. Storper conducted a mental status examination of Leticia Cepero and concluded that she suffered from excessive ruminations about the conflict between her and Marglli Gallego which manifested itself into significant paranoid persecutory ideations.  *(Tr. 458:24 to 459:5)*.

36. His diagnosis was that Mrs. Cepero suffered from "acute situational reaction, generalized anxiety disorder with significant obsessive ruminations, mood disorder." *(Tr. 459:17-20)*.

37. Based on his examination of Mrs. Cepero and the medical records provided, Dr. Storper <u>did not</u> believe that the incident of May 2019 caused her present emotional condition, exarcerbated it, or caused her emotional distress.  *(Tr. 459:21 to 460:2)*.

38. Dr. Storper believed that Mrs. Cepero's emotional problems are due to preexisting issues and conflicts, coupled with inadequate treatment and that the events of May 15, 2019 did not materially alter "what was clearly a preexisting condition and preexisting conflict." *(Tr. 460:19 to 461:3) and (Tr. 461:24 to 462:2)*.

39. He further stated that Mrs. Cepero believes her life to be at risk even though there is no evidence of any real physical threats to her well-being.  *(Tr. 461:18 -23)*.

40. Dr. Storper stated that people such as Mrs. Cepero with "excessive ruminations" suffer from altered perceptions which can distort reality. *(Tr. 462:3-14)*.

41. Leticia Cepero offered no testimony and/or evidence records to support her claim that she suffered emotional distress based on the filing of the November 2020 lawsuit.  She merely

pointed out that she got "nervous" when she saw the November 2020 lawsuit but then she spoke to "Michael" (debtor's counsel Michael Brooks) and "he explained it to me and I got calm. No problem." *(Tr. 433:15 – 24). (See also, Association's Ex. No. 1, Interrogatory Answer No. 6).*

### C. Emotional Distress Claim of Josue Cepero

42. Dr. Henry Storper examined the medical records and conducted a mental status examination of Josue Cepero.

43. *The medical records offered into evidence by Debtors for Josue Cepero do not support the assertion that the event on May 15, 2019 was the cause of his psychological or emotional distress. (Debtors' Ex. No. 3)(See also, Tr. 447:2 to 447:21 and Tr. 450:2 to 451:6)(Citing Dr. Henry Storper's review of the Debtors' past medical history that shows the Josue Cepero had only a few visits with a psychiatrist, Dr. Marjorie Caro, on October 3, 2018, July 30, 2019, August 2019, and October 2019; and that Dr. Caro noticed problems with anxiety and depression from the October 2018 visit to every other visit thereafter.) (See also, Association's Ex. No. 1, Interrogatory Answer No. 4). (See also, Debtor's Ex. No. 3).*

44. Further, Dr. Storper noted that nothing in the records demonstrated any exacerbation or increasing of symptoms. *(Tr. 452:4 to 452:11).*

45. Dr. Storper concluded that Mr. Cepero demonstrated obsessive ruminations on the conflict between the association and his wife and him, as well as persecutory ideations in which he feels Marglli Gallego and the association are out to harm him. *(Tr. 453:6 to 453:16).*

46. Dr. Storper noted that Mr. Cepero stated that "he feels like he's being watched and is the object of special scrutiny in his environment. He believes that neighbors have turned against

him, because they were fearful of the power of the homeowner's association, or their minds had been poisoned against him." *(Tr. 453:17 to 453:24)*.

47. Dr. Storper diagnosed Mr. Cepero with depressive disorder with obsessive ruminations and generalized anxiety disorder. *(Tr. 453:25 to 454:2)*.

*48*. Dr. Storper testified that he did not believe the May 2019 incident was the cause of Josue Cepero's emotional distress. *(Tr. 454:3 to 454:17)*.

49. Josue Cepero's testimony seemingly contradicted many aspects of his wife's testimony. He contradicted his wife's claim that Marglli Gallego threatened the Debtors in 2014 or 2015. *(Tr. 487:16-18)(See, Para. 28(a) supra)*.

50. Mr. Cepero contradicted his wife's testimony that she did not suffer any psychological conditions prior to May 15, 2019, and he went on to describe how his wife changed approximately four years ago and that prior to 2017 she was a normal wife, mother, and friend who had an "excellent relationship with all of neighbors." *(Tr. 488:11 to 489:5)(See, Para. 21 supra)*.

51. Josue Cepero offered no testimony as to any alleged psychological or emotional distress suffered by him, merely pointing out that his wife's aforementioned change of behavior has impacted his marriage in a negative manner. *(Tr. 489:24 to 490:5)*.

52. Debtors offered no evidence whatsoever to corroborate any claim that Josue Cepero suffered emotional distress as a result of the filing of the November 2020 lawsuit.

## CONCLUSIONS OF LAW

53. Movant must prove each element of their claims by clear and convincing evidence. *See,* <u>In re Cantin</u> (Bankr. S.D. Fla. 2019); <u>Jove Eng'g v. I.R.S.</u>, 92 F.3d 1539, 1545-46 (11th Cir. 1996), and <u>In re SLK Associates, Inc.</u>, 166 B.R. 985 (Bankr. S.D. Fla. 1994).

54. In order to meet the burden of proof for clear and convincing evidence, a movant must demonstrate that the evidence being presented is "highly" probable such that it places the fact finder with an "abiding conviction" that the truth of the facts asserted are highly probable. *See*, <u>Proctor & Gamble Co. v. Teva Pharms. USA, Inc.,</u> *566 F.3d 989, 994 (Fed. Cir. 2009); and* <u>Shire Dev. LLC v. Watson Pharms., Inc.</u> *(S.D. Fla. 2013*).

