UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In Re:                                                                    Case Number:17-20358-LMI
                                                                                   Chapter 13
**JOSUE CEPERO AND
LETICIA CEPERO**

_____Debtor(s)\_\_\_\_\_/

### DEBTORS' CLOSING ARGUMENT ON HEARING ON ORDER ON SANCTIONS AND SETTING FURTHER EVIDENTIARY HEARING (ECF #339)

Debtors JOSUE and LETICIA CEPERO, by and through the undersigned counsel, hereby submit their Closing Argument on Evidentiary Hearing held on December 30, 2021 on *Order on Sanctions and Setting Further Evidentiary Hearing* (ECF #339), and state:

### OVERVIEW

In its July 19, 2021 *Order Finding Hammocks Community Association, Inc. and Marglii Gallego in Contempt* (ECF #328), the Court found both Respondents in contempt for: 1) filing a lawsuit in circuit court against Leticia Cepero, with knowledge that filing said lawsuit was not permitted and in violation of the bankruptcy stay provisions; and 2) improperly initiating contact with the Debtors on May 15, 2019, and blocking the Debtors' vehicle with vehicles owned by Gallego and Hammocks, in violation of stay away Orders previously entered by this Court.

Thereafter, on October 27, 2021, the Court entered the *Order on Sanctions and Setting Evidentiary Hearing* (ECF #339) directing an evidentiary hearing to be held on December 30, 2021 on two issues: a) to establish Debtors' entitlement to and the extent of damages for emotional distress arising from Respondents' contempt; and b) to

1

assess the respective ability of the Respondents to pay punitive damages to allow the Court to determine the amount of punitive damages to be awarded to the Debtors.

At the recent evidentiary hearing, as detailed fully below, the Debtors met their burden of proof to establish entitlement to damages for emotional distress based upon all of the evidence submitted, including the testimony and IME Reports of Respondents' own medical expert who concluded that Leticia Cepero "does have a strong obsessive preoccupation with **these events** [events which include the May 15, 2019 incident] and with these conflicts [with Respondents], which has come to **dominate her existence** and is **causing her significant emotional distress.**" *Debtors' Ex. 17 at 4-5* [Emphasis added]. Where Debtors were required to prove significant distress along with a causal connection between the significant emotional distress and Respondents' acts for which they were found in contempt, Debtors did so. Respondents' own expert concedes this, and this concession is amplified by records of a doctor and clinical social worker treating Leticia Cepero, as well as the testimony of both Debtors.

As detailed below, Respondents' improper acts have caused significant emotional distress to Leticia Cepero in so many ways, including but not limited to causing her to be severely deprived of the ability to sleep. Further, these acts has severely interfered with the marriage of Leticia Cepero and her husband, Josue Cepero, where Leticia Cepero is obsessed over Respondents' improper acts.

As to the ability of Respondent Hammocks to pay punitive damages, the Debtors proved Hammocks' ability to pay. More importantly, Hammocks has conceded its ability to pay punitive damages. *See* ECF #407, Respondents' closing argument, at 14, ¶68:

> 68. Debtors have established that Hammocks Community Association has the ability to pay punitive damages.

2

That Hammocks also contends, **through counsel jointly representing both Respondents**, that Hammocks should not be held responsible and punished for the acts of its President, Marglii Gallego, this matter will be separately addressed in Debtor's response to Respondents' closing argument. Suffice it to say, this Court has already held, per ECF #328, that Hammocks is responsible for the acts of its President on May 15, 2019, and for the lawsuit both Respondents filed in 2020 in knowing violation of the automatic stay.

Based upon the fact that emotional distress establishes is truly "significant" to the extent that Leticia Cepero, who has no prior history of such distress, cannot sleep or function normally other than to be obsessed over the matters with Respondents, and where the marriage of the Ceperos has been gravely injured due to her obsession, the amount of the damage should therefore be substantial.

