*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on June 7, 2022.**

**Laurel M. Isicoff
Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE: | CASE NO. 17-20358-BKC-LMI |
| JOSUE CEPERO and LETICIA CEPERO, | Chapter 13 |
| Debtors._____/ | |

### ORDER ON DAMAGES

This matter came before the Court on December 30, 2021 on a trial to determine whether the Debtors are entitled to damages for emotional distress and, if so, how much those damages should be (the "Damages Trial"). The Court has considered the evidence admitted at trial and the testimony of the witnesses. For the reasons outlined below, the Court finds that the Debtors are entitled to

1

some damages for emotional distress, and for punitive damages, in the amount and subject to the terms and findings of this Order.[1]

The Court previously entered an Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt (ECF #328) (the "Contempt Order") holding that the Hammocks Community Association, Inc. (the "Association") and its then President, Marglli Gallego ("Gallego") had violated (i) two prior contempt orders entered by the Court in December of 2018 (collectively the "Original Contempt Orders")[2]; and (ii) the automatic stay by virtue of an incident that occurred on May 15, 2019 (the "May Incident") and a lawsuit that was filed on November 20, 2020 (the "November 2020 Lawsuit").

The Court subsequently entered its Order on Sanctions on October 28, 2021 (ECF #339) (the "Sanctions Order") holding that the Debtors were entitled to sanctions as follows:

> *The Court finds that the Debtors are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress. The Court also finds the Debtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress.*

The Court previously awarded the Debtors $54,065.00 for attorney fees. The Court recently issued its Order Granting In Part Motion To Reconsider Motion To Reconsider awarding the Debtors an additional $4,125.00 in attorney fees, for a total of $58,190.00. This Order addresses the Debtors' request for

---

[1] The following constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52 made applicable to this contested matter pursuant Fed. R. Bankr. P. 7052.
[2] *Agreed Order on Debtor's* [sic] *Amended Motion for Contempt Against Hammocks Community Association, Inc. and Its' President, Marglli Gallego* (ECF #189) and *Order on Debtor's* [sic] *Amended Motion for Contempt Against Hammocks Community Association, Inc. and Its' President, Marglli Gallego* (ECF #191).

2

emotional damages and the amount of punitive damages to which the Debtors are entitled.

**Emotional Distress Damages**

In order to "recover 'actual' damages for emotional distress under §362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014).

The Debtors relied on their own testimony as well as the written reports of three professionals – Frances Pena, a licensed clinical social worker who is treating Mrs. Cepero; Dr. Oscar Pozo, a psychiatrist who is treating Mrs. Cepero, and Dr. Marjorie Caro, a psychiatrist treating Mr. Cepero.  None of the Debtors' professionals appeared to testify.

Ms. Pena first spoke with Ms. Cepero in April 2020, a little less than a year after the May Incident and saw her several times subsequent to the initial visit. Ms. Pena outlined Mrs. Cepero's condition, including PTSD, panic attacks, unable to sleep, having nightmares, apprehensive about going out due to the homeowner's board.  Dr. Pozo first saw Mrs. Cepero in June of 2020 and saw her at least two more times during the course of the subsequent year and a half. Dr. Pozo has diagnosed Mrs. Cepero with acute stress reaction, major depressive disorder and generalized anxiety disorder.  Neither professional cites the situation with the Association and Ms. Gallego as the sole cause of Mrs. Cepero's anxiety, but both Ms. Pena and Dr. Pozo cite the situation as a significant contributing factor to her problems.

3

Dr. Caro initially saw Mr. Cepero in October of 2018. Mr. Cepero cited as his major issues financial stressors that impacted his relationship with his wife, as well as multiple losses in the family. Among other things, Mr. Cepero had trouble sleeping. Dr. Caro prescribed a medication for Mr. Cepero's "extreme" anxiety and major depressive disorder. Mr. Cepero apparently returned in July of 2019 describing his feelings and symptoms worsening "related to issues in the place where he is living." Mr. Cepero continued to visit Dr. Caro, each time relating his symptoms to a variety of factors including "his current living situation."