55. As stated by the Eleventh Circuit Court of Appeals, "[T]o recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation." *Lodge v. Kondaur Capital Corp., 750 F. 3d 1263, 1271 (11th Cir. 2014); See also, In re Lyubarsky, 615 B.R. 924, 931 (Bankr. S.D. Fla. 2020).*

56. The medical records provided by Debtors demonstrate that they are both suffering from some degree of psychological and emotional distress relating to anxiety and other disorders, however, these records do not demonstrate any causal connection between their psychological conditions and the May 15, 2019 incident or the filing of the November 2020 law.

57. In fact, testimony from the Debtors indicates a psychological and emotional shift that occurred via an actual or a perceived conflict stemming back to 2017. *(Tr. 488:11 to 489:5).*

58. Respondent's medical expert, Psychiatrist Dr. Henry Storper testified that Debtors emotional problems are due to preexisting issues and conflicts, coupled with inadequate treatment and that the events of May 15, 2019 did not materially alter "what was clearly a preexisting condition and preexisting conflict." *(Tr. 460:19 to 461:3) and (Tr. 461:24 to 462:2). (See also, Tr. 454:3 to 454:17).*

59. Debtors did not prove by clear and convincing evidence that their psychological conditions were causally connected to the incidents on May 15, 2019, and the filing of the lawsuit on November 2020.

60. Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc.*, 634 Fed.Appx. at 773 (11th Cir. 2015). "The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner... where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche*, 361 B.R. 615, 624 (Bankr.N.D.Ga. 2005).

61. "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison*, 599 B.R. 173, 182 (Bankr.N.D.Fla. 2019) ; *In re Roche*, 361 B.R. at 624. See also, *In re Lyubarsky*, 615 B.R. 924 (Bankr. S.D. Fla. 2020).

62. This Court has already found that "[D]ebtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress." *(ECF 339, p. 2).*

63. However, this Court has not ascribed the amount of punitive damages that will be attributable to each party.

64. This Court already found that Marglli Gallego acted recklessly and carelessly by cutting off the Debtors with her car, and by filing the November 2020 lawsuit knowing the parties were in bankruptcy. *(ECF 339, p. 8-9).*

13

65. However, this Court found that Hammocks Community Association violated its contempt orders solely based on the fact that Mrs. Gallego was driving an association vehicle at the time of the May 15, 2019 incident. *(ECF 328, p. 6)*

66. As noted by this Courts opinion in *In re Lyubarsky,* "In determining the among of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure it will punish and deter." *In re Lyubarsky, 615 B.R. 924, 939 (Bankr. S.D. Fla. 2020)(citing In Re Novak, 223 B.R. 363, 368 (Bankr. M.D. Fla. 1997).*

67. There was no evidence presented that the Association's involvement in either the May 15, 2019 incident or the filing of the November 2020 lawsuit were deliberate and/or or willful. In fact, much of the evidence points to an ongoing conflict with Marglli Gallego and the Debtors.

68. Debtors have established that Hammocks Community Association has the ability to pay punitive damages. However, the nature of the association's conduct is not to be measured by or confused by the conduct of Marglli Gallego, which this Court has already found to have acted recklessly and carelessly.

69. The amount of punitive damages is left to the discretion of the bankruptcy court. *In re Lyubarsky, 615 B.R. 924, 938 (Bankr. S.D. Fla. 2020)(citing In re Lansaw, 853 F.3d 657, 670 (3rd Cir. 2017) .*

70. For the foregoing reasons, Hammocks Community Association respectfully believes that it should not be subject of any punitive award, or that in the alternative if a punitive award is granted; it should be within the range of one and two.

71. For assessing punitive damages against Marglli Gallego, this Court has discretion in

determining the amount of damages against her. However, Debtors have not fulfilled their burden of proof in proving by clear and convincing evidence that Marglli Gallego has the ability to pay punitive damages.

72. In their attempt to demonstrate the Marglli Gallego has the ability to pay punitive damages, the only evidence offered by Debtors' counsel was Exhibit No. 1.

73. Exhibit No. 1 contains a Warranty Deed and an attached Certificate of Approval showing that Mrs. Gallego is the owner of a property located at 14851 SW 104th Street, Unit 14, Miami, FL 33196, and a quit claim deed transferring Marglli Gallego a one percent ownership right in a property located at 14921 SW 104 ST., Bldg. #1, Apt. # 106, Miami, FL 33196.

74. No testimony or evidence was proffered in reference to the values of these properties, whether these properties were the homestead of Marglli Gallego as defined by the Florida Constitution, whether they were encumbered by mortgages, the income of Mrs. Gallego, are as to any other aspects of Mrs. Gallego's financial ability.

75. As a result, Debtors have not met their burden of proof by clear and convincing evidence that Marglli Gallego has the ability to pay punitive damages. Therefore, Marglli Gallego should not be assessed any punitive damages.

###

**Submitted by:**

Miguel F. Parlade, Esq.
FBN: 0388068
Law Offices of Miguel Parlade, P.A.
Attorney for Hammocks Community Association, Inc. and Marglli Gallego
P.O. Box 771747
Miami, FL 33177
Telephone: (305) 235-9040
Email: parladelaw@gmail.com

15

**Copies to:**
Miguel F. Parlade, Esq.
Michael J. Brooks, Esq.

Attorney Miguel Parlade is directed to serve a conformed copy of this Order on all interested parties immediately upon receipt hereof and to file a certificate of service.