Further, the amount of punitive damages should also be sizeable where Respondents were previously warned and directed by the Court twice to stay away from the Debtors. Instead of staying away, Respondents did the exact opposite and fabricated an entire tale that Debtors followed Marglii Gallego to a school where she was picking up her son – a tale, as detailed in ECF #328, that was contradicted by a bank record showing Debtors at another location at the same time, video evidence showing that Marglii Gallego, driving a Hammocks vehicle, blocked the Debtors' vehicle, and an audio tape of a 911 call where Marglii Gallego identified herself as the President of Hammocks who was on the property making inspections for Hammocks.

I. DEBTORS PROVED ENTITLEMENT TO DAMAGES FOR EMOTIONAL DISTRESS.

Debtors are entitled to compensatory damages for emotional distress provided they suffered significant emotional distress, clearly establish significant emotional distress and demonstrate a causal connection between the significant emotional distress and contemptors' wrongful conduct.  *In re Rhodes*, 563 B.R. 380, 388-89 (Bankr. M.D. Fla. 2017).  Debtors met this burden.

A.    Respondents' expert conceded that Leticia Cepero sustained significant emotional distress as a direct result of the May 15, 2019 incident.

While retained to testify that May 15, 2019 incident caused no more emotional distress to Leticia Cepero than she had already sustained by prior wrongful acts of Respondents leading to the entry of the first agreed order of contempt (ECF #189) and the second order of contempt (ECF #191), his report and testimony show otherwise.

Respondents' expert, Dr. Henry Storper conceded that Leticia Cepero sustained significant emotional distress, and that there was a causal connection between her significant emotional distress and the May 15, 2019 incident:

Q Okay. And with regards to Leticia, your diagnostic impression. These were the labels again that I started with. You found her to be in **acute situational reaction, generalized anxiety disorder with significant obsessive rumination, mood disorder, unspecified**.  That's what I see in your report.

A Yes, that's what's written.  *Tr. 477, lines 18-25.*

***

THE WITNESS: So my answer is, **her chronic difficulties with the HOA and Ms. Gallego have had a lot to do with the symptoms that she displayed**.  *Tr. 479, lines 5-8.*

***

THE COURT: So with respect to Exhibit 17, ask your question.

BY MR. ARSLANIAN:
Q On Page 4, carrying over to Page 5, you wrote, "**She does have strong obsessive preoccupation with these events and with these conflicts, which**

4

**has come to dominate her existence and is causing her significant stress.**" You wrote that, correct?

A It sounds like me. I'd like to find it. What part of the report -- it sounds like near the end, right?

Q Near the end, bottom of Page 4, continuing to the top on Page 5.

A I see it. I have it in front of me. I wrote it.

Q So you believe that she has a strong obsessive preoccupation with the events, **and the events include the May 15, 2019 altercation**; isn't that correct?

A **That's correct**. *Tr. 482, line 9 – 483, line 4.* [Emphasis added].

As detailed below, it is virtually impossible to separate the causal connection between the significant emotional distress Leticia Cepero sustained and the May 15, 2019 incident at issue, even if Respondents committed other wrongful acts towards her. There is no evidence in the record of any other source to Leticia Cepero's mental suffering and emotional distress other than Respondents' misconduct.

While Dr. Storper also testified that the May 15, 2019 had no effect on the emotional distress already sustained by Respondents' prior wrongful and contemptuous acts, his report and testimony clearly indicate that the May 15, 2019 **is** a source of Leticia Cepero's significant emotional distress. Dr. Storper's conclusions are more fully analyzed later in this brief.

B. The medical records admitted into evidence and testimony clearly evidence both significant emotional distress sustained by Leticia Cepero and a causal connection with the Respondents' contemptuous conduct including the May 15, 2019 incident.