The Association and Ms. Gallego relied on the testimony of Dr. Henry Storper, a board-certified psychiatrist. Dr. Storper examined both Mr. Cepero and Mrs. Cepero. Based on Dr. Storper's examination of Mr. Cepero and Dr. Storper's review of Dr. Caro's reports, Dr. Storper testified[3] that Mr. Cepero has major depressive disorder with obsessive ruminations (about the Hammocks board) and generalized anxiety disorder. Dr. Storper opined that the May Incident did not cause Mr. Cepero's problems and based on Dr. Caro's reports, that the May Incident did not cause any exacerbation of Mr. Cepero's prior symptoms. However, on cross-examination Dr. Storper acknowledged that the May Incident *could* have exacerbated Mr. Cepero's condition but he also felt that Mr. Cepero was being under-treated for his issues, and that Mr. Cepero was not being given the proper medication for his conditions.

With respect to Mrs. Cepero, Dr. Storper testified that he did not believe the May Incident caused or "materially altered" Mrs. Cepero's existing conditions,

---

[3] At the request of the Debtors, the Court admitted Dr. Storper's expert reports as well.

4

which he diagnosed as acute situational reaction, generalized anxiety disorder with significant obsessive ruminations (about the HOA situation) and an unspecified mood disorder. He based this opinion on a report from Mrs. Cepero's general doctor (a report not in evidence) that referenced a "recurrence" of Mrs. Cepero's anxiety[4], as well as the delay of almost one year between the May Incident and Mrs. Cepero's first visit with Ms. Pena. Nonetheless, on cross-examination Dr. Storper conceded he had no basis to find that Mrs. Cepero's problems were caused by anything other than the situation with Ms. Gallego and the Association. Indeed, in Dr. Storper's written report he writes "There are persistent obsessive ruminations about this conflict. She manifests significant paranoid persecutory ideation, in which she believes that she and her family will be harmed or possibly killed, by employees of the homeowner's association and by Ms. Gallego, in particular."

The Association and Ms. Gallego argue that the evidence shows that both Mr. and Mrs. Cepero had pre-existing issues relating to stress, and that therefore, the May Incident is not a cause of their emotional issues. The Association and Ms. Gallego also point to a long temporal gap between the May Incident and the Ceperos' next appointments with their respective professionals.

Based on the evidence the Court finds that, while Mrs. Cepero may have suffered from anxiety prior to the May Incident, the May Incident aggravated Mrs. Cepero's anxiety, to the point where she thinks everything that happens somehow is related to the conflict with the Association and Ms. Gallego,

---

[4] Mrs. Cepero did testify that in 2017 when she went to the doctor she was very sad because her father had died but she had never been diagnosed with anxiety and never took any medication until Dr. Pozo started treating her.

5

including a car backfiring which Mrs. Cepero somehow believed was instead, someone firing bullets at her house. Moreover, this conflict started back in 2017. Indeed, the reason the Original Contempt Orders were entered was because of these tensions.

Florida law recognizes that "aggravation of a [pre-existing] psychiatric condition may be compensable if it is the direct and proximate result" of the incident giving rise to the claim being tried. *See Deneault v. Alachua County School Board,* 555 So. 2d 909, 914 (Fla. 1st DCA 1990); *Cameron v. Supermedia, LLC,* 2016 WL 1572952, at *4 (N.D. Fla. 2016) ("[T]he aggravation of a preexisting ailment or condition may be taken into account in determining damages.").

Thus, the Court finds that while the May Incident was not the single cause of Mrs. Cepero's emotional distress, it was a significant factor, and appears to be the "straw that broke the camel's back". The Court does not find compelling the delay in going for professional help. What the Court does note is that after the May Incident, and continuing until today, Mrs. Cepero thinks every interaction with anyone having to do with the Association, and even those who are not (in the case of the car backfiring) , is meant to be a threat of some kind. Indeed, Dr. Storper noted this in his report.

Based on the foregoing, the Court finds that Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident.[5] The Debtors have proven that the May Incident not only caused Mrs. Cepero significant emotional distress, it also aggravated any emotional distress that Mrs. Cepero

---

[5] Mrs. Cepero acknowledged that she had minor distress arising from the November 2020 Lawsuit so there are no emotional damages arising from that violation.

may have already been suffering due to the prior conduct of Ms. Gallego, as condoned by the Association.

However, the evidence does not support damages for emotional distress for Mr. Cepero. The Court certainly recognizes Mr. Cepero's distress at seeing his wife's situation, and there is no doubt that his wife's distress continues to cause him stress. Nonetheless, Mr. Cepero was having "extreme" stress and anxiety long before the May Incident. It does not appear from the reports that were submitted, or the testimony, that Mr. Cepero's anxiety issues increased in any meaningful way, including treatment, although there is no question Dr. Caro noted that Mr. Cepero had increased anxiety after the May Incident.