Leticia Cepero first saw clinical social worker Frances Pena on April 11, 2020. *Debtors' Ex. 2*; *Tr. 456, line 12*. She first saw Dr. Oscar Danilo Pozo, a psychiatrist, on June 23, 2020. *Debtors' Ex. 4; Tr. 455, lines 20-21*. These medical records admitted into evidence are replete with proof that Leticia Cepero sustained significant emotional

5

distress as a result of the Respondents' [the contemptors] acts including the May 15, 2019 incident.

Frances Pena diagnosed Leticia Cepero with Post Traumatic Stress Disorder and Adjustment Disorder with Mixed Anxiety and Depression.  *Debtors' Ex. 2, April 11, 2020 report*, further stating that Leticia Cepero had "a big problem with president of the board and her mental health has been declining since and she is not able to function;" she "appears depressed and anxious;" "crying with panic attack;" she "spoke about incidents of persecution from the board of the association;" and that she "was unable to sleep."  *Id.*

The report in *Debtors' Ex. 2 of November 2, 2020* contains the same diagnostic impressions, similar statements linking her entire condition to the situation with Association and Gallego, and statements that Leticia Cepero is unable to sleep or eat. In fact, every report in *Debtors' Ex. 2* contains the same diagnostic impressions, along with statements linking her condition solely to the Association and Gallego and references to Leticia Cepero's severe anxiety, inability to function and inability to sleep.

Each Report in *Defendants' Ex. 2* also contains notations that Leticia Cepero is worried about Hammocks and Gallego continuing to come after her, as well.

Dr. Pozo diagnosed Leticia Cepero as having: Acute stress reaction; Major depressive disorder, recurrent with psychotic features; and Generalized anxiety disorder.  *Debtors' Ex. 4, Report of June 23, 2020 at 3.*  This Report only cites "problems with board association of her community housing" as the source of these illnesses.  *Id.*  This Report details insomnia of Leticia Cepero, as well.  *Id.*

In *Debtors' Ex. 4, Report of August 3, 2021*, Dr. Pozo diagnosed Leticia Cepero has having: Anxiety disorder, unspecified; Major depressive disorder, single episode, moderate; and Post-traumatic stress disorder, unspecified. In the Report, Leticia Cepero reported "persistent anxiety" that was due to "a conflictive dispute with a Board association members of her neighborhood." *Id.* Again, inability to sleep is mentioned, as well as panic attacks. *Id.* Dr. Pozo prescribed the following medications for Leticia Cepero: Effexor; Clonazepam and Melatonin. *Debtors' Ex. 4, Report of June 23, 2020 at 3; Report of February 19, 2021 at 2.*

Regarding the effect that the May 15, 2019 incident had upon her, Leticia Cepero testified as follows:

Q And I know that you just talked about certain things. I'm going to ask you about those in a second, but I want you to focus on the May 15, 2019 incident.

A Okay.

Q Please describe to the Judge the type of feelings that resulted in the problems, if any, that it caused you.

A To me it has been a horrible movie, terror movie. It has completely changed my life. **I live worried, thinking about what are they going to do to me tomorrow**. *Tr. 381, lines 2-13.* [Emphasis added].

***

Q Okay. All right. And after the May 15, 2019 incident, would you please tell the Court what affect it has on your ability to sleep, and overall in your marriage with Josue?

A I do not sleep. And I'm going to talk very clearly, with respect, because I want to be honest according to the subjects. **My marriage, intimately I have no desire to do anything. I have no motivation, nothing**. *Tr. 381, line 22 – 382, line 5.* [Emphasis added].

The testimony of Leticia Cepero is consistent with all of the medical records on her condition. Her marriage is ruined and her ability to function has ceased.

C. No evidence of any prior mental health issues of Leticia Cepero.

7

In *Debtors' Ex. 4, Report of June 23, 2020 at 1*, Dr. Pozo wrote:

PAST PSYCHIATRIC HISTORY:

As far as can be determined Ms. Cepero's psychiatric history is entirely negative.  There are no psychiatric hospitalizations, no prior psychiatric treatment, and no history of assaultive or suicidal behavior.  There is no history of depressions, anxiety attacks, or other common psychiatric symptoms.  No psychotropic drugs have ever been taken.  There is no history of noncompliance with medication or treatment.  The patient reports She was referred by PCP and initiated in psychotherapy on 4/4/2020 because problems related with the board association of her community housing.