Having proven the causal connection between Mrs. Cepero's emotional distress and the May Incident, the question then is, what should be the damages that should be awarded to Mrs. Cepero? The Debtors have requested an undifferentiated one million dollars for the emotional distress and for punitive damages. While the Court does not find that the Ceperos are entitled to one million dollars, the Court finds that it is appropriate to award Mrs. Cepero damages even though there is no evidence that Mrs. Cepero incurred any expenses associated with the treatments she has received.[6]

There is no mathematical formula to determine the damages for emotional distress. Thus the Court must consider the amount of damages based on the nature of the contempt and the stay violation, as well as how other courts have

---

[6] The Debtors' closing statement did not identify any actual damages associated with the emotional distress claim. The Court did review the evidence; it appears that the medical charges were paid by the Debtors' insurance. The Court presumes that, since the Debtors did not request any costs, that the Court's understanding of the evidence is correct.

7

measured damages for emotional distress. *See In re Lyubarsky,* 615 B.R. 924 (Bankr. S.D. Fla. 2020).

In *In re Lyubarsky,* this Court awarded $25,000 for emotional distress damages caused by egregious behavior by a creditor and its counsel. The Court finds that Ms. Gallego's conduct on May 15, 2019, coupled with her blatant lies when she testified as a witness, easily support a similar award in this case. Therefore the Court finds it is appropriate to award damages for emotional distress in the amount of $25,000.

**Punitive Damages**

The calculation of punitive damages is subject to the discretion of the Court. As the Court wrote in *In re Lyubarsky*:

> Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc.*, 634 Fed. Appx. at 773 (internal citations omitted). "The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner. . . where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche,* 361 B.R. 615, 624 (Bankr.N.D.Ga. 2005).
>
> "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison*, 599 B.R. 173, 182 (Bankr.N.D.Fla. 2019); *In re Roche,* 361 B.R. at 624. . . .
>
> In determining the *amount* of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will *punish and deter.*" *In re Novak,* 223 B.R. 363, 368 (Bankr.M.D.Fla. 1997) (emphasis added). *See, e.g., In re Campbell*, 553 B.R. 448, 557 (Bankr.M.D.Ala. 2016)(awarding $50,000.00 in punitive damages where the Court determined "that such an amount is necessary to deter [the party] from engaging in such conduct in the future."); *In re Brodgen,* 588

> B.R. 625 (Bankr.M.D.Fla. 2018)(awarding punitive damages that doubled actual damages, exclusive of attorney's fees; the court found that even if the punitive damages were insufficient to deter future behavior, that the amount was "not insignificant"); *In re Harrison*, 599 B.R. at 191(awarding punitive damages against parties, the court multiplied actual damages by factors of 2 and 3.375 in an effort to deter future behavior). The amount of punitive damages "[is] largely left to the discretion of the bankruptcy court." *In re Lansaw*, 853 F.3d at 670.

*Lyubarksy*, 615 B.R. at 937-38.

Before awarding punitive damages, the Court must consider two additional factors. The first is whether the Association should be liable for punitive damages arising solely from Ms. Gallego's conduct. The second is whether the Association and Ms. Gallego have proven they do not have the ability to pay any punitive damages.[7]

The Association has conceded it has the ability to pay the punitive damages award but argues that it should not be responsible for punitive damages because the Debtors have not presented any evidence that the Association, as opposed to Ms. Gallego, acted in a way that would warrant punitive damages assessed against the Association.[8]

The Court agrees with the Association. In *Mercury Motors Exp., Inc. v. Smith,* 393 So. 2d 545, 549 (Fla. 1981), the Florida Supreme Court laid out the

---

[7] The burden of proof is on the person against whom punitive damages is assessed to demonstrate that he/she or it does not have the financial ability to pay. *See Johnson v. Howard,* 24 F. App'x 480, 488 (6th Cir. 2001); *In re Lyubarsky,* 615 B.R. at 928; *Rinaldi v. Aaron,* 314 So. 2d 762 (Fla. 1975).

[8] The Debtors argue that this argument is untimely and, besides, the Association bears responsibility for the acts of Ms. Gallego. The Court does not believe the argument is untimely. The Association's responsibility for actual damages related to Ms. Gallego's conduct, which the Court has already found *is* appropriate, does not automatically translate into responsibility for punitive damages associated with Ms. Gallego's conduct.

framework for an employer's liability for punitive damages arising from conduct by the employee.

> Before an employer may be held vicariously liable for punitive damages under the doctrine of respondeat superior, there must be **some fault on his part.** . . . Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages.