Leticia Cepero testified that prior to conflict with Hammocks and Gallego, she never had any mental health issues.  *Tr. 380, line 22 – 381, line 1.*  Josue Cepero testified as follows, regarding her behavior changes:

Q The behavior that you saw your wife exhibit during her testimony, is that something that you normally see from her?

A At this time, yes.

Q When you say "at this time," do you mean in the last few months, the last year? What is it that you mean?

A In the last four years.

Q And prior to 2017, did she exhibit behavior like she exhibited today?

A No, sir.

Q Please described the type of woman she was before all of these problems with the association and Marglii Gallego started.

A Okay. An incredible wife, mother and  friend. She would always receive us jolly, in a  jolly manner at all times. A very normal conduct in her activities, her relationships. And a person that had an excellent relationship with all of her neighbors. *Tr. 488, line 11 – 489, line 5.*

Other than the word "recurrent" appearing in a medical report in 2020, Respondents' expert could not identify any medical record or document evidencing a prior history of mental health issues on the part of Leticia Cepero:

8

Q And isn't it true that Leticia first sought help from Dr. Pozo in June of 2020?

A Yes.

Q And that she saw Ms. Pena commencing in April of 2020?

A Yes.

Q And you also noted that she has no prior psychiatric history?

A That's what she told me, yes.

Q Well, you haven't seen any records showing prior psychiatric history that you saw, right?

A Well, I do have one piece of information that I mentioned. Should I mention it?

Q Mention away.

A Okay. Dr. Pozo diagnosed her as major depression recurrent. So recurrent implies prior episodes.

Q Okay. But that was in -- I'm sorry, but that was in 2020.

A Well, he saw her for the first time in 2020, but a recurrent episode means he must have identified a prior episode. We don't know when it is.

Q Did you ask Leticia about that during your interview?

A She said she had no prior history, so I did not ask -- I asked her if she had prior history and she said no.  *Tr. 474, line 12 – 475, line 14.*

Dr. Storper even wrote in his IME Report (*Debtors' Ex. 17 at 2*) that: "She has no psychiatric history."

D.   There is no evidence of a causal connection of Leticia Cepero's significant emotional distress to any other matter or situation, but exclusively to Respondents' wrongful and contemptuous conduct, including the May 15, 2019 incident.

Nothing in the records with Frances Pena (*Debtors' Ex. 2*) or the records of Dr. Pozo (*Debtors' Ex. 4*) indicate a source or causal connection of Leticia Cepero's significant emotional distress to any other matter other than Respondents' wrongful and

9

contemptuous conduct. Again, Respondents' expert testified that her chronic difficulties with the HOA and Gallego have a lot to do with her symptoms (*Tr. 479, lines 5-7*); and, Leticia Cepero suffers "significant stress" from an "obsessive preoccupation" with "events" which include the May 15, 2019 incident. *Tr. 482, line 12 – 483, line 4.*

Dr. Storper could not identify any other source of her significant stress other than the wrongful acts of Respondents. *Tr. 479, line 5 – 483, line 4.*

E. There is no hint or suggestion that Leticia Cepero's emotional distress is anything but "significant."

The Court observed the demeanor and state of Leticia Cepero during her testimony. This testimony was that of someone clearly under significant emotional distress. Respondents' expert concluded that Leticia Cepero was under "significant stress" as the result of her preoccupation with "events," including the May 15, 2019 incident - events and conflicts with Respondents that have "come to dominate her existence and is causing her significant distress." *Debtors' Ex. 15 at 4-5.*

Further, there has been no hint or suggestion by anyone, including Respondents' expert, that the significant stress of Leticia Cepero is feigned and/or not real.