*Id.* at 549 (emphasis added).

While Ms. Gallego was an officer of the Association, rather than an employee, there does not appear to be any reason why the analysis should be different. The Debtors did not put on evidence that would support a finding that the Association acted or did not act in way that "foreseeably contributed" to the Debtors' injuries. Therefore the Court finds that the Association is not liable for the punitive damages awarded to the Debtors.

The Court finds it is appropriate for punitive damages to be assessed against Ms. Gallego. As the Court found in the Contempt Order, Ms. Gallego intentionally violated the Original Contempt Orders. Ms. Gallego lied during the trial to determine whether the Original Contempt Orders were violated. The Court found and finds that Ms. Gallego's conduct during the May Incident, and the filing of the November 2020 Lawsuit, were willful and malicious.

Ms. Gallego did not appear at the trial. Even though her nonappearance was due to COVID[9], her criminal attorney did appear at the trial and informed

---

[9] The Debtors also did not subpoena Ms. Gallego until the night before the trial. As the Court has repeatedly admonished counsel, do not wait until the last minute to subpoena a critical

10

the Court that, even if his client was present, he would not allow her to answer any questions, but instead assert her Fifth Amendment right against self-incrimination.[10] When a party seeks to assert his or her Fifth Amendment right in a civil matter, "the adverse party is entitled to an adverse inference, meaning an inference that, had the party testified, such testimony would not have been favorable to his claim or defense." *In re Neves,* 638 B.R. 220, 229 (Bankr. S.D. Fla. 2014).

However, a party may not rely solely on the adverse inference. The adverse party "must present some evidence tending to prove its assertion that is independent of the defendant's refusal to testify." *Id.* In this case, in addition to relying on the adverse inference, the Debtors submitted evidence that demonstrates that Ms. Gallego owns one property at the Hammocks, and a small interest in another property at the Hammocks. Ms. Gallego, through the Association's counsel, argued in the closing argument that the Debtors did not show that either property is unencumbered, or is not exempt as Ms. Gallego's homestead. However, that burden was on Ms. Gallego, not the Debtors, and Ms. Gallego did not present any evidence, by testimony or otherwise to prove that she does not have the ability to pay punitive damages.[11]

Although Ms. Gallego was not present, her criminal counsel appeared and advised the Court what would have happened if Ms. Gallego had appeared.

---

witness, even if the witness is a party. After all, a party is not required to show up for a trial, although, of course, there is a risk in failing to do so.

[10] At the time Ms. Gallego, according to her criminal counsel, had been charged with two felonies – an organized scheme to defraud and grand theft.

[11] The deadline to file exhibits was December 27, 2021. The Association (whose attorney was representing Ms. Gallego also) did not submit exhibits that would demonstrate Ms. Gallego's inability to pay. Ms. Gallego did not separately submit any exhibits.

Consequently, the Court finds that it is appropriate to apply the inference to Ms. Gallego's ability or inability to pay punitive damages, and that Ms. Gallego therefore is able to pay punitive damages in some amount.

The Court finds that it is appropriate to apply a factor of one to the punitive damages. What Ms. Gallego did was reprehensible, and was part of an ongoing pattern of abuse of the Ceperos. But the purpose of punitive damages is to punish and deter Ms. Gallego and others who might choose to abuse people through a position of influence and power. Based on Ms. Gallego's current situation, the Court finds that doubling the actual damages will be enough of a punishment and deterrent to Ms. Gallego with respect to her actions going forward.

Based on the foregoing it is ORDERED as follows:

1. Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident in the amount of $25,000.00. The Association and Ms. Gallego are jointly and severally liable for these damages.

2. As separately ordered, the Ceperos are entitled to an attorney fee award in the total amount of $58,190.00. The Association and Ms. Gallego are jointly and severally liable for these damages.

3. The Ceperos are entitled to punitive damages in the amount of $83,190.00, which is an amount equal to the amount of actual damages awarded to the Ceperos, for which punitive damages Ms. Gallego will be solely responsible.

4. The Ceperos will be entitled to prepare final judgments in these amounts that can be recorded in the public records of Miami-Dade County and

otherwise, as required by Florida law, if the amounts in this order, including the attorney fees, are not paid within 30 days from the entry of this order.

### CONCLUSION

The Court is aware that the Ceperos have sold their home in the Hammocks and will be moving away. Hopefully, removing themselves from this home and the bad memories associated with this home will help them as part of the fresh start to which a, hopefully, positive conclusion to their bankruptcy case will entitle them.

###

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*