F. The suggestions of Dr. Storper and Respondents that the May 15, 2019 incident did not exacerbate or had no effect on Leticia Cepero because she had already been damaged by Respondents' prior wrongful and contemptuous conduct is both illogical and not supported by substantial competent evidence.

The thrust conclusion of Dr. Storper as advanced by Respondents is that the May 15, 2019 incident did not materially affect Leticia Cepero's mental condition, because she was already damaged by the Respondents' prior wrongful and contemptuous acts:

> This incident was **another example of the ongoing conflict between the Ceperos and Ms. Gallego, 1-2 years prior to this episode** (*Debtors' Ex. 17 at 2*)

> . . . She has had severe situational difficulties with the other parties.  The event of May 15, 2019 did not materially change it.  (*Debtors' Ex. 17 at 4*).

This fundamental conclusion is akin to an assertion that subsequent abuse by an aggressor has no effect on a victim because he or she is already damaged by the prior abuse by the same actor or actors.  Put another way, if it takes 6 or 7 blows from a hammer to drive a nail into a piece of wood, each of the 6 or 7 blows from the hammer are significant in reaching the ultimate conclusion of driving the nail into the wood.  One or two strikes from the hammer cannot be disregarded.

The entire suggestion by Respondents – we could not have caused her significant emotional distress on May 15, 2019, because we already caused her significant emotional distress by our prior contemptuous acts – is an affront to the administration of proper justice which should be summarily rejected.

Dr. Storper also testified that he believed that the May 15, 2019 did not exacerbate Leticia Cepero's condition.  *Tr. 459, line 21 – 460, line 2.*  These suggestions are illogical and without any evidentiary basis.  Since Leticia Cepero was not observed by Dr. Storper or any other psychologist or psychiatrist **prior to May 15, 2019**, Dr. Storper has no basis to make any conclusions regarding exacerbation.

Further, one is hard-pressed to imagine how a person, suffering from an obsessive fear of continued persecution, would not suffer significant emotional distress from the May 15, 2019 incident **after** a Court entered two separate Orders forbidding further contact.  This precise conduct would only serve to "fuel the fire" of Leticia Cepero's fears that Gallego and Hammocks would never leave her and her husband alone.  That a doctor would testify that Leticia Cepero suffers from unfounded paranoia

11

that the Respondents will continue to harass her, while finding that the May 15, 2019 has no effect on her is absolutely baseless and illogical.

      1.  To take Respondents' assertions to their illogical and improper ends, the Court must look to the prior history between the parties, including the Court's prior admonishments of any further contact.

In two separate Orders, ECF #189 and ECF #191, Respondents were directed to stay away from the Debtors.  These Orders were the product of a Motion for Contempt, ECF #140, and an Amended Motion for Contempt, ECF #159, based upon events occurring in 2017.  Attached to the original Motion for Contempt, ECF #140, were Affidavits detailing misconduct by Respondents including allegations that: i) Gallego was telling others that Debtors were not good people (ECF #140-3); ii) Gallego called Leticia Cepero a whore on July 9, 2017 (ECF #140-1 at 1); iii) on August 3, 2017, Gallego called Leticia Cepero a thief (ECF #140-1 at 2-3); iv) in 2017 Gallego challenged Leticia Cepero to a fist fight (ECF #140-1 at 3); and v)  Gallego said that the Ceperos were "thieves and liars" trying to defraud Hammocks.  (ECF #140-2).

According to Dr. Storper and Respondents, it is these acts, **and only these acts**, that caused Leticia Cepero significant emotional distress; but, the May 15, 2019 incident had no effect on her condition.  In other words, being called a whore and a thief, along with being challenged to a fist fight caused all of the significant emotional distress, but being followed and blocked in by Hammocks' President Marglii Gallego after the Court entered stay-away Orders, then having to face a fabricated claim that the Ceperos followed Gallego to her son's school, had no effect on her.

The Respondents' position is, just as the fabrication in the underlying proceeding, simply outrageous.

   2. Leticia Cepero's paranoia that Hammocks and Gallego will not leave her alone is based upon the acts of Respondents and Exhibits in evidence.

 Dr. Storper also wrote that Leticia Cepero believes her life may be threatened, but there is no evidence of any threats to her wellbeing or harm. *Debtors' Ex. 17 at 4.* The May 15, 2019 incident is evidence to the contrary. The Court had twice directed Hammocks and Gallego to leave the Ceperos alone. They did not do so.

 *Debtors' Exs. 13, 14 and 15* show incidents on video, after the Court found Respondents in contempt, that serve as a basis for her feelings: 1) people knocking on her door and leaving (*Debtors Ex. 15*); 2) having the hedges and vegetation on her property cut down (*Debtors Ex. 14*); and, much worse, 3) a video showing a vehicle driving in front of the Ceperos' home, followed by the sound of two gunshots. *Debtors' Ex. 13.* These videos, coupled with the events of May 15, 2019, all serve to support her belief that she and her husband are not going to be left alone.

 G. Josue Cepero has also sustained compensable damages as a result of Respondents' contemptuous acts.

 The medical records of Dr. Marjorie Caro, *Debtors' Ex. 3*, support a damages to Josue Cepero, as well. While the medical records demonstrate anxiety and stress, including loss of sleep, due to "financial stressors" on October 3, 2018 (*Debtors' Ex. 3, Report of October 3, 2018*), the medical records show that his condition worsened after the May 15, 2019 incident. *See Debtors' Ex. 3, Report of July 30, 2019* noting that symptoms since last visit had worsened, and noting that: "he has been experiencing persistent and worsening feelings of sadness, worthless, despair, insomnia, hopeless, helpless, abandoned, lack of concentration, anorexia **related to issues in the place where he is living . . .**" [Emphasis added].

His condition worsened and the source of his worsened condition changed from financial stressors to Respondents' misconduct. A later report notes the issue as: "patient continues with issues in his living situation and has problems with the landlord since they were reported to the police." *Debtors' Ex. 3, Report of November 12, 2019 at 1.* The references to the "landlord" must be reasonably construed as problems with Hammocks, the Association.

Josue Cepero was ultimately diagnosed as presenting the following medical conditions: Anxiety disorder, unspecified; Insomnia; and Major depressive disorder, single episode, without psychotic features. *Debtors' Ex. 3, Report of October 4, 2019 at 6.* Like Leticia Cepero, the diagnosis supports a claim of significant emotional distress.

More importantly, in addition to whatever he has suffered personally as a result of Respondents' misconduct, Josue Cepero laid out in detail how his marriage has suffered greatly as a result of Leticia Cepero's preoccupation with issues over Respondents. *See Tr. 488, line 11 – 489, line 5, quoted above in Section I, C above.*

In conclusion on the issue of entitlement, Debtors have met their burden of proof in establishing significant emotional distress and a causal connection between the significant emotion distress and Respondents contemptuous acts. Further, the suggestions of Respondents that Debtors cannot be entitled to damages, because Respondents caused the damage by prior acts leading to contempt should be thoroughly rejected by the Court.

II. DEBTORS ARE ENTITLED TO SUBSTANTIAL DAMAGES FOR THE SIGNIFICANT EMOTIONAL DISTRESS CAUSED BY RESPONDENTS.

To be clear, Debtors would have rather have been left alone in peace, as this Court twice directed Respondents to do, rather than face the events of May 15, 2019,

the protracted litigation to debunk a fabricated claim that Debtors committed wrongful conduct, and face a second improper lawsuit. Had they been left alone in peace as this Court desired, we would not be here doing what we are doing, and the Debtors' situation would be vastly different.

Debtors are, therefore, entitled to damages in excess of $1 million. Such a demand is not unreasonable under the circumstances. What is the value of being able to sleep comfortably in peace each night? What is the value of losing your previously cheerful and outgoing spouse who was been converted to a person obsessed over fear of being persecuted by Respondents, a very real obsession that controls and absolutely ruins her daily life? What is the value of having to live in fear for years without being able to function properly? The demand is respectfully not unreasonable in light of the actual conditions that each Debtor finds themselves in as a direct and proximate result of the failure of Respondents to respect and obey two simple Orders of this Court.

As to Josue Cepero, Dr. Storper diagnoses him as having: Major depressive disorder, with obsessive ruminations; and Generalized anxiety disorder. *Debtors' Ex. 16 at 5.* Dr. Caro's diagnosis of Josue Cepero is: Anxiety disorder, unspecified; Insomnia; and Major depressive disorder, single episode, without psychotic features. *Debtors' Ex. 3, Report of October 4, 2019 at 6.*

As to Leticia Cepero, Dr. Storper diagnoses her as having: Acute Situational reaction; Generalized anxiety disorder with significant obsessive ruminations; and Mood Disorder unspecified. *Debtors' Ex. 17 at 4.* In *Debtors' Ex. 4, Report of August 3, 2021*, Dr. Pozo diagnosed Leticia Cepero has having: Anxiety disorder, unspecified;

15

Major depressive disorder, single episode, moderate; and Post-traumatic stress disorder, unspecified.

These are significantly serious mental conditions on the part of both Debtors, and these conditions have caused great harm to both Debtors – harm which could have been avoided had Respondents simply followed the Orders of the Court.

III. RESPONDENTS HAVE THE ABILITY TO PAY PUNITIVE DAMAGES.

Debtors proved that Hammocks, a very large homeowner association with approximately 6,500 units paying an annual budget of greater than $4.2 million which includes attorneys' fees, has the ability to pay punitive damages. Hammocks owns approximately 25-30 units (*Debtors' Ex. 8*), and various motor vehicles (*Debtors' Ex. 11*). Hammocks also owns greater than $800,000.00 in accounts receivable (*Debtors' Ex. 9*), and has various bank accounts with sizeable balances (*Debtors' Ex. 7*).

More importantly, as set forth in the Overview above, Hammocks readily admits that Debtors proved that Hammocks has the ability to pay punitive damages. *See* ECF #407, Respondents' closing argument, at 14, ¶68.

With respect to Marglii Gallego's ability to pay punitive damages, Debtors provided proof that she owns two units in the Hammocks community. During the trial, one of her attorneys announced on the record that Marglii Gallego is currently facing charges for a scheme to defraud, and for grand theft, and announced that under no circumstances would she testify at this trial, but would invoke her Fifth Amendment rights:

> MR. JUAREGUI: Correct, Judge. Because -- I'm sorry. I didn't mean to interrupt, Judge. She does have an open felony case. She's currently being charged in Miami-Dade County with two felonies, one an organized scheme to defraud, and

16

one a grand theft. So **of course, I would not allow her to testify under any circumstances at this hearing, and she would be pleading the Fifth**.

THE COURT: Okay. Well, that's helpful to know anyway. So may I make a note of that for the record, then, Mr. Juaregui?

MR. JUAREGUI: Yes, Judge, for the purposes of her invoking the Fifth Amendment, yes. *Tr. 364,* lines 3-15. [Emphasis added].

Since Marglii Gallego was not going to testify, but would instead invoke her Fifth Amendment rights no matter what, Debtors having put forward evidence of assets belonging to her and wishing to question her regarding financial matters with Hammocks – all matters which Mr. Juaregui would not have permitted – Debtors are entitled to an adverse inference, that Marglii Gallego does have an ability to pay. *See, for example Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307 (S.D. Fla. 2018) (the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a civil cause).

IV. THE PUNITIVE DAMAGES, UNDER THE CIRCUMSTANCES PRESENTED, SHOULD BE SUBSTANTIAL TO ENSURE NO FURTHER MISCONDUCT.

Hammocks has stated on the record, after improperly suggesting no punitive damages should be assessed against Hammocks, that the Court should use a multiplier "within the range of one to two."  *See*  ECF #407, Respondents' closing argument, at 14, ¶70.  Under the circumstances presented, addressed below, Debtors contend that the Court should utilize a multiplier **<u>at a minimum</u>** of 2 times the actual damages due to the multiple violation against the Debtors.  *See and compare In re Lyubarsky*, 615 B.R. 924 (Bankr. S.D. Fla. 2020), multiplier of two awarded for a single violation.  Here, there

are multiple violations, and multiple Orders cautioning Respondents and directing them not to commit further misconduct.

The fact that this proceeding stems from prior misconduct by Respondents leading to two separate Orders forbidding further contact strongly favors a multiplier of at least 2 to deter future misconduct standing by itself. However, other factors are present favoring such a multiplier. In addition to the May 15, 2019 incident, the Court was presented with the 2020 lawsuit that violated the automatic stay. What favors a multiplier of greater than 2 is not the mere fact that the 2020 lawsuit was filed, but that a similar lawsuit was filed against the Debtors and dismissed in 2017 because of the automatic stay.

An overriding theme in this particular proceeding, as detailed mostly in Leticia Cepero's testimony and the medical records regarding her mental condition, including the IME Report of Dr. Storper, is a fear of continuation of persecution and wrongful conduct by Respondents. A 2017 lawsuit is improperly filed against Debtors after they filed for bankruptcy, and then a 2020 lawsuit alleging many of the same claims is refiled improperly against Debtors. Respondents commit several various improper acts directed towards Debtors in 2017, and are found in contempt in 2018 with clear directives to stop the misconduct and leave the Debtors alone. This is followed by the May 15, 2019 incident, and a fabrication that Debtors committed misconduct.

Has the misconduct stopped, and/or will it stop? The videos admitted into evidence as *Debtors' Exs. 13, 14 and 15*, videos evidencing a removal of plants from the property of the Ceperos, someone knocking on their door and leaving, and another video evidencing a van parking by their property and shooting off two gunshots suggest

that the misconduct has not stopped. These videos were shot after the Court entered ECF #328 finding Respondents in contempt in July, 2021. *Tr. 381, lines 14-21.*

*Debtors' Ex. 13*, the video detecting a vehicle driving up to the Ceperos' home, followed by the sound of two gunshots is troubling, and fuels the fears that the Ceperos already possess.

Even if these videos, surely serving as a basis for the worry on the part of the Debtors, are completely disregarded by the Court as three separate coincidences having nothing to do with Respondents despite each matter depicted in the videos occurring after the Court found Respondents in contempt in July of 2021, a multiplier in excess of 2 is still justified under all of the other circumstances discussed herein.

## CONCLUSION

For all the reasons advance above Debtors have proven entitlement to damages for significant emotional distress caused by Respondents, and the damages should be substantial and in excess of $1 million. Further, both Respondents have the ability to pay punitive damages (conceded by Hammocks), and the punitive damages should be awarded in excess of a multiplier of two so as to serve the purpose for which punitive damages are intended.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District Florida and I am in compliance with the additional qualifications to practice in this Court and that a true and correct copy of this *DEBTORS' CLOSING ARGUMENT ON HEARING ON ORDER ON SANCTIONS AND SETTING FURTHER EVIDENTIARY HEARING (ECF #339)* was sent by email to those set forth in the NEF, this 21st day of February 2022.

                    Law Office of Michael J. Brooks, P.A
                    Attorney for Debtors
                    8410 S.W 40th Street
                    Miami, FL 33155
                    Telephone:1(877)290-9197

By:_____/s/_____
        Michael J. Brooks, Esquire
        Florida Bar No. 434442